**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED AIR LINES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 08-cv-3337** |
| ) | |
| **v.** ) | **Hon. James B, Moran** |
| ) | **Magistrate Judge Sidney I. Schenkier** |
| **THE CITY OF LOS ANGELES and** ) | |
| **LOS ANGELES WORLD AIRPORTS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**OBJECTIONS BY THE CITY OF LOS ANGELES**
**TO THE BANKRUPTCY COURT'S MEMORANDUM OF DECISION**

ROCKARD J. DELGADILLO
  Los Angeles City Attorney
KELLY MARTIN
  General Counsel
JOHN TAVETIAN
  Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
  ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:   (310) 646-3260
Facsimile:    (310) 646-9617

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Anthony G. Stamato
Robert M. Spalding
KAYE SCHOLER LLC
3 First National Plaza
70 West Madison Street, Suite 4100
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and*
*Los Angeles World Airports*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... v

INTRODUCTION.................................................................................................. 1

FACTS ................................................................................................................. 2

    **A.** LAX Is A Scarce Government Resource ................................................2

    **B.** United's Terminal 8 Lease .................................................................3

    **C.** Turboprop Operations In The CTA Cause Problems At LAX ............3

    **D.** In June 2005, United Proposed To Move Turboprop Operations From The RTF to the CTA. ..................................................................5

    **E.** The Bankruptcy Court's Decisions ....................................................6

    **F.** United's Motion for Reconsideration ................................................8

ARGUMENT ...................................................................................................... 14

**I.** THE DISTRICT COURT EXAMINES THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW *DE NOVO*. ....................................................................................................... 14

**II.** THE BANKRUPTCY COURT'S CONCLUSION THAT THE CITY HAS THREATENED TO BREACH THE TERMINAL 8 LEASE SHOULD BE SET ASIDE BECAUSE, BY ENTERING INTO AN UNAPPROVED SUBLEASE WITH SKYWEST — THE AIRLINE THAT OWNS OR LEASES THE TURBOPROPS THAT OPERATE AT TERMINAL 8 — UNITED IS IN PRIOR BREACH OF THE TERMINAL 8 LEASE........................ 15

**III.** TO THE EXTENT THAT ANY REVIEW IS NECESSARY OF THE CITY'S DETERMINATION THAT ITS PROHIBITION ON TURBOPROP OPERATIONS AT TERMINAL 8 WAS ADOPTED TO ENSURE THE SAFETY AND EFFICIENCY OF LAX, UNDER THE DOCTRINE OF PRIMARY JURISDICTION, SUCH REVIEW MUST TAKE PLACE IN THE FIRST INSTANCE BEFORE FAA.................................... 16

    **A.** The City, As A Recipient Of Federal Grant Money, Is Required To Comply With Federal Grant Assurances...........................................17

    **B.** Federal Grant Assurances Require The City To Operate LAX In A Safe And Efficient Manner..............................................................18

**TABLE OF CONTENTS (cont'd)**

                                                                                    **Page**

C.   FAA Has The Authority To Review The Manner In Which The
     City Maintains And Operates LAX In A Safe and Efficient
     Manner...............................................................................................19

D.   Under The Doctrine Of Primary Jurisdiction, FAA Should
     Determine In The First Instance Whether The City's Decision
     To Prohibit Turboprop Operations At Terminal 8 Was Taken
     To Ensure The Safety And Efficiency Of Aircraft Operations At
     LAX. ...................................................................................................20

IV.  **THE CITY'S PROHIBITION OF TURBOPROPS FROM TERMINAL 8
     FOR SAFETY AND EFFICIENCY REASONS IS AN EXERCISE OF
     THE CITY'S POLICE POWER. ............................................................ 22**

     A.   Contrary To The Bankruptcy Court's Findings, The Evidence Is
          Essentially Uncontradicted That The City Adopted The
          Prohibition On Turboprop Operations At Terminal 8 For Safety
          And Efficiency Reasons. ..................................................................22

          1.   The Evidence Supports The Conclusion That The Prohibition
               On Turboprop Operations At Terminal 8 Was Based On
               Safety Considerations. ..............................................................22

          2.   The Evidence Supports The Conclusion That The Prohibition
               On Turboprop Operations At Terminal 8 Was Based On
               Efficiency Considerations...........................................................23

     B.   The City's Decision To Prohibit Turboprop Operations From
          The CTA — Including United's Turboprop Operations From
          Terminal 8 — Was An Exercise Of Its Police Powers. ........................25

     C.   Contrary To The Bankruptcy Court's Conclusion, The City's
          Prohibition Of Turboprops From Terminal 8 For Safety And
          Efficiency Is Not A "Financial Transaction.".....................................26

          1.   *U.S. Trust* Concerned A Financial Decision................................27

          2.   The City's Prohibition of Turboprops Is Not A Financial
               Decision. ...................................................................................28

## TABLE OF CONTENTS (cont'd)

                                                                                    **Page**

V.    BECAUSE THE CITY NEVER RELINQUISHED ITS RIGHT TO
      REGULATE UNITED'S AIRCRAFT OPERATIONS IN
      UNMISTAKABLE TERMS, THE CITY RETAINS ITS SOVEREIGN
      RIGHT TO REGULATE UNITED'S OPERATION OF ITS AIRCRAFT
      — INCLUDING ITS RIGHT TO PROHIBIT TURBOPROP
      OPERATIONS FROM TERMINAL 8. ....................................................... 29

VI.   THE CITY'S PROHIBITION OF TURBOPROP OPERATIONS AT
      TERMINAL 8 DOES NOT BREACH THE TERMINAL 8 LEASE
      BECAUSE THE ACOP, NOT THE TERMINAL 8 LEASE, GOVERNS
      AIRCRAFT OPERATIONS OUTSIDE TERMINAL 8. ............................. 31

      A.   The Bankruptcy Court Previously Correctly Held That The
           ACOP Is The Source Of United's Right To Operate At LAX. .......... 31

      B.   There Is No Language In The Terminal 8 Lease That Gives
           United The Right To Operate Aircraft At LAX. ............................ 32

      C.   As Requested, The City Produced The ACOP In Effect When
           United Signed The Terminal 8 Lease. ........................................ 34

VII.  THE BANKRUPTCY COURT'S DECISION INCORRECTLY
      CONSTRUES THE TERMINAL 8 LEASE, AND AS SO CONSTRUED
      THE CITY COULD "NEVER PROHIBIT UNITED FROM OPERATING
      TURBOPROPS AT TERMINAL 8" ON THE BASIS OF SAFETY AND
      SECURITY CONCERNS. ...................................................................... 38

      A.   The Bankruptcy Court Incorrectly Confuses "Aprons," "Gate
           Positions," and "Loading Ramps." ........................................... 39

      B.   The Terms Of The Terminal 8 Lease Do Not Give United Special
           Rights To "Aprons" and "Ramps," But Merely A Right To
           Their Use In Common With Other Airlines. ............................... 41

      C.   Similarly, The Use Of The Term "Surround" In Sections 22, 23
           and 24 Is Consonant With The City's Definitions Of Aprons,
           Gate Positions, And Loading Ramps. ........................................ 45

      D.   Other Aspects Of Sections 22, 23 and 24 Are Not In Conflict
           With The City's Definitions Of Aprons, Gate Positions, And
           Loading Ramps. ..................................................................... 45

      E.   Section 23 Of The Terminal 8 Lease Does Not Support The
           Bankruptcy Court's Conclusions. ............................................ 48

## TABLE OF CONTENTS (cont'd)

**Page**

  F. **Under The Missing Witness Rule, The Court Can Assume That Testimony From United's Witnesses About The Meaning Of The Terminal 8 Lease Would Not Support Its Legal Position.** .................................50

VIII. **THE ACOP DOES NOT SUPPORT THE CONCLUSION THAT "LOADING RAMPS AND GATE POSITIONS" ARE PART OF THE PAVEMENT OUTSIDE OF TERMINAL 8.** .................................. 51

IX. **THE CITY NEEDS TO KNOW WHAT PARTS OF THE APRON CONSTITUTE "LOADING RAMPS" AND "GATE POSITIONS" UNDER THE BANKRUPTCY COURT'S ANALYSIS.** ............................ 52

X. **THE PARTIES' PERFORMANCE UNDER THE LEASE DOES NOT SUPPORT THE BANKRUPTCY COURT'S CONCLUSIONS.** ............................. 54

XI. **THE BANKRUPTCY COURT'S FINDINGS WITH RESPECT TO THE TERMINAL 6 LEASE VIOLATE THE CITY'S DUE PROCESS RIGHTS AND MUST BE REJECTED.** ......................................................... 56

XII. **UNITED HAS NOT ESTABLISHED THAT IT WOULD SUFFER IRREPARABLE HARM.** ........................................................... 57

**CONCLUSION** ................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### FEDERAL CASES

*Am. Hosp. Ass'n v. Harris*,
    625 F.2d 1328 (7th Cir. 1980) .......................................................................58

*Am. Food and Vending Corp. v. UPS*,
    No. 02-9439, 2003 U.S. Dist. LEXIS 1464 (N.D. Ill. Jan. 30, 2003)...............60

*Bordallo v. Camacho*,
    475 F.2d 712 (9th Cir. 1973) ...........................................................................20

*Bowen v. Pub. Agencies Opposed to Social Security Entrapment*,
    477 U.S. 41, 54 (1986)......................................................................................29

*Chicago Coll. of Osteopathic Med. v. George Fuller Co.*,
    719 F.2d 1335 (7th Cir. 1983) .........................................................................51

*Cleveland Hair Clinic, Inc. v. Puig*,
    968 F. Supp. 1227 (N.D. Ill. 1996)...................................................................60

*Doe v. Pataki*,
    481 F.3d 69 (2d Cir 2007).................................................................................31

*Far E. Conference v. United States*,
    342 U.S. 570 (1952).....................................................................................16, 21

*Givemepower Corp. v. Pace Compumetrics Inc.*,
    No. 07-0157, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. Mar. 23, 2007) ..........60

*Green River Bottling Co. v. Green River Corp.*,
    997 F.2d 359 (7th Cir. 1993) ...........................................................................58

*Healthback, L.L.C.*,
    226 B.R. 464 (Bankr. W.D. Okla. 1998) .........................................................20

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)..........................................................................................29

*Hsiung v. City and County of Honolulu*,
    378 F. Supp. 2d 1258, 1267 (D. Haw. 2005) ..................................................31

*Hyatt Corp. v. Hyatt Legal Servs.*,
    736 F.2d 1153 (7th Cir. 1984) .........................................................................61

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Int'l Caucus of Labor Comms. v. Metro. Dade County*,
    724 F. Supp. 917 (S.D. Fla. 1989) ....................................................................19

*Land-O-Sun Dairies v. Fla. Supermarkets*,
    143 B.R. 964 (Bankr. M.D. Fla. 1992) .........................................................14

*Lesser v. A-Z Assocs. (In re Lion Capital Group)*,
    63 B.R. 199 (S.D.N.Y. 1985)........................................................................14

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)......................................................................................57

*Matsuda v. City and County of Honolulu*,
    512 F.3d 1148 (9th Cir. 2008) .....................................................................29

*McGrath v. R. I. Retirement Bd.*,
    88 F.3d 12 (1st Cir. 1996)............................................................................29

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) .....................................................................58

*Pharm. Research & Mfrs. v. Walsh*,
    538 U.S. 644 (2003)......................................................................................20

*Promatek Indus. v Equitrac Corp.*,
    300 F.3d 808 (7th Cir. 2002) .......................................................................60

*Raleigh-Durham Airport Auth. v. Delta Air Lines, Inc.*,
    429 F. Supp. 1069 (E.D.N.C. 1976)............................................................41

*Ricci v. Chicago Mercantile Exch.*,
    409 U.S. 289 (1973)......................................................................................21

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) .......................................................................58

*Russell v. Amtrak*,
    189 F.3d 590 (7th Cir. 1999) .......................................................................51

*Ticketmaster L.L.C. v. RMG Tech., Inc.*,
    507 F. Supp.2d 1096 (C.D. Cal. 2007) .......................................................60

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States  v. Fla. E. Coast Ry. Co.*,
    410 U.S. 224 (1973)............................................................................................57

*United States v. Mahone*,
    537 F.2d 922 (7th Cir. 1976) ........................................................................51

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ..........................................................................26, 31

*United States* v. *W. Pac. R.R.* Co.,
    352 U.S. 59 (1956)..........................................................................20, 21

 *U.S. Trust Co. v. New Jersey*,
    431 U.S. 1 (1977).....................................................................26, 27, 28

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*,
    310 U.S. 32 (1940) ........................................................................26

*Yankee Atomic Elec. Co. v. United States*,
    112 F.3d 1569 (Fed. Cir. 1997)...............................................................29

## FAA CASES

*Carey v. Afton Lincoln County Mun. Airport Joint Powers Bd.*,
    2007 FAA LEXIS 40 (FAA Jan. 18, 2007) ........................................................18

*Fed. Express Corp. v. Auths. of Taiwan*,
    1996 DOT Av. LEXIS 411 (FAA June 21, 1996) ...........................................41

*Jimsair Aviation Servs. v. San Diego County Reg'l Airport Auth.*,
    2007 FAA LEXIS 272 (FAA Apr. 12, 2007) ...........................................17, 19

*Platinum Aviation and Platinum Jet Ctr. v. Bloomington-Normal Airport Auth.*,
    2007 FAA LEXIS 405 (FAA Nov. 28, 2007).......................................17, 19, 20

*Sanford Air, Inc. v. Town of Sanford*,
    2007 FAA LEXIS 84 (FAA Mar. 5, 2007)..............................................17, 19

*Tulloch v. City of Harlingen*,
    2006 FAA LEXIS 595 (FAA Aug. 21, 2006)....................................................19

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

### STATE CASES

*Bustamante v. Intuit, Inc.,*
    141 Cal. App. 4th 199 (Cal. App. 2006)..........................................................................54

*City of Atascadero v. Merrill Lynch,*
    68 Cal. App. 4th 445 (Cal. App. 1998).............................................................................39

*City of Glendale v. Superior Court of Los Angeles,*
    18 Cal. App. 4th 1768 (Cal. App. 2d Dist. 1999) ............................................................30

*Enos v. Foster,*
    155 Cal. App. 2d 152, 317 P.2d 670 (Cal. App. 1957).....................................................15

*Laurel Hill Cemetery v. City and County of San Francisco,*
    152 Cal. 464 (Cal. 1907)..................................................................................................29

*Medico-Dental Bldg. Co. of Los Angeles v. Horton & Converse,*
    21 Cal.2d 411, 132 P.2d 457 (Cal. 1942).........................................................................15

*Pac. Employers Ins. Co. v. Indus. Accident Comm'n,*
    9 Cal. App. 2d 634 (Cal. App. 3d Dist. 1963) .................................................................26

*Robinson & Wilson, Inc. v. Stone,*
    35 Cal. App. 3d 396, 110 Cal. Rptr. 675 (1973)..............................................................54

*S. Calif. Gas Co. v. City of Los Angeles,*
    50 Cal. 2d 713 (1958) ......................................................................................................29

*W. Indem. Co. v. Pillsbury,*
    170 Cal. 686 (Cal. 1915)..................................................................................................25

### FEDERAL STATUTES AND REGULATIONS

28 U.S.C. § 157(c)(1)................................................................................................................14

49 U.S.C. § 40101....................................................................................................................19

49 U.S.C. § 47101................................................................................................................17, 20

49 U.S.C. § 47107....................................................................................................................17

49 U.S.C. § 47122.................................................................................................................... 20

### TABLE OF AUTHORITIES (cont'd)

**Page(s)**

14 C.F.R. Part 13.1 .................................................................................17

14 C.F.R. Part 16.1(a) ............................................................................17

14 C.F.R. Part 16.109(a) .........................................................................17


### STATE STATUTES

Cal. Civ. Code § 1641 ..............................................................................39


### ORDERS & REPORTS

FAA REPORT
    Airport Capacity Enhancement Tactical Initiative, January 1996,
    Commuter Gate Placement Design Team Study ...........................................4, 24

FAA Order 5190.6A, AIRPORT COMPLIANCE REQUIREMENTS .........................18, 19, 20

FAA Order 5190.6A § 4-7 ....................................................................18, 19

FAA Order 5190.6A § 4-7(a) .....................................................................18

FAA Order 5190.6A, § 4-7(a)(3) .................................................................18

FAA Order 5190.6A § 4-7 (b) ....................................................................18

FAA Order 5190.6A, § 4-8 ...................................................................18, 19

FAA Order 5190.6A § 4-8 (a)(2) .................................................................19

FAA, Notice to Airmen (NOTAM) Briefing Guide .................................................41

GAO Report 08-29, Aviation Runway and Ramp Safety ...........................................41


### OTHER AUTHORITIES

L. Tribe, American Constitutional Law 666 (2d ed. 1988) ......................................58

## INTRODUCTION

Pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure, the City of Los Angeles (the "City"), by and through its Department of Airports, also known as the Los Angeles World Airports ("LAWA") (the City and LAWA are collectively referred to herein as the "City"), respectfully submits objections to the proposed findings of fact and conclusions of law in the Bankruptcy Court's Memorandum of Decision ("MoD"), issued May 31, 2008.

The dispute in this adversary proceeding is whether the City, the owner and operator of the Los Angeles International Airport ("LAX"), has the right to enforce a rule that, for safety and efficiency reasons, regulates United's aircraft operations by prohibiting small, 30-seat turboprop aircraft from operating at Terminal 8 at LAX. United Air Lines, Inc. ("United") contends that a lease between it and the City, pursuant to which United occupies demised premises inside Terminal 8 (the "Terminal 8 Lease"), prohibits the City from enforcing such a regulation on the operation of aircraft. In its Memorandum of Decision, the Bankruptcy Court recommended that the District Court issue a permanent injunction that would prevent the City from enforcing its prohibition on turboprop operations at Terminal 8, even if the prohibition is imposed for safety or security reasons. *See* MoD at 2, 18-19 & 6/19/07 Op. Tr. at 23:17-21.

The City has been assigned critical and sensitive duties under both federal and state law to ensure that LAX is operated in a safe and efficient manner. The proper exercise of such duties at the fourth busiest airport in the world (in terms of aircraft operations) requires a balancing of myriad factors, changing over time, affecting the safety and security of the traveling public, airline personnel, cargo operators and airport employees throughout the airport. United has contended in this case that the City has somehow abrogated those duties with respect to aircraft operations on the apron surrounding and adjacent to Terminal 8 through the entry into the 40-year Terminal 8 lease. Not only does the Terminal 8 Lease say no such thing, but United carries a very heavy burden to demonstrate that the City would have agreed to give up duties which are so central to the City's ability to operate LAX. Moreover, with due respect, the Bankruptcy Court lacked the jurisdiction and institutional competence to evaluate (and reject) the

1

City's stated reasons for prohibiting turboprop operations at Terminal 8. Review of airport operational determinations is vested exclusively in the Federal Aviation Administration ("FAA"), the designee of the Secretary of the U.S. Department of Transportation ("DOT").

The City respectfully requests oral argument before the Court.

## FACTS

### A.    LAX Is A Scarce Government Resource

LAX is managed by LAWA. LAWA's Executive Director reports to the Mayor of the City of Los Angeles and the City of Los Angeles Board of Airports Commissioners ("BOAC"). 7/28/06 Tr. at 112:1-113:4 (Herrera). BOAC derives its authority from the City Charter.[1] In managing LAX, LAWA serves a constituency comprised of the citizens of the City of Los Angeles, the communities surrounding LAX, the traveling public, airlines — both existing and those new airlines desiring to commence operations at LAX, concessionaires, and others using and visiting LAX. *Id*. at 116:10-22 (Day); 3/15/07 Tr. at 83:2-20 (DiGirolamo).

LAX consists of nine passenger terminals, Terminals 1 through 8 and the Tom Bradley International Terminal ("TBIT") and two remote terminal facilities. *See* MoD at 5-6.[2] American Airlines uses one of those remote terminal facilities and, before 2005, United Air Lines, Inc. ("United") used the other remote terminal facility ("RTF") for its commuter flight operations. Terminals 1 through 8 and TBIT collectively are known as the Central Terminal Area ("CTA"). 7/27/06 Tr. at 185:8-17 (Jack).

LAX currently serves 61 million passengers per year. 3/15/07 Tr. at 143:17-19 (DiGirolamo). It is situated on 3500 acres, a small amount of land for a commercial airport.

---

[1] The City submitted a copy of the City Charter with its "Emergency Motion of the City of Los Angeles and Los Angeles World Airports to Invoke Conditionally the Primary Jurisdiction of the Secretary of Transportation and to Require United Air Lines, Inc., To Exhaust its Administrative Remedies before the Secretary of Transportation." (filed March 14, 2007; Docket No. 121). Unless otherwise indicated references to Docket Numbers refer to the Docket in the Bankruptcy Court, Adversary Proceeding 05-02806.

[2] The MoD references three remote terminals, but one of these terminals, the Trans State terminal, is not operational. 7/27/06 Tr. at 184:24-185:7 (Jack).

7/27/06 Tr. at 180:16-25 (Jack); 3/15/07 Tr. at 65:l-22 (Day); United Ex. 120.  It is landlocked

on three sides by suburban communities and the fourth side by the Pacific Ocean. 7/27/06 Tr. at

180:17-25 (Jack); United Ex. 120.  As a consequence, there is no room to expand the airport.

Currently Terminals 1, 3, and TBIT are overcrowded, 3/15/07 Tr. at 65:9-66:25 (Day),

and overcrowded terminals are a security risk.  City Ex. 25 at LA06458.  Terminals 7 and 8,

which United leases, are under-utilized by United.  7/27/06 Tr. at 130:3-12 (Peters); 3/15/07 Tr.

at 69:20-70:21 (Day), 82:9-12 (DiGirolamo).  Terminal 7 is configured to handle aircraft as large

as a 747.  7/27/07 Tr. at 186:12-16 (Jack).  Terminal 8 is configured to handle Boeing 737 or

A320 aircraft.  *Id*. at 186:17-187:13 (Jack).  As configured by United, Boeing 737s can carry up

to 128 passengers and A320s can carry up to 156 passengers.  By contrast, the turboprops that

are now operating at Terminal 8 are Embraer 120s, which can carry a maximum of 30

passengers.  *Id*. at 194:19-23 (Jack).  Due to the inefficient use of gates, LAX is the only

Category X airport (large international airport) that has not returned to its pre-September 11,

2001, flight levels.  3/15/07 Tr. at 88:16-89:15 (DiGirolamo).  In addition, there is a demand by

any number of new entry and existing airlines for gates at LAX.  *Id*. at 83-95 (DiGirolamo).

### B.    United's Terminal 8 Lease

United's lease for Terminal 8 ("Terminal 8 Lease") is dated June 4, 1981.  Pertinent

terms of the Terminal 8 Lease are discussed herein.

### C.    Turboprop Operations In The CTA Cause Problems At LAX

Prior to 1982, turboprop aircraft had operated at a terminal on the western end of LAX

where TBIT now stands. 7/28/06 Tr. at 41:6-42:3.  After TBIT was constructed, in or about

1982, airlines moved their turboprop operations to the terminals within the CTA.  *Id*. at 42:4-8.

Turboprop operations in the CTA ultimately created substantial problems in airfield operations.

*Id*. at 43:5-11.  In an attempt to address these problems, DOT, FAA, LAWA and some of the

airlines serving Los Angeles, including United, City Ex. 9 (Appendix A lists United as a

participant), jointly prepared the "Airport Capacity Enhancement Tactical Initiative, January 1996, Commuter Gate Placement Design Team Study" ("FAA Report").[3]

As an initial matter, the FAA Report found that LAX "has experienced a large increase in the number of commuter aircraft using the airport." City Ex. 9 at 6 (LA 00096). Significantly, the FAA Report found that "[t]his increase has required the use of more of the existing large aircraft gates for commuter operations" and that the increase "has also meant far more interaction between the commuter type aircraft and the non-commuter aircraft," which the FAA found to be "<u>problems</u>." *Id.* (emphasis added).

The FAA Report recommended that for "the present demand, the best commuter gate option is gate configuration 1" and for "the future demand, the best option is also gate configuration 1." *Id.* at LA 00110. As detailed in the FAA Report, "Gate Configuration 1" proposed moving commuter airline operations out of the CTA to a common-use remote terminal. *See id.* at LA 00101. As such, it was the FAA Report's conclusion that moving turboprop operations out of the CTA was the best way to address both the problem that "more of the existing large aircraft gates [were being used] for commuter operations" and the problem of increased "interaction between the commuter type aircraft and the non-commuter aircraft."

In response to the FAA Report, BOAC passed Board Resolution No. 19944 ("1997 BOAC Resolution") which adopted a policy excluding turboprop operations from the CTA. City Ex. 10; 7/28/06 Tr. at 118:5-11 (Day). Specifically, BOAC authorized LAWA's Executive Director to "prohibit any additional commuter airline from operating at gates within the Central Terminal Area." City Ex. 10 at 1. Recognizing that moving existing turboprop operations out of the CTA might cause the airlines with those turboprop operations to incur some costs in connection with such a move, BOAC authorized the "Executive Director to negotiate, but not implement a plan, rather to make final modifications which are subject to subsequent final Board approval, with presentation of actual physical locations and any costs associated with such

---

[3] The FAA Turboprop Report is still available on FAA's website: http://www.faa.gov/about/office_org/headquarters_offices/ato/publications/bench/media/LAXTAC2.PDF.

displacement in connection with relocation of commuter aircraft operations away from the Central Terminal Area." *Id*.

      **D.**    **In June 2005, United Proposed To Move Turboprop Operations From The RTF to the CTA.**

As one of the many consequence of the terrorist attacks of September 11, 2001, United consolidated its commuter operations at LAX at the RTF.  7/27/06 Tr. at 161:24-163:3 (Vais). United did not have any turboprop operations at the CTA as of the end of 2001.  *See* MoD at 6.

In early 2005, United advised the City that it wished to move its operations from the RTF to Terminal 8.  In connection with that notice, United did not ask for gate assignments.  3/15/07 Tr. at 118:7-20 (DiGirolamo).  In early 2005, United was flying approximately 63 turbo-prop flights a day from the RTF.  City Ex. 27.  Discussions took place between United and the City concerning United's proposed move. Ultimately, United informed the City it was moving its RTF turbo-prop operations to Terminal 8 effective June 8, 2005.

Initially, on June 3, 2005, the City notified United "that turboprop commuter aircraft operated by or on behalf of United are prohibited from operating at gates in the Central Terminal Area." United Ex. 28.  The City's denial took into account the needs of United and balanced such needs against the needs of the City.  3/15/07 Tr. at 69-72 (Day).  Subsequently, on June 7, 2005, recognizing that United thought that "a number of informal or general communications served in United's mind as notice to LAWA, and LAWA staff cooperation in response was taken as an indication of LAWA's policy acceptance of the planned change," the City "formally approved" "the turboprop operation at Terminal 8" subject to revocation on six months written notice from the City.  United Ex. 29; 7/28/06 Tr. at 123:22-124:12 (Day).

Safety was and remains a concern of the City in United's turboprop operations at Terminal 8 and was one of a number of factors considered by it in denying United permission to operate turboprop aircraft at Terminal 8.  7/28/06 Tr. at 118:3-120:13 (Day).  Specifically, the City was concerned that passengers boarding turboprops could be subject to "jet blast" from jet aircraft operating in the CTA.  Jet blast is caused by the exhaust from a jet engine.  7/27/06 Tr. at

191:1-7 (Jack). The larger the turbo fan engine, potentially the more powerful the jet blast. *Id*. at 192:7-9 (Jack). Persons or property in close proximity to jet blast can be injured or damaged. *Id*. at 193:2-6 (Jack); 3/15/07 Tr. at 160:8-161:5 (DiGirolamo). In addition, Terminal 7 and Terminal 8 are in close proximity sharing a taxi lane which situation in combination with the operation of turboprops in such proximity to jet aircraft raises another significant safety concern for the City. 7/28/06 Tr. at 120:14-23 (Day); 3/15/07 Tr. at 104:19-24 (DiGirolamo).

Thereafter, on November 22, 2005, the City provided United with the required six month's notice "that the approval granted in the June 7, 2005, letter, is hereby revoked. Accordingly, United Airlines shall cease such turboprop operations in Terminal 8 on or before May 24, 2006." United Ex. 36. On December 30, 2005, United initiated an adversary proceeding, by filing a complaint in the Bankruptcy Court.

E.      The Bankruptcy Court's Decisions

As summarized by the Bankruptcy Court, in response to United's complaint, it first entered a temporary restraining order and after a two-day evidentiary hearing, it entered a preliminary injunction. MoD at 7. A trial on the merits was held on March 15, 2007. On June 19, 2007, (judgment was entered June 20, 2007) the Bankruptcy Court denied United's motion for a permanent injunction, correctly holding that the Terminal 8 Lease is not an operating agreement that permits United to operate aircraft at LAX.

The Bankruptcy Court rejected each of the arguments that United raised. Specifically, as stated by the Bankruptcy Court, United claimed that

> Section 7 of the terminal facilities lease, dated June 4, 1981, with a term expiring January 1, 2002,[4] the T-8 Lease, United Exhibit 1, gives United a right to conduct its air transportation business in Terminal 8.

6/19/07 Op. Tr. at 19:2-6. But the Bankruptcy Court rejected that argument and concluded that

> This set of arguments fails in its first point. Section 7 of the terminal facilities lease does not give United a right to conduct its air transportation business.

---

[4] The court's June 19, 2007 decision was incorrect on this point. The Terminal 8 Lease expires in 2022.

*Id*. at 19:13-16.[5]

The Bankruptcy Court explained its reasoning in more detail as follows:

[T]he introductory phrase [to Section 7], "in the conduct of its air transportation business," describes the <u>use</u> of the property intended by the parties.   [The] permitted activities … are all related to the construction of the terminal buildings and the activities that would occur <u>inside</u> those buildings.

Noticeably absent from Section 7(a) is any mention of the <u>operation of aircraft.</u> <u>This is entirely sensible because the demised premises do not include the areas on</u> <u>which aircraft would operate</u>.

\* \* \*

<u>Section 7 of the T-8 lease then does not grant United a right to fly specific aircraft</u> <u>from Terminal 8</u>.  If the T-8 lease were the sole source of United's operating rights at LAX, it would be reasonable to conclude … that the lease does contain some implied right to operate … aircraft.

It would, after all, be highly unlikely that an airline would enter into a long-term lease without the contractual right to operate its air transportation business.  This is the conclusion that I reached preliminarily when I granted a preliminary injunction.  However, another document is relevant here and is of greater importance than first appeared.  Titled the [Air Carrier] Operating Permit, which I will refer to as the ACOP, City Exhibit 8, this agreement is considerably more than a simple permit to use landing facilities.   It is a bilateral contract containing extensive provisions on the operation of aircraft at LAX.  <u>This ACOP gives</u> <u>United the right to operate aircraft at LAX in Section 3</u>, and contemplates that United has leased terminal space that would permit the operation of the aircraft.

<u>The ACOP, not the T-8 Lease, is the source of United's right to operate at LAX</u>.  When the ACOP is understood in this manner, it is clear that <u>there is no need for</u> <u>the T-8 lease to imply a right on United's part to operate particular aircraft from</u> <u>Terminal 8</u>.  Any right to operate turboprops from Terminal 8 must derive from the ACOP or from some provision of other applicable law, not the T-8 lease.

*Id*. at 20:25-23:8 (emphasis added).

---

[5] United's arguments consisted of four points:

(1) Section 7 of the terminal facilities lease, dated June 4, 1981, with a term expiring January 1, 2002 [*sic*], the T-8 Lease, United Exhibit 1, gives United a right to conduct its air transportation business in Terminal 8; (2) United's turboprop operations are an integral part of its air transportation business; (3) Section 30 of the T-8 lease prevents the City from enforcing regulations that contravene the rights granted in Section 7; and (4) that, therefore, the City may not prohibit United's turboprop operations in Terminal 8.

6/19/07 Op. Tr. at 19:2-12.  The Court found that the entire "set of arguments fails in its first point."  *Id*. at 19:13-14.

Significantly, the Bankruptcy Court also found that "United's reading of the [Terminal 8 Lease] would result in the conclusion that the City could never prohibit United from operating turboprops at Terminal 8 even if its prohibition were based on legitimate safety or security concerns." *Id*. at 23:17-21. The Bankruptcy Court rejected that position as follows:

> In other words, United argues that the City could not prohibit United's turboprop operations at Terminal 8 for any reason, as long as they're part of United's air transportation business. Thus, if there were a safety concern, that safety concern would not be effective, because in United's view turboprop operations at T-8 are part of the right that's granted to it by the lease, and a prohibition of turboprop operations would be inconsistent with or contravene the rights granted to United under the lease. And, therefore, even if there were safety considerations, a regulation based on those considerations would not be enforceable.
>
> It is highly unlikely that an international airport would enter into such agreement. And as I've indicated, the Terminal 8 lease properly understood does not give United such a right.

*Id*. at 25:1-18.

### F.    United's Motion for Reconsideration

In response to the Bankruptcy Court's ruling, United filed a Motion for Reconsideration. In that motion, United tried to resurrect its position — which it advocated during the preliminary injunction hearing and during the trial on the merits — that the Terminal 8 Lease is the source of its right to operate particular aircraft — specifically turboprops — from Terminal 8. United argued that the Bankruptcy Court's ruling was in error because

> United has always taken the position that the ACOP does not trump United's rights under the T-8 lease because the ACOP … was … issued subsequently to the execution of the T-8 lease, and thus is subject to the express limitations of section 30 of the T-8 lease.… [T]he important undisputed fact is that the ACOP was entered into subsequent to the execution of the T-8 Lease by more than twenty years. The only ACOP in evidence has a term beginning on July 1, 2002.… There is no record evidence of the existence of other ACOPs, let alone what the terms of those operating permits might be. Thus, it makes no sense that United's flight operations at Terminal 8 have been pursuant to no written agreement at all for nearly all of the term of the T-8 lease.

United Br. for Reconsideration (7/10/07) at 5 (emphasis original).

During a July 24, 2007, hearing on United's Motion for Reconsideration, the Bankruptcy Court informed the parties that it had decided to "reopen the evidence to allow either party to submit whatever ACOPs were in existence at the time that the [Terminal 8] lease was entered

into." 7/24/07 Tr. at 6:7-9.  There was in fact "an ACOP … in existence at the time that the [Terminal 8] lease was entered into" — that other permit was Operating [Lease] Agreement No. 1115, as amended.

Lease No. 1115 — referred to by both United and the City as the "Operating [Lease] Agreement No. LAA-1115 — did the following things:  (1) it conferred upon United the right to operate its aircraft at LAX, (2) it regulated those operations, and (3) it reserved regulatory rights to the City.  When Lease No. 1115 expired on June 30, 1993, it was replaced by an Air Carrier Operating Permit — ACOP — which became effective July 1, 1993.  That "1993 ACOP" eventually expired and was replaced by a new ACOP in 2002 — the "2002 ACOP" —which the Bankruptcy Court has previously considered and which, as amended, remains in place today. Thus, between the adoption of Lease No. 1115, on July 14, 1943, and today, either Operating [Lease] Agreement No. 1115 (as amended), the 1993 ACOP (as amended),[6] or the 2002 ACOP (as amended) has permitted the City to issue — and certainly did not restrict its ability to issue — reasonable regulations concerning United's airfield activities.

United filed a Response to Additional Evidence which is significant for two reasons.

*First*, United did not assert that Operating [Lease] Agreement No. 1115 was not in fact the operating permit in existence when United signed the Terminal 8 Lease in 1981.

*Second*, United did not challenge the City's assertion that the "operational rights" language in Operating [Lease] Agreement No. 1115 is as broad as the "operational rights" language in the 2002 ACOP, previously considered by the Court.  In addition, United did not challenge the City's assertion that the language in Operating [Lease] Agreement No. 1115 permitted the City to issue — and certainly did not restrict its ability to issue — reasonable regulations concerning United's airfield operations in at least the same manner that the 2002 ACOP does.  Thus, there is no dispute between the parties as to these facts.

---

[6] Section 10 of the 1993 ACOP contains the same provisions as Section 10 of the 2002 ACOP, previously considered by the Court (the only difference being that "Airline" was used in the 1993 ACOP in place of "Permittee" in the 2002 ACOP).  *Compare* Section 10, 1993 ACOP (City Supp. Ex. 19) at 22-23 *with* Section 10, 2002 ACOP (City Ex. 8) at LA-00214 to -00215.

In addition, however, in its Response to Additional Evidence, United raised yet another new argument — which it could have and should have submitted to the Bankruptcy Court at any time before the March 15, 2007, trial. Specifically, for the first time in nearly two years of litigation with the City, United argued that the Terminal 8 Lease divided the airfield at LAX into two separate areas — "common-use areas" and "non common-use areas" — even though the term "non common-use areas" does not appear either in Operating [Lease] Agreement No. 1115 (as amended), the 1993 ACOP (as amended), the 2002 ACOP (as amended), or the Terminal 8 Lease. *E.g.*, United's Response to Additional Evidence at 2. The Bankruptcy Court requested the parties to submit additional briefing on United's newly-minted, "nuanced" argument. 7/30/07 Tr. at 9:13. The parties did so by the end of August 2007.

Next, after the Bankruptcy Court completed a brief sabbatical, the parties reconvened in November 2007. During that status conference, the Court requested additional briefing on the unmistakability doctrine. 11/14/07 Tr. at 58:11-60:8. The parties submitted that briefing, and in response to a paper submitted by the City, United raised yet another brand new argument. In "United Air Lines Inc.'s Response To The City's Motion For Leave, *Nunc Pro Tunc*, To File Two Additional Briefs Regarding The 'Unmistakability' Doctrine,'" filed on Friday, December 7, 2007, United argued for the first time that "the loading ramp is the portion of the apron on which airplanes park adjacent to terminal buildings." *Id*. at 3-4.

The City moved to strike United's newest argument, on the grounds that United should have made this argument before the close of evidence so that the City could have submitted evidence to rebut this factually incorrect argument. *See* Motion By The City Of Los Angeles To Strike United's Untimely Argument (filed Dec. 10, 2007). During the hearing on the City's motion, the Bankruptcy Court recognized that United's argument was new, and informed United that if it wanted to make a new argument, the Bankruptcy Court would reopen the evidence "to address the question of what a loading ramp is." 12/11/07 Tr. at 12:23-13:5 ("If you want to argue what "loading ramp" is, given that that was not previously addressed, I would allow the

evidence to be reopened to address the question of what a loading ramp is. [United's Counsel]:

Okay. We want to continue to argue that.").

The Bankruptcy Court held a half-day evidentiary hearing on January 11, 2008. The City

presented one witness, Michael DiGirolamo, the Deputy Executive Director of Airport

Operations at LAX.

- Mr. DiGirolamo testified that the term apron refers to "the concrete area around the satellite where aircraft parking positions are." 1/11/08 Tr. at 32:4-7. An apron is also known as a ramp, the tarmac, and a contact stand, among other names. *Id*. at 32:8-16; *id*. at 33:2-9.

- Mr. DiGirolamo also testified that a gate position "is a numerical designation for an area where an aircraft is parked on the apron. Inside a satellite it would be the numerical area inside the satellite where … ticket[s are taken] … and a door is [located to enter] either … a ramp or a jet way." *Id*. at 32:22-33:1; 33:2-4 ("when a plane is parked at a gate position outside of a terminal, … [i]t is parked on the apron.").

- Finally, Mr. DiGirolamo testified that a loading ramp is "an inclined area coming off of a second level satellite, which is the public level, down to the apron. It could be a set of stairs that goes from the satellite down to the apron. Some are exposed, some are included into the building. But it is a conveyance which passengers get from the satellite public area down to the apron." *Id*. at 29:18-30:2.

- Although the Memorandum of Decision does not address this, Mr. DiGirolamo testified that a "ramp" and a "loading ramp" are not the same things. *Id*. at 32:17-20 ("Q: Now, you just used the term ramp in describing another name for apron. Is that the same thing as a loading ramp? A No.").

During his testimony, Mr. DiGirolamo reviewed several photographs and identified the

various concrete "aprons" that surround different terminals at LAX. *See, e.g.., id*. at 33:18-36:4

(referencing Ex. 3 to City Supp. Ex. 53 and identifying aprons surrounding and adjacent to

Terminals 2, 3, 4, 5, 6, 7 and 8); *id*. at 37:13-38:15 (referencing City Supp. Ex. 31 and

identifying aprons surrounding and adjacent to Terminals 7 and 8). He also identified "loading

ramps" at several of the terminals, some were just ramps, some had stairs, and still others had a

ramp and stairs together. *See, e.g., id*. at 38:17-42:14 (referencing City Supp. Ex. 31 and

identifying loading ramps surrounding Terminal 7); *id*. at 42:15-44:7 (referencing City Supp. Ex.

31 and identifying loading ramps surrounding Terminal 8); *id*. at 59:24-61:3 (referencing City

Supp. Ex. 54 and identifying 10 loading ramps surrounding Terminal 6). Mr. DiGirolamo never testified that the loading ramps or gate positions were part of the apron. Furthermore, Mr. DiGirolamo never testified that the loading ramps or gate positions were part of the demised premises of Terminal 8 that are governed by the lease.

Despite the fact that United had called five witnesses at the preliminary injunction hearing and permanent injunction trial, United presented no witness at the January 2008 hearing.

One of United's witnesses at the preliminary injunction hearing, Christopher Sandifer, the Director of Airport Affairs and Corporate Real Estate for United, had previously testified, on cross-examination, in conformity with Mr. DiGirolamo's testimony that planes sit on the apron — or ramp — but not loading ramp, when they are not operating on the airfield:

```
15     Q   Are you aware of the actual areas that a
16   turboprop at Terminal 8 would operate on, the
17   specific names of the real estate?
18     A   The physical areas?
19     Q   Right.
20     A   It's commonly referred to as apron or ramp
21   parking positions, and that's a static area.  It's
22   where the aircraft sits when it's not operating on
23   the airfield.
```

7/27/06 Tr. at 90:15-23.

Another United witness, Lori Peters, United's Regional Manager of Corporate Real Estate, had also previously testified, on direct examination, in conformity with Mr. DiGirolamo's testimony. First, Ms. Peters testified that aprons surround the terminal buildings, just as Mr. DiGirolamo did:

```
5      Q   And 80 is a group exhibit with a number of
6    photographs.  Could you identify for the court
7    what's in those photographs.
8      A   These photographs represent exterior
9    pictures of the building itself, as well as the
10    surrounding apron area, including asphalt and
11    concrete.
```

*Id*. at 139:5-11.

A little later, Ms. Peters volunteered the following testimony on direct examination which is also in conformity with Mr. DiGirolamo's testimony that planes park on the aprons, not on loading ramps or gate positions:

```
16    Q   Can you describe what's in that photograph
17    and why that photograph is significant.
18    A   Well, this is the concrete apron of which
19    the aircraft for United Express is parked.  And the
20    darker areas that you can see in the photograph
21    actually represent deterioration of the concrete
22    itself, which is a significant issue because what
23    would happen is if we parked an aircraft in these
24    areas, we actually refer to them as sinkholes, and
25    the –
```

*Id*. at 142:16-25.

And finally, on cross examination, by testifying that passengers walk on the apron after they deplane, Ms. Peters once again testified in conformity with Mr. DiGirolamo's testimony that aprons surround the terminal buildings — not loading ramps, and not gate positions:

```
 1   Q   So passengers have to walk on the concrete
 2   tarmac, I guess we refer to it, and also up the
 3   stairs of the plane exposed for a period of time,
 4   correct?
 5    A   Well, with respect to the jet bridges
 6   themselves, one of the things that United did was to
 7   extend the bridges so that they were more easily
 8   accessible.  But there is a brief area where there
 9   is a passenger walking on an apron and up a short
10   flight, a number of stairs.
```

*Id*. at 157:1-10.

This testimony from United's witnesses is not that surprising since United's position during the March 2007 Trial, as explained by its counsel, was that the area surrounding the terminal and underneath it is the apron — not the loading ramp, and not the gate position:

```
 7                              United
 8   consolidated its United Express operations at the
 9   central terminal at all of its hubs.  It flies
10   turboprops out of four of the five of its hubs in a
11   manner substantially similar to what it does at LAX.
12   Passengers walk on the apron for a brief period of
13   time, they walk up a staircase, they get on their
14   plane and they fly to their destination.
```

3/15/07 Tr. at 20:7-14.

> 2  And [Mr. Sandifer will ] also address LAWA's argument
> 3  that LAWA's position that the leases only give
> 4  United the right to essentially operate in the
> 5  terminal itself as opposed to the apron underneath
> 6  the terminal.

*Id.* at 21:2-6.  Moreover, in its Reply Brief in Support of its Motion for Reconsideration, United

acknowledged that parking positions outside the terminals are not the same things as loading

ramps by asserting (incorrectly) that United has rights to <u>two separate</u> things:  "United also has

rights to the adjacent aircraft parking positions and loading ramps."  United Rep. Brief for

Reconsideration (7/20/07) at 4.

<u>**ARGUMENT**</u>

**I.    THE DISTRICT COURT EXAMINES THE BANKRUPTCY COURT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW *DE NOVO*.**

Under 28 U.S.C. § 157(c)(1), the district judge "consider[s] the bankruptcy judge's

proposed findings and conclusions and [reviews] *de novo* those matters to which any party has

timely and specifically objected."  28 U.S.C. § 157(c)(1) (emphasis added).  "In reviewing

matters *de novo*, the district court is required to make an independent assessment of the issues."

*See Lesser v. A-Z Assocs. (In re Lion Capital Group)*, 63 B.R. 199, 203 (S.D.N.Y. 1985) (citing

*Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir. 1984)).  This *de novo* review is

necessary to protect the parties' constitutional right to an Article III trial court.  *See Land-O-Sun

Dairies v. Fla. Supermarkets*, 143 B.R. 964, 971 (Bankr. M.D. Fla. 1992) (noting that "the

special treatment afforded non-core, related proceedings ensures that an Article III judge enters

the final order after a *de novo* review of the evidence" provides the protection required by Article

III of the Constitution.).[7]

---

[7] United has not appealed the Bankruptcy Court's dismissal of the core issues, and thus the
dispute between the parties is simply a contract dispute.

II.   **THE BANKRUPTCY COURT'S CONCLUSION THAT THE CITY HAS THREATENED TO BREACH THE TERMINAL 8 LEASE SHOULD BE SET ASIDE BECAUSE, BY ENTERING INTO AN UNAPPROVED SUBLEASE WITH SKYWEST — THE AIRLINE THAT OWNS OR LEASES THE TURBOPROPS THAT OPERATE AT TERMINAL 8 — UNITED IS IN PRIOR BREACH OF THE TERMINAL 8 LEASE.**

Following the Bankruptcy Court's Memorandum of Decision, LAWA has searched for and been unable to find any request for consent or granting of consent for United to enter into sublease of its space at Terminal 8 to Skywest.  United admittedly subleases its space at LAX to Skywest.  *See* May 23, 2008 Declaration of Lori Peters, Docket No. 232, ¶¶ 6, 11, 13 (referencing the fact that Skywest operates flights from Terminal 8); 7/27/06 Tr. at 162:8-14, 164:17-24 (Vais) (testifying that Skywest operated out of T6 prior to the move to the RTF).  United's Terminal 8 Lease requires it to seek the City's consent before entering into a sublease.  *See* Section 19, Terminal 8 Lease (United Ex. 1) at 015478 ("Lessee shall not mortgage, pledge, or otherwise encumber or assign the leasehold estate herein created without the prior written consent of Board, nor shall Lessee sublet or sublease the demised premises, nor license or permit the use of same, in whole or in part, without the prior written consent of General Manager.").

The District Court should, at a minimum, require United to produce a copy of a consent letter from the City, if one exists, and if United cannot produce such a letter, the City requests that the District Court permit evidentiary development and briefing on whether United's obligation to seek consent before subleasing constitutes a breach of the Terminal 8 Lease that, *inter alia*, excuses any alleged breach by the City.  *See Medico-Dental Bldg. Co. of Los Angeles v. Horton & Converse*, 21 Cal.2d 411, 418, 132 P.2d 457, 462 (1942) (the first consideration is whether the covenants in question "are mutually independent or dependent" covenants of the Lease).  The "covenants in a lease are to be construed as independent or dependent according to the intention of the parties and the good sense of the case."  *Enos v. Foster*, 155 Cal. App. 2d 152, 155; 317 P.2d 670, 672 (Cal. App. 1957).

III.  **TO THE EXTENT THAT ANY REVIEW IS NECESSARY OF THE CITY'S DETERMINATION THAT ITS PROHIBITION ON TURBOPROP OPERATIONS AT TERMINAL 8 WAS ADOPTED TO ENSURE THE SAFETY AND EFFICIENCY OF LAX, UNDER THE DOCTRINE OF PRIMARY JURISDICTION, SUCH REVIEW MUST TAKE PLACE IN THE FIRST INSTANCE BEFORE FAA.**

The Bankruptcy Court's conclusion that the doctrine of primary jurisdiction "has no application" in this case was preordained because it chose to characterize the dispute between United and the City as simply a "contract dispute":  "No regulation of the Secretary of Transportation or the Federal Aviation Administration has any bearing on this contract dispute." MoD at 4 (emphasis added).  In order to characterize the dispute as simply a "contract dispute," however, the Bankruptcy Court had to reject the City's statement that the ban on turboprop operations at Terminal 8 was adopted to ensure the safety and efficiency of aircraft operations at LAX.  And the Bankruptcy Court did just that by finding that turboprop operations at Terminal 8 do not "present any significant risk to public safety" and that "maximizing airport efficiency in connection with air carrier contracts is essentially a financial transaction."  *Id*. at 16-17.

If the resolution of this case, however, requires review of the City's ban on turboprop operations at Terminal 8, or its stated purpose of ensuring the safety and efficiency of aircraft operations at LAX, such review must take place at FAA, which not only possesses the necessary expertise to evaluate the City's ban and stated purposes, but has been vested by law with the authority to review the lawfulness of airport operational determinations when so called upon by affected parties.  Of course airport operational determinations concerning safety and efficiency are of critical importance — safety for obvious reasons, and efficiency is an especially significant issue given LAX's limited space in the CTA and LAX's importance to the economy of the entire economy in Southern California.  By contrast, the Bankruptcy Court (and the judiciary more generally) lacks the institutional competence and the jurisdiction, in the first instance, to render judgments on airport operations, including specifically the safety and efficiency of the regulation of turboprop operations on terminal aprons at LAX.  *Far E. Conference v. United States*, 342 U.S. 570, 574 (1952) ("[I]n cases raising issues of fact not

within the conventional expertise of judges or cases requiring the expertise of administrative

discretion, agencies created by Congress … should not be passed over.").

A.     **The City, As A Recipient Of Federal Grant Money, Is Required To Comply With Federal Grant Assurances.**

In its capacity as the owner and operator of LAX, the City has accepted federal grant

funds for LAX under the Airport Improvement Program ("AIP") established by the Airport and

Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47101, *et seq.*  As required by the

AAIA, the City provided certain assurances to the Secretary of Transportation (and by extension,

FAA) — set forth in 49 U.S.C. § 47107 — as a condition precedent to receiving AIP grants.  It is

FAA's position that upon acceptance of an AIP grant, the assurances became a binding

obligation between the City, as the airport sponsor, and the federal government.  *E.g.*, *Platinum

Aviation and Platinum Jet Ctr. v. Bloomington-Normal Airport Auth.*, 2007 FAA LEXIS 405 at

*14-*15 (FAA Nov. 28, 2007); *Jimsair Aviation Servs. v. San Diego County Reg'l Airport Auth.*,

2007 FAA LEXIS 272 at *12-*13 (FAA Apr. 12, 2007); *Sanford Air, Inc. v. Town of Sanford*,

2007 FAA LEXIS 84 at *27 (FAA Mar. 5, 2007).  FAA has established extensive enforcement

procedures, which may be initiated by FAA and by affected parties that further assure

compliance with grant assurances and the resolution of any disputes that may arise under the

grant assurances.[8]  Furthermore, Congress and FAA have established a range of remedies to

ensure compliance by airports with these grant assurances.[9]

---

[8] *See*, *e.g.*, 14 C.F.R. § 13.1 (each report of a violation of FAA enabling statues or regulations "will be reviewed by FAA personnel to determine the nature and type of any additional investigation or enforcement action the FAA will take."); *id*. § 13.5 ("Any person may file a complaint with the Administrator with respect to anything done or omitted to be done by any person in contravention of any provision of any Act or of any regulation or order issued under it, as to matters within the jurisdiction of the Administrator."); *id*. § 13.3 (under the Federal Aviation Act, the Airport and Airway Improvement Act, and regulations issued by DOT, FAA "may conduct investigations, hold hearings, issue subpoenas, require the production of relevant documents, records, and property, and take evidence and depositions"); 14 C.F.R. Part 16.1(a) (establishing hearing and enforcement procedures for "proceedings involving Federally-assisted airports" whether the proceedings are instituted by FAA or by filing a complaint with FAA).

[9] *See*, *e.g.*, 14 C.F.R. § 16.109(a) (FAA may issue an order terminating eligibility for grants, an order suspending the payment of grant funds, an order withholding approval of any new application to impose a passenger facility charge, a cease and desist order, an order directing the refund of fees unlawfully collected, or any other compliance order issued by FAA); *id*. §13.14(a)

**B.    Federal Grant Assurances Require The City To Operate LAX In A Safe And Efficient Manner.**

Citing to FAA Order 5190.6A, AIRPORT COMPLIANCE REQUIREMENTS, FAA has repeatedly held as follows:

> The owner of an airport developed with Federal assistance is responsible for operating the aeronautical facilities for the benefit of the public. This means, for example, that the owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure the safe and efficient operation of the airport.

*Sanford Air*, 2007 FAA LEXIS 84 at *30 (citing FAA Order 5190.6A §§ 4-7, 4-8) (emphasis added); *Carey v. Afton Lincoln County Mun. Airport Joint Powers Bd.*, 2007 FAA LEXIS 40 at *22 (FAA Jan. 18, 2007) (same).

Section 4-7(a) of the AIRPORT COMPLIANCE REQUIREMENTS requires the City to adopt and enforce adequate rules, regulations and ordinances which are necessary for the safe and efficient operation of LAX:

> **4-7.  REQUIREMENT TO OPERATE THE AIRPORT.**
>
> (a)(3) The owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure [the] safety and efficiency of flight operations and to protect the public using the airport.

FAA Order 5190.6A,[10] § 4-7(a)(3) (emphasis added). In addition, section 4-7(b) of the AIRPORT COMPLIANCE REQUIREMENTS provides that the City's prime requirement of regulating LAX is to eliminate hazards to aircraft and people on the ground:

> **4-7.  REQUIREMENT TO OPERATE THE AIRPORT.**
>
> **b.  Local Regulations.**  The prime requirement for local regulations is to control the use of the airport in a manner that will eliminate hazards to aircraft and to people on the ground.

*Id*. § 4-7(b).

Finally, the AIRPORT COMPLIANCE REQUIREMENTS also gives the City the express broad

---

("Any person who violates any of the following statutory provisions, or any rule, regulation, or order issued thereunder, is subject to a civil penalty"); *id*. § 13.20(a) (FAA may issue "orders of compliance, cease and desist orders, orders of denial, and other orders").

[10] Available at http://www.faa.gov/airports_airtraffic/airports/resources/publications/orders/media/Obligations_5190_6a.pdf (relevant pages are attached hereto in the Statutory Addendum).

authority to control the size and type of aircraft that operate at LAX:

### 4.8.  RESTRICTIONS ON AERONAUTICAL USE OF AIRPORT.

**a(2).  Safety and Efficiency.**  In the interest of safety, the airport owner may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

*Id.* § 4-8(a)(2).

These three provisions of FAA Order 5190.6A leave no doubt that the City, as owner and operator of LAX, is responsible for ensuring that aircraft operations at LAX are safe and efficient.  Moreover, contrary to the Bankruptcy Court's assertions, MoD at 4, the City is required to take action to ensure the safety and efficiency of operations at LAX.  Thus, the Bankruptcy Court's assertion that "[n]o regulation of the Secretary of Transportation or the Federal Aviation Administration has any bearing on this contract dispute," *id.*, flies in the face of the terms of FAA Order 5190.6A.

As the FAA found in *Tulloch v. City of Harlingen*, 2006 FAA LEXIS 595 (FAA Aug. 21, 2006), "[t]he owner of an airport developed with Federal assistance is responsible for operating the aeronautical facilities for the benefit of the public."  According to the FAA, "[t]his means, for example, that the owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure the <u>safe</u> and <u>efficient</u> operation of the airport."  *Id.* at *25 (emphasis added) (*citing* FAA Order 5190.6A §§ 4-7, 4-8*); cf. Int'l Caucus of Labor Comms. v. Metro. Dade County*, 724 F. Supp. 917, 929 (S.D. Fla. 1989) ("It is undisputed that airport authorities have legitimate interests in 'security and operational efficiency.'")

### C.    FAA Has The Authority To Review The Manner In Which The City Maintains And Operates LAX In A Safe and Efficient Manner.

The Federal Aviation Act of 1958, as amended, 49 U.S.C. § 40101, *et seq.*, assigns FAA broad responsibilities for the regulation of air commerce in the interests of safety, security, and development of civil aeronautics.  With respect to airports, FAA has a statutory mandate to ensure that airport owners comply with their federal grant assurances.  *E.g.*, *Platinum Aviation*, 2007 FAA LEXIS 405 at *11-*12; *Jimsair*, 2007 FAA LEXIS 272 at *13; *Sanford Air*, 2007

FAA LEXIS 84 at *28.

FAA's responsibilities include ensuring that airport sponsors, such as the City, who have assumed the obligation to "maintain and operate its airport facilities safely, efficiently, and in accordance with specified conditions" comply with their obligations to do so. *Platinum Aviation,* 2007 FAA LEXIS 405 at *11-*12 ("Pursuant to 49 U.S.C. § 47122, the FAA has a statutory mandate to ensure airport owners comply with their federal grant assurances" "to maintain and operate [their] airport facilities safely, efficiently, and in accordance with specified conditions."); *Bordallo v. Camacho*, 475 F.2d 712, 715 n.5 (9th Cir. 1973) (The operation of the airport "must comply with certain basic standards necessary for efficiency and safety. The Federal Aviation Administration is charged by law for seeing that basic standards are complied with.") (emphasis added).  Relying on Order 5190.6A, FAA has consistently asserted that:

> [i]n all cases involving restrictions on airport use imposed by airport owners for safety and efficiency reasons, the FAA will make the final determination on the reasonableness of such restrictions when those restrictions deny or limit access to, or use of, the airport.

*E.g.*,  *Jimsair*, 2007 FAA LEXIS 272 at *22 (citing FAA Order 5190.6A, § 4-8) (emphasis added); *Sanford Air*, 2007 FAA LEXIS 84 at *30 (same).

> **D.     Under The Doctrine Of Primary Jurisdiction, FAA Should Determine In The First Instance Whether The City's Decision To Prohibit Turboprop Operations At Terminal 8 Was Taken To Ensure The Safety And Efficiency Of Aircraft Operations At LAX.**

The "primary jurisdiction" doctrine requires that where a matter has been placed under the authority and special competence of an administrative body, courts should suspend the judicial process until that administrative body has had the opportunity to address the issue in question.  *E.g.*, *In re Healthback, L.L.C.*, 226 B.R. 464,470 (Bankr. W.D. Okla. 1998) (citing *United States* v. *Western Pacific R.R.*Co., 352 U.S. 59, 63-64 (1956)).  The administrative agency must be afforded this opportunity in order to promote the proper relationship between courts and administrative agencies which are charged with particular regulatory duties.  *Western Pacific*, 352 U.S. at 64; *see also Pharm. Research & Mfrs. v. Walsh*, 538 U.S. 644, 672 (2003) (Breyer, J., concurring) (discussing the benefits of primary jurisdiction).

In informing United that "turboprop commuter aircraft operated by or on behalf of United are prohibited from operating at gates in the Central Terminal Area," LAX's Executive Director stated that United's proposed location of turboprop operations to Terminal 8 would "violate a policy established by the Board of Airport Commissioners in 1997" that "was triggered by a combination of concerns including efficiency of the Central Terminal Area and safety considerations." United Ex. 28. Thus, from the very beginning, the City has taken the position that its decision to prohibit turboprop operations at Terminal 8 was taken to ensure the safety and efficiency of aircraft operations at LAX — one of the principal responsibilities the City has as a recipient of federal grant money, and one of the areas that FAA is charged with enforcing.

Given both FAA's expertise and authority with respect to airport operations, virtually every basis for invoking the primary jurisdiction doctrine applies to this case: (1) the case raises "issues of fact not within the conventional expertise of judges," *Far East Conference*, 342 U.S. at 574; (2) the case requires "the exercise of administrative discretion," *id.*; (3) the promotion of uniform application of the agencies rules, *Western Pacific*, 352 U.S. at 63-64; (4) invocation of the doctrine will promote utilization of the special knowledge and expertise of the agency, *id.*; and (5) adjudication of the issue by the agency will materially aid the court, *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305 (1973). Therefore, if review is to be had of operational determinations as to whether turboprop operations at Terminal 8 "present any significant risk to public safety," MoD at 16, and whether prohibiting turboprop operations at Terminal 8 maximizes airport efficiency, such review should be made by the agency of the Federal government with statutory authority and institutional competence to do so — FAA.[11]

---

[11] Here, of course, there is every reason to believe that FAA may well have a very different view than the Bankruptcy Court as to whether the City's decision to ban turboprop operations at Terminal 8 was in fact taken for safety and efficiency reasons. After all, FAA was one of the authors (along with DOT and the City) of the FAA Report, which identified two problems caused by commuter operations at LAX — (1) "the use of more of the existing large aircraft gates for commuter operations" [— a concern about efficiency], and (2) "far more interaction between the commuter type aircraft and the non-commuter aircraft" [— a concern about safety], City Ex. 9 at LA00096 — and which concluded that commuter operations at LAX, which includes turboprop operations, should be moved away from the Central Terminal Area to a remote common use terminal facility in order to solve the two identified problems.

IV.    **THE CITY'S PROHIBITION OF TURBOPROPS FROM TERMINAL 8 FOR SAFETY AND EFFICIENCY REASONS IS AN EXERCISE OF THE CITY'S POLICE POWER.**

As demonstrated above, the Bankruptcy Court avoided dealing with the City's primary jurisdiction argument — that determinations about safety and efficiency of airport operations should be made by the City, subject to review in the first instance by FAA — by concluding that the "City's decision to prohibit turboprop operations from the central terminal facility" was not "concerned with safety" and that "maximizing airport efficiency … is essentially a financial transaction."  *See supra* Section II; MoD at 16-17.  The Bankruptcy Court also avoided dealing with the City's police powers arguments in the same way.  *See* MoD at 14,17.  For the reasons which follow, the District Court should reject the Bankruptcy Court's conclusions to the contrary, and find that the evidence is essentially uncontradicted that the City's prohibition of turboprop operations at Terminal 8 was a valid exercise of its police powers.  Failing that, this Court should not engage in a review of the merits of the City's prohibition, but instead refer the issue to FAA for its expert determination.

A.    **Contrary To The Bankruptcy Court's Findings, The Evidence Is Essentially Uncontradicted That The City Adopted The Prohibition On Turboprop Operations At Terminal 8 For Safety And Efficiency Reasons.**

1.    **The Evidence Supports The Conclusion That The Prohibition On Turboprop Operations At Terminal 8 Was Based On Safety Considerations.**

The Bankruptcy Court rejected the City's argument that safety concerns justified its prohibition on turboprop operations at Terminal 8 by simply dismissing virtually uniform contrary evidence submitted by the City:

- the statement in LAWA's letter notifying United "that turboprop commuter aircraft operated by or on behalf of United are prohibited from operating at gates in the Central Terminal Area" and that that prohibition is based on "a combination of concerns including efficiency of the Central Terminal Area and safety considerations," United Ex. 28;

- the testimony of Michael DiGirolamo, the Deputy Executive Director of Airport Operations at LAX — who has worked at LAX for 28 of the last 33 years, 7/28/06 Tr. at 32:10-15 — that he considered turboprop operations in the Central Terminal Area to be unsafe because of (a) the mix of small turboprop aircraft and large jet aircraft;

(b) passengers being subject to jet blast; and (c) passenger being subject to high noise levels, 7/28/06 Tr. at 42:4-43:25;

- the testimony of Kim Day, the former Executive Director of LAX, who testified that "I truly believe the operation in Terminal 8 is less safe for commuters than in the commuter terminal," 3/15/07 Tr. at 69:1-3, and that she opposed permitting United to move turboprop operations to Terminal 8 and its active apron because "the safety of the airport would be jeopardized a bit by having turboprops operate there …any time you have a passenger who is walking on an active apron area, you are increasing the safety risk at the airport," 7/28/06 Tr. at 118:12-18; and

- the testimony of Raymond Jack, the former Chief of Operations at LAX who, prior to June 2006, had been responsible for "overseeing the safe and expeditious conduct of air commerce and travel on the airfield side of LAX," 7/27/06 Tr. at 173:5-10, who testified that "We agree that [removal of turboprops from the CTA] ensure[s] an appropriate level of safety to individuals on the Terminal 8 ramp," 7/28/06 Tr. at 15:17-25.

The Bankruptcy Court did not address either Ms. Day's testimony or Mr. Jack's testimony.  It discounts Mr. DiGirolamo's testimony because it found that his "observations were made in 1996-97 that did not involve T8 and were made without knowledge of the safety measures employed by United," but yet fails to make a determination as to whether the mix of turboprops and large jet aircraft outside of Terminal 8 poses a safety issue or whether passengers boarding turboprops at Terminal 8 are subject either to jet blast or high noise levels.  (The Bankruptcy Court might have been reluctant to make such expert safety determinations.)  Failing to make those assessments necessarily undermines the Bankruptcy Court's vague conclusion that the "use of turboprops in the central terminal area of LAX was not shown to present any significant risk to public safety."  MoD at 16.  Moreover, the Bankruptcy Court utterly fails to describe what level of risk turboprop operations pose to public safety, content instead to assert only that they do not "present any 'significant' risk.."

### 2.    The Evidence Supports The Conclusion That The Prohibition On Turboprop Operations At Terminal 8 Was Based On Efficiency Considerations.

With respect to efficiency issues, the Bankruptcy Court also simply dismisses the City's evidence that prohibiting turboprop operations in the CTA was also done to increase airport efficiency by finding that the City's action was instead "essentially a financial transaction."

*Id*. at 16-17.  In so characterizing the City's action, the Bankruptcy Court ignores the FAA Report, the 1997 BOAC Resolution, and testimony from the City's witnesses.  It ignores the fact that the City has an obligation to many stakeholders, including its citizens, the traveling public, its current airline tenants, potential new airline entrants to LAX, and concessionaires at LAX, among others, to maximize the economic potential of LAX by operating it efficiently.

The FAA Report — titled "Airport Capacity Enhancement" — indicates that FAA's purpose was to "identify and analyze capacity problems" at LAX "and recommend improvements that have the potential for reducing delays."  City Ex. 9 at LA00091, LA00096.  The FAA report found that LAX "has experienced a large increase in the number of commuter aircraft using the airport."  *Id*. at LA00096.  According to the FAA Report, "[t]his increase has required the use of more of the existing large aircraft gates for commuter operations" and "has also meant far more interaction between the commuter type aircraft and the non-commuter aircraft."  *Id*.  Significantly, the FAA Report found that "the use of more of the existing large aircraft gates for commuter operations" and "the  interaction between the commuter type aircraft and the non-commuter aircraft" were "<u>problems</u>."  *Id*. (emphasis added).

As detailed in the FAA Report, "the best commuter gate option" proposed moving commuter airline operations out of the CTA to a common-use remote terminal.  *Id*. at LA00110.  As such, it was the FAA Report's conclusion that moving turboprop operations out of the CTA was the best way to address both the problem of using "more of the existing large aircraft gates for commuter operations" and the problem of increased "interaction between the commuter type aircraft and the non-commuter aircraft."

The Bankruptcy Court also ignored testimony from Kim Day, the former Executive Director of LAX, who at first denied United's request to move turboprop operations from the RTF to Terminal 8.  Ms. Day testified that because LAX was built to accommodate only about 40 million passengers, but now was handling about 60 million passengers, "[w]e had to maximize the <u>efficiency</u> of every particular facility we had."  3/15/07 Tr. at 65:5-11 (emphasis added).  She also testified that, if small commuter planes were used at every gate in Terminal 8,

"the number of people that were in that terminal on a daily basis was probably, I'd say, 20 to 25 percent of its capacity, so that would not maximize Terminal 8's <u>efficient</u> use." *Id*. at 69:20-70:3 (emphasis added).[12]

Indeed, by finding that the City's ban was "essentially a financial transaction," the Bankruptcy Court in the Memorandum of Decision was rejecting the conclusion it reached during the permanent injunction trial — that "I take that as a given, that the airport would prefer to have United use the remote facility to allow more <u>efficient</u> use of the main facility. …And I will accept as already established that it would be more <u>efficient</u> to do it the other way." *Id.* at 26:6-13 (emphasis added).

For all of the foregoing reasons, the City submits that, on *de novo* review, the District Court should reject the Bankruptcy Court's proposed findings of fact and conclusions of law on these issues, and find that the evidence is essentially uncontradicted that the turboprop prohibition was validly premised upon safety and efficiency considerations.

### B.    The City's Decision To Prohibit Turboprop Operations From The CTA — Including United's Turboprop Operations From Terminal 8 — Was An Exercise Of Its Police Powers.

As demonstrated above, the City adopted the prohibition on turboprops in the CTA, including Terminal 8, for safety and efficiency reasons.

Since a sovereign's police powers include acts taken to promote the public safety, health and morals,[13] the City's prohibition — adopted for safety reasons — was an exercise of the City's police powers. Even if the District Court adopts the Bankruptcy Court's finding that United's turboprop operations are "safe," *see*, *e.g.*, 6/19/07 Op. Tr. at 23:22-25, that does not

---

[12] Similarly, the 1997 BOAC Resolution found that as of 1996 31% of all aircraft operations at LAX were commuter aircraft operations and that "[l]imited gate capacity in the Central Terminal Area combined with increasing passenger demand and aircraft operations no longer make it <u>efficient</u> for Los Angeles International Airport to offer premium gate space to commuter aircraft." City Ex. 10 at LA04367.

[13] *E.g.*, *W. Indem. Co. v. Pillsbury*, 170 Cal. 686, 733 (Cal. 1915) ("The very foundation of the conception of police power is that it must exist and can only exist to protect the public from evil, hurt, or mischief, and to promote the public interest or welfare or the public convenience.").

mean, of course, that the City's decision to prohibit turboprops in the CTA was not adopted to *increase* the safety of aircraft operations in the CTA. As such, the prohibition — adopted for safety reasons — was clearly an exercise of police power.

In addition, since a sovereign's police powers also include acts taken to promote the public convenience and general prosperity, including acts taken to promote society's economic needs such as efficient use of scarce governmental resources,[14] the City's prohibition — also adopted to improve the efficiency of operations at LAX — was also an exercise of the City's police powers. The City submitted substantial evidence during the trial that improving the efficiency of operations at LAX would increase the public convenience.[15] As such, the prohibition — also adopted for economic reasons — was clearly an exercise of police power.

C.     **Contrary To The Bankruptcy Court's Conclusion, The City's Prohibition Of Turboprops From Terminal 8 For Safety And Efficiency Is Not A "Financial Transaction."**

In its discussion of "contracts involving governmental entities," the Bankruptcy Court relies primarily on *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, (1977), to support its assertion that "contracts that are essentially financial transactions are not subject to the reserved power doctrine." MoD at 14. *U.S. Trust*, however, is inapposite to the facts of this dispute.

---

[14] *E.g.*, *W. Indem. Co.*, 170 Cal. at 733; *Pac. Employers Ins. Co. v. Indus. Accident Comm'n*, 219 Cal. App. 2d 634, 639 (Cal. App. 3d Dist. 1963) (under its police powers "the state may 'prescribe regulations promoting the health, peace, morals, education, and good order of the people, and legislate so as to increase the industries of the state, develop its resources and add to its welfare and prosperity.' In fine, when reduced to its ultimate and final analysis, the police power is the power to govern.") (citations omitted); *United States v. Winstar Corp.*, 518 U.S. 839, 921 (1996) ("it is reasonable to presume (*unless the opposite clearly appears*) that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts) (Scalia, J., concurring) (*emphasis original*; emphasis added); *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38-39 (1940) (sovereign authority involves not only legislation to promote "health, morals and safety," but also "extends to economic needs as well") (emphasis added).

[15] *See, e.g.*, 3/15/07 Tr. at 64:13-14 (Day) (prohibition was adopted to make "sure that the airport is efficient"); *id.* at 66:20-24 (Day) ("Q: So is it fair to say then that efficient gate use dovetails with safety in many situations? … THE WITNESS: I agree with that statement."); *id.* at 134:18-135:20 (DiGirolamo) (prohibition was adopted "to keep more flights coming in to keep the air fares down"); *see also id.* at 26:2-23 (Court) ("I will accept as already established that it would be more efficient to do it the other way.").

### 1.     *U.S. Trust* Concerned A Financial Decision.

In *U.S. Trust*, the dispute concerned a New Jersey statute which (together with a concurrent and parallel New York statute) repealed a statutory covenant made by the two states in 1962. That covenant limited the ability of the Port Authority of New York and New Jersey to subsidize rail operations from revenues and reserves. 431 U.S. at 3. Specifically, in connection with the Port Authority's acquisition of the Hudson & Manhattan Railroad (which became known as "PATH" for Port Authority Trans-Hudson Corporation) and the World Trade Center, the two states entered into a covenant that provided that "so long as any of such bonds remain outstanding and unpaid …[none] of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged …[shall be used] for any railroad purposes whatsoever other than permitted purposes." *Id*. at 10.

Thereafter, PATH incurred deficits that were so high that, pursuant to the terms of the covenant, the Port Authority was unable to issue bonds for any new passenger railroad facility that was not self-supporting. *Id*. at 12. Because both New York and New Jersey desired to expand PATH, and could not do so with the covenant in place, they both ultimately passed proposals that retroactively repealed the 1962 covenant. *Id*. at 14. As a result of doing so, "the market price for Port Authority bonds was adversely affected," *id*. at 19, and the Supreme Court concluded that its repeal "totally eliminated an important security provision and thus impaired the obligation of the States' contract," *id*.

In analyzing whether a State's contract was invalid *ab initio* under the reserved powers doctrine — the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty — the Court noted that the "police power and the power of eminent domain were among those that could not be 'contracted away.'" *Id*. at 23-24. The Court also noted that "the State could bind itself in the future exercise of [its] taxing and spending powers," however. *Id*. at 24. In *U.S. Trust*, the Court concluded that the issue involved "a financial obligation" and that because the States' promised "that revenues and reserves securing the bonds would not be depleted by the Port Authority's operation of deficit-producing

27

passenger railroads," the promises were "purely financial and thus not necessarily a compromise of the State's reserved powers." *Id*. at 24-25.

### 2.    The City's Prohibition of Turboprops Is Not A Financial Decision.

The Bankruptcy Court attempts to force the facts of the instant dispute into the *U.S. Trust* paradigm by asserting that the Terminal 8 Lease concerned United

> undertaking the financial responsibility for the construction [of the terminal.] The grant of preferential gate access at T8 was a necessary component of the overall transaction: United could not have been expected to agree to finance construction of a terminal without assurance that it would be able to use the terminal in the ordinary course of its business.

MoD at 17. The Court in *U.S. Trust*, however, actually provides an example that rejects the Bankruptcy Court's analysis.

The Court pointed out that the mere fact that a government entity undertakes a financial obligation does not mean that it relinquishes its right to exercise its police powers:

> [A] revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons.

431 U.S. at 25. Thus, even though closing a revenue bond facility would destroy the security for the revenue bond — just as New Jersey's action "totally eliminated an important security provision" for Port Authority bonds — the Court stated that the State could nonetheless exercise its police powers to do so.

Here, of course, the City's action in prohibiting turboprop operations at Terminal 8 — done for safety and efficiency reasons — has no effect on any security interest of United in Terminal 8. Moreover, contrary to the Bankruptcy Court's statement, prohibiting turboprop operations at Terminal 8 does not impinge on United's ability "to use the terminal in the ordinary course of business." It can still use Terminal 8 in the same manner it always has — to serve its passengers — but the planes that park outside of the Terminal cannot be turboprops.[16]

---

[16] Also, the City notes that in nearly all of the cases cited by the Bankruptcy Court the courts protected the governmental action. *See*, *e.g.*, *Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1154 (9th Cir. 2008) (holding that government's contracts with plaintiffs "do not restrict its ability to exercise its eminent domain power in any way" and remanding for consideration

**V.    BECAUSE THE CITY NEVER RELINQUISHED ITS RIGHT TO REGULATE UNITED'S AIRCRAFT OPERATIONS IN UNMISTAKABLE TERMS, THE CITY RETAINS ITS SOVEREIGN RIGHT TO REGULATE UNITED'S OPERATION OF ITS AIRCRAFT — INCLUDING ITS RIGHT TO PROHIBIT TURBOPROP OPERATIONS FROM TERMINAL 8.**

The City never unmistakably relinquished its sovereign power to regulate aircraft operations at LAX in either Lease [Operating] Agreement No. 1115, the 1993 ACOP, the 2002 ACOP or the Terminal 8 Lease.  As such, the City retains its ability to regulate aircraft operations at LAX, including regulating the types of aircraft that can park on the aprons.

In entering into Lease [Operating] Agreement No. 1115 in 1943, the City and United specifically agreed that "Nothing in this Article shall be construed to impair or prohibit any exercise of the general police power by Lessor." Article XVI, Lease [Operating] Agreement No. 1115 (City Supp. Ex. 1).  That provision of Lease [Operating] Agreement No. 1115 is consistent with California law, which provides that police powers cannot be bargained away by contract. *See Laurel Hill Cemetery v. City and County of San Francisco*, 152 Cal. 464, 475 (1907); *see also S. Calif. Gas Co. v. City of Los Angeles,* 50 Cal. 2d 713, 718 (1958). Indeed, the California courts have held that "the police power to enact and enforce land use regulations in the future could not be contracted away."  *City of Glendale v. Superior Court of Los Angeles*, 18 Cal. App. 4th 1768, 1779 (Cal. App. 2d Dist. 1993).  Accordingly, Lease [Operating] Agreement No. 1115 neither limited, infringed nor impaired the City's ability to use its police powers to regulate operations at LAX, including regulating the type of aircraft that can park on the aprons.

---

under U.S. Trust's heightened scrutiny test); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444 (1934) ("An emergency existed in Minnesota which furnishes a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community"); *McGrath v. R. I. Retirement Bd.*, 88 F.3d 12, 20 (1st Cir. 1996) ("We conclude that the [law being challenged], as applied, passes constitutional muster under the Contracts Clause); *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1581 (Fed. Cir. 1997) (holding that contracts between plaintiff and government did not unmistakably preclude a later assessment and that plaintiff was therefore "not exempt from the assessment"); *Bowen v. Pub. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 54 (1986) (amendment to statute "falls well within the limits of Congress' reserved power to alter the law"); *but see U.S. Trust,* 431 U.S. at 32 (1977) ("We therefore hold that the Contract Clause of the United States Constitution prohibits the retroactive repeal of the 1962 covenant.")

29

In entering into the Terminal 8 Lease in 1981, the City and United agreed that nothing in that lease "shall in any manner affect, change, impair, amend, modify, or enlarge any of the rights, privileges, duties or obligations of either of the parties hereto under or by reason of any lease, license, permit or agreement heretofore entered into by the parties hereto."  Section 38, Terminal 8 Lease (United Ex. 1) at 015509 (emphasis added). Accordingly, since the City's police powers to regulate aircraft operations at LAX were not limited before signing the Terminal 8 Lease, and since the parties expressly agreed that the Terminal 8 Lease did not limit, infringe or impair those police powers, the City retained the ability to use its police powers to regulate aircraft operations, including regulating the type of aircraft that can park on the aprons.

Section 24(n) of the 1993 ACOP and Section 26(n) of the 2002 ACOP similarly provide that the ACOP "shall not in any way change, amend, modify, alter, enlarge, impair or prejudice any of the rights, privileges, duties or obligations of either of the parties hereto, under or by reason of any other agreement between said parties."  Section 24(n) 1993 ACOP (City Supp. Ex. 19) (emphasis added); *see also* Section 26(n), 2002 ACOP (City Ex. 8). Accordingly, like Lease [Operating] Agreement No. 1115 and the Terminal 8 Lease, neither the 1993 ACOP nor the 2002 ACOP, limited, impaired or prohibited the City from exercising any of its police powers, either. As such, the City retained the ability to use its police powers to regulate aircraft operations at LAX, including regulating the type of aircraft that can park on the aprons at the terminals.

Indeed, despite numerous opportunities to do so since the City first raised the applicability of the unmistakability doctrine, United has utterly failed (repeatedly) to point to any specific language that unmistakably surrendered the City's sovereign right to regulate United's aircraft operations at LAX, including its aircraft operations on the aprons at LAX.

Thus, the City's ability to exercise its "general police powers" at LAX, first recognized in Operating [Lease] Agreement No. 1115 in 1943 remains unfettered today. As such, under the unmistakability doctrine,[17] the Terminal 8 Lease cannot be read to include an unstated term that

---

[17] The sovereign acts protected by the unmistakability doctrine include acts by state and municipal entities. *See Doe v. Pataki*, 481 F.3d 69, 79 (2d Cir 2007) (applying *Winstar* analysis

30

exempts United from regulation of its aircraft operation, because the City's sovereign power to regulate was not surrendered in unmistakable terms. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 910 (1996) (Breyer, J.) (concurring)[18] (*citing Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)). The City thus retains its sovereign right to regulate United's operation of its aircraft — including its right to prohibit turboprop operations from the CTA, including Terminal 8.

## VI. THE CITY'S PROHIBITION OF TURBOPROP OPERATIONS AT TERMINAL 8 DOES NOT BREACH THE TERMINAL 8 LEASE BECAUSE THE ACOP, NOT THE TERMINAL 8 LEASE, GOVERNS AIRCRAFT OPERATIONS OUTSIDE TERMINAL 8.

### A. The Bankruptcy Court Previously Correctly Held That The ACOP Is The Source Of United's Right To Operate At LAX.

The Bankruptcy Court's statement in the Memorandum of Decision that "under a lease with the City, United was given the right to <u>operate</u> commercial aircraft, including turboprops, at one of the central terminal buildings at LAX," MoD at 2 (emphasis added), is not supported by the evidence. As shown below, the Terminal 8 Lease gives United a right to occupy and <u>use</u> the demised premises in Terminal 8 and gives United a non-exclusive, preferential right to <u>use</u> gate positions and loading ramps located outside of the terminal building. But the Terminal 8 Lease does not contain any provision that gives United the right to <u>operate</u> aircraft of any kind, including turboprops, at LAX.

---

to stipulation entered into by the State of New York); *Hsiung v. City and County of Honolulu*, 378 F. Supp. 2d 1258, 1267 (D. Haw. 2005) (applying *Winstar* analysis to lease with municipality).

[18] The majority in *Winstar* held that the Government had unmistakably agreed "to regulate [plaintiffs] in a particular fashion, into the future." 518 U.S. at 921. In a concurrence, Justice Breyer concluded that the unmistakability doctrine extended only to cases in which the plaintiff was seeking injunctive relief, and not in cases in which the plaintiff was seeking damages. *See Winstar*, 518 U.S. at 916, 917 (1996) ("in all these [unmistakability] cases, the language was directed at the claim that the sovereign had made a broad promise not to legislate, or otherwise to exercise its sovereign powers" and that the Court had not disabled future courts from finding that the government could make "narrow promise in more typical cases — say, a promise not to abrogate, or to restrict severely through legislation and without compensation [*i.e.*, damages], the very right that a sovereign explicitly granted by contract"). Here — unlike *Winstar* — the *primary* relief that United seeks — and has obtained — is to enjoin the City from exercising its sovereign power to regulate airfield operations. *See Winstar*, 518 U.S. at 883.

United's right to <u>operate</u> aircraft from LAX does not come from its Terminal 8 Lease, but rather from its ACOP (Air Carrier Operating Permit).  The Bankruptcy Court previously and correctly reached the same conclusion:

> The ACOP, not the T-8 Lease, is the source of United's right to <u>operate</u> at LAX. When the ACOP is understood in this manner, it is clear that there is no need for the T-8 lease to imply a right on United's part to operate particular aircraft from Terminal 8.  <u>Any right to operate turboprops from Terminal 8 must derive from the ACOP or from some provision of other applicable law, not the T-8 lease.</u>

6/19/07 Op. Tr. at 23 (emphasis added).  The Bankruptcy Court never explains in the Memorandum of Decision its reason for rejecting its previous conclusion.

**B.      There Is No Language In The Terminal 8 Lease That Gives United The Right To Operate Aircraft At LAX.**

The Terminal 8 Lease is a lease which allows United to <u>use</u> real property.  A major characteristic of the Terminal 8 Lease is the payment of a fixed monthly rent in exchange for its right to <u>use</u> specific real property defined on a map attached to the lease, with such real property measured in and such rent determined by its area in square feet.  Indeed, the demised premises of Terminal 8 — the area for which United pays rent — does not include "gate positions" and "loading ramps."  This is evident from the description of the demised premises in Section 3 the Terminal 8 Lease and the attached drawings.[19]  And the City reiterated this fact during the January 11, 2008, evidentiary hearing:  "even accepting their view that loading ramp is part of the apron, they don't pay for it.  It is not part of their demised premises."  1/11/08 Tr. at 152:12-15 (City Counsel).  The Terminal 8 Lease is utterly silent as to any rights of United to <u>operate</u> its aircraft on the runways, taxiways and aprons at LAX.

The Bankruptcy Court does not identify which provision in the Terminal 8 Lease gives United the right to <u>operate</u> aircraft at LAX — instead, it focuses on provisions that give United the right to <u>use</u> "gate positions and loading ramps."  Neither the Bankruptcy Court nor United

---

[19] Color copies of the drawings that are attached to the Terminal 8 Lease, City Supp. Ex. 61,  are attached to the Declaration of Sandra J. Miller, filed concurrently with these Objections.

has ever identified any provision in the Terminal 8 Lease that gives United the right to operate aircraft at LAX, because there is none.

As used by the Bankruptcy Court, none of the three "forms of gate use employed in the air transportation business" — "exclusive use," "preferential use" or "common use" — contain the right to operate aircraft outside of the terminal. *See* MoD at 10 n.8. These "forms of gate use" relate solely to an airline's right to use gates, and not an airline's right to operate aircraft outside of the terminal.

With respect to the Terminal 8 Lease, the word "preferential" appears only three times in the Terminal 8 Lease: (1) the phrase "[p]referential use gates" appears in Section 2 of the Terminal 8 Lease, *see* United Ex. 1 at 015419; (2) the phrase "preferential but nonexclusive use of gate positions and aircraft loading ramps" appears in Section 22 of the Terminal 8 Lease, *see id.* at 015493; and (3) the phrase "preferential, but not exclusive, assignment by the General Manager of gate positions and loading ramps to the Lessee" appears in Section 23 of the Terminal 8 Lease, *see id.* at 015494. None of these provisions — or any other provision in the Terminal 8 Lease — give United the right to operate aircraft outside of Terminal 8.[20]

That United's terminal leases, including the Terminal 8 Lease, do not give it a right to operate aircraft at LAX is also made clear by the administrative complaint that United filed in 1995 challenging new landing fees at LAX. *See* City Supp. Ex. 28. In this complaint, filed more than 10 years before this current dispute between United and the City, the airline complainants (including United) recounted that in 1993 the City adopted the 1993 ACOP and imposed new landing fees on the airlines operating at LAX.[21] *Id.* at ¶ 65. As set forth in the Complaint, the airlines refused to pay the new landing fees, and the City informed the airlines

---

[20] In addition, the Bankruptcy Court's description of exclusive use gates, preferential use gates and common use gates in vague and confusing — which is not surprising because, unlike FAA which has special expertise in airport operations, the Bankruptcy Court has none. For example, although the Bankruptcy Court states that "Exclusive use, as the term implies, grants an airline complete control over the use of a gate for its flights or those of its assignees," MoD at 10 n.8, the Bankruptcy Court never defines what it means by the phrase "compete control."

[21] Landing fees are fees that the City charges airlines for their use of airfield and aprons at LAX.

"that, unless they immediately began to pay the increased fees [imposed under the ACOP], it would, in effect, prevent them from conducting any operations at LAX." *Id*. at ¶ 88. There is no assertion in the administrative complaint that the City's threat to "prevent them from conducting any operations at LAX" breached the right in any terminal lease to operate aircraft at LAX. In 1995, United did not assert that the Terminal 8 Lease gave it the right to operate aircraft at LAX, because the Terminal 8 Lease did not then and does not now do any such thing.

Moreover, in the airlines' complaint before FAA, they conceded that the landing fees in dispute consistent of two charges, one charge for their aircraft's use of the airfield, and a second charge for their aircraft's use of aprons. City Supp. Ex. 28 at 32, ¶ 62 ("the $1.56 landing fee is broken down into two separate rates: $1.40 for use of the airfield and $0.16 for use of the apron"). Thus, the City imposed one charge for the use of terminal areas — the terminal rent, and a second charge for the use of airfield and apron areas — the landing fee.

Since the Terminal 8 Lease is not the source of United's right to operate aircraft, including turboprops, at LAX, nor the source of United's right to use airfield and apron areas beyond the terminal, the City's decision to prohibit turboprop operations in the areas surrounding Terminal 8 could not violate any right or property interest that United has been granted under the Terminal 8 Lease. Thus, imposition of a permanent injunction to enjoin a breach of the Terminal 8 Lease is without legal basis.

### C. As Requested, The City Produced The ACOP In Effect When United Signed The Terminal 8 Lease.

In considering United's Motion for Reconsideration, the Bankruptcy Court informed the parties that it had decided to "reopen the evidence to allow either party to submit whatever ACOPs were in existence at the time that the [Terminal 8] lease was entered into." 7/24/07 Tr. at 6:7-9. The Bankruptcy Court explained its decision as follows:

> If there was an ACOP like [the 2002 ACOP] or some other permit in existence at the time of the [Terminal 8] lease that reserved to LAX regulatory authority with respect to the nature of aircraft that could operate out of Terminal 8, the lease would never have given [United] the right to operate unrestricted commercial aircraft out of Terminal 8 and there would not have been a right that would have been subject to what I'm calling a grandfather clause.

> But if there was no such permit and we have to look to the lease for United's right
> to operate, then the decision that I [made] at the time of the preliminary injunction
> hearing would be the correct interpretation.

7/24/07 Tr. at 8:12-25.

As requested by the Bankruptcy Court, on July 27, 2007, the City submitted to the

Bankruptcy Court (and served on United) a document titled "Submission of Additional Evidence

by the City of Los Angeles in Response to the Court's Order to Reopen Evidence" ("Submission

of Additional Evidence") which attached Operating [Lease] Agreement No. 1115, the ACOP "in

existence at the time of the [Terminal 8] lease that reserved to LAX regulatory authority with

respect to the nature of aircraft that could operate out of Terminal 8."

Specifically, Operating [Lease] Agreement No. 1115 did the following things:  (1) it

conferred upon United the right to operate its aircraft at LAX, (2) it regulated those operations,

and (3) it reserved regulatory rights to the City.  Another one of the documents the City

submitted, the Fifth Amendment — executed in 1979 — made clear that both United and the

City recognized that Lease No. 1115 granted "operational rights" to United.  *See* Fifth

Amendment at 3 ("To the extent this Lease grants operating rights to Lessee, the term of this

Agreement shall be for the period commencing April 1, 1947 and shall continue in full force and

effect to and including December 31, 1992.") (emphasis added) (City Supp. Ex. 13).  The Fifth

Amendment also extended the term of Lease No. 1115 until December 31, 1992.  *Id*.

Thus, the Fifth Amendment establishes both that Lease No. 1115 was in effect (as

amended) when United signed Lease No. 3088 in June 4, 1981, and that it was Lease No. 1115

— not any terminal lease — that gave United the right to use the "landing field, and any

extensions thereof or additions thereto, runways, aprons, [and] taxiways … and all other

conveniences for flying, landings and take-offs of [its] aircraft" at LAX.  Beginning on July 1,

1993 until today, United's right to use "the access space to the aircraft loading aprons and the

35

taxiways, runways and air navigational aids of Airport for the purpose of landing, taking off, and parking of its aircraft" at LAX has been governed either by the 1993 ACOP or the 2002 ACOP.[22]

As the City made clear in its Submission of Additional Evidence (dated July 27, 2007), the "operational rights" language in Operating [Lease] Agreement No. 1115 is as broad as the "operational rights" language in the 2002 ACOP, previously considered by the Court.

| Operating [Lease] Agreement No. 1115, ARTICLE I — PREMISES | 2002 ACOP, Section 3: |
|---|---|
| **(A) Use of Airport**.  The use, in common with others authorized to do so, of said Airport and appurtenances, together with its facilities, improvements and services which have been or may hereafter be provided at or in connection with said Airport from time to time, including without limiting the generality hereof, the landing field, and any extensions thereof or additions thereto, runways, aprons, taxiways, sewage and water facilities, flood lights, landing lights, control tower, signals, radio aids, and all other conveniences for flying, landings and take-offs of aircraft of lessee …. <br><br> Art I.A, Operating [Lease] Agreement No. 1115 (City Supp. Ex. 1) (emphasis added). | **(a) Airfield**.  Permittee shall have the right to use, in common with others, the access space to the aircraft loading aprons and the taxiways, runways and air navigational aids of Airport for the purpose of landing, taking off, and parking of its aircraft. <br><br> Section 3(a), 2002 ACOP (City Ex. 8). |

Thus, between July 14, 1943 and today, either Operating [Lease] Agreement No. 1115 (as amended), the 1993 ACOP (as amended), or the 2002 ACOP (as amended) has given United the right to operate aircraft at LAX, not any of United's terminal leases.

In addition, the City demonstrated that the language in Operating [Lease] Agreement No. 1115 permitted the City to issue — and certainly did not restrict its ability to issue — reasonable regulations concerning United's airfield operations in at least the same manner that

---

[22] Section 3(a) of the 1993 ACOP contains the same provisions as Section 3(a) of the 2002 ACOP (the only differences being that "Airline" was used in the 1993 ACOP in place of "Permittee" in the 2002 ACOP and the 1993 ACOP provides United with the right to use space at LAX for the "purpose of the landing and taking off of its aircraft" while the 2002 ACOP provides uses the language for the purpose of "the landing, taking off, and parking of its aircraft"). *Compare* Section 3(a), 1993 ACOP (City Supp. Ex. 19) at 5 *with* Section 3(a), 2002 ACOP at 6.)

the 2002 ACOP permits the City to issue — and certainly does not restrict its ability to issue —

such reasonable regulations concerning United's airfield operations.

| Operating [Lease] Agreement No. 1115, ARTICLE XVI – RULES AND REGULATIONS | 2002 ACOP Section 10 — Rules and Regulations |
|---|---|
| <u>Lessor shall adopt and enforce rules and regulations, which Lessee agrees to observe and obey, with respect to the use of the Los Angeles Airport,</u> which shall provide for the <u>safety</u> of those using the same; provided that such rules and regulations shall be consistent with safety and with rules, regulations and orders of the Civil Aeronautics Authority with respect to aircraft operations at said Los Angeles Airport; and provided further, that such rules and regulations shall not be inconsistent with the provisions of this lease or the procedures prescribed or approved from time to time by the Civil Aeronautics Authority with respect to the landing and taking off of Lessee's aircraft at said Airport. <u>Nothing in this Article shall be construed to impair or prohibit any exercise of the general police power by Lessor</u>. | The exercise of the operating rights under this Permit shall be subject to:<br><br>(a) Any and all applicable rules, regulations, orders and restrictions which are now in force or which may hereafter be adopted by City with respect to the operation of Airport, . . .<br><br>(b) Any and all applicable laws, ordinances, statutes, rules, regulations or orders of any governmental authority, federal, state or local, lawfully exercising authority over Airport or Permittee's operations conducted hereunder;<br><br>…<br><br>Nothing herein contained shall be deemed to impair Permittee's right to contest any such rules, regulations, orders, restrictions, directives or conditions or the reasonableness thereof, under federal, state or local law…. |
| Art XVI, Operating [Lease] Agreement No. 1115 (City Supp. Ex. 1) (emphasis added) | Section 10, 2002 ACOP (City Ex. 8). |

Thus, between July 14, 1943 and today, either Operating [Lease] Agreement No. 1115 (as amended), the 1993 ACOP (as amended),[23] or the 2002 ACOP (as amended) has permitted the City to issue — and certainly did not restrict its ability to issue — reasonable regulations concerning United's airfield activities.

Having submitted the ACOP "in existence at the time of the [Terminal 8] lease that reserved to LAX regulatory authority with respect to the nature of aircraft that could operate out of Terminal 8," then it follows, according to the Bankruptcy Court's analysis in June of 2007, that "the lease would never have given [United] the right to operate unrestricted commercial aircraft out of Terminal 8 and there would not have been a right that would have been subject to

---

[23] *See supra* n.6.

what I'm calling a grandfather clause." The Bankruptcy Court's determination to the contrary in the Memorandum of Decision should be rejected.

## VII. THE BANKRUPTCY COURT'S DECISION INCORRECTLY CONSTRUES THE TERMINAL 8 LEASE, AND AS SO CONSTRUED THE CITY COULD "NEVER PROHIBIT UNITED FROM OPERATING TURBOPROPS AT TERMINAL 8" ON THE BASIS OF SAFETY AND SECURITY CONCERNS.

The Bankruptcy Court's June 20, 2007, decision found that "United's reading of the [Terminal 8 Lease] would result in the conclusion that the City could never prohibit United from operating turboprops at Terminal 8 even if its prohibition were based on legitimate safety or security concerns." 6/19/07 Op. Tr. at 23:17-21. The Bankruptcy Court rejected that position:

> In other words, United argues that … even if there were safety considerations, a regulation based on those considerations would not be enforceable.

> It is highly unlikely that an international airport would enter into such agreement. And as I've indicated, the Terminal 8 lease properly understood does not give United such a right.

*Id.* at 25:1-18.

While the Bankruptcy Court eventually does adopt United's reading of the Terminal 8 Lease, it fails to address just how, under that reading, the City could ever prohibit turboprop operations at Terminal 8 even if such a prohibition "were based on legitimate safety or security concerns." The City submits that the Bankruptcy Court had it right in June of 2007 — "It is highly unlikely that an international airport would enter into such agreement. And as I've indicated, the Terminal 8 lease properly understood does not give United such a right." *Id.* at 25:14-18. For this reason alone, the District Court should reject the Bankruptcy Court's Memorandum of Decision.

However, an analysis of the actual terms of the Terminal 8 Lease would yield the same result: The lease does not grant United rights with respect to the apron areas outside Terminal 8, and therefore nothing in the Terminal 8 Lease limits the City's right to prohibit turboprop operations in that portion of LAX. Instead, the Bankruptcy Court has misunderstood and hopelessly confused several specialized terms critical to the proper construction of the lease.

38

A.    **The Bankruptcy Court Incorrectly Confuses "Aprons," "Gate Positions," and "Loading Ramps."**

The Bankruptcy Court misunderstood three terms of central significance to the construction of the Terminal 8 Lease:  (1) aprons, (2) gate positions and (3) loading ramps, and instead lumps gate positions and loading ramps together as the same thing.  Under the Terminal 8 Lease, however, aprons, gate positions and loading ramps are three distinct and separate structures or areas, and the City objects specifically to the Bankruptcy Court's incorrect failure to distinguish between "gate positions" on the one hand and "loading ramps" on the other. The City further objects to the Bankruptcy Court's assertion that "gate positions and loading ramps for which United is given preferential use under the T8 lease indeed include the paved surfaces adjacent to its terminal space."  MoD at 12.  By failing to distinguish "gate positions" from "loading ramps" — and by failing to distinguish these two things from "aprons," the Bankruptcy Court not only misconstrues the lease, but it also fails to interpret the lease, as it is required to do under California law, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," Cal. Civ. Code § 1641, and to "interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless," *City of Atascadero v. Merrill Lynch*, 68 Cal. App. 4th 445, 473 (Cal. App. 1998) (citation omitted).

All of the evidence in the record as to the meaning of "aprons," "gate positions," and "loading ramps," including testimony of the City's and United's witnesses, presents a consistent picture.  United failed to submit directly contrary evidence, and the Memorandum of Decision cites no evidence contrary to the evidence submitted by the City.

The Bankruptcy Court accurately summarizes Mr. DiGirolamo's testimony concerning the definition of "gate positions" and "loading ramps."[24]  Mr. DiGirolamo testified that a gate position "is a numerical designation for an area where an aircraft is parked on the apron.  Inside a

---

[24] The City notes that, while the Bankruptcy Court's quotation of Mr. DiGirolamo's testimony is not word-for-word accurate, the substance of his testimony does not differ from the words used in the Memorandum of Decision.

satellite it would be the numerical area inside the satellite where a ticket lift [occurs] and a door is [located to enter] either a ramp or a jet way." 1/11/08 Tr. at 32:22-33:1; 33:2-4 ("when a plane is parked at a gate position outside of a terminal, … [i]t is parked on the apron."). He further testified that a loading ramp is "an inclined area coming off of a second level satellite, which is the public level, down to the apron. It could be a set of stairs that goes from the satellite down to the apron. Some are exposed, some are included into the building. But it is a conveyance which passengers get from the satellite public area down to the apron." *Id.* at 29:18-30:2. Mr. DiGirolamo testified that the term apron refers to "the concrete area around the satellite where aircraft parking positions are." 1/11/08 Tr. at 32:4-7. He testified that an apron is also known as a ramp, the tarmac, and a contact stand, among other names, *id.* at 32:8-16; *id.* at 33:2-9, and directly testified that a "ramp" and a "loading ramp" are not the same things. *Id.* at 32:17-20 ("Q: Now, you just used the term ramp in describing another name for apron. Is that the same thing as a loading ramp? A: No.").

Two United witnesses had also previously testified in conformity with the testimony of Mr. DiGirolamo at the January 11, 2008, evidentiary hearing that the area outside of the terminals where planes park is the apron, not the "loading ramp" and not the "gate position." Both United's Director of Airport Affairs and Corporate Real Estate, Christopher Sandifer, and United's Regional Manager of Corporate Real Estate, Lori Peters, testified that planes sit on the apron — or ramp, but not loading ramp — when they are not operating on the airfield. *See* 7/27/06 Tr. at 90:15-23 (Sanidfer) ("the actual areas that a turboprop at Terminal 8 would operate on" is "commonly referred to as apron or ramp parking positions, and that's a static area. It's where the aircraft sits when it's not operating on the airfield."); *id.* at 142:18-19 (Peters) ("this is the concrete apron of which the aircraft for United Express is parked."); *id.* at 157:8-10 (Peters) ("there is a brief area where there is a passenger walking on an apron").

This testimony from United's witnesses is not that surprising since United's position during the March 2007 trial, as explained by its counsel, was that the area surrounding and underneath the terminal is the apron — not the loading ramp, and not the gate position. *See*

3/15/07 Tr. at 20:12-14 ("Passengers walk on the apron for a brief period of time, they walk up a staircase, they get on their plane"); *id*. at 21:3-6 ("LAWA's position that the leases only give United the right to essentially operate in the terminal itself as opposed to the apron underneath the terminal").

Moreover, Mr. DiGirolamo's usage of the terms "aprons," "gate positions," and "loading ramps" is supported by the usage of these same terms by FAA and other governmental bodies. FAA, Notice to Airmen (NOTAM) Briefing Guide at 10, *available at* http://www.faa.gov/ airports_airtraffic/airports/ airport_safety/media/d_notam_training.pdf  ("The terms ramp and apron are synonymous" and "Apron/Ramp = a defined area, on a land aerodrome, intended to accommodate aircraft for purposes of loading or unloading passengers, mail or cargo, fueling, parking, or maintenance"),[25]   Thus, the City's evidence established, as correctly summarized by the Bankruptcy Court, that a "loading ramp" is any "conveyance which passengers [can use to] get from the satellite public area down to the apron," thus including stairways in addition to sloping concrete ramps.  1/11/08 Tr. at 29:20-30:2 (DiGirolamo).

B.    The Terms Of The Terminal 8 Lease Only Give United A Right To Use "Aprons" and "Ramps" In Common With Other Airlines.

The Terminal 8 Lease gives United the preferential right to use "gate positions" and "loading ramps," but denies United any "special possessory, exclusive or vested rights" to "aprons," or "ramps":

---

[25] *See also* Policy Regarding Airport Rates and Charges, 61 Fed. Reg. 31994, 31999 (June 21, 1996) ("Aprons or ramps that are treated as airfield assets are subject to the general [Historical Cost Accounting] valuation requirement.  In contrast, the airport proprietor may use any reasonable method to establish the fee for any other apron or ramp."); Notice of Passenger Facility Charge (PFC) Approvals and Disapprovals, 64 FR 28860, 28861 (May 27, 1999) (describing an approved project for PFCs as "Apron expansion (west ramp)"); GAO Report 08-29, Aviation Runway and Ramp Safety at 1 n.1 ("Ramps are areas of airports where aircraft are readied for arrival and departure") (Nov. 2007) *available at* http://www.gao.gov/new.items/d0829.pdf; *Fed. Express Corp. v. Auths. of Taiwan*, 1996 DOT Av. LEXIS 411 at *2 (FAA June 21, 1996) (noting that an agreement for ground services called for "ramp (apron) services for passenger and cargo"); *Raleigh-Durham Airport Auth. v. Delta Air Lines, Inc.*, 429 F. Supp. 1069, 1087 (E.D.N.C. 1976) (defining "airside operations … as the take-off, landing, runway, ramp, and airline maintenance areas).

> No special possessory, exclusive or vested rights whatsoever, save and except a
> use in common with other airlines, and Lessee's preferential but nonexclusive use
> of <u>gate positions</u> and <u>aircraft loading ramps</u> adjacent to Lessee's demised
> premises, pursuant to Section 23, shall vest in Lessee by reason of the proximity
> of such demised premises to said gate positions and aircraft loading ramps.

Section 22, Terminal 8 Lease (United Ex. 1) at 015493 (emphasis added); *see also* Section 23,

Terminal 8 Lease (United Ex. 1) at 015494 ("Such rules, regulations and directives shall provide

for the preferential, but not exclusive, assignment by the General Manager of <u>gate positions</u> and

<u>loading ramps</u> to the Lessee ….") (emphasis added).

Thus, the Terminal 8 Lease provided United with a preferential right to use "gate

positions" and "loading ramps" but recognized only United's right "to use in common with other

airlines" other areas in proximity to gate positions and loading ramps, *i.e.*, aprons (or ramps).

Lease [Operating] Agreement No. 1115, the operating agreement in effect in 1981 when the

parties entered into the Terminal 8 Lease, gave United only the right to operate on LAX's

"aprons," and other airfield areas, in common with other airlines:

> **(A) Use of Airport.**  The use, in common with others authorized to do so, of said
> Airport and appurtenances, … the landing field, and any extensions thereof or
> additions thereto, runways, <u>aprons</u>, taxiways, … and all other conveniences for
> flying, landings and take-offs of aircraft of lessee …."

Art I.A, Operating [Lease] Agreement No. 1115 (City Supp. Ex. 1) (emphasis added).  The

ACOP referenced by the Bankruptcy Court in this paragraph is the operating agreement that was

in effect when United filed its complaint.  It is a successor operating agreement to Operating

[Lease] Agreement No. 1115, and continued to give United the right to operate on LAX's aprons

— "ramps" — in common with other airlines.

Contrary to the Bankruptcy Court's conclusion, there is nothing inconsistent by reason of

the fact that Sections 7G, 22, and 23 of the Terminal 8 Lease refer to "gate positions" and

"loading ramps" as being "adjacent" to United's demised premises.  As used in Sections 7G, 22

and 23 of the Terminal 8 Lease, the terms "gate position" and "loading ramp" together with the

word "adjacent" are entirely consistent with the City's definitions of those terms.

Section 7G uses the word "adjacent" as follows:  it provides that United "agrees, upon

request by City, to permit other scheduled air carriers assigned by City to gate positions and

loading ramps adjacent to [United's] demised premises pursuant to Section 23 of this Agreement, to utilize Lessee's passenger holdroom(s) and jetway passenger loading bridge(s)" under certain circumstances.  In context, "adjacent" means nothing more than "immediately next to."  Under the City's definitions of "gate position" and "loading ramp," there would be nothing inconsistent with a scheduled air carrier being assigned to use a "gate position" (a hole in the terminal building wall where passengers leave the terminal building on their way to their airplane) and a "loading ramp" (a conveyance outside the terminal building that passengers use to descend from the terminal area to the apron) immediately adjacent to United's demised premises.  Nothing in Section 7G's use of the word "adjacent" in connection with the terms "gate positions" and "loading ramps" necessarily (much less, ineluctably) supports the Bankruptcy Court's conclusion, contrary to all the evidence, that "adjacent" means that "gate positions" and "loading ramps" refer to pavement outside the terminal, as the Bankruptcy Court incorrectly found.

Moreover, Section 7G — in addition to referring to "gate positions" and "loading ramps" adjacent to United's demised premises — also refers to "loading bridge(s) adjacent" to United's demised premises.  Since, under the Bankruptcy Court's logic, the definitions of gate positions and loading ramps "necessarily includes pavement outside the terminal," MoD at 11, because Section 7G refers to them as being "adjacent" to United's demised premises, then it would also follow that the definition of "loading bridge" also "necessarily includes pavement outside the terminal," MoD at 11, because they, too, are described as being "adjacent" to United's demised premises.  This is certainly not the case, as the unrefuted evidence is that "loading bridges" are another name for jetways — the metal structures that are attached to and extend from the gate position on the side of the terminal building to the door of aircraft parked on the apron at a gate position.  1/11/08 Tr. at 28:16-29:1 (DiGirolamo) ("loading bridge," "jetway," "air bridge," and "passenger loading bridge" "all mean the same thing"); *id.* at 81:23-82:3 ("loading bridge" is "sometimes called a jetway or jet bridge").  Indeed, far from being part of the "pavement outside of the terminal," passengers walk through loading bridges to board their planes.  Thus, even though they are described in Section 7G as being "adjacent" to United's demised premises, the

definition of "loading bridge" does not "necessarily include[] pavement outside the terminal," just like the definitions of "gate positions" and "loading ramps" do not "necessarily include[ ] pavement outside the terminal"  The Bankruptcy Court's contrary conclusion should be rejected.

The same goes for Section 22's use of the word "adjacent" in both of its two sentences. The first sentence, Section 22 basically states that the "City is providing … large areas of apron pavement, airplane gate positions and aircraft loading ramps in the area immediately adjacent to and surrounding the Satellite Buildings."  In context, "adjacent," here, even more clearly means "immediately next to" given the use of the words "immediately" and "surrounding."

The second sentence of Section 22 uses "adjacent" in stating that United will have "preferential but nonexclusive use of gate positions and aircraft loading ramps adjacent to [United's] demised premises."  As in Section 7G, the City's definition of "gate position" and "loading ramp" are entirely consistent with this language.  A "gate position" (a hole in the terminal building wall where passengers leave the terminal building on their way to their airplane) and a "loading ramp" (a conveyance outside the terminal building that passengers use to descend from the terminal area to the apron) are necessarily immediately next to United's demised premises.

Finally, Section 23 uses "adjacent" as follows:  "Such rules, regulations and directives shall provide for the preferential, but not exclusive, assignment by the General Manager of gate positions and loading ramps to the Lessee of the demised premises next adjacent to each gate position and loading ramp."  Here, again, as in Sections 7G and 22, the use of "gate position" and "loading ramp" is entirely consistent.  United's demised premises are "next adjacent to," *i.e.*, immediately next to, a "gate position" (a hole in the terminal building wall where passengers leave the terminal building on their way to their airplane) and a "loading ramp" (a conveyance outside the terminal building that passengers use to descend from the terminal area to the apron).

Sections 7G, 22 and 23's use of the word "adjacent," therefore, does not support the Bankruptcy Court's conclusion that "gate positions" and "loading ramps" must refer to pavement area outside of Terminal 8.

44

**C.    Similarly, The Use Of The Term "Surround" In Sections 22, 23 and 24 Is Consonant With The City's Definitions Of Aprons, Gate Positions, And Loading Ramps.**

The Bankruptcy Court appears to rely upon the fact that "'gate positions and … loading ramps' are described as part of the access to taxiways and runways that 'surround' the terminal buildings," MoD at 12, to support its conclusion that "gate positions" and "loading ramps" must refer to the outside pavement. There is, however, nothing inconsistent with the evidence submitted by the City about the meaning of "gate positions" and "loading ramps" and use of the term "surround" in various sections.

Quite simply, "gate positions" literally "surround" the terminal building, as is obvious to anyone who has flown on a commercial airline. Similarly, "loading ramps" also surround a terminal building. Indeed, during the January 11, 2008, evidentiary hearing, Mr. DiGirolamo specifically identified "loading ramps" as surrounding terminal buildings. *See* 1/11/08 Tr. at 38:17-42:14 (referencing City Supp. Ex. 31 and identifying loading ramps surrounding Terminal 7); *id*. at 42:15-44:7 (referencing City Supp. Ex. 31 and identifying loading ramps surrounding Terminal 8); *id*. at 45:15-46:16 (referencing City Supp. Ex. 33 and identifying loading ramps surrounding Terminal 5); *id*. at 59:24-61:3 (referencing City Supp. Ex. 54 and identifying 10 loading ramps surrounding Terminal 6). Nothing about the term "surround" suggests that it cannot refer to "gate positions" or "loading ramps" as described by the City. Indeed, that is a fully natural construction of the term. The Bankruptcy Court was, therefore, in error in rejecting consistent testimony to conclude that the term "surround" when applied to "gate positions" and "loading ramps" refers to the pavement outside the terminal.

**D.    Other Aspects Of Sections 22, 23 and 24 Are Not In Conflict With The City's Definitions Of Aprons, Gate Positions, And Loading Ramps.**

According to the Bankruptcy Court, its conclusion that "gate positions and loading ramps" — collectively — are part of the paved surface outside the terminal building is supported by the language of Section 23 which provides that United will not "use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes" *See* MoD at 12.

45

The meaning of the last sentence of Section 23, however, is precisely the opposite of that given it by the Bankruptcy Court, once the Terminal 8 Lease is considered as a whole rather than on a piecemeal basis: United is prevented from trying to convert its preferential, non-exclusive rights to use "gate positions" and "loading ramps" into preferential rights to operate on other areas of LAX including the adjacent apron. In other words, United is granted no "preferential" right to use areas adjacent to its preferential gate positions and preferential loading ramps but merely has a right to use "in common with other airlines," as provided under the ACOP.[26] Quite clearly, this common use of the aprons is intended so as not to limit the City's broad and necessary authority to direct airfield operations so as to further the safety and efficiency of LAX.

The last sentences of both Sections 22 and 23 merely reiterate the limitations of United's preferential rights — that its existing preferential rights to gate positions and loading ramps were not "possessory, exclusive or vested" (Section 22) and that its existing preferential rights to gate positions and loading ramps are <u>not</u> intended to give rise, by implication or otherwise, to preferential rights at any other area of LAX (Section 23).

The last sentence in Section 22 makes it clear that United has preferential rights — and nothing more than preferential rights — in gate positions and loading ramps at Terminal 8:

> No special possessory, exclusive or vested rights whatsoever … shall vest in [United] by reason of the proximity of such demised premises to said gate positions and aircraft loading ramps.

Section 22, Terminal 8 Lease (United Ex. 1) at 015493. Similarly, the last sentence of Section 23 merely makes clear United's agreement that it cannot use its preferential rights to use gate

---

[26] Lease [Operating] Agreement No. 1115, in effect in 1981 when the parties entered into the Terminal 8 Lease, gave United the right to operate on LAX's aprons in common with other airlines:

> **(A) Use of Airport**. The use, in common with others authorized to do so, of said Airport and appurtenances, … the landing field, and any extensions thereof or additions thereto, runways, *aprons*, taxiways, … and all other conveniences for flying, landings and take-offs of aircraft of lessee …."

Art I.A, Operating [Lease] Agreement No. 1115 (City Supp. Ex. 1) (emphasis added). Thus, Section 22 of the Terminal 8 Lease simply recognized that United had the pre-existing right to use aprons in common with other airlines. Section 22, Terminal 8 Lease (United Ex. 1) at 015493.

positions and loading ramps to use the common use aprons "for long-term aircraft parking or aircraft maintenance purposes."[27]

According to the Bankruptcy Court, the City's reservation of the right to regulate the use of vehicles on "apron and loading ramps," is consistent with its conclusion that "gate positions and loading ramps" — collectively — are part of the paved surface outside of the terminal building. *See* MoD at 12. The Bankruptcy Court's conclusion, however, ignores evidence submitted at the January 11, 2008, evidentiary hearing that "vehicles and automotive equipment" moved over the loading ramps. 1/11/08 Tr. at 117:6-118:5 (DiGirolamo) (referring to City Supp. Ex. 43, "Q   Right.  Can you drive a vehicle on a baggage loading ramp? A   Or a baggage ramp, yes. Q   Okay.  And do you see a baggage ramp on this picture? A   Yes."). Thus, contrary to the Bankruptcy Court's conclusion, because vehicles can travel on loading ramps, the "reservation" in Section 24 is "meaningful."

Finally, and significantly, consistent with the City's position that (1) "gate positions" and "loading ramps" are not part of the paved surfaces adjacent to (or surrounding) the terminals; and (2) "gate positions" and "loading ramps" are different and distinct parts of the airport (and different and distinct from the apron), Section 24 does not reserve to the City "the right to regulate the use of vehicles and automotive equipment upon, over and across the" gate positions. The Memorandum of Decision asserts that the definition of gate positions "necessarily includes pavement outside the terminal," MoD at 11, and it reads Section 23's reference to parking on gate positions, as parking on "the paved surface outside the [terminal] building," *id*. at 12. If that were true, however — which it is not — then presumably, Section 24 would reserve to the City "the right to regulate the use of vehicles and automotive equipment upon, over and across the" gate positions. Otherwise, the City would not have the ability to "regulate the use of vehicles

---

[27] This is consistent with other language in the Terminal 8 Lease which provides that "'Preferential Use Gates' shall mean aircraft parking/loading positions assigned by the General Manager pursuant to Section 23." Terminal 8 Lease (United Ex. 1) at 015419. Since "Preferential Use Gates" are aircraft parking positions, this limitation on United's ability to use gate positions for long-term aircraft parking makes perfect sense.

and automotive equipment upon, over and across" some portion (undefined by United and the Bankruptcy Court) of pavement surrounding the terminal buildings at LAX known as the "gate position." That Section 24 does not reference "gate positions" is consistent with the City's definitions of "gate positions" — and of "aprons" and "loading ramps" — and inconsistent with the definitions of those terms advanced by United and adopted by the Bankruptcy Court.

### E.    Section 23 Of The Terminal 8 Lease Does Not Support The Bankruptcy Court's Conclusions.

The Bankruptcy Court's statement that the Terminal 8 Lease "requires the City to allow United to use" "paved surfaces adjacent to its terminal space" "for loading and unloading its aircraft, in preference to other carriers, taking into account United's needs and requirements, and in keeping with industry practice at the Airport," MoD at 12, apparently refers to Section 23 of the Terminal 8 Lease. *See* Section 23, Terminal 8 Lease (United Ex. 1) at 015494 ("needs" appears in only Section 11.C and Section 23 of the Terminal 8 Lease, and "industry" appears only in Section 23). However, the Bankruptcy Court has plucked disparate phrases from Section 23 which do not support its assertions.

Section 23 is titled, "Assignment of Gate Positions and Loading Ramps." It simply provides for the "assignment" of gate positions and loading ramps in accordance with rules and regulations and that those rules and regulations shall provide for the preferential assignment of gate positions and loading ramps to United "taking into account [United's] needs and requirements." Thus, Section 23 is only concerned with how gate positions and loading ramps are assigned to United; it is utterly silent with respect to the City's ability to regulate aircraft operations outside Terminal 8. Moreover, the uncontroverted evidence at the preliminary and permanent injunction trials was that the prohibition on turboprops was not a gate assignment issue. *See, e.g.*, 3/15/07 Tr. 71:3-9 (Day) (Q: "did you consider United approaching you and the implications of your decision to be a request for a gate assignment?" A: "No. I saw it as an operational change."); *id.* at 117:1-6 (Day) (Q: "was United Airlines proposed move of the

turboprops from the remote facility to Terminal 8 a gate assignment matter?" A: "No, I wouldn't categorize it that. [I considered it a]n operational move.").

Second, the Bankruptcy Court makes an unsupported logical leap by asserting that because "Industry practice at LAX has included substantial operation of turboprop aircraft from the central terminal area, … the prohibition of turboprop aircraft from T8 contradicts the preferential use provision of the lease." MoD at 12-13. The "industry practice" referred to in Section 23, however, is not whether any particular aircraft has ever operated from the central terminal area, but how "gate positions" and "loading ramps" have been used. With respect to "industry practice," Section 23 simply states that "[i]t is further understood that the gate positions and loading ramps are to be used for the loading and unloading of aircraft in passenger service in keeping with industry practice at the Airport." Section 23, Terminal 8 Lease (United Ex. 1) at 015494. Thus, contrary to the Bankruptcy Court's assertion, the industry practice referred to in the Terminal 8 Lease has nothing to do with the types of aircraft used at LAX, but rather that industry practice is that "gate positions" and "loading ramps" are to be used for the loading and unloading of passengers. The City's prohibition of turboprop operations at Terminal 8 has absolutely no effect on how "gate positions" and "loading ramps" are to be used — they are still "to be used for the loading and unloading of aircraft in passenger service." *Id*.

Section 30 of the Terminal 8 Lease provides that the City can issue rules and regulations that are "reasonable and not inconsistent with or contravene the rights granted to [United] under this Lease." Section 30, Terminal 8 Lease (United Ex. 1 at 015501). First, prohibiting turboprops from operating at Terminal 8 to increase the safety and efficiency of operations at LAX is "reasonable." Even the Bankruptcy Court's incorrect conclusion that the prohibition was not motivated by safety concerns does not assert that it is unreasonable for the City to take action to increase the safety of aircraft operations at LAX.

Second, and more importantly, prohibiting turboprops from operating at Terminal 8 is "not inconsistent with or [in contravention of] the rights granted to" United under the Terminal 8 Lease. Specifically, prohibiting turboprop operations at Terminal 8 in no way contravenes

United's preferential use rights at Terminal 8 — the City wants to prohibit turboprops, it did not pass a regulation that required United to accommodate other airlines at its preferential use gate positions and preferential use loading ramps, or that required United to pay a premium for its preferential use gate positions and preferential use loading ramps, or that did anything to take away, limit or compromise United's preferential use rights.  With the turboprop ban in effect, United would still be able to exclude other airlines from its preferential use gate positions and preferential use loading ramps — just as it has the right to do now.

Finally, the City notes, once again, that its definitions of "gate position" and "loading ramp" is entirely consistent with the way that Section 23 uses these terms.  A "gate position" and a "loading ramp" are certainly both "used for the loading and unloading of aircraft in passenger service in keeping with industry practice at the Airport."   The Bankruptcy Court, again, fails to distinguish how its definition of "gate position" is used differently from its definition of a "loading ramp" in the "the loading and unloading of aircraft in passenger service."

### F.    Under The Missing Witness Rule, The Court Can Assume That Testimony From United's Witnesses About The Meaning Of The Terminal 8 Lease Would Not Support Its Legal Position.

When United had the chance to submit testimonial evidence in support of its position that "loading ramps" are the part of the apron, it did not.  Under the "missing witness" rule, therefore, the District Court can draw the inference that the testimony, if produced, would have been unfavorable to United's position.  *See United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

In this case, United produced five witnesses to testify during the preliminary and permanent injunction trials, but none of them were produced to testify in support of its position — first advanced in a brief filed in December 2007 — that loading ramps are part of the aprons outside of Terminal 8.  Each of United's witnesses, of course, has the type of relationship with United that pragmatically renders his or her testimony unavailable to the City, as each of them, presumably, would be hostile to the City's position.  *See Chicago Coll. of Osteopathic Med. v. George Fuller Co.*, 719 F.2d 1335,1353 (7th Cir. 1983) (citing and quoting *Zuber v. N. Pac. Ry.*

*Co.*, 246 Minn. 157, 166, 74 N.W.2d 641, 649 (1956) ("An employee-employer relationship is such that "'where an employee who could give important testimony relative to issues in litigation is not present and his absence is unaccounted for by his employer, who is a party to the action, the presumption arises that the testimony of such employee would be unfavorable to his employer.'")); *see also Russell v. Amtrak*, 189 F.3d 590, 595 (7th Cir. 1999) (citing Illinois Pattern Instruction 5.01, which "allows a jury to draw a negative inference against a party from the failure to produce the evidence or witness if (1) the evidence is in that party's control; (2) it is not equally available to the other party; (3) the party would have offered the evidence if it was favorable; and (4) the party last in possession of the evidence had no reasonable excuse for the failure to produce it.).

## VIII.    THE ACOP DOES NOT SUPPORT THE CONCLUSION THAT "LOADING RAMPS AND GATE POSITIONS" ARE PART OF THE PAVEMENT OUTSIDE OF TERMINAL 8.

Contrary to the Memorandum of Decision, the ACOP simply does not state that "the permit <u>governs</u> 'Airport landing facilities.'"   MoD at 12.  The term "landing facility" appears only twice in the ACOP — in the second recital, the ACOP states that the "Permittee … desires to use Airport landing facilities" and in the definitions section of the ACOP, "landing facility" is defined as "[c]ommon use areas of the airfield which include the runways, taxiways, service roads, and common use ramps."  City Ex. 8 at LA 00190.

Moreover, contrary to the impression created by the Bankruptcy Court, the ACOP does not distinguish between so-called "common use ramps" and so-called "preferential use ramps." MoD at 12.  Indeed, the term "preferential use ramps" does not appear in the ACOP, nor does the word "preferential" (thus, the phrases "preferential use loading ramp" and "preferential use apron" are also absent from the ACOP).

As United consistently did in its submissions, the Bankruptcy Court erroneously confuses technical terms concerning areas outside of the terminal.  MoD at 12.[28]  As established by the

---

[28] *See*, *e.g.*, United Supp. Br. Re: Dec. 19, 2007 Status Hearing (12/18/07) at 3 n.4 (confusing ramp and loading ramp by asserting that "a 'preferential use' loading ramp … is the type of ramp

City's evidence, a ramp is different from a loading ramp.  1/11/08 Tr. at 32:17-20 (DiGirolamo) ("Q:  Now, you just used the term ramp in describing another name for apron.  Is that the same thing as a loading ramp?  A   No.").  A ramp is another name for "apron," the large area of concrete that surrounds the terminal buildings.  *Id.* at 32:4-7, 32:8-16, 33:2-9.  United never offered any evidence to the contrary, and the Bankruptcy Court cites none.

## IX.    THE CITY NEEDS TO KNOW WHAT PARTS OF THE APRON CONSTITUTE "LOADING RAMPS" AND "GATE POSITIONS" UNDER THE BANKRUPTCY COURT'S ANALYSIS.

The Bankruptcy Court never even attempts to define which part of the paved surface adjacent to United's terminal space is "apron," which part is "gate position" and which part is "loading ramp."  This failure is critical because, as the Bankruptcy Court recognizes, the Terminal 8 Lease gives United preferential use rights to "gate positions" and "loading ramps," but not to aprons.  *See* MoD at 12.  Accepting for the sake of argument the Bankruptcy Court's conclusion that the definitions of "gate positions" and "loading ramps" "necessarily includes pavement outside the terminal," on which parts of the "pavement outside the terminal" does United have preferential rights?  The Memorandum of Decision is utterly silent on this issue.

If the "gate positions" and "loading ramps" (according to the Bankruptcy Court, these terms apparently refer to the same area) refer to the "paved surfaces adjacent to [United's] terminal space" on which a plane parks, then United's preferential use rights — and therefore the

---

specifically governed by the T-8 Lease, not the ACOP"); United Resp. Br. to Submission of Add'l Evid. (7/30/07) at 8 (referring to "preferential gate and loading-position access rights"); United Reply Br. to Submission of Add'l Evid. (8/17/07) at 13 (referring to "the specific terms in the T-8 Lease regarding the ramps, loading areas, and the loading and unloading of passengers"); 12/11/07 Tr. at 7:13-17 ("the loading bridge is where you park an aircraft.") (emphasis added); *id.* at 8:11-14 ("the term 'gates' include where you park the airplanes.") (emphasis added); *id.* at 12:10-19 ("United [has] the right of first use of the parking aprons adjacent to Terminal 8.' THE COURT:  Okay. MR. JOSLIN:  And so -- THE COURT:  What's that have to do with loading ramps?  MR. JOSLIN:  It's the same thing.") (emphasis added); *id.* at 13:20-23 ("whether you call it a loading apron, a parking position, or a loading ramp, regardless of how you slice it, that is covered by the T8 lease.").

City's right to regulate the "remaining" apron — <u>must</u> necessarily vary by the size of the aircraft that is parked outside of a terminal.[29]

While the Bankruptcy Court's conclusion that gate positions and loading ramps are part of the pavement outside of Terminal 8 is wrong, if the District Court were to adopt it, there would be an entirely new significance to the City. Under the FAA's Policy Regarding Airport Rates and Charges, the City may not charge fair market value rent for the land underneath common use aprons because they are deemed to be part of the airfield. 61 Fed. Reg. at 31999. If, however — as the Bankruptcy Court incorrectly held — the Terminal 8 Lease's grant to United of preferential rights to use gate positions and loading ramps means that it has preferential rights to use parts of the apron, then under the Policy Regarding Airport Rates and Charges the City can — and will — charge United a fair market value rent for those parts of the apron that constitute the "gate positions" and "loading ramps" under the Bankruptcy Court's decision. *Id.* (authorizing airport proprietors to "use any reasonable method to establish the fee for" preferential use aprons).[30] Because the Bankruptcy Court's Memorandum of Decision fails to identify which parts of the apron are the loading ramps and which parts are the gate positions, these terms now become vague, rendering the Terminal 8 Lease uncertain in a critical respect — the surface area subject to the lease.

It is hornbook California law that, "[w]here a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Robinson & Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 407, 110 Cal. Rptr. 675

---

[29] For example, if at any particular gate United parks a 747 at 10:00 am, under the Bankruptcy Court's definition of "gate position" and "loading ramp," United's preferential use rights cover an area of "pavement outside the terminal" that is at least 231 feet long (the length of a 747) and 195 feet wide (the wingspan of a 747). But, if United parks a 30-seat turboprop at that same gate at 1:00 PM, United's preferential rights shrink and cover an area of "pavement outside the terminal" that is only 65 feet long (the length of an Embraer EMB 120 30-seat turboprop) and only 64 feet wide (the wingspan of an Embraer EMB 120).

[30] Moreover, since the language in United's Terminal 7 and Terminal 6 leases concerning preferential rights is nearly identical to the language in the Terminal 8 Lease, the City will also seek to charge United fair market value rental for the parts of those aprons on which United has preferential rights to use gate positions and loading ramps.

(1973) (citations omitted).  "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (Cal. App. 2006) (citations omitted).  Here, the Bankruptcy Court's vague definitions for "gate positions" and "loading ramps," not supported by the evidence, make  the Terminal 8 Lease uncertain and, therefore, unenforceable.  The definitions of "aprons," "loading ramps," and "gate positions" offered by the City suffer no such fatal defect, and would save the enforceability of the lease.

## X.    THE PARTIES' PERFORMANCE UNDER THE LEASE DOES NOT SUPPORT THE BANKRUPTCY COURT'S CONCLUSIONS.

The Bankruptcy Court places great emphasis on the fact that the BOAC authorized the Executive Director "to prohibit any additional commuter airline from operating at gates within the Central Terminal Area" but limited the Executive Director's ability to move existing commuter operations out of the CTA by authorizing the Executive Director only "to negotiate, but not implement a plan" to do so.  *See* MoD at 13 n.9.  Indeed, the Bankruptcy Court concludes that this difference supports its conclusion that "turboprop operation in the central terminal [area] is within the rights of an air carrier with preferential gate use."  *Id*.  The Bankruptcy Court's conclusion is based on two false premises, however, and accordingly should be rejected.

First, there is no evidence to suggest that only airlines with preferential rights had commuter operations in the CTA when BOAC passed in the 1997 BOAC Resolution.  Indeed, the opposite is true — US Air Express is listed in the FAA Study as having commuter operations in the CTA, but it did not have preferential rights to use gate positions and loading ramps in the CTA.[31]  City Ex. 9 at 10.  Thus, the BOAC's caution in authorizing LAWA's Executive Director "to negotiate, but not implement a plan" to move commuter operations out of the CTA could not be based on the status of those airlines having "preferential gate use," as the Bankruptcy Court

---

[31] A copy of US Air's lease that was effective in 1997 when BOAC passed the 1997 BOAC Resolution is attached to the Declaration of Sandra J. Miller.  *See* City Supp. Ex. 62.

implies.  It is much more likely that BOAC's caution was based on a desire to have final approval over whatever plan was negotiated.

Second, there is no evidence that BOAC's authorization to allow LAWA's Executive Director to "prohibit any additional commuter airline from operating at gates within the Central Terminal Area" would have exempted airlines with preferential rights to use gate positions and loading ramps from that prohibition.  For example, Continental has a lease at LAX that gives it preferential rights to use gate positions and loading ramps.[32]  However, according to the FAA Study, Continental did not have any commuter operations at LAX, much less in the CTA.  *See id*.  Given the wording of the 1997 BOAC Resolution, there is no doubt that the Executive Director was empowered to prohibit Continental from operating commuter flights "at gates within the Central Terminal Area."  Under the 1997 BOAC Resolution, the fact that Continental has "preferential gate use" does not permit it to move commuter operations into the CTA any more than it would permit another carrier without such rights to do so.

Accordingly, because in 2005 United did not have any commuter flights at Terminal 8 when it informed the City that it wanted to move turboprop flights from the RTF to Terminal 8, the Executive Director's decision to prohibit that move was entirely consistent with the 1997 BOAC Resolution's instruction that authorized the Executive Director "to prohibit any additional commuter airline from operating at gates within the Central Terminal Area."

Moreover, the Bankruptcy Court overlooks the specific conduct of the two parties in this dispute — United and the City.  First, and most significantly, in response to United's notification that it intended to move its turboprop operations from the RTF to Terminal 8, the City told United "that turboprop commuter aircraft operated by or on behalf of United are prohibited from operating at gates in the Central Terminal Area."  United Ex. 28.  The City submits that its initial reaction to United's plan is the most relevant and most telling fact with respect to the parties' performance under the Terminal 8 Lease.  Indeed, even when the City later granted United

---

[32] A copy of Continental's lease that was effective in 1997 when BOAC passed the 1997 BOAC Resolution  is attached to the Declaration of Sandra J. Miller.  *See* City Supp. Ex. 63.

permission to move turboprop operations to Terminal 8, it approved "the turboprop operation at Terminal 8" subject to revocation on six months written notice from the City. United Ex. 29; 7/28/06 Tr. at 123:22-124:12 (Day). The City's actions are entirely consistent with the fact that its regulatory authority over aircraft operations gave it the power to restrict turboprops operations, and that no provision in the Terminal 8 Lease gives United the right to control airfield operations.

Second, if United had an unfettered right to move its turboprop operations to Terminal 8, it would have had no reason to tell the City that it was intending to do so. Indeed, United's actions seem even less consistent with its current position. According to the City's June 7, 2005, letter — which is unrebutted — United thought that "LAWA staff cooperation in response was taken as an indication of LAWA's policy acceptance of the planned change." If United's preferential right to use gate positions and loading ramps meant that it — and it alone — could determine which aircraft operate outside of Terminal 8, then "LAWA's policy acceptance" would be irrelevant. United's actions in connection with moving turboprop operations from the RTF to the CTA is consistent with the City's position that the City, and not United, regulates which aircraft can use which gates at LAX.

## XI.   THE BANKRUPTCY COURT'S FINDINGS WITH RESPECT TO THE TERMINAL 6 LEASE VIOLATE THE CITY'S DUE PROCESS RIGHTS AND MUST BE REJECTED.

The Memorandum of Decision also finds that the City has no basis for its position that it may deprive United of gate positions and loading ramps at T6. MoD at 13-14. The City objects specifically to these findings of fact and proposed conclusions of law in their entirety since any ruling on the issues addressed in this paragraph would violate the City's due process rights. The issue of the interplay between the Terminal 8 Lease and the Terminal 6 Lease was not addressed at trial. Indeed, the Bankruptcy Court previously stated as follows:

> United also requests declarations that "United is entitled to use turboprops on T-8" and "United's use of turboprops on T-8 cannot impact United's rights to utilize gates at T-6."

> However, because the issue addressed at trial was only whether the T-8 lease gave
> United a contractual right to operate turboprops at Terminal 8, and because this
> court's jurisdiction is based on the contractual nature of the dispute between the
> parties, the judgment entered today will declare only that United does not have a
> contractual right under the T-8 lease to operate turboprops at Terminal 8.

6/19/07 Op. Tr. at 29:1-13.  At no time between June 29, 2007, when United filed its motion for

reconsideration and May 31, 2008, when the Bankruptcy Court issued its Memorandum of

Decision did the Bankruptcy Court request briefing on any issues relating to the Terminal 6

Lease or give notice that the T6 Lease was now at issue.  Because the City was not given the

opportunity to submit evidence or argument on the T6 Lease, any ruling with respect to that

Lease would violate the City's due process rights.  *Logan v. Zimmerman Brush Co*., 455 U.S.

422, 433 (1982).  A constitutionally protected hearing "embraces not only the right to present

evidence but also a reasonable opportunity to know the claims of the opposing party and to meet

them.  The right to submit argument implies that opportunity; otherwise the right may be but a

barren one." *United States  v. Fla. E. Coast Ry. Co*., 410 U.S. 224, 242-43 (1973).  *See also* L.

Tribe, American Constitutional Law 666 (2nd ed. 1988) (our judicial system is based on the

deeply felt principle that each side must have the opportunity to be fully and fairly heard).

## XII.    UNITED HAS NOT ESTABLISHED THAT IT WOULD SUFFER IRREPARABLE HARM.

The Bankruptcy Court asserts that "United has established the inadequacy of damages"

because a return to the RTF "would disrupt its schedules and cause a decline in convenience and

comfort for passengers."  MoD at 18.  To the contrary, the evidence is clearly inadequate to

establish United's claim of irreparable harm and therefore its right to obtain a permanent

injunction.  The City requests that the District Court immediately lift the injunction pending

appeal imposed by the Bankruptcy Court on May 31, 2008.

Irreparable injury is an injury for which the Court cannot compensate the movant should

the movant prevail in the final decree.  *See Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d

380, 386 (7th Cir. 1984).  Lost income or other economic loss that is calculable and compensable

by monetary damages ordinarily is not irreparable injury.  *See Green River Bottling Co. v. Green

River Corp.*, 997 F.2d 359, 363 (7th Cir. 1993).  Moreover, the moving party must present

sufficient facts to show a loss of goodwill, because "conclusory statements" of "loss of reputation, competitiveness, and goodwill" is not sufficient to warrant injunctive relief. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (finding that affidavit of principal shareholder regarding market share decrease and affidavit of expert witness regarding likelihood of competitive disadvantage in similar fact situation is inadequate to show loss of goodwill necessary to impose injunction). The cost of compliance with government regulations, however, is not irreparable harm. *See Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (injury resulting from attempted compliance with governmental regulation is not irreparable harm).

The Bankruptcy Court relies almost entirely on a United survey that summarized customer satisfaction ratings for travel at LAX. MoD at 18 n.13. This survey, even if its results are accepted, is inadequate to establish irreparable harm. The key metric of the survey, prepared internally by United's marketing division, was a customer's Definite Intent to Repurchase ("DIR"). DIR was described by United's Senior Vice-President for On-Board Services, Sean Donohue, as "the overall customer satisfaction rating" and "is a roll-up of components of the entire journey." 7/27/06 Tr. 55:19-22 (Donohue). Mr. Donohue testified that this number represented the customer's "reservation, they're rating us was the trip on time, did we deliver their bags on time." *Id*. at 59:1-7 (Donohue). Thus, data in this survey does not measure customer satisfaction with any particular aspect of United's commuter operations at LAX, including whether those flights originate from the RTF or the CTA. The DIR was measured during two periods of time — June-November 2004 (when turboprops were operating out of the RTF) and June-November 2005 (when turboprops were operating out of the CTA). *Id*. at 55:11-17. On cross-examination, Mr. Donohue acknowledged that the percentage difference in DIR between the two periods was 0.8%.[33] *Id*. at 59:1-22. That means that for every 1,000 passengers

---

[33] Some subcategories of the survey indicated a larger percentage improvement after the move to the RTF, 7/27/06 Tr. at 56:13-16 (Donohue), but these subcategory improvements apparently did not lead to an increase in the overall customer satisfaction rating.

8 more passengers rated United higher — on all aspects of their travel experience with United (including aspects such as ease of making their reservations that have nothing to do with whether the flights were from the RTF or the CTA) — for six months in late 2005 when turboprops were operating from the CTA than for six months in late 2004 when they were operating from the RTF. The change, even if all of it could be attributed to the move from the RTF to the CTA, is hardly a statistically significant difference. Nor did any United witness testify that it was a statistically significant difference.

Moreover, among United's best customers — its most frequent fliers, United Mileage Plus Premier Members — the DIF actually decreased after United moved the turboprop operations from the RTF to the CTA. *Id*. at 61:9-15 (Donohue). When United was operating from the RTF, 41.7% of Mileage Plus Premier members flying on turboprops indicated a DIF, while only 37.5% of Mileage Plus Premier members flying on turboprops indicated a DIF once turboprops began to operate from the CTA. *Id.* Thus, since United's own survey indicates that its best customers — customers which Mr. Donohue agreed were "very valuable," *id*. at 61:3-4 — preferred their overall experience with United when turboprop operations were in the RTF, the finding of irreparable harm is dubious at best.

The internally-prepared survey prepared by United is simply insufficient to demonstrate that United's customer base would be eroded in any way or that it would suffer a loss of goodwill if turboprop operations were returned to the RTF. This lack of evidence distinguishes this case from other cases in which a court has found that a loss of business goodwill was sufficient to support a finding of irreparable harm. *See*, *e.g.*, *Promatek Indus. v Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002) (there was clear evidence that customers had been diverted to a competitor's website by use of infringing trademark); *Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153 (7th Cir. 1984) (trademark infringement would lead to dilution of holder's mark); *Am. Food and Vending Corp. v. UPS*, No. 02-9439, 2003 U.S. Dist. LEXIS 1464 (N.D. Ill. Jan. 30, 2003) (absolute termination of a vending machine contract could lead to erosion of market share and harm to the vending company's reputation); *Cleveland Hair Clinic, Inc. v. Puig*, 968 F.

Supp. 1227, 1246 (N.D. Ill. 1996) (defendant had the ability to <u>force plaintiff out of business</u>, and any monetary judgment would "come too late" to save plaintiff).[34]

In the present case, United has presented nothing more than passengers' representations about their likelihood to purchase future tickets on United based on their overall travel experience, including aspects of that experience that have nothing to do with the physical location of turboprops.  7/27/06 Tr. 62:14-17 (Donohue) ("if a customer happened to be on a canceled trip, they are not going to rate us very highly.  If there was a lengthy delay because of a mechanical problem, they are going to mark us down.").  This fact, even under the reading most favorable to United, cannot establish irreparable harm.

Finally, the Bankruptcy Court acted unlawfully by issuing an injunction without ordering United to give the City security, a required by Fed. R. Civ. P. 65(c).  This is ground enough to dissolve the injunction pending appeal.  In any event, the City requests a hearing on the amount of adequate security before any injunction against it is extended or issued.

## CONCLUSION

For all of the foregoing reasons, the City respectfully requests that the District Court reject the proposed findings of fact and conclusions of law to which the City has objected, above, and that the District Court dissolve the injunction pending appeal that the Bankruptcy Court entered on May 31, 2008.

---

[34] The Ninth Circuit has indicated a similar standard for determining loss of goodwill sufficient to support a permanent injunction.  *Compare Ticketmaster L.L.C. v. RMG Tech., Inc.*, 507 F. Supp.2d 1096 (C.D. Cal. 2007) (copyright infringement and contractual violations resulting in customers' inability to purchase products sufficient to demonstrate loss of goodwill) with *Givemepower Corp. v. Pace Compumetrics Inc.*, No. 07-0157, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. Mar. 23, 2007) (no injunction warranted when only evidence of loss of goodwill was defendant's access to certain proprietary databases).

Dated:  June 30, 2007

Respectfully submitted,

KAYE SCHOLER LLC,

By:   /s/ Robert M. Spalding_____

ROCKARD J. DELGADILLO, City Attorney
KELLY MARTIN, General Counsel
JOHN TAVETIAN, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
    ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:   (310) 646-3260
Facsimile:    (310) 646-9617

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Anthony G. Stamato (ARDC #6207688)
Robert M. Spalding (ARDC #6256701)
KAYE SCHOLER LLC
3 First National Plaza
70 West Madison Street, Suite 4100
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and
Los Angeles World Airp`orts*

# Statutory Addendum

- FAA Order 5190.6a - Airport Compliance Requirements; §§4-7, 4-8

- 49 U.S.C. § 47107

- DOT Policy Regarding Airport Rates and Charges, 61 Fed. Reg. 31994 (June 21, 1996)

FAA Order 5190.6a
Airport Compliance Requirements
Sections 4-7 and 4-8

**ORDER**

**5190.6A**

# AIRPORT COMPLIANCE
# REQUIREMENTS



## OCTOBER 2, 1989

## DEPARTMENT OF TRANSPORTATION
### FEDERAL AVIATION ADMINISTRATION

ations should be inspected at regular intervals to assure that there are no holes or depressions.

(5) Field lighting and VASI's must be maintained in a safe and operable condition at all times. The VASI's must be aligned on a regular basis and at times when conditions dictate.

(6) Segmented circles and wind cones should be inspected on a regular basis to ensure proper serviceability.

(7) All drainage structures should be inspected, particularly sub–drain outlets, to ensure unobstructed drainage.

(8) All approaches must be checked to assure conformance with the approach obligations incurred.

b. Criteria for Satisfactory Compliance.

(1) What constitutes an acceptable level of maintenance is difficult to express in measurable units. A standard yardstick of satisfactory maintenance effort will not apply in all circumstances. Grass cut to a height of 8 inches may be acceptable at some airports but it could impair safety and efficiency at others. A one–half inch crack in runway paving may be inconsequential under certain circumstances. Depending on its location, the volume of traffic, the age of the pavement, climatic and other conditions, it could be the forerunner of serious pavement failure implying an obligation to apply immediate corrective measures. The degree of maintenance effort required of an airport owner is a matter of professional judgment.

(2) Compliance with this maintenance obligation is considered satisfactory when the airport owner:

(a) Fully understands that airport facilities must be kept in a safe and serviceable condition;

(b) Has adopted and implemented a sufficiently detailed program of cyclical preventive maintenance that in the judgment of FAA is adequate to carry out this commitment; and

(c) Has available the equipment, personnel, funds and other resources including contract arrangements to effectively implement such a program.

c. Major Repair.

(1) The obligation to maintain the airport does not extend to major rehabilitation of a facility that has become unusable due to normal and unpreventable deterioration or through acts of God. Therefore, the restoration of a building destroyed by fire or windstorm or a major rehabilitation of a portion of the landing area inundated by floods is not included in the sponsor's maintenance obligations. Likewise, the complete resurfacing of a runway, unless it is the result of obvi-

ous neglect of routine maintenance, is not included in the sponsor's obligations. Failure to perform day–to–day maintenance may have a cumulative effect resulting in major repairs and reconstruction.

(2) The airport owner has a commitment to prevent gross overstressing of the airport pavement. If the owner is not prepared to strengthen the pavement, then its use must be limited to aircraft operations which will preclude overstressing the pavement. Should pavement failure occur because the sponsor failed to take timely corrective action after being advised of the pavement limitations, any cost required to restore the failed pavement to a satisfactory condition will not be eligible for AIP funding. Strengthening of the pavement, after correction of the failure, would be eligible for consideration for AIP funding.

4–7. REQUIREMENT TO OPERATE THE AIRPORT.

a. General. The owner of an airport developed with Federal assistance is more than a passive landlord of specialized real estate. The obligation to maintain the airport includes the responsibility to operate the aeronautical facilities and common use areas for the benefit of the public. This means, for example, that:

(1) If field lighting is installed, the owner is responsible for making arrangements for it and the associated airport beacon and lighted wind and landing direction indicators to be operated throughout each night of the year or when needed in accordance with subparagraph 4–7e below.

(2) If any part of the airport is closed or hazardous to use, the owner is responsible for providing warning to users, such as adequate marking and issuing a Notice to Airmen (NOTAM) to advise pilots of the condition.

(3) The owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure safety and efficiency of flight operations and to protect the public using the airport.

b. Local Regulations. The prime requirement for local regulations is to control the use of the airport in a manner that will eliminate hazards to aircraft and to people on the ground. For example, aircraft themselves become a hazard to other aircraft if allowed to park too close to an active runway. There should be adequate controls such as fencing and other facilities to keep motorists, cyclists, pedestrians, and animals from inadvertently wandering onto the landing area or areas designated for aircraft maneuvering. Frequently local air traffic patterns are needed to establish uniform and orderly approaches and departures from the airport. As in the operation of any public service facil-

ity, there should be adequate rules covering vehicular traffic, sanitation, security, crowd control, access to certain areas and fire protection. The fueling of aircraft, storing of hazardous materials, spray painting, etc., at a public airport should be controlled by the airport owner in the interests of protecting the public.

**c. Operations in Inclement Weather.** The obligation to maintain the airport does not impose any specific responsibility to remove snow or slush, or to provide sanding of icy pavements. The owner is responsible for providing a safe, usable facility, and where climatic conditions render airport unsafe, the owner will promptly notify airman by proper notices and, if necessary, to close all or a part of the airport until the conditions are corrected. However, the conditions should be corrected within a reasonable amount of time.

**d. Aircraft Rescue and Firefighting Responsibility.** The agreements under which airports are acquired or developed with Federal assistance do not specifically impose a responsibility to provide rescue or firefighting capabilities. Beginning in 1988 aircraft rescue and firefighting (ARFF) equipment became eligible under AIP for airports being served by air carriers using aircraft designed for more than 20 passenger seats and not certificated under FAR Part 139. Such an airport owner acquiring ARFF equipment under AIP must assure that it will maintain sufficiently trained personnel to operate the equipment; have the equipment available during scheduled operations of the air carrier; and to notify the air carriers using the airport when the equipment is not available due to being out of service for maintenance or repair.

**e. Part-Time Operation of Airport Lighting.**

(1) As noted in subparagraph 4–7a above, field lights must be operated whenever needed. This means that the lights must be on during the hours of darkness (dusk to dawn) every night, or be available for use upon demand. One effective arrangement is an attendant with authority and capability to turn on the proper lights when requested to do so by the radio or other signal. An acceptable alternative is the installation of an electronic device which permits remote activation of field lighting by radio equipment in an aircraft. (See AC 150/5340-14, Economy Approach Lighting Aids, and AC 150/5340-27, Air to Ground Radio Control of Airport Lighting Systems.)

(2) At some locations it may not be necessary to operate the lights all night. This might occur where the aeronautical demand is seasonal, or where it ceases after a certain hour each night because the airport's off airway location is not likely to be needed for emergency use. In very rare cases it may be undesirable to

permit use of an airport during certain hours of darkness. An example might be where air traffic control is suspended during some part of the night and the local environment (such as obstructions or heavy enroute traffic) makes use of the airport hazardous during that period. Under such circumstance FAA may consent to a part–time operation of field lights.

**4–8. RESTRICTIONS ON AERONAUTICAL USE OF AIRPORT.**

**a. Safety and Efficiency.**

(1) While the airport owner must allow its use by all types, kinds, and classes of aeronautical activity as well as by the general public (passengers, visitors, etc.), the obligation agreements do provide for exceptions as discussed in this paragraph. When complaints are filed with FAA regarding restrictions imposed by the airport owner in the interest of safety and/or efficiency, assistance of the appropriate local Flight Standards and Air Traffic representatives should be obtained in determining the reasonableness of the restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

(2) In the interest of safety, the airport owner may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public. This allows the imposition of reasonable rules or regulations (see paragraph 4–7b) to restrict use of the airport. For example, they may prohibit aircraft not equipped with a reasonable minimum of communications equipment from using the airport. They may restrict or deny use of the airport for student training, for taking off with towed objects, or for some other purpose deemed to be incompatible with safety under the local conditions peculiar to that airport. Agricultural operations may be excluded due to conflict with other types of operations or lack of facilities to safely handle the pesticides used in this specialized operation. (The regional enforcement office of the Environmental Protection Agency (EPA) should be contacted in cases pesticide use and control problems.) Also, designated runways, taxiways, and other paved areas may be restricted to aircraft of a specified maximum gross weight or wheel loading. Likewise, use of airport facilities by the general public may be restricted by vehicular, security, and crowd control regulations. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the

airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

**b. Parachute Jumping.** Parachute jumping is an aeronautical use and requests to airport owners from parachute jumping clubs, organizations, or individuals to establish a drop zone within the boundaries of an airport should be evaluated on the same basis as other aeronautical uses of the airport. Any restriction, limitation, or ban against parachute jumping on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit an aeronautical use "for the safe operation of the airport or when necessary to serve the civil aviation needs of the public" (see paragraph 4–8a). Among the reasonable limitations on parachute jumping that an airport owner might require are:

    (1) The airport owner designate reasonable time periods for jumping and specific areas for drop zones.

    (2) Jumpers (or requesting organization) agree to pay a reasonable fee that is not unjustly discriminatory.

    (3) Jumpers hold a general liability insurance policy that names the airport owner as an additional ensured party, with the amount of insurance to be reasonable and not unjustly discriminatory. The airport owner is not required to permit this activity if, in his judgment, it creates a safety hazard to the normal operations of aircraft arriving or departing from the airport, nor is the airport owner required to close the airport to provide a safe environment for the parachute jumpers. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

**c. Ultralight Vehicles.** Ultralight vehicle operations are considered an aeronautical activity (FAR Part 103) and, as such, must be normally accommodated on airports which have been developed with Federal assistance. This doesn't necessarily mean that they must be operated on conventional runways if ultralight operations can be safely accomplished at a designated

ultralight operations area on the airport. An airport operator may make the determination that proposed ultralight operations are unsafe and not allow them to conduct flight operations on the airport. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

Another obligation of the airport operator is to ensure that users of the airport contribute a fair share towards the operation of the airport. The operator of an obligated airport should impose a fee for the use of airport facilities by ultralight vehicle operators. This is consistent with FAA policy provided the charges and fees are not discriminatory.

**d. Congestion.** Where the volume of air traffic is approaching or exceeding the maximum practical capacity of an airport, an airport owner may designate a certain airport in a multiple airport system (under the same ownership and serving the same community) for use by a particular class or classes of aircraft. The owner must be in a position to assure that all classes of aeronautical needs can be fully accommodated within the system of airports under the owner's control and without unreasonable penalties to any class and that the restriction is fully supportable as being beneficial to overall aviation system capacity. For example, a reliever general aviation airport in a community where the same airport sponsor owns and operates another full–service airport could restrict regularly scheduled air carrier services from the general aviation reliever airport. This might be justifiable as a means of ensuring the reliever airport's attractiveness as a general aviation facility.

However, in no case may an airport receiving air carrier service use this concept to support a total ban or prohibition on general aviation access to primary air carrier airport(s). The right for general aviation access at an air carrier airport is a long established interpretation of the assurance relating to the prohibition against discrimination of classes or types of aeronautical activities.

Any application of this specific provision should be coordinated with the Assistant Chief Counsel in the region for applicability, given a specific case under review.

Additionally, an airport does have the right to designate certain runways or other aviation use areas at the

Order 5190.6A

10/2/89

airport to a particular class or classes of aircraft as a means of enhancing airport capacity or ensuring safety. Any such restrictions should be clearly supportable based on operational considerations and not instituted as a means of deliberately discriminating against a particular class.

**e.   Temporary Closing of an Airport.**

(1)   **Closing for Hazardous Conditions.** Airport owners are required to physically mark any temporary hazardous conditions and to adequately warn users through the use of NOTAMS. This implies a duty to provide similar warning notices when an airport is completely closed to air traffic as a result of temporary field conditions that make use of the airport hazardous. The basic obligation requires that prompt action be taken to restore the airport facilities to a serviceable condition as soon as possible.

(2)   **Closing for Special Events.** Section 511 (a) (3) of the AAIA requires that any proposal to temporarily close the airport for nonaeronautical purposes must be approved by the FAA. For example, an airport developed or improved with Federal funds may not be closed for the purpose of using the airport facilities for special outdoor events, such as sports car races, county fairs, parades, etc., without FAA approval. However, in certain circumstances where promoting aviation awareness through such activities as model airplane flying, etc., the FAA does support the limited use of airport facilities so long as there is not total closure of the airport. In these cases safeguards need to be established to protect the aeronautical use of the airport while the nonaeronautical activities are in progress. There will be occasions when airports may be closed for brief periods of time for aeronautical purposes. Examples are: an air show designed to promote a particular segment of aviation; to celebrate an official occasion held in connection with an aviation activity such as exhibits; or annual fly–ins and aviation conventions. In such cases, airport management should be encouraged to limit the period the airport will be closed to the minimum time consistent with the activity. Such closing should be well publicized in advance including issuance of NOTAM to minimize any inconvenience to the flying public.

(3)   **Closing of a Part of an Airport.** In some instances, reasons may be presented to justify the temporary use of a part of an airport for an unusual event of local significance which does not involve closing the entire airport. In such cases, all the following conditions must be met:

(a)   The event is to be held in an area of the airport which is not required for the normal operation of aircraft and where the event would not interfere

with the airport's normal use; or in a limited operational area of an airport having a relatively small traffic volume and where it has been determined that the event can be conducted in the area without interference with aeronautical use of the airport.

(b)   Adequate facilities for the landing and takeoff of aircraft will remain open to air traffic and satisfactory arrangements are made by the owner to ensure the safe use of the facilities remaining open.

(c)   Proper NOTAMS are issued in advance.

(d)   Necessary steps are taken by the airport owner to ensure the proper marking of the portion of the airport to be temporarily closed to aeronautical use.

(e)   The airport owner notifies in advance the appropriate Flight Standards office and any air carrier using the airport.

(f)   The airport owner agrees to remove all markings and repair all damage, if any, within 24 hours after the termination of the event, or issues such additional NOTAMS as may be appropriate.

(g)   The airport owner coordinates beforehand the special activities planned for the event with local users of the airport and with the Department of Defense (DOD) if there are any military activities at the airport.

(h)   No obstructions determined by FAA to be hazards, such as roads, timing poles, or barricades, will be constructed for the remaining operational area of the airport.

**f.   Noise and Environmental Restrictions.** Proposed airport use restrictions are becoming more common as airports respond to community concern over environmental issues and noise problems. Airport owners often propose such restrictions as a means of reducing noise impacts when they are considering alternatives to improve compatibility. This is generally done as part of an FAR Part 150, Airport Noise Compatibility Program study, or in some cases as part of an environmental impact assessment report.

Airport use restrictions: (1) must be reasonably consistent with reducing noncompatibility of land uses around the airport; (2) must not create an undue burden on interstate or foreign commerce; (3) must not be unjustly discriminatory; (4) must not derogate safety or adversely affect the safe and efficient use of airspace; (5) meet both local needs and the needs of the national air transportation system to the extent practicable; and (6) must not adversely affect any other powers or responsibilities of the FAA Administrator prescribed by the law or any other program established in accordance with the law.

Proposed Part 150 airport use restrictions will be reviewed by FAA in Washington for consistency with Federal agreements. Where there is a potential for inconsistency with a Federal agreement, the Community and Environmental Needs Division, APP–600, will coordinate the proposed restriction with AAS–300 for input. A determination on compatibility with Federal agreements will be made by AAS–300 and the Chief Counsel's office.

The airport operator is expected to analyze fully in a Part 150 program the anticipated burden on commerce of a proposed airport use restriction. FAA will make the determination on whether the burden is undue. Similar restrictions may have little impact at one airport and a great deal of impact at others, such as occurs when a restriction adversely affects airport capacity and/or excludes or limits certain users from the airport. The magnitude of both impacts must be clearly presented. An airport owner for certain justifiable envi-

ronmental reasons may designate a certain airport in a multiple airport system under the same ownership and serving the same community for use by a particular class or classes of aircraft. The same concepts as discussed in subparagraph 4–8d will apply. If this is being contemplated, it must be considered on a case-by-case basis in coordination with APP–600 and AAS–300.

If Airports offices are confronted with a proposed environmental or noise restriction outside of the FAR Part 150 process where those restrictions have the potential to be contrary to a Federal agreement, the proposed restriction must be fully reviewed to determine its compatibility with Federal agreements. If there is any concern about potential incompatibility, coordination with AAS–300 and APP–600 is necessary.

An airport owner subject to Federal agreements cannot simply use environmental or noise reasons as a means not to comply with specific Federal grant agreements.

## SECTION 3.   APPROACH PROTECTION AND COMPATIBLE LAND USE

**4–9.   PROTECTION OF APPROACHES.**

   **a.   Obstructions/Airport Hazard.**   The airports developed by or improved with Federal funds are obligated to prevent the growth or establishment of obstructions in the aerial approaches to the airport. The term "obstruction" refers to natural or man made objects which actually penetrate that surfaces defined in FAR Part 77, Objects Affecting Navigable Airspace, or other appropriate citation applicable to the agreement as applied to the particular airport. In agreements issued prior to December 31, 1987, airport owners agreed that insofar as it is within their power and reasonably possible, to prevent the construction, erection, alteration or growth of an obstruction. This was to be done either by obtaining the control of the land involved through the acquisition and retention of easements or other land interests or by the adoption and the enforcement of zoning regulations. Effective with the Airport and Airway Safety and Capacity Expansion Act of 1987 (P. L. 100–223) the standard approach protection assurance was changed to read:

      "It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removal, lowering, relocating, marking, or lighting or otherwise mitigation of existing airport hazards and by preventing the establishing or creation of future airport hazards." (See Appendix 5 for "Airport Hazard.")

The airspace allocated will vary from airport to airport. The Regional Air Traffic, Airspace and Procedures Branch, should be contacted for guidance on application of this provision when an issue is raised.

   **b.   Preexisting Obstructions.**

      **(1)**   Historically, some airports were developed at locations where preexisting structures or natural terrain (for example, hill tops) would constitute an obstruction by currently applicable standards. If such obstructions were not required to be removed as a condition for a grant agreement, the execution of the agreement by the Government constitutes a recognition that the removal was not reasonably within the power of the sponsor.

      **(2)**   Also, there are many former military airports that were acquired as public airports under the Surplus Property Act, where the existence of obstructions at the time of development was considered acceptable. At such airports where obstructions in the approach cannot feasibly be removed, relocated, or lowered, and where FAA has determined them to be a hazard, consideration may be given to the displacement or relocation of the threshold.

   **c.   Zoning Ordinances.**   One method of meeting the obligation to protect airport approaches involves appropriate height restriction zoning. Any airport owner who has the authority to adopt an ordinance restricting the height of structures in the ap-

49 U.S.C. § 47107

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

# TITLE 49 - TRANSPORTATION
## SUBTITLE VII - AVIATION PROGRAMS
### PART B - AIRPORT DEVELOPMENT AND NOISE
#### CHAPTER 471 - AIRPORT DEVELOPMENT
##### SUBCHAPTER I - AIRPORT IMPROVEMENT

## § 47107. Project grant application approval conditioned on assurances about airport operations

(a)  **General Written Assurances.—**  The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that—

(1)  the airport will be available for public use on reasonable conditions and without unjust discrimination;

(2)  air carriers making similar use of the airport will be subject to substantially comparable charges—

(A)  for facilities directly and substantially related to providing air transportation; and

(B)  regulations and conditions, except for differences based on reasonable classifications, such as between—

(i)  tenants and nontenants; and

(ii)  signatory and nonsignatory carriers;

(3)  the airport operator will not withhold unreasonably the classification or status of tenant or signatory from an air carrier that assumes obligations substantially similar to those already imposed on air carriers of that classification or status;

(4)  a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport, with a right given to only one fixed-base operator to provide services at an airport deemed not to be an exclusive right if—

(A)  the right would be unreasonably costly, burdensome, or impractical for more than one fixed-base operator to provide the services; and

(B)  allowing more than one fixed-base operator to provide the services would require reducing the space leased under an existing agreement between the one fixed-base operator and the airport owner or operator;

(5)  fixed-base operators similarly using the airport will be subject to the same charges;

(6)  an air carrier using the airport may service itself or use any fixed-base operator allowed by the airport operator to service any carrier at the airport;

(7)  the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions;

(8)  a proposal to close the airport temporarily for a nonaeronautical purpose must first be approved by the Secretary;

(9)  appropriate action will be taken to ensure that terminal airspace required to protect instrument and visual operations to the airport (including operations at established minimum flight altitudes) will be cleared and protected by mitigating existing, and preventing future, airport hazards;

(10)  appropriate action, including the adoption of zoning laws, has been or will be taken to the extent reasonable to restrict the use of land next to or near the airport to uses that are compatible with normal airport operations;

(11)  each of the airport's facilities developed with financial assistance from the United States Government and each of the airport's facilities usable for the landing and taking off of aircraft always will be available without charge for use by Government aircraft in common with other

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

aircraft, except that if the use is substantial, the Government may be charged a reasonable share, proportionate to the use, of the cost of operating and maintaining the facility used;

**(12)** the airport owner or operator will provide, without charge to the Government, property interests of the sponsor in land or water areas or buildings that the Secretary decides are desirable for, and that will be used for, constructing at Government expense, facilities for carrying out activities related to air traffic control or navigation;

**(13)** the airport owner or operator will maintain a schedule of charges for use of facilities and services at the airport—

　　**(A)** that will make the airport as self-sustaining as possible under the circumstances existing at the airport, including volume of traffic and economy of collection; and

　　**(B)** without including in the rate base used for the charges the Government's share of costs for any project for which a grant is made under this subchapter or was made under the Federal Airport Act or the Airport and Airway Development Act of 1970;

**(14)** the project accounts and records will be kept using a standard system of accounting that the Secretary, after consulting with appropriate public agencies, prescribes;

**(15)** the airport owner or operator will submit any annual or special airport financial and operations reports to the Secretary that the Secretary reasonably requests and make such reports available to the public;

**(16)** the airport owner or operator will maintain a current layout plan of the airport that meets the following requirements:

　　**(A)** the plan will be in a form the Secretary prescribes;

　　**(B)** the Secretary will approve the plan and any revision or modification before the plan, revision, or modification takes effect;

　　**(C)** the owner or operator will not make or allow any alteration in the airport or any of its facilities if the alteration does not comply with the plan the Secretary approves, and the Secretary is of the opinion that the alteration may affect adversely the safety, utility, or efficiency of the airport; and

　　**(D)** when an alteration in the airport or its facility is made that does not conform to the approved plan and that the Secretary decides adversely affects the safety, utility, or efficiency of any property on or off the airport that is owned, leased, or financed by the Government, the owner or operator, if requested by the Secretary, will—

　　　　**(i)** eliminate the adverse effect in a way the Secretary approves; or

　　　　**(ii)** bear all cost of relocating the property or its replacement to a site acceptable to the Secretary and of restoring the property or its replacement to the level of safety, utility, efficiency, and cost of operation that existed before the alteration was made;

**(17)** each contract and subcontract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, and related services will be awarded in the same way that a contract for architectural and engineering services is negotiated under chapter 11 of title 40 or an equivalent qualifications-based requirement prescribed for or by the sponsor;

**(18)** the airport and each airport record will be available for inspection by the Secretary on reasonable request, and a report of the airport budget will be available to the public at reasonable times and places;

**(19)** the airport owner or operator will submit to the Secretary and make available to the public an annual report listing in detail—

　　**(A)** all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and

　　**(B)** all services and property provided to other units of government and the amount of compensation received for provision of each such service and property;

**49 USC 47107**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(20)** the airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport, but the sponsor does not have any obligation under this paragraph, or because of it, to fund special facilities for intercity bus service or for other modes of transportation; and

**(21)** if the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long-term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

**(b)  Written Assurances on Use of Revenue.—**

**(1)**  The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that local taxes on aviation fuel (except taxes in effect on December 30, 1987) and the revenues generated by a public airport will be expended for the capital or operating costs of—

>  **(A)**  the airport;

>  **(B)**  the local airport system; or

>  **(C)**  other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property.

**(2)**  Paragraph (1) of this subsection does not apply if a provision enacted not later than September 2, 1982, in a law controlling financing by the airport owner or operator, or a covenant or assurance in a debt obligation issued not later than September 2, 1982, by the owner or operator, provides that the revenues, including local taxes on aviation fuel at public airports, from any of the facilities of the owner or operator, including the airport, be used to support not only the airport but also the general debt obligations or other facilities of the owner or operator.

**(3)**  This subsection does not prevent the use of a State tax on aviation fuel to support a State aviation program or the use of airport revenue on or off the airport for a noise mitigation purpose.

**(c)  Written Assurances on Acquiring Land.—**

**(1)**  In this subsection, land is needed for an airport purpose (except a noise compatibility purpose) if—

>  **(A)**
>
>>  **(i)**  the land may be needed for an aeronautical purpose (including runway protection zone) or serves as noise buffer land; and
>
>>  **(ii)**  revenue from interim uses of the land contributes to the financial self-sufficiency of the airport; and

>  **(B)**  for land purchased with a grant the owner or operator received not later than December 30, 1987, the Secretary of Transportation or the department, agency, or instrumentality of the Government that made the grant was notified by the owner or operator of the use of the land and did not object to the use and the land is still being used for that purpose.

**(2)**  The Secretary of Transportation may approve an application under this subchapter for an airport development project grant only if the Secretary receives written assurances, satisfactory to the Secretary, that if an airport owner or operator has received or will receive a grant for acquiring land and—

>  **(A)**  if the land was or will be acquired for a noise compatibility purpose—
>
>>  **(i)**  the owner or operator will dispose of the land at fair market value at the earliest practicable time after the land no longer is needed for a noise compatibility purpose;
>
>>  **(ii)**  the disposition will be subject to retaining or reserving an interest in the land necessary to ensure that the land will be used in a way that is compatible with noise levels associated with operating the airport; and
>
>>  **(iii)**  the part of the proceeds from disposing of the land that is proportional to the Government's share of the cost of acquiring the land will be paid to the Secretary

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

for deposit in the Airport and Airway Trust Fund established under section 9502 of the Internal Revenue Code of 1986 (26 U.S.C. 9502) or, as the Secretary prescribes, reinvested in an approved noise compatibility project, including the purchase of nonresidential buildings or property in the vicinity of residential buildings or property previously purchased by the airport as part of a noise compatibility program; or

**(B)** if the land was or will be acquired for an airport purpose (except a noise compatibility purpose)—

**(i)** the owner or operator, when the land no longer is needed for an airport purpose, will dispose of the land at fair market value or make available to the Secretary an amount equal to the Government's proportional share of the fair market value;

**(ii)** the disposition will be subject to retaining or reserving an interest in the land necessary to ensure that the land will be used in a way that is compatible with noise levels associated with operating the airport; and

**(iii)** the part of the proceeds from disposing of the land that is proportional to the Government's share of the cost of acquiring the land will be reinvested, on application to the Secretary, in another eligible airport development project the Secretary approves under this subchapter or paid to the Secretary for deposit in the Fund if another eligible project does not exist.

**(3)** Proceeds referred to in paragraph (2)(A)(iii) and (B)(iii) of this subsection and deposited in the Airport and Airway Trust Fund are available as provided in subsection (f) of this section.

**(d) Assurances of Continuation as Public-Use Airport.—** The Secretary of Transportation may approve an application under this subchapter for an airport development project grant for a privately owned public-use airport only if the Secretary receives appropriate assurances that the airport will continue to function as a public-use airport during the economic life (that must be at least 10 years) of any facility at the airport that was developed with Government financial assistance under this subchapter.

**(e) Written Assurances of Opportunities for Small Business Concerns.—**

**(1)** The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that the airport owner or operator will take necessary action to ensure, to the maximum extent practicable, that at least 10 percent of all businesses at the airport selling consumer products or providing consumer services to the public are small business concerns (as defined by regulations of the Secretary) owned and controlled by a socially and economically disadvantaged individual (as defined in section 47113 (a) of this title) or qualified HUBZone small business concerns (as defined in section 3(p) of the Small Business Act).

**(2)** An airport owner or operator may meet the percentage goal of paragraph (1) of this subsection by including any business operated through a management contract or subcontract. The dollar amount of a management contract or subcontract with a disadvantaged business enterprise shall be added to the total participation by disadvantaged business enterprises in airport concessions and to the base from which the airport's percentage goal is calculated. The dollar amount of a management contract or subcontract with a non-disadvantaged business enterprise and the gross revenue of business activities to which the management contract or subcontract pertains may not be added to this base.

**(3)** Except as provided in paragraph (4) of this subsection, an airport owner or operator may meet the percentage goal of paragraph (1) of this subsection by including the purchase from disadvantaged business enterprises of goods and services used in businesses conducted at the airport, but the owner or operator and the businesses conducted at the airport shall make good faith efforts to explore all available options to achieve, to the maximum extent practicable, compliance with the goal through direct ownership arrangements, including joint ventures and franchises.

**(4)**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(A)** In complying with paragraph (1) of this subsection, an airport owner or operator shall include the revenues of car rental firms at the airport in the base from which the percentage goal in paragraph (1) is calculated.

**(B)** An airport owner or operator may require a car rental firm to meet a requirement under paragraph (1) of this subsection by purchasing or leasing goods or services from a disadvantaged business enterprise. If an owner or operator requires such a purchase or lease, a car rental firm shall be permitted to meet the requirement by including purchases or leases of vehicles from any vendor that qualifies as a small business concern owned and controlled by a socially and economically disadvantaged individual or as a qualified HUBZone small business concern (as defined in section 3(p) of the Small Business Act).

**(C)** This subsection does not require a car rental firm to change its corporate structure to provide for direct ownership arrangements to meet the requirements of this subsection.

**(5)** This subsection does not preempt—

**(A)** a State or local law, regulation, or policy enacted by the governing body of an airport owner or operator; or

**(B)** the authority of a State or local government or airport owner or operator to adopt or enforce a law, regulation, or policy related to disadvantaged business enterprises.

**(6)** An airport owner or operator may provide opportunities for a small business concern owned and controlled by a socially and economically disadvantaged individual or a qualified HUBZone small business concern (as defined in section 3(p) of the Small Business Act) to participate through direct contractual agreement with that concern.

**(7)** An air carrier that provides passenger or property-carrying services or another business that conducts aeronautical activities at an airport may not be included in the percentage goal of paragraph (1) of this subsection for participation of small business concerns at the airport.

**(8)** Not later than April 29, 1993, the Secretary of Transportation shall prescribe regulations to carry out this subsection.

**(f)  Availability of Amounts.—**  An amount deposited in the Airport and Airway Trust Fund under—

**(1)** subsection (c)(2)(A)(iii) of this section is available to the Secretary of Transportation to make a grant for airport development or airport planning under section 47104 of this title;

**(2)** subsection (c)(2)(B)(iii) of this section is available to the Secretary—

**(A)** to make a grant for a purpose described in section 47115 (b) of this title; and

**(B)** for use under section 47114 (d)(2) of this title at another airport in the State in which the land was disposed of under subsection (c)(2)(B)(ii) of this section; and

**(3)** subsection (c)(2)(B)(iii) of this section is in addition to an amount made available to the Secretary under section 48103 of this title and not subject to apportionment under section 47114 of this title.

**(g)  Ensuring Compliance.—**

**(1)** To ensure compliance with this section, the Secretary of Transportation—

**(A)** shall prescribe requirements for sponsors that the Secretary considers necessary; and

**(B)** may make a contract with a public agency.

**(2)** The Secretary of Transportation may approve an application for a project grant only if the Secretary is satisfied that the requirements prescribed under paragraph (1)(A) of this subsection have been or will be met.

**(h)  Modifying Assurances and Requiring Compliance With Additional Assurances.—**

**(1)  In general.—**  Subject to paragraph (2), before modifying an assurance required of a person receiving a grant under this subchapter and in effect after December 29, 1987, or to require compliance with an additional assurance from the person, the Secretary of Transportation must—

**(A)** publish notice of the proposed modification in the Federal Register; and

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

(B) provide an opportunity for comment on the proposal.

(2) **Public notice before waiver of aeronautical land-use assurance.—** Before modifying an assurance under subsection (c)(2)(B) that requires any property to be used for an aeronautical purpose, the Secretary must provide notice to the public not less than 30 days before making such modification.

(i) **Relief From Obligation To Provide Free Space.—** When a sponsor provides a property interest in a land or water area or a building that the Secretary of Transportation uses to construct a facility at Government expense, the Secretary may relieve the sponsor from an obligation in a contract made under this chapter, the Airport and Airway Development Act of 1970, or the Federal Airport Act to provide free space to the Government in an airport building, to the extent the Secretary finds that the free space no longer is needed to carry out activities related to air traffic control or navigation.

(j) **Use of Revenue in Hawaii.—**

(1) In this subsection—

(A) "duty-free merchandise" and "duty-free sales enterprise" have the same meanings given those terms in section 555(b)(8) of the Tariff Act of 1930 (19 U.S.C. 1555 (b)(8)).

(B) "highway" and "Federal-aid system" have the same meanings given those terms in section 101 (a) of title 23.

(2) Notwithstanding subsection (b)(1) of this section, Hawaii may use, for a project for construction or reconstruction of a highway on a Federal-aid system that is not more than 10 miles by road from an airport and that will facilitate access to the airport, revenue from the sales at off-airport locations in Hawaii of duty-free merchandise under a contract between Hawaii and a duty-free sales enterprise. However, the revenue resulting during a Hawaiian fiscal year may be used only if the amount of the revenue, plus amounts Hawaii receives in the fiscal year from all other sources for costs Hawaii incurs for operating all airports it operates and for debt service related to capital projects for the airports (including interest and amortization of principal costs), is more than 150 percent of the projected costs for the fiscal year.

(3) (A) Revenue from sales referred to in paragraph (2) of this subsection in a Hawaiian fiscal year that Hawaii may use may not be more than the amount that is greater than 150 percent as determined under paragraph (2).

(B) The maximum amount of revenue Hawaii may use under paragraph (2) of this subsection is $250,000,000.

(4) If a fee imposed or collected for rent, landing, or service from an aircraft operator by an airport operated by Hawaii is increased during the period from May 4, 1990, through December 31, 1994, by more than the percentage change in the Consumer Price Index of All Urban Consumers for Honolulu, Hawaii, that the Secretary of Labor publishes during that period and if revenue derived from the fee increases because the fee increased, the amount under paragraph (3)(B) of this subsection shall be reduced by the amount of the projected revenue increase in the period less the part of the increase attributable to changes in the Index in the period.

(5) Hawaii shall determine costs, revenue, and projected revenue increases referred to in this subsection and shall submit the determinations to the Secretary of Transportation. A determination is approved unless the Secretary disapproves it not later than 30 days after it is submitted.

(6) Hawaii is not eligible for a grant under section 47115 of this title in a fiscal year in which Hawaii uses under paragraph (2) of this subsection revenue from sales referred to in paragraph (2). Hawaii shall repay amounts it receives in a fiscal year under a grant it is not eligible to receive because of this paragraph to the Secretary of Transportation for deposit in the discretionary fund established under section 47115.

(7) (A) This subsection applies only to revenue from sales referred to in paragraph (2) of this subsection from May 5, 1990, through December 30, 1994, and to amounts in the Airport

**49 USC 47107**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Revenue Fund of Hawaii that are attributable to revenue before May 4, 1990, on sales referred to in paragraph (2).

**(B)** Revenue from sales referred to in paragraph (2) of this subsection from May 5, 1990, through December 30, 1994, may be used under paragraph (2) in any Hawaiian fiscal year, including a Hawaiian fiscal year beginning after December 31, 1994.

**(k)  Annual Summaries of Financial Reports.—** The Secretary shall provide to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives an annual summary of the reports submitted to the Secretary under subsection (a)(19) of this section and under section 111(b) of the Federal Aviation Administration Authorization Act of 1994.

**(l)  Policies and Procedures To Ensure Enforcement Against Illegal Diversion of Airport Revenue.—**

**(1)  In general.—** Not later than 90 days after August 23, 1994, the Secretary of Transportation shall establish policies and procedures that will assure the prompt and effective enforcement of subsections (a)(13) and (b) of this section and grant assurances made under such subsections. Such policies and procedures shall recognize the exemption provision in subsection (b)(2) of this section and shall respond to the information contained in the reports of the Inspector General of the Department of Transportation on airport revenue diversion and such other relevant information as the Secretary may by law consider.

**(2)  Revenue diversion.—** Policies and procedures to be established pursuant to paragraph (1) of this subsection shall prohibit, at a minimum, the diversion of airport revenues (except as authorized under subsection (b) of this section) through—

**(A)** direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport;

**(B)** use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems;

**(C)** payments in lieu of taxes or other assessments that exceed the value of services provided; or

**(D)** payments to compensate nonsponsoring governmental bodies for lost tax revenues exceeding stated tax rates.

**(3)  Efforts to be self-sustaining.—** With respect to subsection (a)(13) of this section, policies and procedures to be established pursuant to paragraph (1) of this subsection shall take into account, at a minimum, whether owners and operators of airports, when entering into new or revised agreements or otherwise establishing rates, charges, and fees, have undertaken reasonable efforts to make their particular airports as self-sustaining as possible under the circumstances existing at such airports.

**(4)  Administrative safeguards.—** Policies and procedures to be established pursuant to paragraph (1) shall mandate internal controls, auditing requirements, and increased levels of Department of Transportation personnel sufficient to respond fully and promptly to complaints received regarding possible violations of subsections (a)(13) and (b) of this section and grant assurances made under such subsections and to alert the Secretary to such possible violations.

**(5)  Statute of limitations.—** In addition to the statute of limitations specified in subsection (n)(7), with respect to project grants made under this chapter—

**(A)** any request by a sponsor or any other governmental entity to any airport for additional payments for services conducted off of the airport or for reimbursement for capital contributions or operating expenses shall be filed not later than 6 years after the date on which the expense is incurred; and

**49 USC 47107**

**(B)** any amount of airport funds that are used to make a payment or reimbursement as described in subparagraph (A) after the date specified in that subparagraph shall be considered to be an illegal diversion of airport revenues that is subject to subsection (n).

**(m)   Audit Certification.—**

**(1)   In general.—**  The Secretary of Transportation, acting through the Administrator of the Federal Aviation Administration, shall include a provision in the compliance supplement provisions to require a recipient of a project grant (or any other recipient of Federal financial assistance that is provided for an airport) to include as part of an annual audit conducted under sections 7501 through 7505 of title 31, a review concerning the funding activities with respect to an airport that is the subject of the project grant (or other Federal financial assistance) and the sponsors, owners, or operators (or other recipients) involved.

**(2)   Content of review.—**  A review conducted under paragraph (1) shall provide reasonable assurances that funds paid or transferred to sponsors are paid or transferred in a manner consistent with the applicable requirements of this chapter and any other applicable provision of law (including regulations promulgated by the Secretary or the Administrator).

**(n)   Recovery of Illegally Diverted Funds.—**

**(1)   In general.—**  Not later than 180 days after the issuance of an audit or any other report that identifies an illegal diversion of airport revenues (as determined under subsections (b) and (l) and section 47133), the Secretary, acting through the Administrator, shall—

**(A)**   review the audit or report;

**(B)**   perform appropriate factfinding; and

**(C)**   conduct a hearing and render a final determination concerning whether the illegal diversion of airport revenues asserted in the audit or report occurred.

**(2)   Notification.—**  Upon making such a finding, the Secretary, acting through the Administrator, shall provide written notification to the sponsor and the airport of—

**(A)**   the finding; and

**(B)**   the obligations of the sponsor to reimburse the airport involved under this paragraph.

**(3)   Administrative action.—**  The Secretary may withhold any amount from funds that would otherwise be made available to the sponsor, including funds that would otherwise be made available to a State, municipality, or political subdivision thereof (including any multimodal transportation agency or transit authority of which the sponsor is a member entity) as part of an apportionment or grant made available pursuant to this title, if the sponsor—

**(A)**   receives notification that the sponsor is required to reimburse an airport; and

**(B)**   has had an opportunity to reimburse the airport, but has failed to do so.

**(4)   Civil action.—**  If a sponsor fails to pay an amount specified under paragraph (3) during the 180-day period beginning on the date of notification and the Secretary is unable to withhold a sufficient amount under paragraph (3), the Secretary, acting through the Administrator, may initiate a civil action under which the sponsor shall be liable for civil penalty in an amount equal to the illegal diversion in question plus interest (as determined under subsection (o)).

**(5)   Disposition of penalties.—**

**(A)   Amounts withheld.—**  The Secretary or the Administrator shall transfer any amounts withheld under paragraph (3) to the Airport and Airway Trust Fund.

**(B)   Civil penalties.—**  With respect to any amount collected by a court in a civil action under paragraph (4), the court shall cause to be transferred to the Airport and Airway Trust Fund any amount collected as a civil penalty under paragraph (4).

**(6)   Reimbursement.—**  The Secretary, acting through the Administrator, shall, as soon as practicable after any amount is collected from a sponsor under paragraph (4), cause to be transferred from the Airport and Airway Trust Fund to an airport affected by a diversion that is the subject

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

of a civil action under paragraph (4), reimbursement in an amount equal to the amount that has been collected from the sponsor under paragraph (4) (including any amount of interest calculated under subsection (o)).

**(7)  Statute of limitations.—**  No person may bring an action for the recovery of funds illegally diverted in violation of this section (as determined under subsections (b) and (l)) or section 47133 after the date that is 6 years after the date on which the diversion occurred.

**(o)  Interest.—**

**(1)  In general.—**  Except as provided in paragraph (2), the Secretary, acting through the Administrator, shall charge a minimum annual rate of interest on the amount of any illegal diversion of revenues referred to in subsection (n) in an amount equal to the average investment interest rate for tax and loan accounts of the Department of the Treasury (as determined by the Secretary of the Treasury) for the applicable calendar year, rounded to the nearest whole percentage point.

**(2)  Adjustment of interest rates.—**  If, with respect to a calendar quarter, the average investment interest rate for tax and loan accounts of the Department of the Treasury exceeds the average investment interest rate for the immediately preceding calendar quarter, rounded to the nearest whole percentage point, the Secretary of the Treasury may adjust the interest rate charged under this subsection in a manner that reflects that change.

**(3)  Accrual.—**  Interest assessed under subsection (n) shall accrue from the date of the actual illegal diversion of revenues referred to in subsection (n).

**(4)  Determination of applicable rate.—**  The applicable rate of interest charged under paragraph (1) shall—

**(A)**  be the rate in effect on the date on which interest begins to accrue under paragraph (3); and

**(B)**  remain at a rate fixed under subparagraph (A) during the duration of the indebtedness.

**(p)  Payment by Airport to Sponsor.—**  If, in the course of an audit or other review conducted under this section, the Secretary or the Administrator determines that an airport owes a sponsor funds as a result of activities conducted by the sponsor or expenditures by the sponsor for the benefit of the airport, interest on that amount shall be determined in the same manner as provided in paragraphs (1) through (4) of subsection (o), except that the amount of any interest assessed under this subsection shall be determined from the date on which the Secretary or the Administrator makes that determination.

**(q)**  Notwithstanding any written assurances prescribed in subsections (a) through (p), a general aviation airport with more than 300,000 annual operations may be exempt from having to accept scheduled passenger air carrier service, provided that the following conditions are met:

**(1)**  No scheduled passenger air carrier has provided service at the airport within 5 years prior to January 1, 2002.

**(2)**  The airport is located within or underneath the Class B airspace of an airport that maintains an airport operating certificate pursuant to section 44706 of title 49.

**(3)**  The certificated airport operating under section 44706 of title 49 does not contribute to significant passenger delays as defined by DOT/FAA in the "Airport Capacity Benchmark Report 2001".

**(r)**  An airport that meets the conditions of subsections (q)(1) through (3) is not subject to section 47524 of title 49 with respect to a prohibition on all scheduled passenger service.

**(s)  Competition Disclosure Requirement.—**

**(1)  In general.—**  The Secretary of Transportation may approve an application under this subchapter for an airport development project grant for a large hub airport or a medium hub airport only if the Secretary receives assurances that the airport sponsor will provide the information required by paragraph (2) at such time and in such form as the Secretary may require.

**(2)  Competitive access.—**  On February 1 and August 1 of each year, an airport that during the previous 6-month period has been unable to accommodate one or more requests by an air carrier

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

for access to gates or other facilities at that airport in order to provide service to the airport or to expand service at the airport shall transmit a report to the Secretary that—

    **(A)** describes the requests;

    **(B)** provides an explanation as to why the requests could not be accommodated; and

    **(C)** provides a time frame within which, if any, the airport will be able to accommodate the requests.

    **(3) Sunset provision.—** This subsection shall cease to be effective beginning October 1, 2008.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1256; Pub. L. 103–305, title I, §§ 111(a), (c), 112 (a), Aug. 23, 1994, 108 Stat. 1573, 1574; Pub. L. 104–264, title I, § 143, title VIII, § 805(a), (b)(2), Oct. 9, 1996, 110 Stat. 3221, 3271, 3274; Pub. L. 104–287, § 5(9), (80), Oct. 11, 1996, 110 Stat. 3389, 3397; Pub. L. 105–135, title VI, § 604(h)(1), Dec. 2, 1997, 111 Stat. 2634; Pub. L. 106–181, title I, § 125(a), Apr. 5, 2000, 114 Stat. 75; Pub. L. 107–217, § 3(n)(7), Aug. 21, 2002, 116 Stat. 1303; Pub. L. 108–7, div. I, title III, § 321(a), Feb. 20, 2003, 117 Stat. 411; Pub. L. 108–11, title II, § 2702, Apr. 16, 2003, 117 Stat. 600; Pub. L. 108–176, title I, §§ 144, 164, 165, title IV, § 424, Dec. 12, 2003, 117 Stat. 2503, 2513, 2514, 2554.)

## Historical and Revision Notes

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47107(a) | | |
| 49 App.:2202(a)(6). | | |
| Sept. 3, 1982, Pub. L. 97–248, §§ 503(a)(6), 505(b)(2), 509(b)(1)(E), 511(a)(1)(B), (C), (2), (5)–(10), (b), 96 Stat. 673, 677, 683, 686, 687. | | |
| | 49 App.:2208(b)(1)(E) (related to 49 App.:2210(a) (1)–(11), (15), (16)). | |
| | 49 App.:2210(a)(1)(A). | |
| Sept. 3, 1982, Pub. L. 97–248, § 511(a)(1)(A), 96 Stat. 686; Dec. 30, 1987, Pub. L. 100–223, § 109(a), 101 Stat. 1499. | | |
| | 49 App.:2210(a)(1)(B), (C), (2). | |
| | 49 App.:2210(a)(3). | |
| Sept. 3, 1982, Pub. L. 97–248, § 511(a)(3), 96 Stat. 686; Dec. 30, 1987, Pub. L. 100–223, § 109(b), 101 Stat. 1499. | | |
| | 49 App.:2210(a)(4). | |
| Sept. 3, 1982, Pub. L. 97–248, § 511(a)(4), 96 Stat. 686; restated Dec. 30, 1987, Pub. L. 100–223, § 109(c), 101 Stat. 1499. | | |
| | 49 App.:2210(a) (5)–(10). | |
| | 49 App.:2210(a)(11). | |
| Sept. 3, 1982, Pub. L. 97–248, § 511(a)(11), 96 Stat. 687; Oct. 31, 1992, Pub. L. 102–581, § 113(a), 106 Stat. 4881. | | |
| | 49 App.:2210(a)(15). | |
| Sept. 3, 1982, Pub. L. 97–248, 96 Stat. 324, § 511(a)(15); added Dec. 30, 1987, Pub. L. 100–223, § 109(f), 101 Stat. 1500. | | |
| | 49 App.:2210(a)(16). | |
| Sept. 3, 1982, Pub. L. 97–248, 96 Stat. 324, § 511(a)(16); added Dec. 30, 1987, Pub. L. 100–223, § 109(g), 101 Stat. 1501. | | |
| 47107(b)(1), (2) | | |
| 49 App.:2208(b)(1)(E) (related to 49 App.:2210(a)(12)). | | |
| | 49 App.:2210(a)(12). | |
| Sept. 3, 1982, Pub. L. 97–248, § 511(a)(12), 96 Stat. 687; restated Dec. 30, 1987, Pub. L. 100–223, § 109(d), 101 Stat. 1499. | | |
| 47107(b)(3) | | |

# Policy Regarding Airport Rates and Charges

United States Department of Transportation
61 Fed. Reg. 31994 (June 21, 1996)

In 1997, the D.C. Circuit vacated certain portions of the Policy, noting

> The Secretary seems to have come up with a rule that represents an overall rough compromise between the interests of most airports and carriers. Unfortunately it is much too rough to withstand judicial review under the APA. Accordingly, we vacate the challenged provisions of the Final Policy, paragraphs 2.4, 2.4.1, 2.4.1(a), 2.5.1, 2.5.1(a), 2.5.1(b), 2.5.1(c), 2.5.1(d), 2.5.1(e), 2.5.3, 2.5.3(a), 2.6, the Secretary's supporting discussion in the preamble, and any other portions of the rule necessarily implicated by the holding of our opinion, and remand this proceeding to the Secretary.

*Air Transp. Ass'n of Am. v. DOT*, 119 F.3d 38 (D.C. Cir. 1997)

The vacated provisions are blacked out on the attached version of the policy.

# DEPARTMENT OF TRANSPORTATION

## Office of the Secretary

## Federal Aviation Administration

[Docket No. 27782]

RIN 2120–AF90

## Policy Regarding Airport Rates and Charges

**AGENCY:** Department of Transportation, Office of the Secretary and Federal Aviation Administration.

**ACTION:** Policy statement.

**SUMMARY:** This document announces Department of Transportation ("Department") policy on the fees charged by Federally-assisted airports to air carriers and other aeronautical users. The statement of policy ("Final Policy") was required by the Federal Aviation Administration Authorization Act of 1994, Public Law 103–305 (August 23, 1994). This statement of policy replaces in its entirety the statement of policy published in the Federal Register on February 3, 1995 ("Interim Policy"). This statement of policy incorporates a substantial modification in the approach of the Interim Policy to determining the reasonableness of fees for facilities other than the airfield and public use roadways. In other respects, the approaches of the two policies are similar. The Department proposed the referenced modification in a notice published in the Federal Register on September 8, 1995 ("Supplemental Proposed Policy"). The Final Policy is not significantly revised from that proposed in the September 8 notice.

**DATES:** This policy is effective June 19, 1996. This agency action is a statement of policy that relaxes restrictions imposed on airport proprietors by the Interim Policy. The Final Policy does not itself impose additional burdens on airlines and other airport users and does not require airport proprietors to impose such burdens.

**FOR FURTHER INFORMATION CONTACT:** David L. Bennett, Director, Office of Airport Safety and Standards, Federal Aviation Administration, 800 Independence Ave. SW., Washington, DC 20591, telephone (202) 267–3053; Barry L. Molar, Manager, Airports Law Branch, Office of the Chief Counsel, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591, telephone (202) 267–3473.

**SUPPLEMENTARY INFORMATION:**

Summary of Policy Statement

The Final Policy requires that fees for the use of the airfield and public-use roadways be established on the basis of costs, and it provides detailed guidance on how costs are to be determined and applied to establish fees. Airfield assets must be valued at their historic cost to the original airport proprietor ("HCA value"). The cost-of-service approach is comparable to common practice in setting fees for regulated public utilities. This approach also reflects the nearly universal practice of establishing fees for the use of the airfield at commercial service airports. Even when airfield fees are set by agreement, the agreement usually reflects a cost-of-service approach. The terms of such agreements generally govern how costs will be calculated.

In formulating the Final Policy, the Department has considered and recognized as reasonable practices that have generally been accepted by industry participants as producing reasonable results. The Final Policy does not seek to disturb those practices. In the case of the airfield and public use roadways, industry practice—HCA-based fees—is the approach supported by aeronautical users as most beneficial to them. For other facilities and services, the Final Policy adopts a different approach.

For those other aeronautical facilities, the Final Policy permits fees to be set by any reasonable method. Fees for such facilities and services are generally established through direct negotiations with individual users. In these negotiations, cost, as defined for reasonable airfield fees, is usually but one of a number of considerations affecting the fees. In the Department's experience, this negotiating process has in almost all cases produced reasonable and non-controversial results. The Department expects that these negotiations will continue to produce reasonable results in all but exceptional situations. The Department has, therefore, adopted a more flexible approach to nonairfield fees to preserve the discretion of airport proprietors and aeronautical users to negotiate the terms for using nonairfield facilities.

The Final Policy also reflects the Department's preference for direct negotiation of fee issues between airport proprietors and airport users. Accordingly, the first of the five fundamental principles listed in the Final Policy states the Department's preference for direct negotiation and resolution. In addition, most of the detailed guidance on establishment of

airfield fees need not be followed if airfield users have agreed to a different practice.

The Final Policy retains the structure of the Supplemental Proposed Policy and the Interim Policy. The Final Policy begins with a statement of applicability, and is then organized into five general principles with supporting guidance for each.

As noted above, the first principle states the Department's preference for direct local negotiation between airport proprietors and aeronautical users.

The second principle restates the legal requirement that rates, fees and charges to aeronautical users must be fair and reasonable, with more detailed guidance on the practices and restrictions that define "fair and reasonable." The detailed guidance applies for the most part to fees charged to aeronautical users for airfield facilities and public-use roadways. For other aeronautical facilities, the policy permits fees to be established using any reasonable methodology. Department oversight of these fees focuses on monitoring for progressive accumulation of surplus aeronautical revenue. For the airfield and public-use roadways, the policy incorporates, among other things, the following: flexibility to deviate from the policy guidance based on agreement with airfield users; recognition that both compensatory and residual pricing approaches are legitimate; standards for the valuation of airfield property; prescription of the kinds of costs that can be reflected in the airfield rate base; and guidance on subsidization of other airports. The Final Policy makes certain distinctions in the reasonable accommodation of air carriers versus other aeronautical users. The Final Policy does not establish standards for fees paid by nonaeronautical users or limit the amount of revenues generated by nonaeronautical fees.

The third principle restates the legal prohibition on unjustly discriminatory rates and charges. Guidance identifies some practices that are required to avoid unjust discrimination and some practices that are not considered to be unjustly discriminatory.

The fourth principle restates the legal obligation to maintain a fee and rental structure that makes the airport as self-sustaining as possible under the circumstances existing at the airport. Supplemental guidance encourages the sponsor of an airport that is not currently self-sustaining to establish long-term goals and targets to make the airport financially self-sustaining. The self-sustainability requirement must be included in each sponsor's grant assurances pursuant to statute and is

subject to enforcement by the FAA in accordance with its grant compliance procedures. However, the Department will not consider on the merits a complaint as to the reasonableness of an airport fee based solely on alleged non-compliance with the self-sustainability requirement. A complaint about compliance with the self-sustainability requirement would be considered by the FAA under its administrative complaint procedures.

The guidance under this principle provides that the Department may investigate the reasonableness of aeronautical fees in a case of progressive accumulation of surplus aeronautical revenue.

The fifth principle restates the basic legal requirements for the application and use of airport revenues. Supplemental guidance has been proposed in the Notice of Proposed Policy and Procedures Concerning the Use of Airport Revenue published at 61 FR 7134 (February 26, 1995).

Finally, the Department is willing to consider arguments that specific provisions of the policy should not apply to a particular airport fee due to unusual circumstances in the context of a proceeding to review that fee. See Los Angeles International Rates Proceeding (''LAX I''), Order 95–6–36, at 16 (June 30, 1995); Second Los Angeles International Airport Rates Proceeding (''LAX II''), Order 95–12–33, at 15 (December 22, 1995).

Background

Two federal statutes have long imposed a reasonableness requirement on the fees charged aeronautical users by airports. When an airport accepts Federal grant money for an airport improvement, it must give certain assurances, including the assurance that the airport will be available for public use on fair and reasonable terms without unjust discrimination. Section 511 of the Airports and Airways Improvement Act of 1982, (''AAIA''), recodified as 49 USC § 47107. This assurance includes an obligation to charge aeronautical users of the airport only reasonable fees. Similarly, section 113(b) of the Federal Aviation Act, the Anti-Head Tax Act, recodified as 49 USC § 40116, allows a publicly-owned airport authority to collect only reasonable landing fees and charges from airlines using airport facilities. See Northwest Airlines v. County of Kent (''Kent County''), 114 S.Ct. 855 (1994). These statutes, however, do not authorize the Department to regulate the reasonableness of fees charged non-aeronautical users.

Airport fees and revenues are subject to other legal requirements as well. Section 511 of the AAIA also bars airports, except for certain grandfathered airports, from diverting airport revenue to nonairport purposes. 49 USC § 47107(b). Section 511 also requires each airport to provide assurances that the airport will maintain a fee schedule that will make the airport as self-sustaining as possible under the circumstances existing at the airport. 49 USC § 47107(a)(13). In addition, the Chicago Convention and many of the United States' bilateral air services agreements obligate the United States to ensure that airports charge foreign airlines the same fees as the U.S. airlines that operate similar services.

On June 9, 1994, the Office of the Secretary of Transportation (''OST'') and the Federal Aviation Administration (''FAA'') issued two related notices on the subject of Federal requirements for airport rates and charges. The Department took this action largely in order to better implement its responsibility to enforce the reasonable fee requirements. A notice of proposed policy entitled ''Proposed Policy Regarding Airport Rates and Charges'' listed and explained the principles that the Department believes define Federal policy on the rates and fees that an airport proprietor can charge to aeronautical users of the airport. Docket No. 27782 (59 FR 29874, June 9, 1994). Notice 94–18, a notice of proposed rulemaking entitled ''Rules of Practice for Federally Assisted Airports,'' proposed detailed procedures for the filing, investigation, and adjudication of complaints against airports for alleged violation of Federal requirements involving fees and other airport-related requirements. Docket No. 27783 (59 FR 29880, June 9, 1994).

The FAA Authorization Act of 1994, Public Law 103–305 (''1994 Authorization Act'') was signed into law on August 23, 1994. Section 113 of that legislation, 49 U.S.C. § 47129, specifically addresses airport fees. Section 47129 directs the Secretary of Transportation (''Secretary'') to determine whether an airport fee imposed on an air carrier is reasonable, upon written request by the airport proprietor or upon complaint filed by an affected carrier within 60 days after the carrier receives written notice of the establishment or increase of the fee. 49 USC § 47129(a)(1). An airport fee subject to section 47129 ''may be calculated pursuant to either a compensatory or residual fee methodology'' or a combination thereof. 49 U.S.C. § 47129(a)(2). Further, in determining the reasonableness of a fee, the

Department ''may only determine whether the fee is reasonable or unreasonable and shall not set the level of the fee.'' 49 USC § 47129(a)(3).

Section 47129 also directs the Secretary to publish in the Federal Register final regulations, policy statements or guidelines establishing (1) procedures for acting on written requests or complaints; and (2) ''the standards or guidelines that shall be used * * * in determining under [section 47129] whether an airport fee is reasonable.'' 49 USC § 47129(b)(1),(2).

Pursuant to 49 USC § 47129(e), the section does not apply to : (1) a fee imposed pursuant to a written agreement with air carriers; (2) a fee imposed ''pursuant to a financing agreement or covenant entered into prior to the date of enactment of [section 47129];'' or (3) any other existing fee not in dispute on the date of enactment. In addition, nothing in section 47129 shall adversely affect: (1) the rights of any party under an existing written agreement between an air carrier and the airport proprietor; or (2) the ability of the airport to meet its obligations under a financing agreement, or covenant that is in force on the date of enactment. 49 USC § 47129(f).

In response to provisions in the 1994 Authorization Act, the Department issued a supplemental notice of proposed policy with revisions to reflect relevant provisions of that legislation. Docket No. 27782 (59 FR 51835, October 12, 1994).

After reviewing all comments received in response to the notices, the OST and the FAA, on January 30, 1995, issued a ''Policy Regarding Airport Rates and Charges,'' the Interim Policy, and requested further public comment. Docket No. 27782 (60 FR 6906, February 3, 1995). Two airport owners are seeking judicial review of the Interim Policy. City of Los Angeles et al. v. U.S. Department of Transportation et al., D.C. Cir. Nos. 95–1188 and 95–1190 (argued March 4, 1996).

After reviewing the comments received in response to the February 3 request for comments, the OST and the FAA published on September 8, 1995 a supplemental notice of proposed policy, the Supplemental Proposed Policy. Docket No. 27782 (60 FR 47012).

The procedural rules required by section 47129(b)(1) were published in the Federal Register on the same date as the Interim Policy. Docket No. 49830 (60 FR 6919, February 3, 1995). The 1994 Authorization Act also required that the Secretary issue a statement of policies and procedures for the enforcement of Federal restrictions on the use of airport revenue. On February 20, 1996, the FAA

issued a Notice of Proposed Policy and Procedures Concerning the Use of Airport Revenue. Docket No. 28472 (61 FR 7134, February 26, 1996).

Comments on the Supplemental Proposed Policy

The Department received more than 50 comments on the Supplemental Proposed Policy. Comments were received from almost all segments of the aviation community, including: airport operators and representative organizations; associations representing U.S. and foreign air carriers and commuter airlines; representatives of other aeronautical businesses at airports; general aviation representatives; a representative of airport concessionaires; individuals with experience in airport operations; and a law firm. In addition, the Department held two public meetings to solicit public input on the Supplemental Proposed Policy. Verbatim transcripts of the meetings have been included in the docket of this proceeding.

The two major US representative organizations for airport operators—Airport Operators Council International/North America (''ACI'') and American Association of Airport Executives (''AAAE'')—filed joint comments. Many individual airport operators endorsed the joint comments of their representative organizations, but some larger airport operators commented independently. Many airport operators' comments were similar, and all of the comments tended to focus on a common group of issues.

On the airline side, the Air Transport Association of America (''ATA'') and Regional Airline Association (''RAA'') filed joint comments. These comments and those of the International Air Transport Association (''IATA'') also tended to focus on the same issues and generally took the same position.

Accordingly, the following discussion of comments is organized by issue, not by commenter. Issues are discussed in the order they arise in the Final Policy. Airport proprietors and their representatives who took the same position on an issue are collectively referred to as ''airport proprietors.'' ATA/RAA and IATA are referred to as ''carriers'' when the organizations took common positions. The summary of comments is intended to represent the general divergence or correspondence in industry views on various issues. It is not intended to be an exhaustive restatement of the comments received. All comments received were considered by the Department, even if not specifically identified in this summary.

After the comment period closed, ACI/AAAE filed reply comments to the comments filed by ATA/RAA. ATA/RAA in turn objected to the reply comments. ATA/RAA requested that the Department reopen the comment period to allow for the filing of reply comments generally, if we accepted the ACI/AAAE reply. The Department has accepted the reply comments for the record. However, we determined that reopening the comment period was not necessary because ACI/AAAE's reply comments were largely repetitions of arguments presented in earlier comments. In no case are the reply comments the sole basis for any decision.

In addition to specific changes noted in the discussion of the issues, the Department has made editorial changes throughout the Final Policy to enhance readability and clarity.

The Department's Authority to Regulate Aeronautical Fees

As noted above, airports have been required by two Federal statutes—the AAIA and the Anti-Head Tax Act—to charge only reasonable fees to aeronautical users. The Department has the responsibility for enforcing these requirements, and the courts have held that a Department decision on the reasonableness of an airport fee is entitled to substantial deference. Kent County, 114 S.Ct. at 864, n. 14; New England Legal Foundation v. Massachusetts Port Authority, 883 F.2d 157, 169 (1st Cir. 1989). Section 113 of the 1994 Reauthorization Act, codified as 49 USC § 47129, requires the Department to resolve significant disputes over the reasonableness of new or increased airport fees on an expedited basis. In that statute Congress also required the Secretary to establish standards for determining the reasonableness of an airport fee. Congress did not limit the Secretary's discretion in any way, except by stating that the Department may not actually set an airport fee.

Given the statutory authority vested in the Secretary, we find that we are empowered both to adopt the guidelines contained in this Final Policy and, in cases heard under section 47129, to examine the fee methodology used by an airport. See LAX I, Order 95–6–36 at 14–15.

ACI/AAAE argue that we must give an airport's fee judgments a presumption of validity, since the decisions of state and local governments are normally entitled to such a presumption. The Final Policy, however, gives airport proprietors substantial discretion in establishing a fee structure. In addition, the airlines challenging an airport fee

have the burden of proof. LAX I, Order 95–6–36 at 17–18. We do not agree that we should include an additional presumption in favor of airport judgments on fees in the final Policy. There is a substantial Federal interest in ensuring that aeronautical users pay only reasonable fees, as shown by Congress' directive that we determine on an expedited basis whether such fees are reasonable when carriers file complaints against new or increased airport fees that meet the jurisdictional requirements of section 47129. Congress' requirements that we publish guidelines for determining the reasonableness of airport fees further indicates that we should carefully examine an airport's fee methodology without presuming that the airport's judgment is likely to be correct.

We also note that we did not use such a presumption in the two LAX cases or in our earlier investigation of fees charged by the Massachusetts Port Authority (''Massport'') under its PACE program. Investigation into Massport's Landing Fees, FAA Docket 13–88–2, Opinion and Order (December 22, 1988) (''Massport Order''), aff'd New England Legal Foundation v. Massachusetts Port Authority, 883 F.2d 157 (1st Cir. 1989).

1. Applicability to General Aviation and Foreign Air Carriers

The Supplemental Proposed Policy would apply to aeronautical uses of any airport, including a general aviation airport. However, the Department proposed to take into account differences in methodologies and mechanisms that airport proprietors may use to charge for different facilities and for different category of users. Proposed Applicability of Policy, section A. The Department also proposed that, at airports where fees high enough to achieve self-sustainability would be too high to permit viable commercial operations, the Department would not object to lower fees to assure that the public had access to commercial aeronautical services. Proposed para. 4.1.2. In the explanatory statement, the Department proposed to add language clarifying that in situations not covered by section 47129, the FAA would apply the policy in its role as administrator of grants under the Airport Improvement Program (''AIP''), assuring that an AIP grant applicant is in compliance with its grant assurances. The FAA would not provide a forum for resolving private disputes.

*Airport proprietors:* Airport proprietors generally oppose application of the policy to general aviation airports and to general aviation facilities. ACI/AAAE consider the Supplemental

Proposed Policy to be an improvement over the interim policy. However, a policy is not needed for general aviation airports and facilities because section 47129 was enacted to respond to airline concerns. If the Department disagrees, ACI/AAAE prefer a separate policy.

Some individual airport proprietors argue that the terms of section 47129 preclude adoption of a policy applicable to any fees except those charged to air carriers and not otherwise excluded by the terms of section 47129. The provisions of section 47129 indicate a belief by Congress that, to minimize the adverse effects of Departmental involvement, certain aeronautical fees should be completely exempt from challenge. Others argue only that such an extension is unwise, based on the differences between commercial service and general aviation airports.

In addition, some airport proprietors object to the application of the policy and the expedited procedures to complaints brought by foreign air carriers on the same grounds.

*General aviation:* The Aircraft Owners and Pilots Association (''AOPA'') explicitly objects to exclusion of general aviation airports from the scope of the policy, and the National Air Transportation Association (''NATA'') supports applying at least some elements of the policy to general aviation airports.

*Other commenters:* One individual commenter observed that at many compensatory airports, general aviation pays less than its allocated costs and is subsidized by airlines and their passengers, who suffer congestion caused by these below-cost fees.

*The Final Policy:* The Final Policy statement applies to general aviation airports and fees charged to general aviation users. However, in response to the comments, we have exercised our discretion to further limit the circumstances in which we will consider a complaint about the reasonableness of fees imposed at a general aviation airport. In addition, the Department reaffirms its earlier decision that foreign air carriers have the same rights as U.S. air carriers under section 47129.

As noted in the preamble to the Supplemental Proposed Policy, the Department has ample authority under other provisions of the Airport and Airway Improvement Act of 1982, as amended (''AAIA'')—49 USC §§ 47107(a), 47122—to adopt policies and guidance defining reasonable fees to be charged by general aviation airports and for general aviation use of commercial service airports. We find nothing in the statute that exempts fees

imposed for general aviation uses of any airport from the requirement that airport proprietors charge all aeronautical users reasonable and not unjustly discriminatory fees. The commenters have not provided any other persuasive reason for using one set of standards to judge the reasonableness of landing fees charged to air carriers and a different set of standards to judge the reasonableness of landing fees charged to other users.

However, as noted previously, the Department recognizes that airport proprietors, especially proprietors of general aviation airports, may use different methods for setting fees for general aviation users than those commonly used for setting fees paid by airlines. The Department reiterates its commitment to apply the policy flexibly in evaluating general aviation fees. The narrowing of the detailed guidance on establishing fees to the airfield and public-use roadways should itself provide increased flexibility to general aviation airports over the Interim Policy.

Even as to the airfield, the Department does not anticipate that application of the policy will be unduly burdensome. The Department understands that many general aviation airports operate at a loss, calculated according to generally accepted accounting principles. By definition, such airports are not generating excessive surpluses. The Department would not expect such airports to increase their losses by paying for sophisticated cost allocation and accounting systems to prove that they are losing money. Similarly, the Department understands that many airport proprietors apply a single charge, e.g., a fuel flowage fee, to general aviation users for their use of all aeronautical facilities. The Department does not intend to disturb this practice. Further, a charge that covers the cost of providing nonairfield facilities would be evaluated under paragraph 2.6 of the Final Policy, as discussed below.

The Department notes the concern that general aviation users are being subsidized by other users at many airports. The Department emphasizes that an airport proprietor generally may not charge any aeronautical user or user group more than its allocated costs based on a reasonable, transparent and not unjustly discriminatory cost allocation methodology. Our general approach in this policy is to refrain from disturbing common and non-controversial industry practice. Therefore, the Department will not object when an airport proprietor charges particular user groups less than their allocated costs, if other aeronautical users are not required to finance the shortfall. The applicable

Federal requirements do not compel airport proprietors to set fees so high that they become a financial bar to the use of the airport.

The Department is making three modifications to the Final Policy in response to concerns raised in the comments. First, we will strengthen the language of the applicability section that distinguishes the FAA's role in processing complaints about general aviation fees from the Department's role in processing complaints under section 47129. Second, because the threat of unreasonably high fees is remote at most general aviation airports, the Final Policy provides that the FAA will not ordinarily undertake an investigation of the reasonableness of a general aviation airport's fees absent evidence of a progressive accumulation of surplus aeronautical revenues. The general aviation airport segment of the industry should not be burdened with the cost of developing sophisticated accounting systems to address a problem that will occur, rarely, if at all. An allegation of unjust discrimination would be considered by the FAA in accordance with the Final Policy. Third, proposed par. 3.4.1 would require common costs to be allocated ''according to a reasonable, transparent and not unjustly discriminatory cost allocation formula'' that meets the conditions specified in that paragraph. Because many smaller airports cannot afford to develop sophisticated cost allocation formulae, the reference to ''cost allocation formula'' is being modified to ''cost allocation methodology.'' If the airport proprietor elects to develop a cost allocation formula, the formula must meet the conditions specified in that paragraph.

As to the application of the policy to foreign airlines, the relevant statutes make it clear that the policy must apply equally to U.S. and foreign airlines. First, we are adopting the Final Policy primarily because Congress directed us in 49 USC § 47129 to establish guidelines or standards for determining the reasonableness of a new or increased airport fee in cases heard under that statute. The Department analyzed the statute's applicability and determined in LAX I that 49 USC § 47129 must be read as giving foreign airlines the same right as U.S. airlines to file complaints and obtain relief. Order 95–6–36 at 53–56. We reaffirmed that determination in LAX II. Order 95–12–33 at 52. Since section 47129 is the principal basis for the adoption of the Final Policy, the Final Policy must apply to foreign airlines.

Even if Section 47129 did not cover foreign airlines, the Final Policy would

have to govern the assessment of the reasonableness of fees charged to foreign airlines. The airport grant statute specifically requires the Department to obtain assurances from each airport sponsor obtaining federal funds that the airport will not unjustly discriminate against any aeronautical user. 49 USC § 47107(a)(1). This provision requires an airport to charge foreign airlines the same fees as similarly situated U.S. airlines. In addition, the United States' obligation under many international agreements to ensure that foreign airlines are treated the same as U.S. airlines would require us to adopt the same standards for determining the reasonableness of airport fees, whether the fees are paid by U.S. airlines or foreign airlines, even if Congress had not enacted 49 USC § 47129.

Several airport parties now object to the Department's adoption of procedural rules allowing foreign airlines to obtain an expedited investigation under section 47129. However, only the City of Los Angeles objected to the inclusion of foreign airlines during the rulemaking proceeding that led to adoption of the Rules of Practice for airport rates and charges cases. 59 FR 53380, 53383 (October 24, 1994); 60 FR 6919 (February 3, 1995). At that time, the Department determined as a matter of discretion that foreign airlines should have the ability to request an expedited investigation, even though it assumed that they did not have such rights under section 47129. The Department's later decision that foreign airlines are covered by 49 USC § 47129 means that foreign airlines by statute have the same procedural rights as U.S. airlines.

## 2. Applicability to Fees Set by Agreement

Section 47129(e), 49 USC § 47129(e), provides that the section does not apply, inter alia, to fees imposed pursuant to a written agreement with air carriers. Section 47129(f), 49 USC § 47129(f), provides , inter alia, that the section shall not adversely affect the rights of parties to an existing agreement between an air carrier and airport proprietor.

In the applicability section of the Supplemental Proposed Policy, the Department stated that section 47129 did not repeal or narrow the scope of the reasonableness requirement for airport fees. The Department proposed to apply the policy in the case of a dispute over the reasonableness of any aeronautical fee. However, disputes over matters described in sections 47129 (e) and (f) would not be processed under the procedures mandated by section 47129. In the explanatory statement, the Department proposed to take into

account the existence of any agreement between U.S. and foreign air carriers and the airport proprietor in making its determination of reasonableness.

*The comments:* Airport proprietors generally argue that the policy should not apply to fees set by agreements with carriers. ACI/AAAE argue that application of the policy to such fees would frustrate the direction given by Congress and would adversely affect airports that rely on agreements that produce steady and predictable revenue flows. ACI/AAAE and individual airport commenters also argue that the Department is legally barred from applying the policy to fees set by agreement because sections 47129(e) and (f) limit the application of all section 47129, not just the provisions governing the expedited procedures. ACI/AAAE refer to numerous court decisions overturning agency actions that have not properly adhered to statutory exceptions.

Other commenters did not address this issue.

*The Final Policy:* The Final Policy applies to fees set by agreement, to the extent discussed below. We do not interpret section 47129 to preclude an investigation of fees set by agreement or the application of the policy in such an investigation. However, in keeping with our policy of encouraging direct negotiation of fees, the Department does not expect to investigate routinely fees set by agreement. Moreover, the Department has decided not to consider complaints about the reasonableness of fees set by agreement if filed by parties to the agreement. The Final Policy is modified to reflect this decision.

However, we do not believe that Congress intended to deprive non-party carriers of the opportunity to have their airport fees reviewed by the FAA, solely because the fees are included in an agreement between the airport proprietor and other airlines. While section 47129 directed the Secretary to establish a policy on reasonable fees, the Secretary already had authority to publish such a policy. Section 47129 did not repeal this authority or the underlying requirement of reasonableness. The existence of an agreement may be a critical factor in evaluating the reasonableness of a fee, but section 47129 does not, by its terms, exempt fees set by agreement from the requirement of reasonableness.

However, the Department agrees that section 47129(e) was enacted to preclude carriers from improving on their bargain by bringing an administrative complaint after they have reached agreement with an airport proprietor. That outcome would be

unfair to airport proprietors who bargain in good faith. The threat of a complaint could discourage airport proprietors from putting forward their best offers in negotiations. The Department is reluctant to interpret section 47129(e) in a way that would discourage effective negotiations.

Complaints about fees charged to non-parties to the agreement brought by non-parties to the agreement would be considered under provisions of the policy applicable to non-signatory carriers, if significant, as discussed below under the heading ''Charges to Non-Signatory Carriers.'' By giving notice that non-parties may challenge fees imposed on them by agreement, the Department expects that airport proprietors and airport users will be able to achieve reasonable results in their negotiations and obviate a full investigation and determination of reasonableness by the Department.

## 3. Applicability to Fees Imposed Pursuant to Financing Agreements

Section 47129(e)(2), 49 USC § 47129(e)(2), provides that the section does not apply to fees imposed pursuant to a financing agreement or covenant entered into before the date of enactment of the statute (August 23, 1994). Section 47129(f)(2), 49 USC § 47129(f)(2), provides that the section shall not adversely affect the ability of an airport proprietor to meet its obligations under a financing agreement or covenant in effect on August 23, 1994.

In the applicability section of the Supplemental Proposed Policy, the Department stated that section 47129 did not repeal or narrow the scope of the reasonableness requirement for airport fees. The Department proposed to apply the policy in the case of a dispute over the reasonableness of any aeronautical fee. However, disputes over matters described in sections 47129 (e) and (f) would not be processed under the procedures mandated by section 47129. The treatment of financing agreements was not otherwise discussed in the Supplemental Proposed Policy.

However, in its order setting for hearing under section 47129, carrier complaints against fees imposed by the Puerto Rico Port Authority, the Department further interpreted the financing agreement exceptions. Puerto Rico Ports Authority Rates Proceeding, Order 95–4–6 (April 3, 1995). The Department stated that:

[I]n order to successfully invoke the exception in subsection (e)(2), the airport must show more than generalized language in a financing

agreement as the source of the imposition of the fee upon the air carrier. The airport must demonstrate that the agreement specifically required the airport to increase directly the fees to air carriers or that it so circumscribed other alternatives that the airport had to impose a new fee or to increase an existing fee. Order 95–4–6 at 13.

The Department explained that this interpretation of section 47129(e)(2) was necessary so that the provision would not make the statute a nullity. Id. at 12.

*The comments:* Airport proprietors urge the Department to revise its interpretation of section 47129(e) to recognize generalized rate covenant language. The airport proprietors argue that Congress was well aware of the broad terms of typical rate covenants and drafted section 47129(e)(2) to cover the typical situation. They further argue that the legislative history makes clear that section 47129(e)(2) was enacted to avoid disrupting existing financing agreements.

The airport proprietors also argue that their preferred interpretation will not render section 47129 a nullity. They assert that airport proprietors do not routinely invoke a rate covenant as a justification for a fee increase. Doing so would signal dire financial circumstances. Further, if an airport proprietor must raise fees to comply with a rate covenant, it will not single out airlines or other aeronautical users, but will raise the fees for all airport users.

Other commenters did not address this issue.

*The Final Policy:* The Department will not modify the interpretation of the financing agreement exceptions. As noted in Order 95–4–6, the airport proprietors' preferred interpretation could turn section 47129(e)(2) into the proverbial exception that swallows the rule.

Moreover, the Department's interpretation does not threaten to disrupt existing financing agreements. Under the Final Policy, debt-service expenses, including reasonable amounts for debt-service coverage, may be included in the rate-base. In an investigation into the reasonableness of a fee, the airport proprietor is free to show that a challenged fee is needed to meet debt-service expenses associated with a general rate covenant. However, the airport proprietor may not rely on a general rate covenant to invoke section 47129(f)(2) as a procedural bar to an investigation of the reasonableness of the disputed fee. See, Order 95–4–6 at 13.

## 4. Definition of Exclusive/Nonexclusive use Aprons for HCA Valuation

The Supplemental Proposed Policy proposed that airfield assets would be valued using the HCA valuation methodology. Proposed par. 2.5.1. Airfield assets would include ramps or aprons not leased on an exclusive use basis and associated land. Proposed Applicability, Section D.

*The comments:* The State of Alaska, which operates most public airports in Alaska, expressed concern that the HCA valuation requirement for aprons might adversely affect its charging practices. The State's lease lots typically abut the side of a public-use apron and include a portion of the apron for exclusive aircraft parking. Treating the lease lots as a non-exclusively leased apron subject to the HCA valuation requirement would devastate the airport system's revenue situation.

The Department did not receive any other comments on this issue.

*The Final Policy:* No modification to the Supplemental Proposed Policy is required to address the concerns of the commenter. As described in the comments, the portion of the apron included in each lease lot is available for exclusive use. Accordingly, this portion of the apron and the remainder of the lease lot would be considered exclusively leased, even though the remainder of the apron is a public-use facility.

The Department has, however, decided to modify the definition to avoid potential confusion. We are modifying the provision to exclude from the definition of airfield assets an apron or ramp which is the subject of a preferential, as well as an exclusive lease or use agreement.

Aprons or ramps that are treated as airfield assets are subject to the general HCA valuation requirement. In contrast, the airport proprietor may use any reasonable method to establish the fee for any other apron or ramp. The Department originally proposed this disparate treatment because exclusively leased facilities have more in common with terminals and other aeronautical facilities than with runways and taxiways. In particular, their use and the fees for their use are ordinarily the subject of individual negotiations.

On further consideration of the issue, the Department has concluded that the preferential use agreements are as likely as exclusive use agreements to be the result of individual negotiations and to give rise to the characteristics that make a ramp or apron more like a terminal than a runway. Many lease and use agreements may provide for only

preferential use. The Department is therefore modifying the Final Policy to exclude from the definition of airfield assets, aprons and ramps that are subject to a preferential or exclusive lease or use agreement.

## 5. Cross Crediting Aeronautical Users With Nonaeronautical Revenues

The Supplemental Proposed Policy proposed that aeronautical users be entitled to a cross-credit of nonaeronautical revenues only if the airport proprietor agrees, and that the airport proprietor could agree to a cross-credit even if aeronautical users do not agree to cover nonaeronautical losses. Proposed para. 2.1.1. The Supplemental Proposed Policy also proposed that the airport proprietor could not require aeronautical users to cover nonaeronautical losses, except by agreement. Id.

*Airport proprietors:* Airport proprietors did not address this issue.

*Carriers:* IATA argues that cross-crediting should be required based on the policy on airport fees set forth by the International Civil Aviation Organization (''ICAO''), laid down in the Statements by the Council to Contracting States on Charges for Airports and Air Navigation Services (ICAO Doc. 9082/4). IATA argues that cross-crediting satisfies the ICAO principle of cost-relatedness, because airport users bring customers to the airport through their operations.

*General aviation:* AOPA supports mandatory cross-crediting because nonaeronautical businesses thrive due to the ready-made market for their services. AOPA also argues that the Supreme Court's decision in Kent County does not preclude the Department from requiring cross-crediting.

*Other commenters:* One law firm involved in public finance objects to the proposed requirement that aeronautical users agree to cover nonaeronautical losses. This commenter argues that the proposal is inconsistent with the airport proprietor's right to set fees unilaterally by ordinance or regulation established elsewhere in the policy. The proposal is also inconsistent with the airport proprietor's unconditional right to employ a residual methodology established by 49 USC § 47129(a)(2), according to this commenter.

*The Final Policy:* The Department is adopting Paragraph 2.1.1, as proposed.

The Department will not require cross crediting of nonaeronautical revenues to aeronautical users, because section 47129 does not permit us to do so. Section 47129(a)(2) preserves the discretion of airport proprietors to use

the compensatory methodology. The essence of the compensatory methodology is that fees to aeronautical users reflect the costs of serving them with no cross-crediting of nonaeronautical profits or losses.

Moreover, it would be unfair to require airport proprietors to share nonaeronautical profits with aeronautical users, if we did not also require aeronautical users to share nonaeronautical losses with airport proprietors. The aeronautical users requesting cross-crediting have not indicated that they are willing to accept such a requirement. More importantly, they have not identified a legal basis for imposing cross-crediting.

By authorizing the residual methodology, section 47129(a)(2) does not authorize unilateral increases in aeronautical charges to cover nonaeronautical losses. The Department is not aware of any airport proprietor who, at the time of enactment, charged aeronautical users to cover aeronautical losses without the aeronautical users' agreement to do so. No airport proprietor has asserted a unilateral right to do so in this proceeding docket.

Moreover, one of the fundamental concepts of reasonableness is that users should not, without their consent, be burdened with paying for facilities they do not benefit from or use. The law firm's proposal clearly conflicts with this concept.

### 6. Rate of Return

The Supplemental Proposed Policy did not propose a separate rate of return to be earned by public entities for airfield facilities and public-use roadways. However, the Department recognized that permitting airport proprietors to use any reasonable methodology to determine the fees for other facilities (proposed para 2.6) might allow an airport proprietor to earn a reasonable rate of return for those facilities. The Department also proposed to allow private equity owners of airports to earn a reasonable return on investment in airfield facilities and public-use roadways. Proposed para. 2.4.

*Airport proprietors:* Airport proprietors argue that they are entitled to earn a rate of return on investment in all facilities, including the airfield. ACI/AAAE point out that public utilities are compensated for forgoing the opportunity to charge market prices by including a rate of return in their rates. The City of Los Angeles and the Port Authority of New York and New Jersey ("PANYNJ") argue that the denial of a rate of return amounts to an unconstitutional taking of property. The

PANYNJ also argues that a rate of return is needed to provide for accumulation of cash reserves for investment, to compensate for the risks of those investments, and to meet cash-flow tests of bond indentures.

*Carriers:* ATA/RAA did not specifically address this issue. IATA prefers allowing airport proprietors a reasonable return on investment, in lieu of an allowance for imputed interest and reasonable reserves.

*General aviation:* General aviation commenters did not address this issue.

*Other commenters:* One individual argues that imputed interest is the functional equivalent of a return on investment. This commenter asks the Department to clarify whether a privately-owned airport may include both imputed interest and a return on investment in the airfield rate base.

*The Final Policy:* The Final Policy does not authorize a separate rate of return for public airport owners. In addition, a new paragraph 2.4.1(a), prohibiting a private equity owner of an airport from charging for both imputed interest and a rate of return on its equity investment in the airfield, is added to the Final Policy.

The Final Policy allows public airport proprietors to include an imputed interest charge in fees for the airfield and public-use roadways. Therefore, a separate return on investment is not justified, and would run counter to traditional concepts of reasonableness. As discussed below under "Application of HCA Requirement to Airfield and Public Use Roadways," the imputed interest charge compensates the airport proprietor for the opportunity costs of its investment in the airfield. The imputed interest charge, therefore, serves the function of a return on investment. In addition, as discussed below, a state or municipal airport proprietor does not have the same entitlement to a return on investment under the Constitution as a private investor.

The Final Policy follows the approach of the Supplemental Proposed Policy for publicly-owned airports. Proprietors of publicly-owned airports may charge imputed interest on their airfield investments in accordance with the Final Policy. However, allowing an airport proprietor to include an imputed interest charge and a return on investment in its rates could allow for a double recovery of the airport proprietor's capital costs. Therefore, proprietors of publicly-owned airports may not charge an additional rate of return on investment.

Private equity owners may include a reasonable return on equity investment.

Para 2.4. However, under new paragraph 2.4.1, they may not include an imputed interest charge on this investment as well. This new provision is intended to avoid possible double recovery of capital costs by a private equity owner.

In light of other provisions in the Final Policy, the Department does not agree with the PANYNJ's claim that a separate allowance for a return on investment is needed to provide for accumulation of reserves to fund capital projects or to meet cash-flow requirements in financing agreements. The imputed interest charge will provide cash flow for these purposes, and the Final Policy allows the airport proprietor to impose reasonable charges to met cash-flow requirements in financing agreements. Para. 2.4.4.

### 7. Imputed Interest

The Supplemental Proposed Policy proposed to allow the airport proprietor to charge imputed interest, at a reasonable rate, on funds invested in the airfield, with two exceptions. First, imputed interest could not be charged on funds obtained by debt-financing, if the debt-service costs are included in the rate base. Second, imputed interest could not be charged on funds generated by fees charged for the use of airfield assets and airfield services. The Supplemental Proposed Policy did not propose a specific imputed interest rate. Proposed para. 2.4.1.

*Airport proprietors:* With one exception, airport proprietors argued that imputed interest should be allowed on all internally generated funds invested in the airfield, including funds derived from airfield revenues. ACI/AAAE and many individual airports argue that the proposed limitation will encourage airport proprietors to borrow funds for airfield investment, rather than use internally generated funds. Borrowing may be the most expensive way to obtain financing. One airport proprietor asserts that the Supplemental Proposed Policy is inconsistent with its own long-standing practice, and it argues that the distinction is arbitrary.

In addition, one airport proprietor noted that the Department's approach could be troublesome due to the difficulty of tracing the source of internal funds invested in the airfield. This airport proprietor noted that requiring airport proprietors to trace the source of funds would make them unable, as a practical matter, to charge imputed interest whenever funds could not be traced.

*Carriers:* Carrier commenters generally object to allowing airport proprietors to charge imputed interest

on any investment made with surplus aeronautical revenues. ATA/RAA argue that the imputed interest allowance serves only to permit the accumulation of excess revenues. According to ATA/RAA and USAir, the Supplemental Proposed Policy would allow airport proprietors to force carriers to first invest in the airport (by paying fees in excess of costs) and then to pay interest on that forced investment through the imputed interest charge. ATA/RAA argue that the U.S. Government strenuously objected to this practice when it was attempted at Heathrow Airport. ATA/RAA further argue that public airport operators (state or city governments or authorities) do not have the same profit motives as private businesses. Therefore, they do not need the financial incentive of imputed interest to trigger investments in the airfield.

IATA also argues that an imputed interest charge serves only to generate surplus aeronautical revenues. Elsewhere in its comments, however, IATA supports allowing airport proprietors to earn a reasonable rate of return on investment.

ATA/RAA and IATA also argue that if imputed interest is allowed, the Department should provide guidelines for the computation of interest. ATA supports use of an airport's bond interest investment rate based on the following reasoning. Interest rates are in part determined by the risk of the investment, and investments that are riskier than airport capital projects might generate higher interest rates. However, by law, public airport proprietors must apply airport revenue to the capital or operating costs of the airport. Given this legal limit on the airport proprietor's investment options, the airport proprietor should not be able to claim a higher imputed interest rate base on alternative investments that are theoretically available.

*General aviation:* General aviation commenters did not address this issue.

*Other commenters:* One individual commenter suggests that imputed interest is in practical terms the same as a profit or payment for lost income. The commenter argues that lost income is not a cost. This commenter also suggests that the imputed interest charge is a device for airports to circumvent the prohibition on charging depreciation for Federally-financed assets.

*The Final Policy:* The Department is adopting the provision of the Supplemental Proposed Policy, as proposed. The Department's approach strikes a reasonable balance between legitimate concerns of airport users, on

the one hand, and airport proprietors, on the other.

Airport proprietors do have discretion to choose where on the airport to invest surpluses generated by aeronautical fees, as well as nonaeronautical fees. In choosing between two investment options, airport proprietors have an incentive to select the option that provides more revenue for reinvestment in the airport. Barring an imputed interest charge on all funds invested in the airfield would encourage airport proprietors to invest elsewhere on the airport, and would thereby defeat the Department's long-range objective of assuring adequate investment in airport airfield capacity.

However, the carriers' concerns have some justification. Under the Final Policy, airfield fees potentially could generate revenues in excess of an airport proprietor's cash needs. This excess may arise from various sources: imputed interest charges; allowances for various reserves; debt-service coverage charges; or simply financial performance that exceeds the projections on which airfield fees are based. There is merit to the carrier position that charging imputed interest on funds derived from airfield revenues could require airfield users to finance airfield investment twice: once in the form of the excess revenue that their otherwise reasonable fees generate and once in the form of the imputed interest charge on the investments made with that revenue. For this reason, the policy does not permit airport proprietors to charge imputed interest on funds that are attributable to airfield operations.

However, the carriers' argument that airport proprietors may not charge imputed interest on any investment in the airfield goes too far. This argument would deny the airport proprietor any compensation for the opportunity costs of its investment in the airfield.

The Department recognizes that disallowing imputed interest on sums attributable to airfield fees may encourage airport proprietors to invest elsewhere on the airport. However, the impact on choice of investments should be less pronounced than disallowing all imputed interest. The limit on imputed interest could also encourage bond financing for airfield investment, but the limit would apply only in the absence of an agreement to the contrary. If an airport proprietor can persuade airfield users that charging imputed interest is less costly than borrowing to finance airfield improvements, the airport proprietor is free to impose an imputed interest charge by agreement.

The Department's approach to imputed interest is consistent with the

position taken by the U.S. government regarding airport fees at Heathrow. In that dispute, the U.S. government did not object to landing fees set to provide a reasonable rate of return on investment, or to the application of that return to new capital projects. Rather, the U.S. government objected to financing new capital development at the London airports by: (1) directly including the full capital costs of projects under construction in the rate base and (2) charging a rate of return for those projects before they came on-line.

The Department will not provide further guidance on a reasonable rate for assessing imputed interest at this time. In many cases, a rate based on the airport proprietor's own interest rate on borrowed funds may be reasonable. However, the airport proprietor's borrowed-fund rate may be but one of a number of relevant factors in determining a reasonable rate of interest. A policy that defines the borrowing rate as the only reasonable rate would not allow for consideration of these factors. In the event of a complaint, the Department would expect the airport proprietor to justify the reasonableness of its imputed interest rate. The Department would not accept an imputed interest rate that is justified solely as a device to recover a depreciation charge for the Federal share of grant-funded facilities.

As we noted in the explanatory statement to the Supplemental Proposed Policy (60 FR 47013), under the Administrative Procedure Act, a carrier complaining about charging imputed interest on funds generated by airfield fees would bear the burden of proving the source of funds. The airport proprietor need not trace the funds in order to claim imputed interest. However, if the airport proprietor has data available that would enable a complainant to trace the funds, that data should be disclosed during the fee negotiations or during a proceeding to resolve a fee dispute.

## 8. Limitation of Airfield Rates to Land and Facilities Currently in Use

The Supplemental Proposed Policy proposed that, absent agreement, airport proprietors may include in the rate base all capital costs associated with the provision of airfield facilities and services currently in use and current costs of planning future aeronautical facilities and services. Proposed para. 2.4. The Supplemental Proposed Policy further proposed that the costs of facilities not yet built and operating could not be included in the rate base. However, debt service and carrying costs of an asset under construction

could be capitalized and amortized when the asset is put in service. In addition the airport proprietor could include in the rate base the costs of land that facilitates current operations of the airport. Proposed para. 2.5.3.

*Airport proprietors:* Airport proprietors consider these provisions unduly restrictive and inconsistent with the public interest. ACI/AAAE comment that the prohibition on expensing interest payments during construction is inconsistent with current practice of some airports. In addition, ACI/AAAE and individual airport commenters argue that applying the in-use provision to acquisition of land for future runway development will encourage airport proprietors to delay land acquisition as long as possible. This delay could drive up the cost and reduce the availability of land as development encroaches on the airport.

The City of Chicago points out that land for future development may be funded with AIP grants under circumstances outlined in the FAA's Airport Improvement Program (AIP) Handbook, FAA Order 5100.38A, Para. 603 (October, 1989). According to Chicago, Paragraph 603 demonstrates that land acquisition for future development is appropriate in certain circumstances.

The Port of Portland suggests that the currently-in-use language may not reflect current industry practice for another reason. Portland notes that at the request of the carriers, it is amortizing a terminal upgrade at Portland International Airport for longer than the useful life of the project to lessen the cost impact on carriers. Portland requests that the policy permit this approach at the discretion of the airport proprietor. This commenter also requests clarification on how the term ''currently'' would be applied in different situations.

*Airport Users:* Airport users did not address this issue.

*Other commenters:* A law firm specializing in public debt-financing asserts that many public airport proprietors are precluded by local law from capitalizing interest during construction. Such entities would be effectively precluded from financing new facilities, because the policy would not permit the expensing of construction financing and interest. This commenter recommends that the policy allow interest during construction and the cost of land for future development to be included in the rate base.

*The Final Policy:* The Department is modifying the Final Policy to permit an airport proprietor to show, on an individual basis, that it is reasonable to allow the costs of land acquired for future airfield development to be included in the rate-base, if the conditions of FAA Order 5100.38A are met, and if the airfield development is included in the airport proprietor's currently effective five-year capital improvement plan. The circumstances listed in FAA Order 5100.38A include rising land costs, encroachment on available land by incompatible uses, and the probable unavailability of land for airport use in the future. The provision on construction interest is adopted without modification. In addition, the Final Policy does not allow an airport proprietor unilaterally to depreciate an asset for longer than its projected useful life.

In addressing this subject, the Department must strike a balance between conflicting concerns. On the one hand, when fees are based on cost, it is generally unreasonable to charge users for facilities they do not benefit from or use. Based on this principle, current users generally should not be charged, as a cost item, the capital costs of projects not yet in operation. Of course, this principle does not preclude assessment of reasonable imputed interest charges just because the proceeds of those charges might fund future capital projects. On the other hand, the policy should not work a financial hardship on airport proprietors or unduly interfere with cost-effective airport expansion by precluding timely acquisition of property needed for future airport development.

In addition, the restriction on charging for facilities not yet in use is effectively limited to airfield facilities. Moreover, the restriction does not apply in the case of agreements with airfield users. If the airport proprietor can persuade airfield users that it is less expensive in the long run to deviate from the Final Policy, the airport proprietor is free to do so by agreement. Likewise if users request a depreciation period that is longer than an asset's useful life, the airport proprietor may agree to it. In these circumstances, an additional modification to the policy is not warranted.

The comments on charging for future facilities address two distinct issues. The first is the treatment of construction interest. As to interest paid during construction, the Department is not modifying the approach proposed in the Supplemental Proposed Policy. This approach is commonly used in determining the reasonableness of rates, and permits the airport proprietor to fully recover all construction interest costs, once the facility is in use.

The comments have not persuaded us that this approach will cause a substantial hardship in the industry. ACI/AAAE have not alleged that the practice of expensing interest is widespread. Moreover, landing fees at most airports are set by agreement. Under the terms of Paragraph 2.4 of the Final Policy, construction interest may be expensed if users have agreed. Similarly, the law firm comment regarding legal restrictions on capitalizing interest does not state that such local restrictions are wide-spread, and does not explain the basis for them. It is not clear that local laws that prohibit the capitalization of interest would permit the direct expensing of interest, because direct expensing would be more burdensome to users. Moreover, airport proprietors themselves have not raised legal restrictions to capitalizing interest as a serious concern.

The second issue is the treatment of land acquired for future development. On this issue, some modification to the Supplemental Proposed Policy is in order. As the FAA has recognized in administering the AIP program, when the factors specified in paragraph 603 of Order 5100.38A are present, it may be prudent to acquire and hold land for future development. Moreover, there may be circumstances in which such a land acquisition cannot be carried out if the costs are not included in the current airfield rate-base. However, based on the standard of reasonableness, the Department must be careful not to burden unduly present users with the costs of land acquired for future development. Therefore, the Department is modifying the final policy to permit an airport proprietor to show that the inclusion of the costs of land needed for future airfield development is reasonable, if the factors specified in FAA Order 5100.38A are present, and if the airfield development is included in the airport's currently effective five-year capital investment program. The latter condition is intended to assure that the land being acquired will actually be used for airfield development. This condition should also increase the likelihood that the airport users paying for the land will actually benefit from its purchase. The Department would decide the reasonableness of charging for the cost of land for future development on an individual basis. In reviewing the reasonableness, the Department would consider, among other factors, the feasibility and costs of alternative means of financing the land acquisition.

The Department will not permit airport proprietors to depreciate an

airfield asset for longer than its useful life, absent user agreement. Such a policy would force airfield users who never used or benefited from the asset in question to pay for a share of its costs. As noted, however, the airport proprietor may provide for a longer amortization period by agreement with airfield users.

In addition, the Department does not consider further guidance on the meaning of ''currently in use'' to be necessary at this time. The meaning of the term should in ordinary circumstances be self-evident—in use during the period when the charge is in effect. See, LAX II, Order 95–12–33 at 50–51. There may be circumstances in which the application of the phrase is not straight-forward, and the Department will address those situations if they arise.

### 9. Allowance For Environmental Costs

The Supplemental Proposed Policy proposed that an airport proprietor could include the costs of environmental mitigation and remediation to the extent it incurs a corresponding actual expense. Proposed para. 2.4.2. The Supplemental Proposed Policy also proposed that the airport proprietor could charge for the costs of insuring against future liability for environmental contamination. However, the costs of self-insurance could be included in the rate-base only if incurred pursuant to a self-insurance program that conforms to applicable standards for self-insurance practices. Proposed para. 2.4.2(d).

*The comments:* One airport proprietor has requested that the Department provide additional flexibility to charge for environmental cleanup costs. It suggests that if an activity is expected to generate predictable environmental cleanup costs, e.g., operation of a fuel tank farm, today's airport users may be reasonably charged for those costs, even if the cleanup occurs in the future.

Other commenters did not address this issue.

*The Final Policy:* The Department will not modify the provisions on allowable environmental costs. The commenter's concern is already addressed by the provision of the Final Policy governing reasonable reserves.

If the use of the airfield today generates predictable environmental remediation expenses in the future, the principle of cost causation would allow, if not encourage, the airport proprietor to charge today's users for those expenses. The policy need not be modified to permit this result.

The policy already permits the airport proprietor to include in the airfield rate base amounts needed to fund debt service and other reserves and to fund reasonable cash reserves to protect against other contingencies. Para. 2.4.4. This provision is sufficiently broad to permit the funding of reserves for predictable costs of environmental remediation caused by current operations. However, if an airport proprietor establishes a reserve for this purpose, the Department would expect the reserve to be separately identified. In reviewing the reasonableness of the reserve, the Department would consider, inter alia, whether the reserve applies to activities that industry experience has shown generate future environmental remediation costs; and whether the reserve reflects industry experience in costs of remediation. Arbitrary reserves or reserves to fund unknown future potential liability would not be acceptable. The latter would be subject to the provision on self-insurance.

### 10. Debt-Service Coverage

The Supplemental Proposed Policy proposed that the airport proprietor could include in the rate base, *inter alia*, amounts ''needed to fund debt service and other reserves and to meet cash flow requirements as specified in financing agreements or covenants (for facilities in use), including, but not limited to, debt-service coverage.'' Proposed para. 2.4.4.

In the LAX II proceeding, the parties disputed the meaning of the term ''needed'' as it appeared in the Interim Policy. Airport parties argued that the coverage was ''needed'' if financing agreements included a debt-service coverage requirement and if the airport was seeking to recover a share of coverage reflecting the airfield's pro rata share of outstanding debt. Carriers argued that no coverage charge would be ''needed'' if the airport's net cash revenues from nonairfield sources were large enough to satisfy the airport's coverage obligation. Comments on the Supplemental Proposed Policy were due before the Department addressed this issue in the final decision in the LAX II proceeding. Order 95–12–33 (December 22, 1995).

*The comments:* In this proceeding, several airport proprietors, but no airlines, filed comments on the issue. The Massachusetts Port Authority (''Massport'') argues that debt-service coverage should be permitted in the rate base in proportion to the allowable debt service for the airfield, regardless of whether an agreement governing airfield fees exists. Massport has adopted compensatory rates by resolution, not by agreement. Massport, Los Angeles and the City of San Francisco argue that the carrier position in LAX II—that coverage is not a cost and therefore cannot be included in the rate base absent agreement—is inconsistent with the terms of proposed paragraph 2.4.4 and with the Department's explanatory statement. Massport argues that the Department clearly signaled its intention that debt-service coverage could be included in the rate base even though it is not a cost in the traditional accounting sense.

Massport, Los Angeles and San Francisco also dispute the carrier position that debt-service coverage is needed only if revenues from other sources are insufficient to meet coverage requirements. These commenters argue that this approach amounts to mandatory residual treatment of debt-service coverage; therefore this approach is inconsistent with the airport proprietor's right to adopt a compensatory fee methodology. Massport argues that by using the term ''needed,'' the Department sought to tie the amount of debt-service coverage allowed in the rate base to the terms of applicable bond documents.

Massport further argues that compensatory airports should not be compelled to give a refund or credit to carriers for debt-service coverage, but should be permitted to use the coverage for any lawful purpose. Massport argues that under the terms of its Trust Agreement, Massport devotes the debt-service coverage charge to its Improvement and Extension fund, which finances the costs of airfield improvements.

Los Angeles also argues that many airports that include debt-service coverage in the rate base retain the coverage funds for discretionary purposes.

Other commenters did not address this issue.

*The Final Policy:* The Department is modifying paragraph 2.4.4 so that it allows airport proprietors to include amounts reasonably needed to meet debt-service coverage requirements. We are not changing the proposed policy on debt-related charges insofar as it allows airports to include charges for debt-service expense.

We are modifying the provision on debt-service coverage charges to address the ambiguity created by the provision of the Interim Policy (which was not resolved in the Supplemental Proposed Policy) and to clarify the Department's position on such charges. When the Department considers charges for debt-service coverage, the Department will not limit its inquiry to determining whether the charge is limited to the airfield's pro rata share of the airport's

overall debt-service coverage requirement. The Department instead will consider a number of factors.

Debt-service coverage is different from debt-service expense, an airport capital cost. Debt-service expense refers to the payment of interest and financing charges and the repayment of principal. Debt-service coverage, in contrast, is a cash flow requirement, not an expense.

Airport bonds typically require that the airport's net cash receipts exceed its debt-service expense by 25 to 50 percent, at a minimum. Many airports include charges for debt-service coverage in their landing fee calculations. However, as shown by the record in LAX II, their use of funds generated by debt-service coverage is almost always subject to substantial restrictions. Typically the airport must refund (or roll over) the funds obtained under the coverage charge if they were not needed during the year for which they were paid, or the airport proprietor must use the funds for capital projects benefiting the airlines. See, LAX II, Order 95–12–33 at 45. Not all airports impose such a charge. For example, the landing fees charged at LAX from July 1993 through June 1995 included no debt-service coverage charge. See Order 95–12–33 at 42.

Airlines have not objected to charges for debt-service expense, but the airline complainants in LAX II objected to Los Angeles' charge for debt-service coverage, as outlined above.

We are modifying the provision on debt-service coverage charges to permit reasonable amounts needed to meet debt-service coverage requirements, with due regard to the characteristic of a bond coverage requirement as a minimum requirement that must be met or exceeded at all times. In future airport fee cases involving a charge for debt-service coverage, we will determine whether the charge is permissible on the basis of the facts in the case. In considering the reasonableness of such a charge, the Department may consider a number of factors. For example, in LAX II, the Department found that Los Angeles' debt-service coverage charge was unreasonable since the record showed that the airfield's net cash revenues greatly exceeded the airfield's share of the airport's debt-service coverage obligation. Given that evidence, the Department did not have to address the airlines' claim that the charge was unreasonable because the airport's overall net cash revenues would satisfy the airport's coverage obligation without the inclusion of an additional charge in the landing fee rate base.

Another factor likely to be considered will be whether carriers using the airport receive any benefit from a debt-service coverage charge. For example, the airport may show that the inclusion of the charge improves the airport's credit rating and therefore reduces the airport's overall debt expense. The airport proprietor might show, instead, that the restrictions on the airport's use of the funds may ensure that the funds are used only for projects benefiting the airlines. An airport proprietor's commitment to refund or roll over unneeded funds in the year following payment also would be relevant to determining the reasonableness of the charge.

We are unwilling in this proceeding to adopt more specific standards for determining the reasonableness of a debt-service coverage charge, in part because the comments do not give us an adequate basis for resolving the issue. The Department will therefore resolve the airports' ability to impose a debt-service coverage charge on a case by case basis. The decision will be governed by whether the particular charge challenged is reasonable.

### 11. Allowance For Reasonable Reserves, Definition of Reasonable

The Supplemental Proposed Policy proposed that the airport proprietor may include in the rate base ''reasonable cash reserves'' to protect against contingencies other than those listed in the policy. Proposed para. 2.4.4. The Department did not propose to further define reasonable reserves.

*The comments:* ATA/RAA do not object to reasonable reserves for short term fluctuation in revenues or for other emergencies. They are concerned that, without more detailed guidance, airport proprietors will be able to establish reserves well in excess of actual needs. ATA/RAA suggest that the policy allow reserves of no more than one month's average revenue, unless the users agree to a higher reserve or the airport proprietor shows that special circumstances justify one.

IATA opposes the allowance of a reserve as a separate cost item. It urges the Department to limit fees to the airport's total costs plus ''a reasonable return on assets (before tax and interest charges) to contribute toward necessary capital improvements,'' based on ICAO Doc. 9082/4, pp. 3–4.

Other commenters did not address this issue.

*The Final Policy:* The Department is adopting the provision of the Supplemental Proposed Policy without modification.

The Department is not persuaded that a more specific definition for reasonable reserves is needed or appropriate for national application. The requirement that reserves be reasonable is intended to prevent arbitrary requirements. The Department would expect the airport proprietor to be able to justify its decision on reserve requirements if a dispute arose.

However, defining a reasonable reserve requirement for any particular airport depends largely on the financial and operating circumstances of the airport at the time the airport proprietor establishes the reserve. A uniform definition for reasonable reserves would unduly limit both the airport proprietor's flexibility to tailor its reserve requirements to meet those circumstances and the Department's flexibility to consider those circumstances in reviewing a fee.

### 12. Allocation of Shared Costs

The Supplemental Proposed Policy proposed that capital costs of facilities used by aeronautical and nonaeronautical users could be allocated to those aeronautical users who use the shared facility in a proportion that reflects the aeronautical purpose and proportionate aeronautical use. Proposed para. 2.4.5(b). Roadways would also be subject to the HCA valuation requirement. Proposed Para. 2.5.1(b).

*Airport Proprietors:* ACI/AAAE request clarification that notwithstanding the valuation requirement for public-use roadways, the Department is not mandating a particular cost allocation formula for determining the aeronautical portion of roadway costs.

The City of Chicago expresses concern that an allocation based strictly on use could be difficult to implement for some airports and could be burdensome. The City of Chicago urges the Department to modify the policy to explicitly provide more flexibility in cost allocation or to at least interpret the existing provisions of the policy as flexibly as we did in the LAX I decision.

*Airport users:* Airport users did not address this issue.

*Other commenters:* One individual suggested that, to minimize the risk that airports are improperly allocating costs to the airfield cost center, the Department should establish criteria for defining cost centers. This commenter suggests that the Final Policy require that any facility that generates revenue be defined as a cost center. In addition, the policy should require that if the facilities generate substantial revenue by direct charges, the full costs should be

covered by those charges. Under this approach, roadway costs would be assigned to a landside access cost center apart from the terminal. Further, the costs in this cost center would be recovered entirely from parking garages and lots, rental car companies and commercial limousine, van and taxi operators.

*The Final Policy:* The Department is not modifying the provisions of the Supplemental Proposed Policy in response to the comments. However, consistent with the decision in LAX II, the Department is modifying the provision to apply to allocation of costs of shared services as well as shared facilities.

The Supplemental Proposed Policy did not propose allocation of shared capital costs based strictly on use. Rather, it proposed consideration of both purpose and proportionate use of the shared facility. This provision of the Supplemental Proposed Policy is being adopted as proposed. The Department determined in LAX II that the possible difficulty of quantifying purpose is not a reason to allocate shared costs based solely on use. LAX II, Order 95–12–33 at 24. Accordingly, no change in the Final Policy is needed to accommodate Chicago's concern.

In reviewing the reasonableness of an allocation, the Department would consider, among other things, whether the allocation had a rational basis and was supported by factual evidence in the record. In addition, the Department would not preclude an airport proprietor from using a reasonable method of allocation just because another method might produce a more precise result. Id. at 33.

We will not adopt the suggestion of the commenter that airport proprietors be required to adopt a separate landside access cost center, which is not funded at all by charges to the aeronautical users. The airport proprietor has discretion in defining cost centers other than the airfield, so long as its cost allocations are reasonable, transparent and not unjustly discriminatory.

Furthermore, the Department specifically determined, in LAX I, that an airport proprietor may allocate a portion of access road costs to the airfield. Order 95–6–36 at 31. As the Department found in LAX I, carriers, other aeronautical businesses and their customers use (or benefit from) terminal area access roadways. Id. Airport proprietors may reasonably allocate a share of roadway costs to the carriers and other aeronautical users. The commenter's proposal would not assure that all passengers who use the roadways are charged for that use—

directly or through the charges they pay to commercial enterprises. Many passengers are dropped off by private vehicles that pay no charge for the using the roadways.

In addition, given the Department's reliance on local decisionmaking, the Department is not prepared to dictate how shared roadway costs are allocated to the carriers, so long as the basic requirements of the policy are met. The share allocated to aeronautical use must reflect the purpose and proportionate use of the facility, and the allocation methodology must be reasonable, transparent and not unjustly discriminatory.

Finally, the Supplemental Proposed Policy was silent on the treatment of the costs of shared services. As a result of the deliberations in LAX II, the Department has concluded that there is no reason to treat these costs differently than the costs of shared facilities. Therefore, the applicable provisions of the Final Policy are being modified to apply to services and facilities.

### 13. Asset Valuation, Limiting HCA Valuation to Airfield and Eliminating the Aeronautical HCA Cost Cap

The Interim Policy required that airport assets included in the aeronautical rate base be valued at historic cost to the original owner ("HCA value"), absent agreement to the contrary. Para. 2.4.1. However, the Interim Policy further provided that, for facilities other than airfield and all airport land employed in providing aeronautical use, other reasonable valuation methods could be used, so long as total aeronautical revenues do not exceed total aeronautical costs, based on HCA accounting. Para. 2.4.1(a).

The Supplemental Proposed Policy proposed to limit the HCA requirement to airfield assets and public use roadways, and to eliminate the HCA cost cap for total aeronautical revenues. Proposed para. 2.5.1. For other aeronautical assets, the Supplemental Proposed Policy would permit the airport proprietor to use any reasonable methodology to establish fees, so long as the methodology is applied on a consistent basis to comparable facilities and is justified. Proposed para. 2.6.1. However, the Department proposed that the progressive accumulation of substantial amounts of surplus aeronautical revenue may warrant an FAA inquiry into whether aeronautical fees are consistent with the airport proprietor's obligations to make the airport available on fair and reasonable terms. Proposed para. 4.2.1.

*Airport proprietors:* Airport proprietors support the proposed

modifications. Among other reasons, these commenters assert that the change would eliminate concerns regarding valuation of tenant-built facilities that revert to the airport proprietor. Further, this proposed modification would address a number of additional concerns of ACI/AAAE, including the following: inconsistency between HCA valuation of nonairfield facilities, on the one hand, and industry practices and local laws and regulations, on the other; potential windfalls for airport tenants that sublease aeronautical facilities; higher landing fees paid by signatory airlines at some residual airports; and inconsistency of the HCA cost cap with the requirement that airports be as self-sustaining as possible, as interpreted by the Office of Inspector General ("OIG").

Airport proprietors further assert that application of the HCA cap to general aviation airports would be particularly burdensome, as those airports as a class have limited nonaeronautical revenue streams.

Airport commenters dispute the carrier claims that terminal facilities should be treated like the airfield because airport proprietors possess market power. ACI/AAAE note that they accepted HCA valuation for airfield facilities reluctantly because the policy would not disrupt existing practices. Airport proprietors point out that terminal facilities are typically leased on preferential or exclusive use basis. They argue that the facilities are, therefore, more analogous to hangars and cargo facilities than to public use airfields. They further argue that airports compete with each other for designation as international gateways and as airline hub locations and for origin and destination ("O&D") traffic. The airport proprietors note that initiation of low-fare service at a given airport can draw O&D passengers from other airports in the region.

ACI/AAAE assert that recent increases in airport charges to carriers do not show airport market power and do not show that airport proprietors lack incentives to manage airports efficiently. Factors contributing to increases include the following: compliance with federal mandates and noise mitigation projects; expansion necessitated by increases in passenger activity and airline hubs; replacement of passenger terminals constructed 30–45 years ago; and construction and financing by airport proprietors of airport facilities that had been financed previously by the airlines directly. As evidence that airports face real-world pressures to reduce airline costs, one airport proprietor points to its decision to refinance airport revenue bonds to

reduce debt-service expense and thereby reduce airline rates and charges.

Another airport proprietor argues that elimination of the HCA cap will facilitate using price to allocate scarce resources efficiently.

Finally, one airport proprietor suggests that, if the HCA valuation requirement is limited to the airfield and public use roadways, references in paragraphs 2.3, 2.4.1, 2.4.2, 2.4.4, 2.4.5, 2.5, 2.5.1, 2.5.3 and 2.7 should be changed to ''airfield/public use roadway rate base.''

*Carriers:* Carriers argue that the Interim Policy's provisions governing asset valuation are needed to protect against the exploitation of locational monopoly power by airport proprietors in pricing ''essential facilities.'' Essential facilities are not limited to the airfield and include facilities for baggage, cargo and passenger handling. ATA/RAA contend that airport proprietors exercise monopoly power in pricing airport facilities in addition to the airfield, because of the airports' locational advantages and the barriers to entry of new competitive airports. In addition, ATA/RAA contend that carriers' investments in airport facilities often preclude them from relocating when an airport proprietor imposes excessive fees. ATA/RAA point to dramatic increases in fees at Los Angeles, Orlando, El Paso and Allentown as evidence of the existing monopoly power of airports.

Carriers argue that, without clear guidelines providing a foundation for negotiations, the policy will not promote direct resolution of disputes. In addition, it will be difficult for airport users to justify the burden of analyzing the airport's cost and revenue calculation to prepare a legal challenge to nonairfield fees.

The past absence of complaints over fees does not provide a basis for relying on effective competition, according to ATA/RAA. They argue that, in the past, negotiations were successful because there was a balance of power between airport proprietors and airport users. Airport proprietors needed airport user support for their financial bond issues. Airport users needed airport proprietors' cooperation to develop needed airport facilities. That balance has been disturbed at many airports, which can successfully issue bonds without carrier support. In addition, the claimed airport monopoly power was constrained by a number of other factors, including: common use of HCA valuation and residual agreements; and the expectations of airlines and airports that fee disputes would be resolved in Federal court.

The carriers argue that the threat of investigation of sustained accumulation of aeronautical surpluses will not curtail abuse of monopoly power. Rather, the policy would encourage airports to overallocate costs to aeronautical cost centers other than the airfield so as to show break-even in accounting terms. This problem is compounded by the lack of record-keeping requirements. ATA/RAA are particularly concerned that airport proprietors will overallocate the costs of municipal services provided to the airport. IATA argues that the Department's decision to restrain authority to investigate an accumulation of aeronautical surpluses is an implicit admission that reliance on negotiation and effective competition is doomed to fail.

The carriers also argue that the Interim Policy properly balances the interests of airport users and airport proprietors. The carriers assert that the overall cap on aeronautical revenues based on HCA costs protects carriers from abuse of monopoly power. Within the overall cap, the Interim Policy provides ample flexibility to airport proprietors to price individual facilities.

ATA/RAA also argue that the concerns expressed by ACI/AAAE in their earlier comments on the Interim Policy are misplaced. ATA/RAA argue that, if the HCA requirement is inconsistent with a state or local law, the state or local law is preempted. USAir asserts that airports may prevent airport tenants from earning windfalls by exercising their rights to approve subleases. USAir is also prepared to assume the risk, as a signatory carrier, that, under a residual system, it would be required to pay higher fees under the Interim Policy than non-signatories.

ATA/RAA also assert that the Supplemental Proposed Policy will permit airport proprietors to generate surplus revenues from aeronautical activities. To the extent that the surpluses are used for capital investment, current users would be required to pay for future capital assets, in contravention of the policy and the position of the U.S. government in the dispute with the United Kingdom over Heathrow airport user fees. The carriers also argue that the prohibition on diversion of airport revenue is not sufficient to prevent unjustified accumulation of surplus airport revenues. ATA/RAA point to the findings of a Congressional investigation that airport revenue diversion is wide-spread and that airport proprietors increasingly view financially successful airports as a potential source of funds to alleviate general budgetary shortfalls.

IATA also argues that the Supplemental Proposed Policy would be inconsistent with the ICAO policy that all airport charges are to be set in relation to the costs of facilities and services provided, citing ICAO Doc. 9082/4. As IATA points out, the ICAO guidelines permit the airport proprietor to earn a reasonable return. IATA argues that the approach of the Supplemental Proposed Policy to pricing of nonairfield assets will permit airport owners to establish fees according to arbitrary and unreasonable standards.

*General Aviation:* While the NATA does not recommend that the Department establish accepted charging practices for facilities leased by aviation businesses, the NATA disagrees with the Department's assertion that disputes over charges for nonairfield assets focus on unjust discrimination. For the NATA members negotiating leases, the level of their fees, rather than unjust discrimination, is the area of disagreement. Therefore, the NATA recommends that proposed paragraph 2.6 be expanded to outline areas for consideration in establishing fees. The NATA acknowledges that each negotiation presents unique circumstances. However, the NATA suggests that the Final Policy identify as relevant the following considerations: physical variables of the airport and leasehold; functional variables of the airport and leasehold; and economic variables of the area served by the airport.

The AOPA asserts that the Interim Policy balanced the needs of airport operators and users. It argues that the approach of the Supplemental Proposed Policy could lead to unreasonable fees. The AOPA is not persuaded that effective competition exists for nonairfield aeronautical assets. Further, neither possible investigation of accumulation of aeronautical surpluses, nor the limitations on use of airport revenue adequately protect against excessive fees.

*Other commenters:* Two individual commenters object to limiting the HCA requirement to the airfield. They argue that doing so will allow airports to generate substantial surpluses.

*The Final Policy:* The Department is following the approach of the Supplemental Proposed Policy on this issue. However, we are adding a provision specifying that, if an airport proprietor bases nonairfield fees on cost, the airport proprietor must follow the policy guidance on allocation of shared costs (Paragraph 2.4.5). This addition will assure that, when a cost-based methodology is employed, shared costs will be treated consistently across all

cost centers. In addition, we are modifying proposed paragraph 3.1.1 governing allocation of costs among users and user groups to conform to the Final Policy's approach to nonairfield fees.

The approach of the Final Policy is justified by differences between airfield assets and public-use roadways, on the one hand, and other aeronautical assets, including passenger terminals, on the other. The airfield and the public-use roadways are common use facilities, and their use is more or less fungible. Generally speaking no single user derives more or less benefit from a particular use. To the extent that this general principal does not hold true during peak times at congested airports, the Final Policy allows for reasonable and not unjustly discriminatory peak-pricing systems. Otherwise, a detailed, cost-based definition of reasonableness is appropriate for such fungible assets and would not disturb industry practices or prevent airport proprietors from allocating resources efficiently.

In contrast, other facilities are generally leased on an exclusive or preferential use basis. In addition, such facilities, including terminals, are much less fungible. For example, carriers typically take responsibility for outfitting their passenger terminal areas and can reasonably be expected to view that responsibility as an opportunity for promotion. The value of gates to carriers may depend in part on their location in the terminal or the intensity of their use. Other non-terminal facilities may be perceived by users to have different values based on a variety of factors, including the following: proximity to runways and taxiways; source of construction financing; ownership of improvements at the end of lease terms; and expected use of facilities, including rights to exclusive or preferential use. A requirement that revenues from these facilities not exceed an amount determined by a cost-based formula could prevent these differences from being fully recognized in establishing fees. A policy that gives preeminence to the free play of negotiation and exchange of benefits to assure that fees for nonairfield facilities are reasonable would permit these differences to be fully recognized and would continue current industry practices. Accordingly, the latter approach is preferable.

The record contains numerous examples of nonairfield fees set on a basis other than HCA valuation. For example, in the public meeting on the Supplemental Proposed Policy held in Washington, DC, all of the airport proprietors testified that they use methods other than HCA valuation for at least some nonairfield facilities. Supplemental Proposed Policy Regarding Airport Rates and Charges, Public Meeting (October 17, 1995), (''October 17 Public Meeting'') Transcript pp. 31–33, 36–37, 39, 79–80, 81. Further, in their comments on the Interim Policy, ACI/AAAE reported that some airports establish fees for leased property by competitive bid or solicitation, often by operation of state law. Comments of ACI and AAAE in response to the Policy Regarding Airport Rates and Charges, Docket No. 27782 (''ACI/AAAE May 4 Comments'') at 6 (May 4, 1995). Their comments also provided other examples of nonairfield facilities that are priced on some other basis than HCA valuation. Id. 12–13. The limited evidence to the contrary offered by the carriers is insufficient to overcome that offered by the airport proprietors. See, October 17 Public Meeting Tr., pp. 77–78. Thus the record demonstrates that requiring HCA valuation for all aeronautical facilities would substantially disrupt current practices that have not been the subject of complaints.

The Interim Policy was intended to preserve that flexibility for establishing rates for nonairfield facilities. Our experience under the Interim Policy, however suggests that the Interim Policy had altered the status quo. For example, in their comments on the Interim Policy, ACI/AAAE reported instances in which airlines informed an airport proprietor that the maximum rental payments it could require must be based on historic costs. ACI/AAAE May 4 Comments at 24–25. In one case, a carrier had agreed to a new hangar lease at rates exceeding HCA rates but then refused to execute the agreement following publication of the Interim Policy. An airport proprietor also testified to concerns that HCA valuation would be used as the starting point for all negotiations under the Interim Policy. Supplemental Proposed Policy Regarding Airport Rates and Charges, Public Meeting (September 20 1995), (''September 20 Public Meeting'') Docket No. 27782, Transcript at 23–25.

The carriers' claims that airport proprietors exercise monopoly power in pricing essential aeronautical facilities are not supported by the Department's experience. Many U.S. carriers have benefited from airports' competition with each other to be the location of aeronautical facilities, including facilities for passenger and cargo hubs. Moreover, as ATA/RAA themselves argue, in their objections to the treatment of imputed interest, publicly-owned airports do not operate under the same profit motive as private investors. Public airports are operated, for the most part, as public facilities to serve the public good by enhancing local access to the national air transportation system. Airport proprietors generally seek to improve air services for their communities. This objective would be frustrated by charging exorbitant fees for aeronautical facilities. There may be isolated exceptions to this general rule. However, the Department is not prepared to require the vast majority of airports to change their methods of doing business to address the extraordinary situation. In the extraordinary situation, the Department would consider airline complaints concerning significant disputes through an expedited administrative procedure (14 CFR Part 302). Other cases would be processed under the FAA's investigative and enforcement procedures (14 CFR Part 13).

The Supplemental Proposed Policy did not propose to permit every method for establishing fees for nonairfield assets, but only any reasonable method. Users are still free to demonstrate that in the circumstances of a particular airport, a particular method is unreasonable. For example, users may demonstrate that the method is not justified in the circumstances or applied on a consistent basis.

As we noted in publishing the Supplemental Proposed Policy, our decision to take a flexible approach to the pricing of nonairfield facilities is based in part on the relative lack of disputes between carriers and airport proprietors over the reasonableness of fees for such facilities, even those deemed essential by the carriers. The widespread acceptance of these industry practices indicates their reasonableness and general fairness. By relying on industry practices in formulating our policy, the Department is fulfilling the Supreme Court's expectation that the Department would in large measure base its standards for reasonable airport fees on the relevant facts and circumstances of the industry. Kent County, 114 S.Ct. at 863, 864 n. 14. We are not persuaded by carriers' arguments that this experience is unreliable.

First, while residual agreements have been common in the industry, so were compensatory agreements. A 1984 Congressional Budget Office study reported that 42 percent of large hub airports (10 out of 24) and 42 percent of medium hub airports employed a compensatory approach to rate-setting. Financing U.S. Airports in the 1980s, Congressional Budget Office (April 1984). The Kent County litigation stemmed in part from the airport proprietor's decision to continue its

historic compensatory approach to landing fees.

Second, based on the comments and testimony in this docket, airport proprietors commonly use methods other than HCA valuation to establish fees for passenger terminal, cargo handling and other ''essential'' nonairfield facilities, as discussed above.

Third, the examples of airport bond financing cited by the carriers do not show that airport proprietors are readily able to obtain debt-financing for nonairfield facilities without carrier agreement. Denver International Airport involved construction of an entire airport in conjunction with the closure of Denver's then existing air carrier airport. Moreover, Denver was unable to maintain investment grade status for the bonds. The Grand Rapids experience involved bond financing for a new runway. Under the Final Policy, runways must be priced based on HCA valuation, absent agreement by the users.

Likewise, the examples of airports that have dramatically raised fees cited by the carriers (Los Angeles, El Paso and Allentown) do not support the claim that airport proprietors exercise market power in establishing fees for nonairfield facilities. First, all three examples involved landing fees, which remain subject to the HCA valuation requirement and detailed guidance of the policy. Second, the conversion from residual to compensatory methodology accounts for much of the increase at two of the airports (Los Angeles and El Paso). ATA/RAA's other example, Orlando, has not yet established new fees. ATA/RAA relies on a projection of what Orlando might do when existing agreements lapse. Moreover, it assumes that the airport will convert from a residual to a compensatory methodology. October 17 Public Meeting Transcript at 38. The selection of either methodology has been deemed reasonable by Congress through enactment of section 47129(a)(2).

Finally, the Department is not convinced that the threat of judicial review of fees for nonairfield facilities was a significant factor in preventing excessive charges. Relatively few airline/airport disputes over airport fees have been resolved by litigation. Of those few, only one or two did not involve charges for use of the airfield. In these circumstances, it is doubtful that the threat of litigation would have proved a significant deterrent to abuse of monopoly power, assuming that power existed.

We have also concluded that, on balance, the approach of the Interim Policy could have additional undesirable results outlined by ACI/AAAE in their joint comments. For example, if market-based rates exceed HCA-based rates, the Interim Policy would have allowed airlines through their subleasing to enjoy the additional revenue, but would have effectively precluded airport proprietors from earning that additional revenue. Thus, that additional revenue would have been unavailable for investment in the national airport system. At a time when Federal resources for airport infrastructure investment are severely strained, we are loathe to restrict unduly the ability of airport proprietors to generate funds for such investment.

The Department agrees that the threat of a Department investigation of accumulation of surplus aeronautical revenue by itself may not be a perfect check against unreasonably high fees for nonairfield facilities. However, we are not relying solely, or even primarily, on this threat. Rather, in our experience, the market generally functions to prevent excessive charges, and airport proprietors have not routinely imposed unreasonably high fees for nonairfield, aeronautical facilities. Moreover, the limitations on the use of airport revenue, including the actions mandated by section 112 of the Reauthorization Act, diminish one possible incentive to generate excessive surplus aeronautical revenue—use of the surplus to fund general governmental activities. At this time, we are not prepared to impose rigid industry-wide pricing criteria for nonairfield facilities to address speculative concerns about a few airports. In explicitly reserving our right to investigate, the Department is signaling its intention to act in those rare situations where intervention would be appropriate. Further, we are signaling our intent to consider the reasonableness of nonairfield fees over the long term and not on the basis of a single year's results. We are, of course, prepared to revisit this issue if experience shows that our approach is not effective in preventing contention, controversy, and unreasonable practices in the pricing of nonairfield aeronautical facilities.

For these reasons, we expect that pricing of nonairfield aeronautical facilities and services under the Final Policy will produce results consistent with the policy guidance that aeronautical charges should not produce unreasonable returns.

The Final Policy merely allows airport proprietors to continue current pricing practices that have not resulted in excessive charges.

Our policy on this issue is consistent with the position of the U.S. government in the dispute over landing fees at Heathrow. In that case, the U.S. government did not argue that the British Airports Authority and (later) BAA plc were not entitled to earn any surplus. Rather, the objections stemmed from circumstances that are unlikely to arise in the United States.

The BAA establishes fees each year following consultation with the users, but without their agreement. The BAA imposed separate landing fees, aircraft parking charges and passenger terminal charges. During the period in dispute, BAA had unilaterally increased its airport user charges at Heathrow to finance on a pay-as-you-go basis substantial new capital improvements at London's Heathrow and Gatwick airports. The BAA had also sought to earn a rate of return on the funds invested in the new projects during construction. Nothing in the Final Policy precludes the Department from determining that an airport proprietor that is financing on a pay-as-you-go basis significant new capital development through unilaterally imposed terminal rents is charging unreasonably high terminal fees. Rather, we are relying on the market mechanism and negotiating process to prevent such an occurrence in the first instance. Nothing in our experience with the US airport industry indicates that a U.S. airport would be able to duplicate the BAA's approach to charging for terminal facilities.

Likewise, the results of our approach to nonairfield assets is consistent with ICAO guidelines. First, the Final Policy does not permit fees to be established for these facilities by any method. Rather, the method must be reasonable. In addition, we rely on market discipline to assure that these fees, which are largely negotiated, are reasonable, and do not result in the generation of excessive profits (or rate of return). As IATA acknowledges elsewhere in its comments, the ICAO guidelines permit an airport proprietor to earn a reasonable return on its investment.

We do not agree with carrier arguments that our approach to enforcing the prohibition on airport revenue diversion will provide incentives to airport proprietors to charge excessive fees for nonairfield facilities and services to obtain additional funds for general municipal purposes. Our approach to nonairfield assets will not undermine enforcement of the requirements on the use of airport revenues. The Department is committed to ensuring that airport revenues are

32009

used for airport purposes, as required by law under 49 USC § 47107(b). Moreover, in section 112 of the FAA Authorization Act of 1994, codified at 49 U.S.C § 47107(l), Congress added new requirements relating to both legal and illegal diversion of airport revenue in response to carrier concerns, as well as new sanctions for violations of the revenue diversion prohibition. On February 20, 1996, the FAA issued a Proposed Policy and Procedures Concerning the Use of Airport Revenues, Docket 28472 (61, FR 71344, February 26, 1996). In addition, on March 18, 1996, the FAA published formats for the preparation and filing of two reports by airport sponsors. One report would list amounts paid and services provided by the airport to other units of government, as well as explanations for claims of lawful diversion. The other report would detail the total revenue and expenditures at each commercial airport, including revenue surplus. These reports were required by section 111 of the 1994 Reauthorization Act.

In addition, the statute prohibiting revenue diversion excludes from the prohibitions certain arrangements that were in place when the statute was enacted. Many instances of airport revenue diversion identified in the Congressional Report cited by the carriers involved ''legal diversion'' under this statutory exception.

To date, our experience does not indicate that the statutory provisions and FAA's actions in implementing them are ineffective in assuring that airport revenue is used for lawful purposes. At this time, concerns about airport revenue diversion do not justify curtailing airport proprietors' customary flexibility to establish fees for non airfield facilities.

We are not adopting the NATA's suggestion that additional guidance be given for lease negotiations. As the NATA acknowledges, each lease negotiation will involve unique considerations and circumstances. A factor that is important in one negotiation may have no relevance in a second. Moreover, the Department is committed to applying the Final Policy to general aviation fees in a flexible way. By delineating criteria to be considered in negotiating leases, the policy would decrease, not increase, flexibility.

Finally, the Department has reviewed the detailed guidance under Principle 2 and modified the provisions as appropriate to reflect the narrowing of the requirement for HCA-based fees. Not all of the paragraphs suggested by the commenter have been modified. In some

cases the unrevised paragraphs implement statutory requirements in addition to the reasonable fee requirement.

*14. Application of HCA Requirement to Airfield and Public Use Roadways*

The Supplemental Proposed Policy proposed that airfield facilities, airfield land and public-use roadways, be valued according to their historic cost to the original airport proprietor, except by agreement with users. Proposed para. 2.5.1. In addition, in proposed Paragraph 2.5.1(a), the Department proposed methods for charging for land dedicated to the airfield and public use roadways (''airfield/roadway land''). This provision is discussed separately below. The Department also proposed to allow airport proprietors to charge more than a *pro rata* share of airfield costs to particular users to encourage efficient use of the airfield. Proposed Para. 2.5.1(b). This provision is also discussed separately below.

*Airport Proprietors:* ACI/AAAE point out that their earlier acceptance of HCA valuation for airfields was not based on analogy to other industries, but based on their conclusion that vast majority of members would not be greatly disadvantaged. ACI/AAAE do not accept the carrier position that airports possess market power with respect to any airport facilities. ACI/AAAE urge the Department to implement the HCA valuation requirement flexibly, to permit direct resolution of disputes. ACI/AAAE also argue that, to be effective, peak-pricing systems must incorporate landing fees that are high enough to balance supply and demand, regardless of the airfield's historic cost. ACI/AAAE request the Department to clarify that an airport using an otherwise acceptable peak-hour pricing system may charge landing fees that are not based on historic cost.

Massport asserts that in some cases, the HCA valuation requirement for the airfield is inconsistent with sound economic theory and efficient allocation of scarce airport resources. Massport suggests that the policy should define HCA valuation for the airfield as presumptively reasonable, but permit an airport proprietor to show that other valuation methods are reasonable.

Los Angeles and San Francisco request that the HCA requirement for the airfield and public-use roadways be eliminated. Los Angeles argues that market-based rents are inherently reasonable, as the Department itself recognized in proposing to narrow the HCA requirement. Market-based rates also reflect economic reality better. Los Angeles further argues that the

reasonableness of market-based pricing has been sustained in judicial decisions, including Blum v. Stenson, 465 U.S. 886, 892–95 (1984); Harmon City, Inc. v. United States, 733 F.2d 1381–1382–84 (10th Cir. 1984); and Telesat Cablevision, Inc. v. City of Riviera Beach, 773 F.Supp. 383, 407 (S.D. FL 1991).

Los Angeles and the City of San Francisco argue that market-based pricing for the airfield is most consistent with the requirement that airport proprietors establish a fee and rental structure that will make the airport as self-sustaining as possible. Both airport proprietors rely on the determination of the OIG that airports must receive no less than fair market value for aeronautical land and improvements in order to meet this mandate. Los Angeles also argues that its proposed method of determining FMV, based on the land's next best use, avoids any risk that the FMV determination will reflect the exercise of market power.

Los Angeles further argues that even though the Supplemental Proposed Policy would allow the airport proprietor to amortize the costs of acquired land, the HCA requirement would not allow the airport proprietor to compensate itself for the opportunity costs of maintaining its investment in the airfield rather than using the property for other purposes. Los Angeles asserts that the courts now recognize opportunity costs as a real cost, citing among other decisions, Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1369 (7th Cir. 1985); Duff v. Marathon Petroleum Co., 985 F.2d 339, 340 (7th Cir. 1993). Los Angeles also complains that the HCA valuation requirement fails to compensate the airport proprietor for the costs of inflation. At a minimum, the policy should be modified to permit adjustments to HCA valuation to reflect general inflation.

Los Angeles also argues that the HCA valuation requirement results in an unconstitutional taking of the airport proprietor's property, because it precludes the airport proprietor from earning a fair return on investment. Los Angeles argues that, under Duquesne Light Co. v. Barasch, 488 U.S. 299, 307, 310 (1989), a rate set at a level that is confiscatory is unconstitutional. A rate that does not allow for a rate of return is per se confiscatory, according to Los Angeles, and therefore, unconstitutional. Los Angeles also suggests that the fair return must be based on the present value of the assets, citing Smyth v. Ames, 169 U.S. 466, 547; Denver Union Stockyard Co. v. United States, 304 U.S. 470, 473 (1938).

Los Angeles also argues (in its comments on the Interim Policy) that the property of public as well as private entities is protected by the takings clause of the Constitution, citing United States v. 50 Acres of Land, 469 U.S. 24, 31 (1984).

Los Angeles further argues that requiring HCA valuation for airfield land subsidizes air carriers needlessly by transferring the value of the airfield assets to the carriers.

In addition, Los Angeles argues that the HCA valuation requirement would make the charge for airfield land in the rate-base a function of happenstance—whether land is owned or leased. If land is leased, the airport proprietor would be able to charge its full rental payments—reflecting fair market value—to the airfield users.

Finally, the Metropolitan Airport Commission (''MAC'') requests the Department to modify the policy to permit any reasonable method for valuing public-use roadways. MAC asserts that off-airport commercial enterprises may attempt to use the provision to pay no more than the roadways' historic costs, even though these enterprises are not aeronautical users. MAC operates the Minneapolis-St. Paul International Airport.

*Carriers:* Carriers support retaining the HCA valuation requirement for the airfield and public-use roadways consistent with their arguments against elimination of the HCA cost cap for total aeronautical revenues.

*General aviation:* AOPA expressed general support for HCA valuation of airfield assets.

*Other commenters:* The American Car Rental Association (''ACRA'') considers the HCA valuation requirement to be inconsistent with fees based on cost recovery. The HCA valuation requirement would, in ACRA's view, perpetuate a subsidy to airfield assets from other parts of the airport.

*The Final Policy:* The Department is adopting the provisions of the Supplemental Proposed Policy without substantive change. After reviewing all comments, the Department has determined that the HCA valuation requirement for the airfield and public-use roadways should be retained. The requirement reflects nearly universal industry practice. See LAX I, Order 95–6–36 at 21. It is acceptable to the overwhelming majority of airport commenters who addressed the issue and has the unanimous support of aeronautical users. While we are willing to allow airports to use other reasonable methods for establishing fees for non-airfield facilities, the rationale for that decision does not apply to fees for

airfield assets, as outlined in the previous section. Among other things, airfield fees have resulted in several major controversies.

Moreover, HCA valuation is recognized as an acceptable method of valuing assets when determining reasonableness, even if it is not the only one. In this regard it is simpler than other methods, especially market valuation techniques. HCA valuation can generally be determined from accounting records. FMV methodologies would invite disputes over appraisals for the value of airfield land. Unlike typical commercial real estate, there is no generally acceptable methodology for identifying and valuing comparable uses for land dedicated to an airfield. Permitting FMV valuation for the airfield would turn landing fee disputes into debates between real estate appraisal experts with the Department in the role of referee. The Supreme Court has noted that the difficulties of calculating FMV caused regulatory agencies to abandon the use of FMV for valuing capital investments for public utilities. Duquesne Light, supra, 488 U.S. at 308–309.

In addition, the HCA valuation requirement allows airport proprietors to fully recover their out-of-pocket costs of providing airfield facilities and services. The policy allows the airport proprietor to fully recover all of its capital expenditures —through depreciation and, for land, through amortization or imputed interest charges. For debt-financed expenditures, the airport proprietor may fully charge airfield users with the costs of paying principal and interest. Other provisions of the policy permit recovery of opportunity costs, and the costs of inflation, to the extent that an airport proprietor is entitled to such recovery, as discussed below. Thus, the HCA valuation requirement for the airfield is not inconsistent with the statutory requirement on self-sustainability. For these same reasons, the HCA requirement is consistent with the principle of cost recovery urged by ACRA and does not result in a subsidy to airfield users.

The Department notes that the Inspector General (in numerous audits of the FAA's monitoring of airport revenue) has recommended that aeronautical leases must be set at fair market value to comply with the self-sustainability requirement. This recommendation is not, as Los Angeles asserts, a basis for eliminating the HCA requirement for the airfield. The Secretary of Transportation, not the Inspector General, is responsible for establishing policy and interpreting the

requirements of the AAIA. In promulgating this policy, the Secretary of Transportation has determined that the requirement of self-sustainability does not mandate FMV-based valuation of airfield assets and of other aeronautical assets. The pricing of these assets is also subject to the standard of reasonableness.

The standard of reasonableness and the standard of self-sustainability are not identical in application. The requirement of a fee and rental structure that will make the airport as self-sustaining as possible does not apply to the setting of a particular fee. Rather, the requirement applies to managing the airport's revenues and establishing a schedule of fees that generates sufficient earnings to meet current expenditures, to offset future deficits, and avoid the necessity of reliance on taxation. See, *e.g., Clifton* v. *Passaic Valley Water Commission,* 557 A.2d 299 (N.J. 1989).

Even if we interpreted the self-sustainability requirement to apply to individual fees, that requirement does not override the requirement of reasonableness. A fee set to maximize revenue (as the OIG assumes FMV-based fees do) may be consistent with the requirement of self-sustainability. However, if the fees resulted in surpluses, those fees might be unreasonable. Congress has declared as a matter of policy that airport proprietors should not seek to create revenue surpluses that exceed the amounts to be used for system purposes and other lawful purposes. 49 USC § 47101(13).

The Department has carefully considered the other objections to the HCA valuation requirement, particularly those expressed by Los Angeles. However, Los Angeles has failed to show that the Department's approach is wrong. While the FMV technique has been sustained in judicial decisions as meeting the standard of reasonableness, Los Angeles has cited no authority establishing that the FMV technique is the only reasonable method for determining rates. Indeed, as Los Angeles acknowledges, the Supreme Court in Federal Power Commission v. *Hope Natural Gas Co.,* 320 U.S. 591, 605 (1944), held that HCA valuation is also a valid basis for determining reasonableness. In that case, the Court abandoned its earlier preference for present valuation of assets expressed in the Smyth v. *Ames* and *Denver Union Stock Yard* cases cited by Los Angeles. The courts have recognized that regulatory agencies normally use historic costs for rate cases. Duquesne Light, supra, 488 U.S. at 309–310; Jersey Central Power & Light Co. v. *FERC,* 810

F.2d 1168, 1175 (D.C. Cir. 1987) (en banc).

The Department likewise is not persuaded that FMV-based landing fees are required to compensate airport proprietors for the opportunity costs of airfield investments. Los Angeles' claim for opportunity costs assumes that airport proprietors are free to disinvest in the airfield and put their capital to other uses. Most airport proprietors subject to this policy, including Los Angeles, are not. These airport proprietors have accepted Federal financial assistance or free Federal land for airport development. Los Angeles has accepted both. In exchange for this Federal assistance, they have committed to continue to operate their airports as airports. Los Angeles' compensation for devoting the LAX airfield for use as an airfield was the Federal financial assistance and donated Federal land.

In any event, to the extent that the airport proprietor is entitled to recover any opportunity costs in the airfield rate base, these costs may be recovered through the imputed interest charge under the Final Policy. The imputed interest charge is intended to compensate the airport proprietor for the use of internally generated funds invested in the airfield and not elsewhere on the airport.

Similarly, an airport proprietor may look to the imputed interest allowance to be compensated for inflation. The Final Policy permits an airport proprietor to charge imputed interest at a reasonable rate. The airport proprietor's adoption of an appropriate and reasonable market-based rate should compensate the airport for inflation. Investors in capital markets expect to be compensated for inflation, as well as the opportunity cost of investment. Therefore, market-based imputed interest rates ordinarily reflect investors' expectations on the future rate of inflation.

The HCA valuation requirement will not violate the Constitutional rights of airport proprietors by denying their right to earn a return on their investment or by taking their property without just compensation.

The requirement does not deny airports—whether privately or publicly-owned—their Constitutional right to a rate of return on their investment. The Supreme Court, after all, has held that a regulatory agency's use of HCA valuation in rate-making cases does not violate the Constitutional principle that regulated firms must be allowed the opportunity to earn a return on their investment. See, Duquesne Light, supra, 488 U.S. at 308–310.

In addition, paragraph 2.4 of the Final Policy explicitly allows private owners of airports to earn a rate of return. Assuming that state and local government agencies operating airports were entitled to earn a rate of return, the Final Policy does not deny them that right. The Final Policy allows an airport proprietor to charge imputed interest on its investment in the airfield, except to the extent those investments were made with funds derived from fees paid for the use of the airfield. This imputed interest represents compensation for the airport proprietor's capital invested in the airport, as would a return on investment.

The HCA valuation requirement thus does not violate the takings clause of the Constitution. The Supreme Court considers three factors in determining whether government action constitutes a taking: the action's character, its economic impact, and the extent to which the action interferes with investment-backed expectations. See Connolly v. *Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224–225(1986); *Concrete Pipe & Products* v. Construction Laborers Pension Trust, 508 U.S. 602; 113 S.Ct. 2264, 2291 (1993). The Final Policy's limits on airfield fees cannot constitute a taking under these standards.

First, the HCA valuation requirement causes no physical invasion or permanent appropriation of an airport's property. Instead, as is typical of many regulatory programs, the HCA valuation requirement adjusts the benefits and burdens of economic life in order to promote the common good. That type of regulation is not normally deemed a taking of property.

Second, the economic impact on airports is not severe. As admitted by Los Angeles' expert witness in LAX I, every airport in the United States except LAX has valued airfield land at historic cost in setting fees. Order 95–6–36 at 21. Even LAX used HCA valuation before 1993, when it implemented the FMV-based fees found unreasonable, in part, by the Department in LAX I. Moreover, the HCA valuation requirement enables airports to recover the actual costs of their investment in airfield facilities, and airports may also obtain imputed interest on their investment, unless the invested funds were derived from airfield fees.

Third, requiring HCA valuation cannot interfere with any airport's investment expectations, as demonstrated by the Court's analysis in Connolly, 475 U.S. 226–227. The HCA requirement merely ratifies the airports' existing practices for pricing airfield assets. In addition, as both ATA/RAA

and ACI/AAAE point out, state and local governments invest in airports in order to further the well-being and general welfare of their citizens, not in order to make a profit. Furthermore, federal statutes have limited airport aeronautical fees for many years and imposed other restrictions on the use of airport funds and property by airport owners.

Los Angeles' concern about anomalous treatment between leased and owned airfield land does not justify abandoning the HCA valuation requirement for the airfield. First, the situation in which an airport proprietor leases an airfield from an independent entity, rather than owns it, is extremely rare. The Department is aware of only two airport proprietors that lease their airfields—the Port Authority of New York and New Jersey and the Metropolitan Washington Airports Authority. In both cases the airport proprietor is leasing from other governmental entities. Second, even as between two airport proprietors that own their airfields, the Final Policy may well require one airport to charge lower fees than the other, because the former has lower costs. Two airports could have different costs for a number of reasons, including the following: differences in land costs at the time of acquisition; differences in the acreage of the respective airfields; differences in the interest rates payable on bonds used to finance the airfield;, and even differences in the salary and benefit structure of the two airport proprietors. Moreover, even with airfield assets valued at FMV, airfield rates could be determined by a factor that could be deemed "happenstance"—the market conditions at the time each airport's fees are established. However, the Department would consider each airport proprietor's costs in determining the reasonableness of its airfield fees because each airport's costs vary. This variation is not a reason to ignore those costs, or to avoid using HCA valuation.

The Department will not adopt the suggestion that the HCA valuation requirement be adopted as a rebuttable presumption. The practice of using HCA valuation for the airfield is wide-spread and long-standing. Therefore, the Department does not see a need to allow airport proprietors to argue routinely that a different valuation methodology is reasonable. Such arguments could greatly add to the burden of processing complaints under section 47129. However, the Department, on a case-by-case basis, has allowed airport proprietors to argue that the HCA valuation requirement should not be

applied to them because of unusual circumstances. See, e.g., LAX I, Order 95–6–33 at 15–17. We would continue to do so.

In addition, the Department is retaining the HCA valuation requirement for the public-use roadways. Public-use roadways are more like the airfield than like terminals. Roadways are common use facilities, like the airfield. An aeronautical user cannot derive commercial or competitive benefit vis-à-vis competitors through the use of the roadways, and aeronautical users do not separately bargain for the use of the roadways.

MAC acknowledges that the provisions of the Final Policy governing reasonable fees do not apply to fees paid by nonaeronautical users. Therefore, nonaeronautical users may not rely on the Final Policy to claim a right to roadway access charges based on HCA valuation.

Airport proprietor concerns about the relationship between the HCA valuation requirement and peak pricing are addressed in the disposition of comments on peak pricing.

### 15. Airfield Revenue Cap Based on HCA Valuation

The Supplemental Proposed Policy proposed that airfield revenues may not exceed airfield costs (proposed para. 2.2) and included detailed guidance on how airfield costs may be determined. Among other things, airfield assets must be valued based on their historic cost to the original airport proprietor. Proposed para. 2.5.1. Together, these provisions would create a cap on total airfield revenue based on HCA valuation of airfield assets.

*The comments:* Los Angeles and San Francisco oppose the cap on airfield revenues based on HCA costs. Both airport proprietors assert that the cap provision violates section 47129(a)(3), which directs that the Secretary "shall not set the level of the fee." Los Angeles argues that the cap deprives the airport proprietor of substantial latitude to set fees. Los Angeles further argues that the cap is inconsistent with the airport proprietor's right to use fair market values for airfield land. In addition, the cap would serve no purpose but to encourage airport proprietors to tinker with fees to keep them in sync with costs. San Francisco also argues that the cap amounts to a subsidy to airfield users.

Carriers and general aviation commenters generally support the HCA cap for the airfield.

*The Final Policy:* The Department is adopting the provisions of the Supplemental Proposed Policy without modification.

The contention that the HCA cap requirement illegally "sets" the fee for airfield use within the meaning of section 47129(a)(3) is wrong. The Final Policy provides detailed guidance on the total costs that may be recovered through airfield fees, but it does not establish a single, comprehensive formula for determining the amount of total airfield revenues. For example, the policy does not establish a single methodology to allocate common costs between the airfield and other cost centers, or to allocate indirect costs. Likewise, the policy does not establish a single permissible time-frame over which to depreciate and amortize airfield assets or a single permissible rate for the imputed interest charge. Each of these decisions is left to the discretion of the airport proprietor and will affect the total amount of revenue that the airfield may generate.

Moreover, the Final Policy does not establish a mandatory formula for charging individual airfield users. Rather, the airport proprietor also has some latitude in setting individual fees to recover total airfield revenue. The airport proprietor has some discretion to allocate costs among airfield users and to establish the basis of the charge. Airport proprietors can and do establish weight-based charges, operations-based charges, or charges based on a combination. Each of these decisions will affect the level of fee that an individual user pays.

In these circumstances, the HCA revenue cap cannot be said to "set" the level of an airfield fee. Furthermore, Congress has directed the Department to develop reasonableness guidelines. Since the Department has determined that airfield fees must be based on costs to assure that fees are reasonable, the required guidelines must set forth cost standards for those fees.

The Department has concluded that airport proprietors do not have a right to value airfield land at fair market value. Therefore, the HCA revenue cap cannot violate that purported right. Assuming, for the sake of argument, that an airport proprietor has a right to be compensated for the opportunity costs of its investment in the airfield, the Final Policy permits an imputed interest charge to be included in the rate-base. Moreover, as discussed above, the HCA cap does not provide a subsidy to airfield users, because it permits the airport proprietor to fully recover the costs of providing airfield services and facilities.

The airfield cost cap merely implements the Department's approach to pricing the airfield. As noted previously, the fundamental requirement of reasonableness for airfield fees is that the fees reflect the costs of providing services and facilities for users. The Department has chosen to impose a specific requirement to achieve that result and provide detailed guidance on acceptable methods for determining costs. The HCA cap follows logically from this approach.

The HCA cap on airfield revenue does not require a constant tinkering with fees to assure that fees never exceed costs in any charging period. The Department expects airport proprietors to set fees prospectively based on their reasonable projections of traffic and of costs determined in accordance with the policy. The Department also expects that airport proprietors will periodically review their fees and adjust them, on a prospective basis, based on projected changes in costs and traffic. This expectation is based on the standard of reasonableness; it is reflected in a separate provision of the Final Policy (paragraph 2.3), which is independent of the HCA cost cap. Moreover, Los Angeles has chosen to set fees on an interim basis and to make periodic adjustments based on actual results. This approach renders its concerns about tinkering moot.

### 16. Amortization of HCA Value of Airfield Land

The Supplemental Proposed Policy included provisions describing how the airport proprietor might recover the cost of airfield land through airfield fees. The Department proposed that, if land was acquired with debt financing, the airport proprietor may include a charge for all related debt-service costs, including principal, interest and debt service coverage. For land acquired with internally generated airport funds or donated by the sponsor, the Supplemental Proposed Policy proposed that the airport proprietor could amortize the land. The Department further proposed that upon completion of the amortization or retirement of the debt, the land may no longer be included in the rate base. Proposed para. 2.5.1(a). The Department did not propose to allow any other treatment.

*Airport proprietors:* Two individual airport proprietors specifically endorse the approach of the Supplemental Proposed Policy on this issue. Other airport proprietors did not comment. In addition, one airport proprietor argues that the amortization provisions should apply to facilities as well as land.

*Carriers:* Carriers object to the amortization of the cost of land acquired

by means other than bond financing, because land is not a wasting asset. Therefore, amortization of land is not permitted by accounting or tax rules, and there is no reasonable basis for determining an amortization schedule for land. The carriers argue that if the Department permits amortization of land, the Department should set forth clear guidelines for the period of amortization. ATA/RAA argue that this period should be considerably longer than 39 years, which is the minimum depreciation period for commercial buildings under the Internal Revenue Code.

*General aviation:* Other aeronautical users did not comment on this issue.

*Other commenters:* One individual commenter requests the Department to limit the meaning of the term amortization to recovery of expenditures for land. This commenter points out that some airport proprietors define amortization as recovering the costs of land plus imputed interest.

*The Final Policy:* The Final Policy adopts the approach of the Supplemental Proposed Policy on recovering the cost of debt-financed land without modification. The Final Policy is being modified to permit an airport proprietor to choose one of two options for recovering the airport sponsor's cost of other land used for the airfield and public-use roadways. First, the airport proprietor may impose a reasonable amortization charge based on the HCA valuation of the land, and remove the land from the rate base upon completion of the amortization. Second, the airport proprietor may retain the original HCA value of the land in the rate-base indefinitely and charge imputed interest, to the extent permitted by this policy. To avoid overcompensation for this land, the airport proprietor may not alternate between methodologies. Amortization is being permitted, in part, because it is used by some airport proprietors and appears to be a reasonable alternative, as discussed below.

The ATA/RAA position on land that was not acquired with debt financing is unreasonable, because ATA/RAA would not permit the airport proprietor to charge either amortization or imputed interest on amounts invested in such land. Thus, ATA/RAA would deny any form of compensation to airport proprietors for their investment in airfield/roadway land.

However, as the carriers argue, land is not a wasting asset. Utility regulators do not generally permit a regulated entity to amortize the cost of land, but permit the regulated industry to include the

value of land in the investment base on which it earns a rate of return.

For this reason, the Department has concluded that the Policy should not mandate amortization as the sole means of cost recovery. However, the Department is not persuaded that amortization should be precluded.

While objecting to the practice, ATA/RAA did not argue that the practice is uncommon. Amortization is used at some airports in the United States and has not generated significant controversy at individual airports.

Further, over the long run, it is not clear that the two approaches would produce substantially different results. During the amortization period, amortization would produce higher annual charges. However, eventually, the land would be removed from the rate base and charges would be reduced. In contrast, if the full HCA value of land is retained in the rate base, airfield fees would include an imputed interest charge indefinitely. Over the long run, the imputed interest charges imposed indefinitely may balance out the higher charges imposed for a fixed period under amortization.

In addition, while the Final Policy may contain some provisions that favor debt-financing over internal financing, the Department seeks to avoid providing unnecessary incentives for debt-financing. The Department is concerned that prohibiting the amortization of airfield land that is not financed with debt could bias some airport proprietors toward using debt-financing for land acquisition.

Finally, the Final Policy precludes charging imputed interest on funds generated by airfield fees that are invested in the airfield. If funds attributable to airfield fees were invested in airfield land and the airport proprietor could not amortize the value of that investment, the airport proprietor would have no means of being compensated for its investment in land.

Based on these considerations, the Final Policy permits either methodology. The airport proprietor may include a reasonable amortization charge, provided that the land is removed from the rate base upon completion of the amortization period. Alternatively, the airport proprietor may retain the HCA value of the land in the rate base and impose a reasonable imputed interest charge, to the extent permitted by the Final Policy. The Final Policy also prohibits an airport proprietor from alternating between methodologies, to obtain undue compensation.

The Final Policy requires that when an airport proprietor elects to amortize its investment the charge must be reasonable. One factor in determining reasonableness is the amortization period. The Final Policy does not specify a particular period because what is reasonable will depend on the individual circumstances of a case. In reviewing the reasonableness of an amortization period, the Department will consider, among other things, whether the airport proprietor has selected a period that gives appropriate recognition to land's character as a non-wasting asset.

The Department will neither permit, nor prohibit, in this policy, the inclusion of an imputed interest element in the amortization charge. The Department would consider an airport proprietor's decision to include an imputed interest element as part of its review of the reasonableness of the amortization charge.

The Department is not adopting the suggestion to expand the provision on amortization to capital assets other than land. Other capital assets are subject to depreciation under generally accepted accounting principles ("GAAP"), and no specific provision in the Final Policy is required to permit depreciation charges. The Final Policy addresses land specifically because land is treated differently than other capital assets under GAAP.

## 17. Costs of Airport Systems

The Supplemental Proposed Policy proposed that the rate base of one airport could include the costs of a second airport currently in use only if the airport proprietor owns both airports; the second airport is currently in use; and the costs of the second airport to be included in the rate base are reasonably related to the benefits that the second airport provides to the aeronautical users of the first airport. Proposed Para. 2.5.4. The Department also proposed that the latter element would be presumed satisfied if the second airport has been designated as a reliever airport for the first airport by the FAA. Proposed para. 2.5.4(a).

*Airport proprietors:* The PANYNJ objects to the common ownership requirement. The PANYNJ argues that the owner of a commercial service airport should be able to contribute to the costs of an airport that serves a critical reliever function, even if the reliever is under separate ownership. The PANYNJ would make benefits the sole criterion.

The State of Alaska argues that by limiting the multiple airport system rate base to airports that have a direct traffic

relationship, the approach of the supplemental notice is more restrictive than the airport system approach provided in the FAA's grant assurances, and is excessively restrictive for the operator of a large system, like Alaska. The State operates 253 airports and seaplane bases.

*Carriers:* IATA opposes the approach of the Supplemental Proposed Policy. IATA argues that pricing must be airport specific to promote transparency and that carriers should not be required to pay for airport facilities that they do not or could not use.

*General aviation:* General aviation users did not comment on this issue.

*Other commenters:* One commenter—a law firm involved in bond financing—argues that the Department's approach does not give adequate consideration to the obligation of owners of airport systems to operate their systems in a financially self-sufficient way, as reflected in 49 USC § 47107(a)(13). This commenter stated that some airport proprietors may operate systems that are financially linked, but that are operationally distinct.

*The Final Policy:* The Department is adopting the provision of the Supplemental Proposed Policy without substantive modification. However, we are making editorial revisions to clarify that the provisions apply to systems of more than two airports. In addition, the Department will permit an airport proprietor to show that its existing practice of subsidizing an airport from another airport's airfield fees is reasonable, even if all of the criteria required by the Final Policy are not met. The Department does not wish to disrupt existing practices that have not generated controversy.

The approach of the Final Policy is based on the requirement of reasonableness. Generally speaking, the standard of reasonableness permits an airport proprietor to charge only for the facilities that it provides that are used by the rate-payer or that benefit the rate-payer. If an airport proprietor does not own the other airport, it cannot be providing those facilities. If the other airport is not currently in use, airfield users cannot be using the other airport or benefiting from it. For these reasons, the common ownership and currently-in-use requirements are retained. The requirement of benefit will be retained as well. It can be reasonable to charge a rate-payer for the costs of a facility from which it benefits, even if the rate payer does not directly use that facility.

This principle may be especially true in the case of a commercial airport/reliever airport system. The reliever airport's function is to draw general

aviation traffic away from the commercial service airport. If the airport proprietor had to charge the full cost of the reliever airport to general aviation users, the increased price might cause those users to elect the commercial service airport—increasing congestion and the carriers' costs of operating there.

However, the requirement of benefit does not mean that a direct traffic relationship is required in all cases. An airport's status as a designated reliever creates a presumption of benefit. However, an airport proprietor is free to show a benefit exists even when the subsidized airport is not a designated reliever.

The State of Alaska's argument regarding the treatment of airport systems appears to refer to the grant assurance on the use of airport revenue. The assurance permits airport revenue from any source to be used for any airport in a local airport system. However, charges to aeronautical users are subject to a separate and more stringent standard of reasonableness. Similarly, the comment about airport financial systems overlooks the reasonableness requirement. Financial self-sufficiency is also a Federal grant obligation. However, the Final Policy is clear that this obligation does not justify charging the users of the airfield more than the costs of operating the airfield to cover the losses incurred elsewhere at an airport. It follows that this standard does not independently justify charging the users of the airfield more than its costs to cover losses incurred at a separate airport. Moreover, section 47107(a)(13) in fact refers to charges that will make the airport, not the airport system, self sufficient.

In response to the State of Alaska's concerns about its approach to financing its airport system, the Department is modifying the Final Policy to provide for consideration, on a case-by-case basis, of the reasonableness of an existing practice that does not satisfy all three criteria listed in the Final Policy. This modification also furthers another Department goal: minimizing disruption of existing, non-controversial practices.

In addition, the policy on this issue does not preclude an airport proprietor from supporting another airport when the conditions specified in the policy are not met. It only precludes adding the cost of that support to the airfield rate base. Even this limitation can be waived by agreement with airfield users. Thus, the airport proprietor has the opportunity to persuade airfield users that the benefits of the second airport justify including some of its costs in the landing fee.

The Department's approach to airport systems is not inconsistent with our policy favoring transparency. An airport proprietor seeking to charge the users of one airport for the costs of another must justify the charge. The Department expects that as part of that justification, the costs of the other airport will be separately identified and the basis for the cost allocation explained.

## 18. Charging For Closed Airports

The Supplemental Proposed Policy proposed that, if an airport proprietor closes an airport as part of an approved plan for the construction and opening of a new airport, reasonable costs of disposition of the closed airport could be included in the rate base of the new airport, to the extent that the costs of disposition exceed the proceeds. Proposed para. 2.5.4(b).

*Airport proprietors:* The City of Chicago requests the Department to clarify that, if an airport is closed and its costs could be included in the rate-base of another airport, then the environmental remediation costs of the closed airport can be included in the rate-base. The City and County of Denver supports the approach of the Supplemental Proposed Policy, because that approach recognizes that an airport proprietor cannot dispose of an airport overnight.

The PANYNJ suggests that the policy should not be limited to airports closed as part of a plan to open a new airport. Rather, the charges also should be permitted if the FAA decides that continued operations at the airport being closed interfere with operations at an existing airport.

*Carriers:* ATA/RAA urge the Department to delete proposed paragraph 2.5.4(b) from the final policy. ATA/RAA argue that the provision is inconsistent with the fundamental principle that charges be just and reasonable and the requirement in proposed paragraph 2.5 that costs be limited to the capital and operating costs directly and indirectly associated with facilities currently in use. ATA/RAA also argue that by permitting airports to fund facilities not in use (the old airport), the provision is inconsistent with the principle underlying the prohibition of prefunding facilities not yet built. ATA/RAA also argue that the Supplemental Proposed Policy would provide a disincentive to airport proprietors to dispose of airports swiftly and efficiently.

*General aviation:* General aviation commenters did not address this issue.

*Other commenters:* Other commenters did not address this issue.

*The Final Policy:* The Department is adopting the provision of the Supplemental Proposed Policy with one modification. The Final Policy would permit an airport proprietor to add to the rate base of the new airport the reasonable costs of maintenance of the old airport while disposition is pending, so long as proceeds of disposition are applied first to credit or refund fees previously paid. This provision would not, however, apply if the terms of the Department's approved plan or user agreement provide otherwise.

The Department has determined that where an airport closure is part of an approved plan for a new airport, reasonable disposition costs, in excess of proceeds, may be included in the rate base of the new airport.

While ATA/RAA argue that the Department's approach requires airport users to pay for the costs of a facility they do not use, the Department considers its approach to be analogous to a situation in which structures must be acquired and demolished to make way for construction of new airfield improvements at an operating airport. The costs of acquiring those structures and demolishing them could be included in the airfield rate base, once the new facilities are in use, even though the demolished structures are never used by the carriers. Where the FAA has determined that an existing airport must be closed in connection with the opening of a new airport, the FAA has determined that the new airport, and hence its users, will benefit from that closure. Because the new airport users will benefit, it is reasonable to include in the rate base reasonable disposition costs, to the extent that they exceed the proceeds from disposition.

The requirement of reasonableness is intended to encourage swift and efficient disposition. While not defining reasonableness in detail, the Department states that it would not ordinarily consider redevelopment costs to be reasonable. The Department would also consider the diligence with which the airport proprietor pursues disposal.

After reviewing the comments, the Department has determined that additional clarification is appropriate. The Department recognizes that in some circumstances disposition expenses may be incurred before an airport's disposition. A new provision is added to the Final Policy permitting an airport proprietor to charge reasonable maintenance costs to airfield users before disposition, only if those costs are credited or refunded to the users upon receipt of the proceeds from a whole or partial disposition. In

reviewing the reasonableness of a charge in this circumstance, the Department would also consider the reasonableness of the airport proprietor's disposal efforts. The Department would ordinarily consider it unreasonable to continue charging for maintenance of the closed airport beyond the time the airport proprietor could have reasonably disposed of that airport. The Department's approach assures that the airport proprietor is not burdened with the costs of maintaining the old airport until the completion of a long disposition process, while also assuring that the users of the new airport are not burdened with the costs of disposition, when disposition proceeds ultimately exceed the airport proprietor's disposition costs.

The Department will not adopt the suggestion that environmental remediation costs of disposed airports be singled out for special treatment. The Department confirms that environmental remediation may qualify as a disposition cost, as discussed above under Issue 9, "Allowance For Environmental Costs." However, the commenter has not offered any explanation for treating environmental remediation differently than any other disposition cost.

The PANYNJ suggests that the policy should permit the disposition costs of a closed airport to be added to the rate-base of an existing airport when the FAA determines that the closure is required to accommodate the operations of the existing airport. The Department is not adopting this suggestion. The PANYNJ's proposed modification would be a solution in search of a problem. The PANYNJ has not offered any examples of this problem arising in the past, and the Department is unaware of any instance in which operations at existing airports have necessitated the closing of nearby airports. Should the situation arise in the future, the Department will address the issue in the context of that specific situation.

### 19. Charges to Non-Signatory Carriers

The Supplemental Proposed Policy proposed that the prohibition on unjust discrimination would not prevent an airport proprietor from establishing reasonable classifications of carriers, such as signatory and non-signatory carriers, and charging higher fees based on these distinctions. Proposed para. 3.1.1.

*The comments:* The City of Chicago argues that the historic cost requirement for the airfield could lead to some anomalies as applied to existing arrangements. Some rate agreements provide for signatory carriers to pay,

under a residual system, for facilities in addition to the airfield. Thus, they are paying more than the HCA-based rates for the airfield. Non-signatory carriers are required to pay even higher rates. Chicago argues that non-signatory carriers may claim that they are entitled to a compensatory HCA-based rate that is lower than the signatory rate. The City of Chicago requests that the Department clarify that an airport proprietor may impose a surcharge on non-signatory carriers, even if the signatory rates exceed HCA-based compensatory rates.

Other commenters did not address this issue.

*The Final Policy:* The Department will adopt the provision of the Supplemental Proposed Policy without modification.

The Department agrees that the Final Policy should not make non-signatory status more attractive to carriers than signatory status. Such a result would conflict with the first principle of the Final Policy, reliance on direct negotiation and agreement to establish reasonable fees. In addition, it is accepted industry practice to charge non-signatory carriers higher rates than signatory carriers, based on the decision of the former not to assume all of the obligations associated with signatory status. The Airport and Airway Improvement Act expressly permits the establishment of classifications based on status as a signatory carrier. See, 49 U.S.C. § 47107(a)(2)(B)(ii).

The Department has concluded that the provisions of the Supplemental Proposed Policy on signatory/non-signatory fees provide adequate flexibility to airport proprietors to charge reasonable surcharges to non-signatory carriers. No modifications are necessary to address Chicago's concerns.

The costs of serving a non-signatory carrier would ordinarily be higher than a compensatory rate reflecting the costs of serving exclusively signatory carriers. For example, non-signatory carriers may increase an airport proprietor's risk of revenue fluctuation. The increased risk in turn would justify higher reserves. In addition, the administrative costs of dealing with non-signatory carriers would ordinarily be higher. Further, an airport proprietor might be able to argue that due to their irregularity, or relative infrequency, operations by non-signatory carriers cost more to serve than a corresponding number of operations performed on a regular basis by signatory carriers. Each of these considerations would provide a justification for imposing a surcharge, in some amount, on non-signatory carriers.

In addition, signatory carriers usually assume obligations or responsibilities that non-signatory carriers do not undertake. Airport proprietors receive intangible benefits from having carriers at the airport undertake these additional responsibilities. A surcharge for non-signatory carriers may be justifiable, in part, as compensation to the airport proprietor for the reduction in these intangible benefits when a carrier elects non-signatory status.

The Department is not prepared at this time to modify the Final Policy to permit on a routine basis non-signatory charges that cause total airfield revenues to exceed airfield costs. However, we will review the reasonableness of such non-signatory charges on a case-by-case basis in light of the considerations outlined above.

*20. Peak Period Charges*

The Supplemental Proposed Policy proposed that under certain conditions, a properly structured peak pricing system would not be considered unjustly discriminatory. Proposed para. 3.2. The Supplemental Proposed Policy did not list prerequisites for peak pricing and did not propose a method for determining peak charges or peak/off peak differentials.

In addition, the Department proposed to permit airport proprietors to charge some segments of airfield users more than their pro rata share of accounting costs based on HCA valuation, to enhance efficient use of the airfield, if the airport proprietor uses a reasonable and not unjustly discriminatory methodology. Proposed para. 2.5.1(b).

*Airport proprietors:* ACI/AAAE and the PANYNJ argue that, to be effective, peak prices must be set without regard to HCA valuation. ACI/AAAE request the Department to clarify the meaning of proposed par. 2.5.1 and specify that an otherwise acceptable peak-pricing system may charge landing fees that are not based on HCA valuation.

*Carriers:* ATA/RAA argue that the subject of peak-period pricing is too complicated and potentially injurious to users to be addressed as one element in the larger policy on airport fees. ATA/RAA urge the Department to delete all references to peak pricing.

IATA argues that peak pricing cannot enhance the efficient utilization of airports, especially for international East-West operations.

*General aviation:* AOPA expresses concerns that the standard proposed—enhancing the efficient utilization of the airport—may provide sufficient latitude to invite abuse. AOPA doubts that many airports are sufficiently congested to justify peak pricing. AOPA suggests that

the Supplemental Proposed Policy could serve as an excuse for unreasonable ratesetting.

*Other Commenters:* Other commenters did not address this issue.

*The Final Policy:* The Department is adopting the provisions of the Supplemental Proposed Policy without substantive modification.

The Department's policy regarding peak pricing was established in its decision in the Massport PACE fee case. Massport Order, supra. In that decision, the Department concluded that a properly structured peak pricing system could be found reasonable and not unjustly discriminatory. Massport Order at 8–9. The Department's purpose in referring to peak pricing in this policy is not to break new ground or expand on the Department's earlier decision. Rather, it is to confirm our support for that decision.

The Department understands the concerns of airport users regarding abuse. The Department does not intend the policy statement to function as a blanket authorization for peak pricing. In reviewing a peak pricing system, the Department would scrutinize it carefully to determine first whether the airport in fact suffers from congestion, and whether the peak-pricing system is an appropriate response.

Regarding the linkage between peak pricing and HCA valuation, Paragraphs 3.2 and 2.5.1(b) each address the allocation of costs among users or user groups. The purpose of these provisions is to make clear that if a properly structured and justified congestion pricing system is in place, the airport proprietors may, during periods of congestion, charge airfield users more than their allocated share of accounting costs determined using HCA valuation. These provisions do not exempt airport proprietors from the requirement that total airfield revenues not exceed total airfield costs as determined in accordance with the Final Policy. Of course, the peak charge may also reflect any additional accounting costs the airport proprietor incurs in serving traffic during peak periods.

*21. Reservation of Authority to Investigate Progressive Accumulation of Aeronautical Surpluses*

In connection with the proposal to eliminate the HCA cost cap for all aeronautical revenue, the Supplemental Proposed Policy included a new provision on accumulation of surplus aeronautical revenue. The Department proposed that the progressive accumulation of substantial surplus aeronautical revenue may warrant an FAA inquiry into whether aeronautical

fees are consistent with the airport proprietor's obligation to make the airport available on fair and reasonable terms. Proposed para. 4.2.1. In discussing the treatment of nonairfield fees, we explained that the Department expects nonairfield aeronautical fees, over, time, to reflect aeronautical costs, including the airport's capital investment needs. 60 FR 47013.

*Airport proprietors:* Some individual airport proprietors objected to this provision. They are concerned that this provision combined with the referenced explanatory statement means that the Department may be introducing an implicit aeronautical cost cap.

*Carriers:* Carriers argue that tying the investigation of the reasonableness of aeronautical fees to the sustained accumulation of surpluses does not provide adequate protection against the exercise of market power in pricing nonairfield facilities. The carriers argue that without clear accounting and cost allocation guidelines, the policy will encourage airports to overallocate costs to aeronautical users to mask aeronautical profits. In addition, they contend that the policy will not provide an adequate mechanism to monitor the accumulation of surplus revenues. ATA/RAA also object that a Department investigation would be triggered only after years of surplus accumulation.

*General aviation:* AOPA also suggests that the protection will be ineffectual because the investigation would only be triggered after a long period of accumulation.

*Other commenters:* ACRA requests the Department to clarify that it will investigate the disposition of all airport revenues, not just aeronautical revenues, and that an investigation would be triggered by the accumulation of surplus airport revenues.

*The Final Policy:* The Department is adopting the provision of Supplemental Proposed Policy without modification.

As discussed above, in the Department's experience, the setting of fees for the use of aeronautical facilities other than the airfield—whether by negotiation or otherwise—has generally produced reasonable results. Further, we do not accept the carriers' argument that those reasonable results were a function of circumstances that are no longer present. Given the low risk of unreasonable results, the Department considers its approach to involve an appropriate level of intervention.

We reiterate that the decision to eliminate the HCA cap for all aeronautical revenue is based in part on our determination that a rigid HCA cap is not necessary to assure that fees for

nonairfield aeronautical facilities and services are reasonable.

Furthermore, the Department has recently made available standard financial reporting formats for airports. Notice of Availability and Request for Comments on Airport Financial Reports, Docket No. 28495 (61 FR 11077, March 18, 1996). These formats, once in use, should assist in monitoring nonairfield aeronautical revenues. In addition, to further enhance the consultation process envisioned by Paragraphs 1.1.1 and 1.1.2, Appendix 1 of the Final Policy is modified to include the Airport Financial Reports with the information the Department expects airport proprietors to make available in user-charge consultations.

As to the concerns of airport proprietors, the Department has recognized that a reasonable charge for nonairfield facilities may include a reasonable rate of return on the airport proprietor's invested capital. An airport proprietor would not be entitled to more under the common understanding of the standard of reasonableness and the limits imposed by international obligations, regardless of whether the Department had promulgated a policy statement. In stating the expectation that, over time, aeronautical revenues would not exceed reasonable aeronautical costs, including reasonable capital costs, the Department is not foreclosing the generation of returns—at reasonable levels.

In addition, the Department emphasizes that an inquiry would be focused on the progressive accumulation of surpluses. The Department would not consider a single year's surplus in isolation. Thus, an airport proprietor need not fear that, over time, losses generated by nonairfield assets in some years cannot be balanced out against profits earned in other years.

Further, if the Department determined that nonairfield fees were unreasonably high, and that airfield fees were reasonable, the Department would not ordinarily specify corrective action involving airfield fees. In addition, the corrective action would ordinarily be prospective in nature.

Finally, with respect to the comment by ACRA, progressive accumulation of surplus airport revenue from all sources is governed by Paragraph 5.2 of the Final Policy. In an inquiry conducted pursuant to Paragraph 5.2, the FAA would not be investigating the reasonableness of fees charged to nonaeronautical users.

Policy Statement Regarding Airport Fees

For the reasons discussed above, the Department adopts the following statement of policy for airport fees charged to aeronautical users:

Policy Regarding the Establishment of Airport Rates and Charges

*Introduction*

It is the fundamental position of the Department that the issue of rates and charges is best addressed at the local level by agreement between users and airports. The Department is adopting this Policy Statement on the standards applicable to airport fees imposed for aeronautical use of the airport to provide guidance to airport proprietors and aeronautical users, to encourage direct negotiation between these parties, to minimize the need for direct Federal intervention to resolve differences over airport fees and to establish the standards which the Department will apply in addressing airport fee disputes under 49 USC § 47129 and in addressing questions of airport proprietors' compliance with Federal requirements governing airport fees.

*Applicability of the Policy*

A. Scope of Policy

Under the terms of grant agreements administered by the Federal Aviation Administration (FAA) for airport improvement, all aeronautical users are entitled to airport access on fair and reasonable terms without unjust discrimination. Therefore, the Department considers that the principles and guidance set forth in this policy statement apply to all aeronautical uses of the airport. The Department recognizes, however, that airport proprietors may use different mechanisms and methodologies to establish fees for different facilities, *e.g.,* for the airfield and terminal area, and for different aeronautical users, *e.g.,* air carriers and fixed-base operators. Various elements of the policy reflect these differences. In addition, the Department will take these differences into account if we are called upon to resolve a dispute over aeronautical fees or otherwise consider whether an airport sponsor is in compliance with its obligation to provide access on fair and reasonable terms without unjust discrimination.

B. Aeronautical Use and Users

The Department considers the aeronautical use of an airport to be any activity that involves, makes possible, is required for the safety of, or is otherwise directly related to, the operation of aircraft. Aeronautical use includes services provided by air carriers related directly and substantially to the movement of passengers, baggage, mail and cargo on the airport. Persons, whether individuals or businesses, engaged in aeronautical uses involving the operation of aircraft, or providing flight support directly related to the operation of aircraft, are considered to be aeronautical users.

Conversely, the Department considers that the operation by U.S. or foreign air carriers of facilities such as a reservations center, headquarters office, or flight kitchen on an airport does not constitute an aeronautical use subject to the principles and guidance contained in this policy statement with respect to reasonableness and unjust discrimination. Such facilities need not be located on an airport. A carrier's decision to locate such facilities is based on the negotiation of a lease or sale of property. Accordingly, the Department relies on the normal forces of competition for nonaeronautical commercial or industrial property to assure that fees for such property are not excessive.

C. Applicability of § 113 of the FAA Authorization Act of 1994

Section 113 of the Federal Aviation Authorization Act of 1994 ("Authorization Act"), 49 U.S.C. § 47129, directs the Secretary of Transportation to issue a determination on the reasonableness of certain fees imposed on air carriers in response to carrier complaints or a request for determination by an airport proprietor. Section 47129 further directs the Secretary to publish final regulations, policy statements, or guidelines establishing procedures for deciding cases under § 47129 and the standards to be used by the Secretary in determining whether a fee is reasonable. Section 47129 also provides for the issuance of credits or refunds in the event that the Secretary determines a fee is unreasonable after a complaint is filed. Section 47129(e) excludes from the applicability of § 47129 a fee imposed pursuant to a written agreement with air carriers, a fee imposed pursuant to a financing agreement or covenant entered into before the date of enactment of the statute (August 23, 1994), and an existing fee not in dispute on August 23, 1994. Section 47129(f) further provides that § 47129 shall not adversely affect the rights of any party under existing air carrier/airport agreements or the ability of an airport to meet its obligations under a financing agreement or

covenant that is in effect on August 23, 1994.

The Department interprets § 47129 to apply to fees imposed on foreign as well as U.S. air carriers.

In addition, the Department does not interpret § 47129 to repeal or narrow the scope of the basic requirement that fees imposed on all aeronautical users be reasonable and not unjustly discriminatory or to narrow the obligation on the Secretary to receive satisfactory assurances that, inter alia, airport sponsors will provide access on reasonable terms before approving Airport Improvement Program ("AIP") grants. Moreover, the Department does not interpret sections 47129(e) and (f) to preclude the Department from adopting policy guidance to carry out the Department's statutory obligation to assure that aeronautical fees are being imposed at AIP-funded airports in a manner that is consistent with the obligation to provide airport access on reasonable terms.

Therefore, the Department will apply the policy guidance in all cases in which we are called upon to determine if an airport sponsor is carrying out its obligation to make the airport available on reasonable terms. However, a dispute that is not subject to processing under the expedited procedures mandated by § 47129, including a dispute over matters described by §§ 47129 (e) and (f), will be processed by the FAA under procedures applicable to airport compliance matters in general. In considering such a dispute, the FAA's role is to determine whether the airport proprietor is in compliance with its grant obligations and statutory obligations relating to airport fees. The FAA proceeding is not intended to provide a mechanism for adjudicating the respective rights of the parties to a fee dispute.

In addition, the Department will not entertain a complaint about the reasonableness of a fee set by agreement filed by a party to the agreement setting the disputed fee. In the case of a complaint about the reasonableness of a fee set by agreement filed by an aeronautical user who is not a party to the agreement, the Department may take into account the existence of an agreement between air carriers and the airport proprietor, in making a determination on the complaint.

Further, the FAA will not ordinarily investigate the reasonableness of a general aviation airport's fees absent evidence of a progressive accumulation of surplus aeronautical revenues.

## D. Components of Airfield

The Department considers the airfield assets to consist of ramps or aprons not subject to preferential or exclusive lease or use agreements, runways, taxiways, and land associated with these facilities. The Department also considers the airfield to include land acquired for the purpose of assuring land-use compatibility with the airfield, if the land is included in the rate base associated with the airfield under the provisions of this policy.

### Principles Applicable to Airport Rates and Charges

1. In general, the Department relies upon airport proprietors, aeronautical users, and the market and institutional arrangements within which they operate, to ensure compliance with applicable legal requirements. Direct Federal intervention will be available, however, where needed.

2. Rates, fees, rentals, landing fees, and other service charges ("fees") imposed on aeronautical users for aeronautical use of airport facilities ("aeronautical fees") must be fair and reasonable.

3. Aeronautical fees may not unjustly discriminate against aeronautical users or user groups.

4. Airport proprietors must maintain a fee and rental structure that in the circumstances of the airport makes the airport as financially self-sustaining as possible.

5. In accordance with relevant Federal statutory provisions governing the use of airport revenue, airport proprietors may expend revenue generated by the airport only for statutorily allowable purposes.

### Local Negotiation and Resolution

1. In general, the Department relies upon airport proprietors, aeronautical users, and the market and institutional arrangements within which they operate, to ensure compliance with applicable legal requirements. Direct Federal intervention will be available, however, where needed.

1.1    The Department encourages direct resolution of differences at the local level between aeronautical users and the airport proprietor. Such resolution is best achieved through adequate and timely consultation between the airport proprietor and the aeronautical users about airport fees.

1.1.1    Airport proprietors should consult with aeronautical users well in advance, if practical, of introducing significant changes in charging systems and procedures or in the level of charges. The proprietor should provide adequate information to permit aeronautical users to evaluate the airport proprietor's justification for the change and to assess the reasonableness of the proposal. For consultations to be effective, airport proprietors should give due regard to the views of aeronautical users and to the effect upon them of changes in fees. Likewise, aeronautical users should give due regard to the views of the airport proprietor and the financial needs of the airport.

1.1.2    To further the goal of effective consultation, Appendix 1 of this policy statement contains a description of information that the Department considers would be useful to the U.S. and foreign air carriers and other aeronautical users to permit meaningful consultation and evaluation of a proposal to modify fees.

1.1.3    Airport proprietors should consider the public interest in establishing airport fees, and aeronautical users should consider the public interest in consulting with airports on setting such fees.

1.1.4    Airport proprietors and aeronautical users should consult and make a good-faith effort to reach agreement. Absent agreement, airport proprietors are free to act in accordance with their proposals, subject to review by the Secretary or the Administrator on complaint by the user or, in the case of fees subject to 49 U.S.C. § 47129, upon request by the airport operator, or, in unusual circumstances, on the Department's initiative.

1.1.5    To facilitate local resolution and reduce the need for direct Federal intervention to resolve differences over aeronautical fees, the Department encourages airport proprietors and aeronautical users to include alternative dispute resolution procedures in their lease and use agreements.

1.1.6    Any newly established fee or fee increase that is the subject of a complaint under 49 U.S.C. § 47129 that is not dismissed by the Secretary must be paid to the airport proprietor under protest by the complainant. Unless the airport proprietor and complainant agree otherwise, the airport proprietor will obtain a letter of credit, or surety bond, or other suitable credit instrument in accordance with the provisions of 49 U.S.C. § 47129(d). Pending issuance of a final order determining reasonableness, an airport proprietor may not deny a complainant currently providing air service at the airport reasonable access to airport facilities or services, or otherwise interfere with that complainant's prices, routes, or services, as a means of enforcing the fee, if the complainant has complied with the requirements for payment under protest.

Federal Register / Vol. 61, No. 121 / Friday, June 21, 1996 / Notices　　32019

1.2   Where airport proprietors and aeronautical users have been unable, despite all reasonable efforts, to resolve disputes between them, the Department will act to resolve the issues raised in the dispute.

1.2.1   In the case of a fee imposed on one or more U.S. air carriers or foreign air carriers, the Department will issue a determination on the reasonableness of the fee upon the filing of a written request for a determination by the airport proprietor or, if the Department determines that a significant dispute exists, upon the filing of a complaint by one or more U.S. air carriers or foreign air carriers, in accordance with 49 U.S.C. § 47129 and implementing regulations. Pursuant to the provisions of 49 U.S.C. § 47129, the Department may only determine whether a fee is reasonable or unreasonable, and may not set the level of the fee.

1.2.2   The Department will first offer its good offices to help parties reach a mutually satisfactory outcome in a timely manner. Prompt resolution of these disputes is always desirable since extensive delay can lead to uncertainty for the public and a hardening of the parties' positions. U.S. air carriers and foreign air carriers may request the assistance of the Department in advance of or in lieu of the formal complaint procedure described in 1.2.1.; however, the 60-day period for filing a complaint under § 47129 shall not be extended or tolled by such a request.

1.2.3   In the case of fees imposed on other aeronautical users, where negotiations between the parties are unsuccessful and a complaint is filed alleging that airport fees violate an airport proprietor's federal grant obligations, the Department will, where warranted, exercise the agency's broad statutory authority to review the legality of those fees and to issue such determinations and take such actions as are appropriate based on that review. Other aeronautical users may also request the assistance of the Department in advance of, or in lieu of, the filing of a formal complaint with the FAA.

1.3   Airport proprietors must retain the ability to respond to local conditions with flexibility and innovation. An airport proprietor is encouraged to achieve consensus and agreement with its aeronautical users before implementing a practice that would represent a major departure from this guidance. However, the requirements of any law, including the requirements for the use of airport revenue, may not be waived, even by agreement with the aeronautical users.

*Fair and Reasonable Fees*

2.   Rates, fees, rentals, landing fees, and other service charges (''fees'') imposed on aeronautical users for the aeronautical use of the airport (''aeronautical fees'') must be fair and reasonable.

2.1   Federal law does not require a single approach to airport rate-setting. Fees may be set according to a ''residual'' or ''compensatory'' rate-setting methodology, or any combination of the two, or according to another rate-setting methodology, as long as the methodology used is applied consistently to similarly situated aeronautical users and conforms with the requirements of this policy. Airport proprietors may set fees for aeronautical use of airport facilities by ordinance, statute or resolution, regulation, or agreement.

2.1.1   Aeronautical users may receive a cross-credit of nonaeronautical revenues only if the airport proprietor agrees. Agreements providing for such cross-crediting are commonly referred to as ''residual agreements'' and generally provide a sharing of nonaeronautical revenues with aeronautical users. The aeronautical users may in turn agree to assume part or all of the liability for non-aeronautical costs. An airport proprietor may cross-credit nonaeronautical revenues to aeronautical users even in the absence of such an agreement, but an airport proprietor may not require aeronautical users to cover losses generated by nonaeronautical facilities except by agreement.

2.1.2   In other situations, an airport proprietor assumes all liability for airport costs and retains all airport revenues for its own use in accordance with Federal requirements. This approach to airport rate-setting is generally referred to as the compensatory approach.

2.1.3   Airports frequently adopt rate-setting systems that employ elements of both approaches.

2.2   Revenues from fees imposed for use of the airfield (''airfield revenues'') may not exceed the costs to the airport proprietor of providing airfield services and airfield assets currently in aeronautical use unless otherwise agreed to by the affected aeronautical users.

2.3   The ''rate base'' is the total of all costs of providing airfield facilities and services to aeronautical users (which may include a share of public-use roadway costs allocated to the airfield in accordance with this policy) that may be recovered from aeronautical users through fees charged for providing

airfield aeronautical services and facilities (''airfield fees''). Airport proprietors must employ a reasonable, consistent, and ''transparent'' (i.e., clear and fully justified) method of establishing the rate base and adjusting the rate base on a timely and predictable schedule.



2.4.2   Airport proprietors may include reasonable environmental costs in the rate base to the extent that the airport proprietor incurs a corresponding actual expense. All revenues received based on the inclusion of these costs in the rate base are subject to Federal requirements on the use of airport revenue. Reasonable environmental costs include, but are not necessarily limited to, the following:

(a) the costs of investigating and remediating environmental contamination caused by airfield operations at the airport at least to the extent that such investigation or remediation is required by or consistent with local, state or federal environmental law, and to the extent such requirements are applied to other similarly situated enterprises.

(b) the cost of mitigating the environmental impact of an airport development project (if the development project is one for which

costs may be included in the rate base), at
least to the extent that these costs are
incurred in order to secure necessary
approvals for such projects, including but not
limited to approvals under the National
Environmental Policy Act and similar state
statutes;

(c) the costs of aircraft noise abatement and
mitigation measures, both on and off the
airport, including but not limited to land
acquisition and acoustical insulation
expenses, to the extent that such measures
are undertaken as part of a comprehensive
and publicly-disclosed airport noise
compatibility program; and

(d) the costs of insuring against future
liability for environmental contamination
caused by current airfield activities. Under
this provision, the costs of self-insurance
may be included in the rate base only to the
extent that they are incurred pursuant to a
self-insurance program that conforms to
applicable standards for self-insurance
practices.

2.4.3   Airport proprietors are
encouraged to establish fees with due
regard for economy and efficiency.

2.4.4   The airport proprietor may
include in the rate base amounts needed
to fund debt service and other reserves
and to meet cash flow requirements as
specified in financing agreements or
covenants (for facilities in use),
including, but not limited to, reasonable
amounts to meet debt-service coverage
requirements; to fund cash reserves to
protect against the risks of cash-flow
fluctuations associated with normal
airfield operations; and to fund
reasonable cash reserves to protect
against other contingencies.

2.4.5   Unless otherwise agreed by
aeronautical users, the airport proprietor
must allocate capital and operating costs
among cost centers in accordance with
the following guidance, which is based
on the principle of cost causation:

(a) Costs of airfield facilities and services
directly used by the aeronautical users may
be fully included in the rate base, in a
manner consistent with this policy. For
example, the capital cost of a runway may be
included in the rate base used to establish
landing fees.

(b) Costs of airport facilities and services
used for both aeronautical and non-
aeronautical uses (shared costs) may be
included in the rate base if the facility or
service in question supports the airfield
activity reflected in that rate base. The
portion of shared costs allocated to
aeronautical users and among aeronautical
uses should not exceed an amount that
reflects the respective aeronautical purposes
and proportionate aeronautical uses of the
facility in relation to each other and in
relation to the nonaeronautical use of the
facility, and must be allocated by a
reasonable, ''transparent'' and not unjustly
discriminatory methodology. Aeronautical
users may not be allocated all costs of
facilities or services that are used by both
aeronautical and nonaeronautical users

unless they agree to that allocation. Likewise,
the airfield may not be allocated all of the
aeronautical share of commonly-used
facilities or services, unless the airfield is the
only aeronautical use the facility or service
supports.

2.5   Airport proprietors must comply
with the following practices in
establishing the rate base, provided,
however, that one or more aeronautical
users may agree to a rate base that
deviates from these practices in the
establishment of those users' fees.




2.5.2   When assets in the rate-base
have different costs, the airport
proprietor may combine the costs of
comparable assets to develop a single
cost basis for those assets.

2.5.4   The rate base of an airport may
include costs associated with another
airport currently in use only if: (1) The
proprietor of the first airport is also the
proprietor of the other airport; (2) the
other airport is currently in use; and (3)
the costs of the other airport to be
included in the first airport's rate base
are reasonably related to the aviation
benefits that the other airport provides
or is expected to provide to the
aeronautical users of the first airport.

(a) Element no. 3 above will be presumed
to be satisfied if the other airport is
designated as a reliever airport for the first
airport in the FAA's National Plan of
Integrated Airport Systems (''NPIAS'').

(b) In the case of a methodology of charging
for a system of airports that is in place on the
effective date of this policy, the Department
will consider an airport proprietor's claim
that the methodology is reasonable, even if
all three elements are not satisfied.

(c) If an airport proprietor closes an
operating airport as part of an approved plan
for the construction and opening of a new
airport, reasonable costs of disposition of the
closed airport facility may be included in the
rate base of the new airport, to the extent that
such costs exceed the proceeds from the
disposition. The Department would not
ordinarily consider redevelopment costs to
be a reasonable cost of disposition.

(d) Pending reasonable disposition of the
closed airport, the airport proprietor may
charge airfield users at the new airport for
reasonable maintenance costs of the old
airport, provided that those costs are
refunded or credited-back to those users
upon the receipt of the proceeds from a
whole or partial disposition.



2.6.1   Reasonable methodologies may include, but are not limited to, historic cost valuation, direct negotiation with aeronautical users, or objective determinations of fair market value.

2.6.2   If an airport proprietor determines fees for such other facilities on the basis of HCA costs, the airport proprietor must follow the guidance set forth in paragraph 2.4.5 for the allocation of shared costs.

2.7   At all times, airport proprietors must comply with the following practices:

2.7.1   Indirect costs may not be included in the fees charged for aeronautical use of the airport unless they are based on a reasonable, ''transparent'' cost allocation formula calculated consistently for other units or cost centers within the control of the airport sponsor.

2.7.2   The costs of airport development or planning projects paid for with federal government grants and contributions or passenger facility charges (PFCs) may not be included in the fees charged for aeronautical use of the airport.

(a) In the case of a PFC-funded project for terminal development, for gates and related areas, or for a facility that is occupied by one or more carriers on an exclusive or preferential use basis, the fees paid to use those facilities shall be no less than the fees charged for similar facilities that were not financed with PFC revenue.

*Prohibition on Unjust Discrimination*

3.  Aeronautical fees may not unjustly discriminate against aeronautical users or user groups.

3.1   The airport proprietor must apply a consistent methodology in establishing fees for comparable aeronautical users of the airport. When the airport proprietor uses a cost-based methodology, aeronautical fees imposed on any aeronautical user or group of aeronautical users may not exceed the costs allocated to that user or user group under a cost allocation methodology adopted by the airport proprietor that is consistent with this guidance, unless aeronautical users otherwise agree.

3.1.1   The prohibition on unjust discrimination does not prevent an airport proprietor from making reasonable distinctions among aeronautical users (such as signatory and non-signatory carriers) and assessing higher fees on certain categories of aeronautical users based on those distinctions (such as higher fees for non-signatory carriers, as compared to signatory carriers).

3.2   A properly structured peak pricing system that allocates limited resources using price during periods of congestion will not be considered to be unjustly discriminatory. An airport proprietor may, consistent with the policies expressed in this policy statement, establish fees that enhance the efficient utilization of the airport.

3.3   Relevant provisions of the Convention on International Civil Aviation (Chicago Convention) and many bilateral aviation agreements specify, inter alia, that charges imposed on foreign airlines must not be unjustly discriminatory, must not be higher than those imposed on domestic airlines engaged in similar international air services and must be equitably apportioned among categories of users. Charges to foreign air carriers for aeronautical use that are inconsistent with these principles will be considered unjustly discriminatory or unfair and unreasonable.

3.4   Allowable costs—costs properly included in the rate base—must be allocated to aeronautical users by a transparent, reasonable, and not unjustly discriminatory rate-setting methodology. The methodology must be applied consistently and cost differences must be determined quantitatively, when practical.

3.4.1   Common costs (costs not directly attributable to a specific user group or cost center) must be allocated according to a reasonable, transparent and not unjustly discriminatory cost allocation methodology that is applied consistently, and does not require any aeronautical user or user group to pay costs properly allocable to other users or user groups.

*Requirement To Be Financially Self-Sustaining*

4.  Airport proprietors must maintain a fee and rental structure that in the circumstances of the airport makes the airport as financially self-sustaining as possible.

4.1   If market conditions or demand for air service do not permit the airport to be financially self-sustaining, the airport proprietor should establish long-term goals and targets to make the airport as financially self-sustaining as possible.

4.1.1   Airport proprietors are encouraged, when entering into new or revised agreements or otherwise establishing rates, charges, and fees, to undertake reasonable efforts to make their particular airports as self sustaining as possible in the circumstances existing at such airports.

(a) Absent agreement with aeronautical users, the obligation to make the airport as

self-sustaining as possible does not permit the airport proprietor to establish fees for the use of the airfield that exceed the airport proprietor's airfield costs.

(b) For those facilities for which this policy permits the use of fair market value, the Department does not construe the obligation on self-sustainability to compel the use of fair market value to establish fees.

4.1.2   At some airports, market conditions may not permit an airport proprietor to establish fees that are sufficiently high to recover aeronautical costs and sufficiently low to attract and retain commercial aeronautical services. In such circumstances, an airport proprietor's decision to charge rates that are below those needed to achieve self-sustainability in order to assure that services are provided to the public is not inherently inconsistent with the obligation to make the airport as self-sustaining as possible in the circumstances.

4.2   In establishing new fees, and generating revenues from all sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under 49 U.S.C. § 47107(b)(1), including reasonable reserves and other funds to facilitate financing and to cover contingencies. While fees charged to nonaeronautical users may exceed the costs of service to those users, the surplus funds accumulated from those fees must be used in accordance with § 47107(b).

4.2.1   The Department assumes that the limitation on the use of airport revenue and effective market discipline for aeronautical services and facilities other than the airfield will be effective in holding aeronautical revenues, over time, to the airport proprietor's costs of providing aeronautical services and facilities, including reasonable capital costs. However, the progressive accumulation of substantial amounts of surplus aeronautical revenue may warrant an FAA inquiry into whether aeronautical fees are consistent with the airport proprietor's obligations to make the airport available on fair and reasonable terms.

*Requirements Governing Revenue Application and Use*

5.  In accordance with relevant Federal statutory provisions governing the use of airport revenue, airport proprietors may expend revenue generated by the airport only for statutorily allowable purposes.

5.1   Additional information on the statutorily allowed uses of airport revenue is contained in separate

guidance published by the FAA pursuant to § 112 of the FAA Authorization Act of 1994, which is codified at 49 U.S.C. § 47107(l).

5.2. The progressive accumulation of substantial amounts of airport revenues may warrant an FAA inquiry into the airport proprietor's application of revenues to the local airport system.

Issued in Washington, DC, on June 14, 1996.

Federico Peña,
*Secretary of Transportation.*

David R. Hinson,
*Administrator, Federal Aviation Administration.*

## Appendix 1—Information for Aeronautical User Charges Consultations

The Department of Transportation ordinarily expects the following information to be available to aeronautical users in connection with consultations over changes in airport rates and charges:

1. Historic Financial Information covering two fiscal years prior to the current year including, at minimum, a profit and loss statement, balance sheet and cash flow statement for the airport implementing the charges, and any financial reports prepared by the airport proprietor to satisfy the provisions of 49 USC §§ 47107(a)(19) and 47107(k).

2. Justification. Economic, financial and/or legal justification for changes in the charging methodology or in the level of aeronautical rates and charges at the airport. Airports should provide information on the aeronautical costs they are including in the rate base.

3. Traffic Information. Annual numbers of terminal passengers and aircraft movements for each of the two preceding years.

4. Planning and Forecasting Information.

(a) To the extent applicable to current or proposed fees, the long-term airport strategy setting out long-term financial and traffic forecasts, major capital projects and capital expenditure, and particular areas requiring strategic action. This material should include any material provided for public or government reviews of major airport developments, including analyses of demand and capacity and expenditure estimates.

(b) Accurate, complete information specific to the airport for the current and the forecast year, including the current and proposed budgets, forecasts of airport charges revenue, the projected number of landings and passengers, expected operating and capital expenditures, debt service payments, contributions to restricted funds, or other required accounts or reserves.

(c) To the extent the airport uses a residual or hybrid charging methodology, a description of key factors expected to affect commercial or other nonaeronautical revenues and operating costs in the current and following years.

[FR Doc. 96–15687 Filed 6–19–96; 8:45 am]
**BILLING CODE 4910–13–P**

## Federal Aviation Administration

**[Summary Notice No. PE–96–30]**

**Petitions for Exemption; Summary of Petitions Received; Dispositions of Petitions Issued**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of petitions for exemption received and of dispositions of prior petitions.

**SUMMARY:** Pursuant to FAA's rulemaking provisions governing the application, processing, and disposition of petitions for exemption (14 CFR Part 11), this notice contains a summary of certain petitions seeking relief from specified requirements of the Federal Aviation Regulations (14 CFR Chapter I), dispositions of certain petitions previously received, and corrections. The purpose of this notice is to improve the public's awareness of, and participation in, this aspect of FAA's regulatory activities. Neither publication of this notice nor the inclusion or omission of information in the summary is intended to affect the legal status of any petition or its final disposition.

**FOR FURTHER INFORMATION CONTACT:** Mr. D. Michael Smith, Office of Rulemaking (ARM–1), Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone (202) 267–7470.

This notice is published pursuant to paragraphs (c), (e), and (g) of § 11.27 of Part 11 of the Federal Aviation Regulations (14 CFR Part 11).

Issued in Washington, D.C., on June 18, 1996.

Donald P. Byrne,
*Assistant Chief Counsel for Regulations.*

Dispositions of Petitions

*Docket No.:* 5010.
*Petitioner:* Office of Aviation Standards (FAA) and the Department of the Air Force

*Sections of the FAR Affected:* 14 CFR 91.119 (b) and (c), 91.159, 91.175 (a) and (b), and 91.179(b)

*Description of Relief Sought/ Disposition:* To amend Exemption No. 5118, as amended, which permits the FAA Office of Aviation Standards to deviate from certain flight rules required by subpart B of part 91 while conducting flight inspections of air navigation facilities and instrument approach procedures. The amendment lists the Department of the Air Forces Flight Inspection Center as an exemption holder on Exemption No. 5118, as amended, and terminates Exemption Nos. 48A and 132E. *GRANT, May 16, 1996, Exemption No. 5118B.*

*Docket No.:* 28212.
*Petitioner:* Air Logistics.
*Sections of the FAR Affected:* 14 CFR 135.243 (b) and (c) and 135.245(a).

*Description of Relief Sought/ Disposition:* To allow a foreign pilot who does not possess a pilot certificate issued by the FAA to act as pilot in command (PIC) or second in command (SIC) on Air Logistics aircraft during operations conducted under part 135. *DENIAL, May 21, 1996, Exemption No. 6439.*

*Docket No.:* 28367.
*Petitioner:* Mr. Stephen R. Raklovits.
*Sections of the FAR Affected:* 14 CFR 103.11.

*Description of Relief Sought/ Disposition:* To permit Mr. Raklovits to operate a powered parachute-type ultralight at night conducting demonstrations, training, and special use operations, including search, rescue, and surveillance, for local, State, and Federal law enforcement agencies. *DENIAL, May 21, 1996, Exemption No. 6440.*

*Docket No.:* 28419.
*Petitioner:* United Parcel Service.
*Sections of the FAR Affected:* 14 CFR 121.433(c)(1)(iii), 121.440(a), 121.441 (a)(1) and (b)(1), and appendix F of part 121.

*Description of Relief Sought/ Disposition:* To permit the United Parcel Service regulatory relief to the extent necessary to conduct a single visit training program (SVTP) for flight crewmembers, and eventually transition into the Advance Qualification Program (AQP) codified in SFAR 58. *GRANT, May 8, 1996, Exemption No. 6434.*

*Docket No.:* 28432.
*Petitioner:* Department of Justice, Federal Bureau of Investigation.
*Sections of the FAR Affected:* 14 CFR 91.209 (a) and (d).

*Description of Relief Sought/ Disposition:* To permit the FBI, to the extent necessary, to conduct aerial surveillance operations that are necessary for the performance of its law enforcement and national security mission. *PARTIAL GRANT, May 20, 1996, Exemption No. 6437.*

*Docket No.:* 28532.
*Petitioner:* J.R. Aviation, Inc.
*Sections of the FAR Affected:* 14 CFR 135.143(c)(2).

*Description of Relief Sought/ Disposition:* To permit J.R. Aviation, Inc., to operate its Robinson R22 helicopter (Registration No. N2346J, Serial No. 2211), without a TSO–C112 (Mode S) transponder installed. *GRANT, May 21, 1996, Exemption No. 6438.*

*Docket No.:* 28551.