**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED AIR LINES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 08-cv-3337** |
| ) | |
| **v.** ) | **Hon. James B, Moran** |
| ) | **Magistrate Judge Sidney I. Schenkier** |
| **THE CITY OF LOS ANGELES and** ) | |
| **LOS ANGELES WORLD AIRPORTS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DECLARATION OF SANDRA J. MILLER

I, Sandra J. Miller, declare as follows:

1.      I am over the age of 18 years and am employed as the Secretary of the Board of Airport Commissioners ("BOAC" or the "Board") the governing body of the Los Angeles Department of Airports ("Los Angeles World Airports" or "LAWA") of the City of Los Angeles (the "City") which operates Los Angeles International Airport ("LAX").  I have personal knowledge of the matters set forth herein and, if called as a witness, could and would testify competently thereto.  I am authorized to give this Declaration on behalf of BOAC and the City.

2.      I make this declaration in support of the City's "Objections By The City Of Los Angeles To The Bankruptcy Court's Memorandum Of Decision And Memorandum In Support Of The City's Objections," in Case No. 08-cv-3337, currently pending in the United States District Court for the Northern District of Illinois, Eastern Division.

3.      If called to testify, I would be prepared to testify as set forth below:

4.      I have been employed by the City since 1978 where I began as a file clerk.  I have worked continuously in the BOAC Office since 1979 and I became the Secretary of BOAC in or about 1984.  One of my responsibilities as Secretary is to maintain the corporate records of BOAC, which includes (but is not limited to) Board Resolutions, Board Orders, and Lease documents executed by LAWA as authorized by the Board.

5.      I was contacted by counsel for the City and asked to locate the drawings that are attached to United Air Lines, Inc.'s Terminal 8 Lease, LAA-3088.  I was also asked to locate the US Air and Continental Airlines lease in effect in 1997, NBL-1912 and LAA-5961, respectively. I personally located or instructed my staff to locate the relevant documents from the Board's files.  Once those documents were collected by my staff, I arranged to have them copied and sent to counsel.

1

6.    I have reviewed the colored Terminal 8 drawings attached to the City's Submission, attached to this declaration as City Supplemental Exhibit 61.  I have also reviewed the copies of NBL-1912 and LAA-5961, attached to this declaration as City Supplemental Exhibits 62 and 63, respectively.  I can attest (1) that they were found in the Board's files where such files are required to be maintained; (2) that they are kept in the ordinary course of the Board's regularly conducted activity; (3) and that the drawings are considered to be an official record of the Board.  Specifically, under the Charter of the City of Los Angeles, the BOAC Office is required to maintain records of board action and documents related to board action. The BOAC authorizes or takes action in respect of such document and the BOAC Office finalizes a Resolution or Board Order authorizing the action.  The document is then associated and filed together with said authorization or action and placed in the BOAC Office files.  This was the procedure at all times during which I was employed by the BOAC and it is my understanding that this was the procedure prior to that time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 30, 2008

Sandra J. Miller

# CITY SUPPLEMENTAL
# EXHIBIT 61
# (Part 1)



TICKETING BUILDING 7

FIRST FLOOR PLAN

BASEMENT FLOOR PLAN

EXHIBIT A

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| | ASST. CHIEF AIRPORTS ENGR. | | CHIEF AIRPORTS ENGINEER | |
|---|---|---|---|---|
| | *Norman Butler* | | *Mal M. Packer* | |
| SCALE | DATE | DRAWN | CHECKED | DRAWING NO. |
| NONE | 4-1-81 | JCB | | 81041-80 |





TICKETING BUILDING 7

FIRST FLOOR PLAN

BASEMENT FLOOR PLAN

KEY PLAN

EXHIBIT C

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | DRAWING NO. |
|-------|------|-------|---------|-------------|
| NONE | 4-1-81 | JCB | | 81041-80 |

ASST. CHIEF AIRPORTS ENGR.
CHIEF AIRPORTS ENGINEER



TICKETING BUILDING 7

FIRST FLOOR PLAN

BASEMENT FLOOR PLAN

KEY PLAN

PUBLIC LOBBY 3,832 FT.²
PUBLIC LOBBY 4,956 FT.²
PUBLIC LOBBY 4,896 FT.²
U.A. 445 FT.²
U.A. 10,651 FT.²
ELEVATOR PASSENGER CHANNEL
PASSENGER CHANNEL TO SATELLITE 6

PUBLIC LOBBY 7,511 FT.²
PUBLIC LOBBY 6,246 FT.²
PUBLIC LOBBY 3534 FT.²
U.A. 403 FT.²
U.A. 10,712 FT.²
U.A. 4,179 FT.²
U.A. 112 FT.²
U.A. 201 FT.²
U.A. 10,988 FT.²

WOMEN
MEN
WOMEN LOCKER
MEN LOCKER
ELECTRICAL EQUIPMENT
BULKING STORAGE

EXHIBIT C

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | |
|-------|------|-------|---------|--|
| NONE | 4-1-81 | JCB | | |

ASST. CHIEF AIRPORTS ENGR.
CHIEF AIRPORTS ENGINEER

DRAWING NO.
81041-80

KEY PLAN

SEE EXHIBIT "C"

TICKETING BUILDING 6 AND 7 ADDITIONS

FIRST FLOOR

NORTH

NOTE:
SEE DRAWING NO. 61/7-1 FOR
PROJECT AREA ANALYSIS FOR
ORIGINAL LEASE SPACE ALLOCATIONS WEST OF
COLUMN LINE 9L.

BAGGAGE CLAIM AREA
5590 FT²

LOST & FOUND
280 FT²

U.A. 787 FT²

U.A. 352 FT²

M.L.

EXISTING
PUBLIC LOBBY
456 FT²

EXISTING
BAGGAGE
CLAIM AREA

EXISTING
PUBLIC LOBBY

EQUIP. ROOM

MECH EQUIP. RM

BAGGAGE TUNNEL

EXIST'G.
ELEV.

ELECT. EQUIP. RM.

EXHIBIT D
CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | DRAWING NO. |
|-------|------|-------|---------|-------------|
| NONE | 4-1-81 | JCB |  | 81041-80 |

ASST CHIEF AIRPORTS ENGR.

CHIEF AIRPORTS ENGINEER

EXHIBIT E

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | DRAWING No. |
|-------|------|-------|---------|-------------|
| NONE | 4-1-81 | JCB | | 81041 - 80 |



KEY PLAN

SATELLITE BUILDING 7

PUBLIC AREA
23,870 FT²

U.A. 2190 FT²

U.A. 1790 FT²

H.I. INC.
COCKTAIL LOUNGE

WOMEN    MEN

H.I. INC.
GIFT & NEWS

H.I. INC.
COFFEE SHOP

WOMEN    MEN

H.I. INC.
COCKTAIL LOUNGE

U.A. 1260 FT²

U.A. 1260 FT²

U.A.
HOLDING AREA

EXHIBIT G

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS

LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT

UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | DRAWING NO. |
|-------|------|-------|---------|-------------|
| NONE | 4-1-81 | JCB | Mal M. Parker | 81041-80 |

ASST CHIEF AIRPORTS ENGR
CHIEF AIRPORTS ENGINEER



KEY PLAN

SATELLITE BUILDING 7

MEZZANINE FLOOR PLAN

EXHIBIT H

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT

LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | DRAWING No. |
|-------|------|-------|-------------|
| NONE | 4-1-81 | JCB | 81041-80 |

ASST. CHIEF AIRPORTS ENGR.

CHECKED

CHIEF AIRPORTS ENGINEER

**CITY SUPPLEMENTAL
EXHIBIT 61
(Part 2)**



KEY PLAN

CHANNEL LEVEL
FLOOR PLAN

PASSENGER CHANNEL

SATELLITE BUILDING 8

U.A.L. FLIGHT SERVICE FACILITY

EXHIBIT I

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | DRAWING NO. |
|-------|------|-------|---------|-------------|
| NONE | 4-1-81 | JCB | — | 81041-80 |

ASST. CHIEF AIRPORTS ENGR.

CHIEF AIRPORTS ENGINEER



KEY PLAN

SATELLITE BUILDING 7

BAGGAGE ROOM

# EXHIBIT K

## CITY OF LOS ANGELES
## DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE NONE | DATE 4-1-81 | DRAWN JCB | CHECKED | DRAWING NO 81041-80 |
|---|---|---|---|---|
| ASS'T CHIEF AIRPORTS ENGR | | CHIEF AIRPORTS ENGINEER | | |

SAT. BLDG NO.7

45'-0"  40'-0"  45'-0"

24'-6"  22'-0"  24'-6"

RAMP LEVEL BAGGAGE HANDLING

U.A.

JR BUILDING

RAMP   DRIVEWAY

TICK. BLDG. NO.7

14'-0"  31'-6"  40'-0"  31'-4"  17'-0"

EXHIBIT M

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

| SCALE | DATE | DRAWN | CHECKED | | 8104I-80 |
|---|---|---|---|---|---|
| NONE | 4-1-81 | JCB | PZJ | | |

ASST. CHIEF AIRPORTS ENGR.

CHIEF AIRPORTS ENGINEER

DRAWING NO.



EXHIBIT N

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.



EXHIBIT O →

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS
LOS ANGELES INTERNATIONAL AIRPORT
LEASE EXHIBIT
UNITED AIRLINES, INC.

DRAWING NO.
81041-80





EXHIBIT P

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS

LEASE EXHIBIT
UNITED AIRLINES, INC.

# CITY SUPPLEMENTAL
# EXHIBIT 62

CITY OF LOS ANGELES
DEPARTMENT OF AIRPORTS

Board File
No. NBL-1912

INITIAL

LEASE

The CITY OF LOS ANGELES, a municipal corporation, acting by order of and through its Board of Airport Commissioners ("City") hereby leases to ~~USAIR, INC.,~~ US Airways, Inc. as Lessee, the following described premises, for the term, at the rental and for the uses hereinafter set forth, all subject to the Standard Terms and Provisions, attached hereto and made a part hereof.

Demised Premises: Ticket counter, ticket office, administrative office, operations office, joint use space and other areas in Terminal One at Los Angeles International Airport ("Airport"), specifically shown on Drawing No. 93055-80, Sheets 1 through 10, attached hereto and marked Exhibit A, and itemized on Schedule A, also attached hereto and incorporated by reference herein.

Term: Three years seven months commencing February 1, 1996, and ending August 31, 1999, subject to termination by either party upon thirty (30) days written notice.

Rental:  $61,637.44 per month.

Use:   Administrative  and operational use.

Terminal Equipment User Fees:   ~~USAIR~~ US Airways, Inc. hereby agrees to comply with the conditions of Resolution No. 18869, which mandates that all users of terminal equipment shall reimburse City for all expenses incurred by City in providing, operating and maintaining said equipment.

Faithful Performance Guarantee:  Pursuant to Board of Airport Commissioners Resolution No. 18052, Lessee is required to furnish and maintain a Faithful Performance Guarantee during the entire term of the Lease.  The Faithful Performance Guarantee shall be in the amount of $374,620.32 which represents three months' rent and joint use space.  The  Faithful Performance Guarantee may be accomplished either in the form of an Irrevocable Letter of Credit or Surety Bond in a form acceptable to the Executive Director of the Department of Airports ("Executive Director").

Expenses/Maintenance:    City shall provide the following:

1.  Electrical;

2.  Heating;

3.  Air conditioning;

slm/t:USAir.lse 1/26/96              -2-

4.   Structural system maintenance;

5.   Electrical system maintenance exclusive of equipment installed by Lessee;

6.   Heating system maintenance;

7.   Air conditioning system maintenance.

Lessee shall be responsible for:

1.   All utilities not furnished by City;

2.   All maintenance not furnished by City;

3.   All custodial services not provided by City;

4.   All possessory interest and other taxes/licenses;

5.   Insurance in the types and in the amounts as shall be prescribed by the City.

Lessee shall be solely responsible for fully complying with any and all applicable present and/or future rules, regulations, restrictions, ordinances, statutes, laws and/or orders of any Federal, State, and/Local Government entity regarding the following:

a.   Affirmative Action

b.   Airport Noise Regulations

c.   Airport Security

d.   Art Endowment

e.   Bike/Shower

f.   Child Care

g.   Commercial Tenants' Occupancy Tax

h.   Coastal Transportation Corridor Ordinance

i.   Commuter/Rideshare

j.   Cultural Affairs Architectural Review

k.   Disabled Access/ADA 1990

l.   Disadvantaged Business Enterprise

m.   Employee Asbestos Notification

n.   Environmental Assessment

o.   Federal Aviation Administration Construction Review

p.   Hazardous Substances

q.   Job Training

r.   LAX landscaping policy

s.   Minority/Women Business Enterprise

t.   Part 150 Uniform Operations Restrictions

u.   Planning Department Site Plan Review

v.   Recycling and Waste Management

w.   Sewer Moratorium

x.   Sign Review

y.   Storm Water Discharge

z.   Water Conservation

Lessee shall also be solely responsible for any and all civil

slm/t:USAir.lse 1/26/96                    -4-

penalties assessed as a result of the Lessee's failure to comply.

Rental Adjustment:   Rental adjustments are scheduled for September 1, annually.  If the new rates are adopted by Board after September 1, of any year, the rates shall be applied retroactively to September 1 of that year.

Joint Use Charges:   Joint use space includes baggage areas and gate holding areas. Lessee hereby agrees that joint use charges shall be paid monthly and shall be distributed among the airline lessees, and sublessees if any, as follows:

1. Ten (10%) percent of the monthly charge to be distributed equally among all Terminal lessees/sublessees, using joint use space;

2. Fifty-five (55%) percent of the monthly charge shall be distributed in the proportion that each terminal lessee's and sublessees operations for that month bears to the total of all of the Terminal lessee's/sublessee's operations;

3. Thirty-five (35%) percent of the monthly charge shall be distributed in the proportion that each Terminal lessee's/sublessee's passengers for that month bears to the total of all such Terminal lessee's/sublessee's passengers.

<u>Security Regulations</u>:  Lessee hereby agrees to comply with any and all federal, state and or local security regulations, including but not limited to, 14 CFR Parts 107 and 108 regarding unescorted access privileges, effective January 31, 1996.  Lessee and any sublessees, shall be solely responsible for any and all civil penalties assessed as a result of the Lessee's and/or sublessee's failure to comply.  Lessee shall also hold City harmless and indemnify City for any and all civil penalties for Lessee's and/or sublessee's failure to comply.


<u>Business Tax Registration:</u>  Lessee shall comply with the City's requirement pertaining to Business Tax.

/ / /

/ / /

/ / /

IN WITNESS WHEREOF, the parties hereto have themselves or through their duly authorized officers caused this Lease to be executed this _25th_ day of _March_, 1997.

CITY OF LOS ANGELES

By _____
          Executive Director
          Department of Airports

**AP**PROVED AS TO FORM
JAMES K. HAHN
City Attorney

MAR 25 1997

By _____
/SHERYL L. MESHACK
Assistant City Attorney

ATTEST:

US Airways, Inc.

~~USAIR, INC.~~

By _____
          Signature

By _____
      Secretary (Signature)

_____
      Print Name

[SEAL]

| INITIAL |
|---------|
|         |

_____
      Print Name

Robert A. Ansel
Vice President
Properties & Facilities
_____
      Print Title

# STANDARD TERMS AND PROVISIONS

## TABLE OF CONTENTS

### (LEASE)

| SECTION | TITLE | PAGE |
|---------|-------|------|
| 1 | Use of Demised Premises | 1 |
| 2 | Improvements and Alterations | 2 |
| 3 | Ownership of Improvements | 3 |
| 4 | Maintenance of Demised Premises | 3 |
| 5 | City's Right of Access and Inspection | 4 |
| 6 | Restrictions and Regulations | 5 |
| 7 | Insurance | 5 |
| 8 | City Held Harmless | 8 |
| 9 | Nondiscrimination and Equal Employment Practices/Affirmative Action Program | 8 |
| 10 | Taxes and Licenses | 11 |
| 11 | Assignments and Subleases | 12 |
| 12 | Default, Termination, and Rental Payments | 12 |
|  | (a)   Not Involving Rent or Other Payments | 12 |
|  | (b)   Failure to Pay Rent or Other Payments | 13 |
|  | (c)   Rental Payments | 13 |
|  | (d)   Rental Acceleration | 13 |
|  | (e)   Rental Adjustments | 14 |
|  | (f)   Performance Guarantee | 14 |

| SECTION | TITLE | PAGE |
|---------|-------|------|
| | (g)  Bankruptcy | 15 |
| | (h)  Liquidated Damages for Delinquent Payment | 15 |
| | (i)  Cross Default | 16 |
| | (j)  Rental Readjustments | 16 |
| 13 | Waiver | 20 |
| 14 | Attorney's Fees | 21 |
| 15 | Hazardous and Other Regulated Substances | 21 |
| 16 | Airfield Security | 23 |
| 17 | Business Tax Registration | 24 |
| 18 | Signs | 24 |
| 19 | Disabled Access | 25 |
| 20 | Interpretation | 25 |
| | (a)  Fair Meaning | 25 |
| | (b)  Section Headings | 25 |
| | (c)  Void Provisions | 25 |
| | (d)  Two Constructions | 25 |
| | (e)  Laws of California | 26 |
| | (f)  City's Consent | 26 |
| | (g)  Gender | 26 |
| | (h)  Section 308 Exclusivity | 26 |
| | (i)  Rights of United States Government | 26 |
| | (j)  War or National Emergency | 26 |
| | (k)  Time | 26 |
| 21 | Other Agreements Not Affected | 26 |
| 22 | Noise Abatement Procedures (applicable to LAX air carriers only. | 27 |
| 23 | Notices | 27 |

T:\Stndtrms\Stermlea.Tbl
Rev. 082595 (JMW)

ii

[Table/Contents/DOA Leases]

STANDARD TERMS AND PROVISIONS

(LEASE)

1.  Use of Demised Premises.

(a)   Lessee shall not use the demised premises, nor any portion thereof, for any purpose other than that hereinabove set forth without first having had and obtained the written consent of the Executive Director of the Department of Airports (hereinafter referred to as "Executive Director").

(b)   There is hereby reserved to City, its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the premises herein leased.  This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from, or operating on Airport.  Lessee agrees not to make any claim or institute legal action against City under any theory of recovery for any interference with Lessee's use and enjoyment of the demised premises which may result from noise emanating from the operation of aircraft to, from, or upon Airport except for claims or actions brought by third parties against Lessee arising from City's operation of Airport.

(c)   Lessee, by accepting this Lease, agrees for itself and its successors and assigns that it will not make use of the demised premises in any manner which might interfere with the landing and taking off of aircraft from Airport or otherwise constitute a hazard to such operations.  In the event the aforesaid covenant is breached, City reserves the right to enter upon the premises hereby leased and cause the abatement of such interference at the expense of Lessee.

(d)   Lessee shall conduct its, and cause its sublessees to conduct their, operations on the demised premises in such manner as to reduce as much as is reasonably practicable, considering the nature and extent of said operations, any and all activities which interfere unreasonably with the use of other premises adjoining the demised premises or Airport, including, but not limited to, the emanation from

the demised premises of noise, vibration, movements of air, fumes, and odors.

2. <u>Improvements and Alterations</u>.

(a)   Lessee shall make no structural improvements, additions, or alterations in, to or upon the demised premises, nor erect, construct, or place any sign upon said premises, without the prior written consent of Executive Director being first had and obtained, and any conditions, restrictions, or limitations relating thereto then stated by said Executive Director shall be conditions hereof as if they had been originally stated at length herein.   Lessee shall also keep the demised premises and any improvements constructed thereon free and clear of liens for labor and material expended by or for Lessee or on its behalf (except when such improvement is constructed by City) and shall hold City harmless from liability with respect to any such improvements, additions, or alterations made thereto.

(b)   City reserves the right to further develop or improve the landing area of Airport as it sees fit, regardless of the desires or view of Lessee, and without interference or hindrance.   If any such development or improvement interferes substantially with Lessee's use and occupancy of the premises demised herein, Lessee shall be entitled to an appropriate reduction in rental or termination of this Lease.

(c)   Lessee agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Administration Regulations in the event any future structure or building is planned for the demised premises, or in the event of any planned modification or alteration of any present or future building or structure situated on the demised premises.

(d)   Lessee, by accepting this Lease, expressly agrees for itself, its successors and assigns that it will not erect nor permit the erection of any structure or object nor permit the growth of any tree on the land leased hereunder above the mean sea level elevation obstruction contours shown on Exhibit "A."   In the event the aforesaid covenants are breached, City reserves the right to enter upon the land leased

hereunder and to remove the offending structure or object and cut the offending tree, all of which shall be at the expense of Lessee.

3. <u>Ownership of Improvements</u>. During the term of this Lease, title to all structures, improvements, facilities, or alterations constructed or installed by Lessee shall remain in Lessee. Upon the termination of this Lease, said structures, improvements, facilities, or alterations, other than machines, equipment, trade fixtures, and similar installations of a type commonly removed without structural damage to the demised premises, shall become a part of the land upon which they are constructed, or of the building to which they are affixed, and title thereto shall thereupon vest in City. In the event the removal of any fixture damages any part of the demised premises, Lessee shall repair such damage and restore the demised premises to as good condition as the same was in prior to said damage, reasonable wear and tear excepted.

4. <u>Maintenance of Demised Premises</u>. Except as otherwise expressly stated elsewhere in this Lease, Lessee, solely at its own cost and expense, shall:

(1) maintain the demised premises in good condition, in compliance with all requirements of law and in accordance with the "maintenance schedule" which, if applicable, shall be attached hereto; and

(2) keep the premises, at all times, free and clear of weeds, wastepaper, discarded plastic, graffiti, discarded pallets, and all other trash and debris of any kind.

If Lessee fails to so maintain the demised premises, City may serve a "Notice to Cure" upon Lessee. Said Notice shall prescribe the work to be accomplished by Lessee in order to correct the maintenance deficiencies and shall state the number of calendar days Lessee shall have to complete the work as prescribed in the Notice. The period of "calendar days" in said Notice shall commence seven (7) days following City's deposit of said Notice in the mail. In addition, a copy of the "Notice to Cure" shall be posted on the demised premises in a conspicuous place.

If, in the opinion of Executive Director, any default is of such nature that it cannot physically be corrected within the period originally specified by City, and if the party in default has responded with a course of action and has commenced to remedy such default promptly after the receipt of such Notice, and shall continuously and diligently proceed in good faith to eliminate such default, then the period for correction may be extended at City's option for such length of time as is reasonably necessary to complete the same.

If the work prescribed in the "Notice to Cure" is not completed by Lessee in a manner reasonably satisfactory to Executive Director, and Lessee fails to correct such work within the time specified by City in the mailed Notice, City may, at City's sole option, and at Lessee's sole cost and expense, enter upon the demised premises and perform whatever work may, in the opinion of Executive Director, be required to correct the maintenance deficiencies. If City exercises this option, Lessee shall pay to City a sum equal to the direct cost of labor and materials expended for said work, plus a surcharge equal to fifty percent (50%) of said direct cost.

Notwithstanding any term, condition, or provision contained in this Section, including, but not limited to, the Notice to Cure provisions, either party may terminate this Lease at any time upon written notice in accordance with the term or termination sections of this Lease.

5.    <u>City's Right of Access and Inspection</u>. City, by and through its officers, employees, agents, representatives, and contractors, shall have the right at all reasonable times and in a reasonable manner, upon notice to Lessee, to enter upon the demised premises for the purpose of inspecting the same or for doing any act or thing which City may be obligated or have the right to do under this Lease, or otherwise, and no abatement of rental shall be claimed by or allowed to Lessee by reason of the exercise of such rights. In the exercise of its rights under this Section, City, its officers, employees, agents, and contractors shall not unreasonably interfere with the conduct of Lessee's business on the demised premises as herein authorized.

6.   <u>Restrictions and Regulations</u>.   Lessee agrees to abide
by any and all:

(1)   applicable rules, regulations, orders, and
restrictions which are now in force or which may be hereafter
adopted by City with respect to the operation of Airport;

(2)   orders, directives, or conditions issued, given or
imposed by Executive Director with respect to the use of the
roadways, driveways, curbs, sidewalks, and parking areas in and
about said Airport; and

(3)   applicable laws, ordinances, statutes, rules,
regulations, or orders of any governmental authority, federal,
state, or municipal, lawfully exercising jurisdiction over the
Airport or Lessee's occupation or use of the demised premises.

Nothing herein contained shall be deemed to impair
Lessee's right, to contest any such rules, regulations, orders,
restrictions, directives, or conditions or the reasonableness
thereof.   City shall not be liable to Lessee for any damage to,
or for any diminution or deprivation of, Lessee's rights
hereunder on account of the exercise of any such authority, or
as may arise from Airport development or operation in the area
of the demised premises during the term of this Lease, unless
the exercise thereof shall so interfere with Lessee's use and
occupancy of the leasehold estate so as to constitute a
constructive eviction or a termination, in whole or in part, of
this Lease by operation of law or otherwise.


7.   <u>Insurance</u>.
(a)   Lessee shall procure at its expense, and keep in
effect at all times during the term of this Lease, the types
and amounts of insurance specified on page 29 hereof.   The
specified insurance shall also, either by provisions in the
policies, by City's own endorsement form or by other
endorsement attached to such policies, include and insure City,
its Department of Airports, its Board of Airport Commissioners,
(hereinafter referred to as "Board") and all of City's
officers, employees, and agents, their successors and assigns,

as insureds, against the areas of risk described on page 29 hereof as respects Lessee's acts or omissions in its operations, use, and occupancy of the premises hereunder or other related functions performed by or on behalf of Lessee in, on or about Airport.

(b) Each specified insurance policy (other than Workers' Compensation and Employers' Liability and fire and extended coverages) shall contain a Severability of Interest (Cross Liability) clause which states, "It is agreed that the insurance afforded by this policy shall apply separately to each insured against whom claim is made or suit is brought except with respect to the limits of the company's liability," and a Contractual Endorsement which shall state, "Such insurance as is afforded by this policy shall also apply to liability assumed by the insured under this Lease with the City of Los Angeles."

All such insurance shall be primary and noncontributing with any other insurance held by City's Department of Airports where liability arises out of or results from the acts or omissions of Lessee, its agents, employees, officers, assigns, or any person or entity acting for or on behalf of Lessee. Such policies may provide for reasonable deductibles and/or retentions acceptable to Executive Director based upon the nature of Lessee's operations and the type insurance involved.

(c) City shall have no liability for any premiums charged for such coverage(s). The inclusion of City, its Department of Airports, Board and all of City's officers, employees, and agents, their successors and assigns, as insureds is not intended to, and shall not, make them, or any of them, a partner or joint venturer with Lessee in Lessee's operations at Airport. In the event Lessee fails to furnish City evidence of insurance and maintain the insurance as required, City, upon ten (10) day prior written notice to comply, may (but shall not be required to) procure such insurance at the cost and expense of Lessee, and Lessee agrees to promptly reimburse City for the cost thereof plus fifteen percent (15%) for administrative overhead.

At least ten (10) days prior to the expiration date of the above policies, documentation showing that the insurance coverage has been renewed or extended shall be filed with City. If such coverage is canceled or reduced, Lessee shall, within fifteen (15) days of such cancellation of coverage, file with City evidence that the required insurance has been reinstated or provided through another insurance company or companies.

(d)     Lessee shall provide proof of all specified insurance and related requirements to City either by production of the actual insurance policy(ies), by use of City's own endorsement form(s), by broker's letter acceptable to Executive Director in both form and content in the case of foreign insurance syndicates, or by other written evidence of insurance acceptable to Executive Director.  The documents evidencing all specified coverages shall be filed with City in duplicate and shall be procured and approved in strict accordance with the provisions in Sections 11.47 through 11.56 of City's Administrative Code prior to Lessee occupying the demised premises.  The documents shall contain the applicable policy number, the inclusive dates of policy coverages, and the insurance carrier's name, shall bear an original signature of an authorized representative of said carrier, and shall provide that such insurance shall not be subject to cancellation, reduction in coverage, or nonrenewal except after written notice by certified mail, return receipt requested, to the City Attorney of the City of Los Angeles at least thirty (30) days prior to the effective date thereof.  City reserves the right to have submitted to it, upon request, all pertinent information about the agent and carrier providing such insurance.

(e)     City and Lessee agree that the insurance policy limits specified herein shall be reviewed for adequacy annually throughout the term of this Lease by Executive Director who may, thereafter, require Lessee, on thirty (30) days' prior, written notice, to adjust the amounts of insurance coverage to whatever reasonable amount said Executive Director deems to be adequate.

(f)     Submission of insurance from a non-California

admitted carrier is subject to the provisions of California Insurance Code Sections 1760 through 1777, and any other regulations and/or directives from the State Department of Insurance or other regulatory board or agency. Lessee agrees, except where exempted, to provide City proof of said insurance by and through a surplus lines broker licensed by the State of California.

8.   <u>City Held Harmless</u>.  In addition to the provisions of Section 7 herein, Lessee shall indemnify, defend, keep, and hold City, including Board, and City's officers, agents, servants, and employees, harmless from any and all costs, liability, damage, or expense (including costs of suit and fees and reasonable expenses of legal services) claimed by anyone by reason of injury to or death of persons, or damage to or destruction of property, including property of Lessee, sustained in, on, or about the demised premises or arising out of Lessee's use or occupancy thereof or Airport, as a proximate result of the acts or omissions of Lessee, its agents, servants, or employees.

9.   <u>Nondiscrimination and Equal Employment Practices/ Affirmative Action Program</u>.

(a)   Lessee, for itself, its heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree, as a covenant running with the land, that in the event facilities are constructed, maintained, or otherwise operated on the property described in this Lease for a purpose for which a United States Department of Transportation (hereinafter referred to as "DOT") program or activity is extended or for another purpose involving the provision of similar services or benefits, Lessee shall maintain and operate such facilities and services in compliance with all other requirements imposed pursuant to Title 49, Code of Federal Regulations (hereinafter referred to as "CFR"), DOT, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of DOT-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

(b)   Lessee, in its operations at Airport, for

itself, its personal representatives, successors in interest, and assigns, as part of the consideration hereof, does hereby covenant and agree, as a covenant running with the land, that: (1) no person on the grounds of race, color, or national origin shall be excluded from participation, denied the benefits of, or be otherwise subjected to discrimination in the use of the facilities covered by this Lease; (2) in the construction of any improvements on, over, or under the premises authorized to be utilized herein and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination; and (3) Lessee shall use said premises in compliance with all other requirements imposed pursuant to Title 49, CFR, DOT, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of the DOT-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

(c) Lessee agrees that in the event of breach of any of the above nondiscrimination covenants, City shall have the right to terminate this Lease and to reenter and repossess said land and the facilities thereon, and hold the same as if said Lease had never been made or issued. This provision shall not become effective until the procedures of 49 CFR, Part 21, are followed and completed including expiration of appeal rights.

(d) Lessee assures that it will undertake an affirmative action program as required by 14 CFR, Part 152, Subpart E, to ensure that no person shall on the grounds of race, creed, color, national origin, or sex be excluded from participating in any employment activities covered in 14 CFR, Part 152, Subpart E. Lessee assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this Subpart. Lessee assures that it will require that its covered suborganizations provide assurances to Lessee that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, as required by 14 CFR, Part 152, Subpart E, to the same effect.

(e) In addition, Lessee agrees not to discriminate

in its employment practices against any employee or applicant for employment because of the employee's or applicant's race, religion, national origin, ancestry, sex, age, or physical handicap.  Lessee further agrees to abide by the provisions of Section 10.8.3 of City's Administrative Code, a copy of which is printed on the CERTIFICATION FOR CONTRACTS OF MORE THAN $500 BUT NOT IN EXCESS OF $5,000, which Certification City acknowledges Lessee has previously submitted and which shall remain valid for one (1) year from the date thereof.

(f)    If applicable, Lessee also agrees to abide by the provisions of Section 10.8.4 of City's Administrative Code, a copy of which is printed on the CERTIFICATION FOR CONTRACTS OF MORE THAN $5,000, which Certification City acknowledges Lessee has previously submitted along with a copy of Lessee's Affirmative Action Plan.  Said Plan, having been approved by City, shall remain valid for one (1) year from the date of approval and, with said Certification, shall be incorporated by reference in and become part of this Lease.  Lessee agrees that prior to the expiration of said Plan, Lessee will again submit to City Lessee's revised and/or updated Affirmative Action Plan for approval as well as another completed Certification.

(g)    Lessee shall furnish its accommodations and/or services on a fair, equal, and not unjustly discriminatory basis to all users thereof and it shall charge fair, reasonable, and not unjustly discriminatory prices for each unit or service; provided that Lessee shall be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar type of price reductions to volume purchasers.

(h)    Noncompliance with paragraph (g) above shall constitute a material breach thereof, and in the event of such noncompliance, City shall have the right to terminate this Lease without liability therefor, or at the election of City or the United States, either or both said governments shall have the right to judicially enforce the provisions in paragraphs (a), (b), and (g) above.  Said termination, however, shall not take place until after Lessee has received written notice of such noncompliance as well as an opportunity to be heard

regarding same and to correct the practice causing noncompliance.

(i) Lessee agrees that it shall insert the provisions found in paragraphs (a), (b), (g), and (h) above in any sublease, assignment, license, or permit by which said Lessee grants a right or privilege to any person, firm, or corporation to render accommodations and/or services to the public on the premises herein leased.

10. Taxes and Licenses. Lessee shall pay all taxes of whatever character that may be levied or charged upon the leasehold estate in the demised premises, or upon Lessee's improvements, fixtures, equipment, or other property thereon or upon Lessee's use thereof. Lessee shall also pay all license or permit fees necessary or required by law or regulation for the conduct of Lessee's business or use of the demised premises.

If a claim is made against City for any of the above charges, City shall promptly notify Lessee in writing; provided, however, that failure by City to give such notice shall not constitute a waiver of Lessee's obligation to pay such taxes, license and/or permit fees.

The obligations of Lessee under this Section, however, shall not prevent Lessee from contesting the validity and/or applicability of any of the above charges and during the period of any such lawful contest, Lessee may refrain from making, or direct the withholding of, any such payment without being in breach of the above provisions. Upon a final determination in which Lessee is held responsible for such taxes and/or fees, Lessee shall promptly pay the required amount plus all legally imposed interest, penalties and surcharges. If all or any part of such taxes and/or fees, penalties, or surcharges are refunded to City, City shall remit to Lessee such sum(s) to which Lessee is legally entitled.

In addition, by executing this Lease and accepting the benefits thereof, a property interest may be created known as a "possessory interest". If such possessory interest is created,

Lessee, as the party in whom the possessory interest is vested, shall be subject to the payment of the property taxes levied upon such interest.

11.   <u>Assignments and Subleases</u>.   Lessee shall not, in any manner, assign, transfer, or encumber this Lease, or any portion thereof or any interest therein, without the prior written consent of Board, nor sublet or sublease the whole or any part of the demised premises, nor license or permit the use of the same, in whole or in part, without the prior written consent of Executive Director.   Consent to one assignment, subletting, use, or occupation shall not be deemed to be a consent to any subsequent assignment, subletting, occupation, or use.   This Lease shall not, nor shall any interest therein, be assignable as to the interest of Lessee by operation of law without the prior written consent of City.

City shall not unreasonably withhold its consent to the assignment of this Lease or the subletting of the premises or any portion thereof; provided, however, that the use of said premises by any such assignee or sublessee must be consistent with the use authorized herein.   A request by Lessee for assignment or subletting shall be submitted to City in writing along with a fully executed copy of the proposed assignment or sublease.

When the proper consent has been received, this Lease shall be binding upon and shall inure to the benefit of the heirs, successors, executors, administrators and assigns of the parties hereto.

12.   <u>Default, Termination, and Rental Payments</u>.
       (a)   <u>Not Involving Rent or Other Payments</u>.
       In the event Lessee fails to abide by the terms and conditions of this Lease, not involving the failure to pay rent or other payments, City shall give Lessee written notice to correct the defect or default and if the same is not corrected, or substantial steps are not taken toward accomplishing such correction, within ten (10) days after City's mailing such notification, City may terminate this Lease upon giving Lessee a thirty (30) day written notice.

(b)   <u>Failure to Pay Rent or Other Payments</u>.
The failure of Lessee to pay the rent, or other required payments, on time is a breach of this Lease for which City may terminate or take such other legal action as it deems necessary or appropriate.  City expects all rent to be paid on time and Lessee agrees to pay on time.

In the event Lessee fails to pay the rent, or other required payments, as provided for under the terms and conditions of this Lease, City shall have the right to give Lessee a three (3) day written notice to pay any and all amounts due or quit the demised premises pursuant to the provisions of California Code of Civil Procedure Section 1161.

(c)   <u>Rental Payments</u>.
Rental shall be paid by Lessee to City on or before the first day of each calendar month of the term hereof.  In the event the commencement or termination date of this Lease falls on any date other than the first day of the calendar month, the applicable rental for that month shall be calculated <u>pro rata</u> according to the number of days during which the demised premises, or any part of same, were occupied by Lessee during said month.

All payments shall be mailed to the following address:

City of Los Angeles
Department of Airports
Accounts Receivable
Post Office Box 92216
Los Angeles, CA  90009-2216

City may designate an alternate address at any time upon giving Lessee a thirty (30) day advance, written notice.

(d)   <u>Rental Acceleration</u>.
If, during any calendar year of the term hereof, two or more monthly payments are delinquent ten (10) or more business days, City may, at its sole option, require the payment of the rental quarterly in advance.  Thereafter, if,

during any calendar year of the term hereof, two or more quarterly rental payments are delinquent ten (10) or more business days, City may, at its sole option, require the payment of rental annually in advance. The exercise of one or both of said options, however, shall not constitute an exclusive remedy for City with respect to delinquent rental payments and shall not be construed to affect the term of this Lease, or abridge City's right to terminate this Lease as otherwise provided herein.

     (e)  <u>Rental Adjustments</u>.

Upon any approved assignment or sublease of all or a portion of this Lease (other than to the Regional Airports Improvement Corporation, to subsidiaries of Lessee or for security purposes pursuant to paragraph 16 hereof), City shall be allowed to adjust the rental payable by Lessee for that portion of the demised premises being assigned or sublet hereunder using the rental rate established by Board by appropriate Blanket Resolution.

     (f)  <u>Performance Guarantee</u>.

Lessee shall furnish to City and maintain throughout the term of this Lease a Faithful Performance Guarantee to secure the faithful performance by Lessee of all the terms, provisions, and covenants contained herein including, but not limited to, the payment of rent and any other specified compensation. The initial amount of said Guarantee shall be three (3) times the highest monthly rental prescribed herein.

If Lessee has previously provided such Guarantee to City and if, for any reason, Lessee's monthly monetary obligation to City is thereafter increased in excess of ten percent (10%), then the amount of Lessee's Guarantee shall, within thirty (30) days after receiving written notice from City, correspondingly be increased to a sum three (3) times the new amount.

Performance Guarantees of less than One Thousand Dollars ($1,000) shall be in the form of a Certificate of Deposit, Irrevocable Letter of Credit or Surety Bond. Performance Guarantees for One Thousand Dollars ($1,000) or

more shall be in the form of an Irrevocable Letter of Credit or Surety Bond.  All Performance Guarantees must be approved as to form by the City Attorney.

Lessee shall furnish such Guarantee in duplicate to the Chief Accounting Officer of City's Department of Airports not later than thirty (30) days following commencement of the term hereof or, if applicable, thirty (30) days following adjustment of rental.  If, for any reason, said Guarantee is not provided by Lessee and/or is not thereafter maintained in sufficient amount throughout the term hereof, City may terminate this Lease at any time upon giving Lessee a thirty (30) day advance, written notice.  Upon the expiration or earlier termination of this Lease, and if Lessee has satisfied all of its obligations to City hereunder, City shall relinquish to Lessee said Guarantee not later than thirty (30) days following such expiration or earlier termination.

(g)  Bankruptcy.
In case of the bankruptcy of Lessee, or the appointment of a receiver for Lessee, or if a receiver is appointed to take possession of the demised premises as a result of any act or omission of Lessee, or if Lessee makes an assignment of this Lease for the benefit of creditors, or if possession of the demised premises is taken by virtue of any attachment, execution, or the levy of any judicial process, and such appointment or taking is not discharged or terminated within sixty (60) days, City, at its election, may, without notice, terminate this Lease.

(h)  Liquidated Damages for Delinquent Payment.
Without waiving any rights available under this Lease or by law, in the event of late or delinquent payments, Lessee recognizes that City will incur certain expenses, the amount of which is difficult to ascertain.  Therefore, in addition to rental(s) owing, Lessee agrees to pay the liquidated damages set forth below to compensate City for all expenses and/or damages and loss resulting from said late or delinquent payments by Lessee.

The liquidated damages for late or delinquent

payments shall be ten percent (10%) per annum, or that percent per annum equal to the prevailing rate on the 25th day of the month preceding the execution of this Lease as established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act plus four and one-half percent (4-1/2%) per annum, whichever is greater, on the balance of the unpaid monthly amount calculated from the date of the delinquency until the close of the business day upon which the delinquency payment is received by City.

(i)  Cross-Default.  A material default or breach of the terms of any other lease, license, permit, or contract held by Lessee with City shall constitute a material breach of the terms of this Lease and shall give City the right to terminate this Lease for cause in accordance with the procedures set forth in Section 12(a) herein.

The failure of Lessee (if Lessee is an air carrier) to pay to City its landing fees and charges pursuant to the terms of Lessee's operating permit, or if no such permit exists, then in accordance with Board's resolution establishing said fees and charges, is a material breach of this Lease for which City shall have the right to declare Lessee in default and to terminate this Lease in accordance with the procedures set forth in Section 12(a) herein.

(j)  Rental Readjustments.  If the terms of this Lease provide for rental readjustments, Lessee acknowledges that this Lease is made and entered into subject to the provisions of Section 238.9 of the Los Angeles City Charter.  In accordance with the requirements of said Section, it is agreed that on January 1, 1996, and every five (5) years thereafter, the rental payable hereunder shall be adjusted to a fair rental value, based upon the then current fair rental value of the demised premises (excluding therefrom the value of improvements placed in or on the demised premises by Lessee) considering the proposed use and development, in accordance with the procedures provided hereinafter.

Said rental readjustments shall be in accordance with the following procedure, to-wit:

(i) At least 180 days prior to the readjustment date(s) provided for in this Lease, the parties shall, by mutual agreement, to adjust the annual rental for the demised premises thereafter payable by Lessee during the next successive five (5) year period, but in no event shall the amount of the monthly rental be reduced below the original sum set for the mutual period of this Lease.

(ii) If the parties are unable to agree upon such adjusted rent before one hundred eighty (180) days prior to said readjustment dates, the monthly rent shall be determined as outlined below.

(iii) An appraiser, who is a member of the Appraisal Institute, or its successor organization, shall be selected by each of the parties. Either Lessee or City shall, when notified in writing by the other to do so, deliver to the other party the name and address of such appraiser. The Executive Director shall immediately fix the time and place for a conference between the parties hereto and their appraisers. At such conference, the parties shall agree upon the general instructions to be given said appraisers. The general instructions shall not place any limitations upon the appraisal techniques to be employed by the appraisers in evaluating the fair rent.

(iv) Each of the two appraisers shall, not later than ninety (90) days prior to the specific adjustment date involved, submit one (1) copy of their

respective appraisal in its entirety to Lessee and another copy to City. Executive Director (or authorized representative) shall, immediately upon receipt of copies of the two (2) appraisals, by written notice, fix a time and place for a conference. Those in attendance shall include Lessee's representatives, including representatives from Lessee's lender, if applicable, representatives of City and the two appraisers, and the parties shall endeavor to voluntarily reach agreement on the adjusted rent.

(v) If the parties cannot agree on the readjusted rent, the President of the Los Angeles Chapter of the Appraisal Institute, or its successor organization, will select a third appraiser as soon as reasonably possible following the second conference referred to above. Said third appraiser will be allowed access to the two reports, will prepare a third appraisal and shall submit one copy of same to Lessee and one copy to City. Lessee and City shall again meet in accordance with the procedures set forth immediately above. Upon completion of the third appraisal, Lessee and City shall each pay one-half (1/2) of the third appraisal fee.

(vi) If the representatives of Lessee and City are still unable to reach agreement on the readjusted rent, then the three appraisal reports and any other relevant material shall be furnished to Board and said representatives shall have the right to make oral presentations to said Board during one of its regular meetings, the date for such presentations to be selected by Executive Director. Board shall review all facts and evidence

submitted to it and shall then prescribe the adjusted rental to apply throughout the respective adjustment period.   Nothing herein shall prejudice the right of Lessee to contest, in a court of competent jurisdiction, such adjusted rental in the event said Board may have acted arbitrarily or unreasonably; provided, however, pending the outcome of any such litigation, Lessee shall be obligated first to either pay the new rental rate and all retroactive amounts directly to City as they come due, or deposit such increased amounts of such rent and the retroactive amounts into a joint escrow account with provision made for the payment of the escrowed funds, including accrued interest, to City (to the extent such funds are owed by Lessee to City) upon a final determination of the appropriate rental adjustment, if any.

(vii)  If, by the date set for rental readjustment, there has been a failure or refusal by either City or Lessee to appoint an appraiser or to submit an appraisal report after the appraiser has been appointed, such failure or refusal will constitute grounds for terminating this Lease at the option of the party who is complying with the rental readjustment procedure.   However, such failure or refusal may be waived, and at the option of the complying party, it may elect to proceed with the rental readjustment with only one appraisal report utilized.   If neither party has timely complied with the rental readjustment procedure, then the parties can renegotiate the time periods for said appraisal in order that the readjustment of the rental can occur.   It is agreed that failure by the parties to timely comply with the rental readjustment

procedures herein shall not be construed to constitute a waiver of the right of City to a rental readjustment. Lessee and City shall each pay the appraiser each selects and shall pay one-half (1/2) of the fees and expenses of the third appraiser.

(viii) In the event such adjustment of rent is not completed prior to the commencement of the respective period involved, Lessee shall continue to pay the rent set for the preceding period, at the intervals and in the manner fixed for such preceding period, and if such rent is thereafter fixed in a different amount, such new rental shall take effect retroactively back to the beginning month of the readjustment period (or the commencement date of this Lease, whichever date is later), and subject to Lessee's right to contest and right to escrow funds as provided above, Lessee shall immediately pay to City that sum which has accrued as a result of a such retroactive application. In the event of a decrease in rent, subject to the restrictions contained in 12(j)(i) above, City will issue a rent credit to Lessee.

(ix) It is understood and agreed that the rental will, without exception, be adjusted on the dates described herein. Accordingly, any deviation from the adjustment procedure shall not be used by either party as an excuse to avoid or delay the rental readjust on said dates.

13. <u>Waiver</u>. The waiver by either party of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other term, covenant, or condition, or of any subsequent breach of the same term, covenant, or condition. The subsequent acceptance of rent

hereunder by City shall not be deemed to be a waiver of any preceding breach by Lessee of any term, covenant, or condition of this Lease other than the failure of Lessee to pay the particular rent so accepted, regardless of City's knowledge of such preceding breach at the time of acceptance of such rent.

14.   Attorney's Fees.   If City shall, without any fault, be made a party to any litigation commenced by or against Lessee arising out of Lessee's use or occupancy of the demised premises and as a result of which Lessee is finally adjudicated to be liable, then Lessee shall pay all costs, expenses, and reasonable attorney's fees incurred by or imposed upon City in connection with such litigation.   In any action by City or Lessee for recovery of any sum due under this Lease, or to enforce any of the terms, covenants, or conditions contained herein, the prevailing party shall be entitled to reasonable attorney's fees in addition to costs, expenses, and necessary disbursements incurred in such action.   Each party shall give prompt notice to the other of any claim or suit instituted against it that may affect the other party.

15.   Hazardous and Other Regulated Substances.   Except for conditions existing prior to the original occupancy of the demised premises by Lessee or by Lessee's predecessors in interest, Lessee agrees to accept sole responsibility for full compliance with any and all applicable present and future rules, regulations, restrictions, ordinances, statutes, laws, and/or other orders of any governmental entity regarding the use, storage, handling, distribution, processing, and/or disposal of hazardous wastes, extremely hazardous wastes, hazardous substances, hazardous materials, hazardous chemicals, toxic chemicals, toxic substances, pollutants, contaminants, or other similarly regulated substances (hereinafter referred to as "hazardous substances") regardless of whether the obligation for such compliance or responsibility is placed on the owner of the land, on the owner of any improvements on the leasehold, on the user of the land, or on the user of the improvements.   Said hazardous substances shall include, but not be limited to, gasoline, aviation, diesel and jet fuels, lubricating oils, and solvents.   Lessee agrees that any damages, penalties, or fines levied on City and/or Lessee as a result of noncompliance with any of the above shall be the sole responsibility of Lessee.

Further, Lessee shall indemnify and pay and/or reimburse City for any damages, penalties, or fines that City pays as a result of noncompliance with the above; provided, however, with respect to joint-use space, Lessee's responsibility is reduced to the extent Lessee, a sublessee or permittee sharing such joint-use space is legally determined to be responsible therefor.

Except for conditions existing prior to the original occupancy of the demised premises by Lessee or Lessee's predecessors in interest, in the case of any hazardous substance spill, leak, discharge, or improper storage on the leasehold or contamination of the leasehold by any person, Lessee agrees to make or cause to be made any necessary repairs or corrective actions as well as to clean up and remove any leakage, contamination, or contaminated ground. In the case of any hazardous substance spill, leak, discharge, or contamination by Lessee or its employees, servants, agents, contractors, or subcontractors on Lessee's premises or as may be discharged in, on or under adjacent property which affects other property of City or its tenants' property, Lessee agrees to make or cause to be made any necessary corrective actions to clean up and remove any spill, leakage, or contamination. If Lessee fails to repair, clean up, properly dispose of, or take any other corrective actions as required herein, City may (but shall not be required to) take all steps it deems necessary to properly repair, clean up, or otherwise correct the conditions resulting from the spill, leak, or contamination. Any such repair, cleanup, or corrective actions taken by City shall be at Lessee's sole cost and expense and Lessee shall indemnify and pay for and/or reimburse City for any and all costs (including any administrative costs) City incurs as a result of any repair, cleanup, or corrective action it takes.

If Lessee installs or uses already installed underground storage tanks, pipelines, or other improvements on the demised premises for the storage, distribution, use, treatment, or disposal of any hazardous substances, Lessee agrees, upon the expiration and/or termination of this Lease, to remove and/or clean up, at the sole option of Executive Director, the above-referred-to improvements. Said removal and/or cleanup shall be at Lessee's sole cost and expense and shall be

undertaken and completed in full compliance with all federal, state, and local laws and regulations, as well as with the reasonable directions of Executive Director.

Lessee shall promptly supply City with copies of all notices, reports, correspondence, and submissions made by Lessee to any governmental entity regarding any hazardous substance spill, leak, discharge, or clean-up including all test results.

This Section and the obligations herein shall survive the expiration or earlier termination of this Lease.

16. <u>Airfield Security</u>. Lessee shall be responsible for fully complying with any and all applicable present and/or future rules, regulations, restrictions, ordinances, statutes, laws, and/or orders of any federal, state, and/or local governmental entity regarding airfield security. Lessee shall be responsible for the maintenance and repair of that portion of the Airport perimeter fence, including gates and doors, that are located on the demised premises or controlled by Lessee. Lessee shall comply fully with applicable provisions of the Federal Aviation Administration Regulations, 14 CFR, Part 107 [and Part 108 if Lessee is an air carrier], including the establishment and implementation of procedures acceptable to Executive Director to control access from the demised premises to air operation areas in accordance with the Airport Security Program required by Part 107. Further, Lessee shall exercise exclusive security responsibility for the demised premises and, if Lessee is an air carrier, do so pursuant to Lessee's Federal Aviation Administration approved Air Carrier Standard Security Program used in accordance with 14 CFR, Part 129.

In addition to the foregoing, gates and doors located on the demised premises which permit entry into restricted areas at Airport shall be kept locked by Lessee at all times when not in use or under Lessee's constant security surveillance. Gate or door malfunctions which permit unauthorized entry into restricted areas shall be reported to Department of Airports' Operations Bureau without delay and shall be maintained under constant surveillance by Lessee until repairs are affected by Lessee or City and/or the gate or door is properly secured.

All civil penalties levied by the Federal Aviation Administration for violation of Federal Aviation Regulations pertaining to security gates or doors located on the demised premises or otherwise controlled by Lessee shall be the sole responsibility of Lessee. Lessee agrees to indemnify City for any federal civil penalties amounts City must pay due to any security violation arising from the use of Lessee's leasehold or the breach of any obligation imposed by this Section.

17. <u>Business Tax Registration</u>. Lessee represents that it has registered its business with the City Clerk of City and has obtained and presently holds from that Office a Business Tax Registration Certificate or a Business Tax Exemption Number required by City's Business Tax Ordinance (Article 1, Chapter 2, Sections 21.00 and following, of City's Municipal Code). Lessee shall maintain, or obtain as necessary, all such Certificates required of it under said Ordinance and shall not allow any such Certificate to be revoked or suspended during the term hereof.

18. <u>Signs</u>. No identification signs pertaining to Lessee's operations shall be installed or placed in or on the demised premises or airport until Lessee has submitted to Executive Director, for approval in writing, drawings, sketches, design dimensions, and type and character of such identification signs proposed to be placed thereon or therein. Any conditions with respect to the use of said signs stated by Executive Director in the latter's written approval thereof shall be conditions thereof as if set forth herein at length.

Lessee shall not, at any time, under any circumstances, install, place, or maintain any type of advertising on the demised premises.

In addition, Lessee's ticket counter, ticket lifts, and podiums leased hereunder shall be free of all advertising, signs, credit card application dispensing units, posters, and banners, including, but not necessarily limited to, those showing Lessee's name, destinations, rates, rent-a-car

arrangements, or other services.  Noncompliance by Lessee with this provision shall result, following a three (3) day written notice by City to Lessee, in City's right to remove said unauthorized signs, advertising, or other written materials and to store same at Lessee's expense.

19.  <u>Disabled Access</u>.  Lessee shall be solely responsible for fully complying with any and applicable present and/or future rules, regulations, restrictions, ordinances, statutes, laws, and/or orders of any federal, state, and/or local governmental entity and/or court regarding disabled access to improvements on the leasehold including any services, programs, or activities provided by Lessee.  Lessee shall be solely responsible for any and all damages caused by, and/or penalties levied as the result of, Lessee's noncompliance.  Further, Lessee agrees to cooperate fully with City in its efforts to comply with Title II of the Americans With Disability Act of 1990.

20.  <u>Interpretation</u>.
    (a)  <u>Fair Meaning</u>.  The language of this Lease shall be construed according to its fair meaning, and not strictly for or against either City or Lessee.

    (b)  <u>Section Headings</u>.  The section headings appearing herein are for the convenience of City and Lessee, and shall not be deemed to govern, limit, modify, or in any manner affect the scope, meaning, or intent of the provisions of this Lease.

    (c)  <u>Void Provisions</u>.  If any provision of this Lease is determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provision of this Lease, and all such other provisions shall remain in full force and effect.

    (d)  <u>Two Constructions</u>.  It is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.

(e) <u>Laws of California</u>. This Lease shall be construed and enforced in accordance with the laws of the State of California.

(f) <u>City's Consent</u>. In each instance herein where City's, Board's or Executive Director's approval or consent is required before Lessee may act, such approval or consent shall not be unreasonably withheld.

(g) <u>Gender</u>. The use of any gender herein shall include all genders, and the use of any number shall be construed as the singular or the plural, all as the context may require.

(h) <u>Section 308 Exclusivity</u>. It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act [49 USC 40103 (Public Law 103-272; 108 STAT. 1102)].

(i) <u>Rights of United States Government</u>. This Lease shall be subordinate to the provisions and requirements of any existing or future agreement between City and the United States relative to the development, operation, or maintenance of Airport.

(j) <u>War or National Emergency</u>. This Lease and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire affecting the control, operation, regulation, and taking over of Airport or the exclusive or nonexclusive use of Airport by the United States during the time or war or national emergency.

(k) <u>Time</u>. Time shall be of the essence in complying with the terms, conditions, and provisions of this Lease.

21. <u>Other Agreements Not Affected</u>. Except as specifically stated herein, this Lease, and the terms, conditions, provisions and covenants hereof, shall apply only to the demised premises herein particularly described and shall

not in any way change, amend, modify, alter, enlarge, impair, or prejudice any of the rights, privileges, duties, or obligations of either of the parties hereto, under or by reason of any other agreement between said parties, except that nothing contained in such other agreement shall limit the use by Lessee of the within demised premises for the herein referred to purpose.

22.   <u>Noise Abatement Procedures (applicable to LAX air carriers only</u>.   Pursuant to the requirements of the 1993 LAX Noise Variance and in order to limit the use of auxiliary power units (APU's), Lessee hereby agrees to provide a sufficient number of ground power units at each gate and maintenance area used by Lessee's aircraft on the demised premises.   Said ground power units shall be made available for use by Lessee's aircraft within ninety (90) days from the effective date of this Lease.   Further, Lessee hereby agrees to comply with the Department of Airports' Noise Abatement Rules and Regulations.

23.   <u>Notices</u>.   Written notices to City hereunder and to the City Attorney of the City of Los Angeles shall be given by registered or certified mail, postage prepaid, and addressed to said parties at Department of Airports, 1 World Way, Post Office Box 92216, Los Angeles, CA 90009-2216, or to such other address as these parties may designate by written notice to Lessee.

US Airways, Inc.   Written notices to Lessee hereunder shall be given by registered or certified mail, postage prepaid, and addressed to ~~USAir, Inc~~., 2345 Crystal Drive, Arlington, VA 22227 or to such other address as Lessee may designate by written notice to City.



The execution of any such notice by Executive Director shall be as effective as to Lessee as if it were executed by Board or by Resolution or Order of said Board, and Lessee shall not question the authority of Executive Director to execute any such notice.

All such notices, except as otherwise provided herein, may either be delivered personally to Executive Director or to the Office of the City Attorney, Airport Division, in the one case, or to Lessee in the other case, or may be deposited in the United States mail, properly addressed as aforesaid with postage fully prepaid by certified or registered mail, return receipt requested, and shall be effective five (5) days after deposit in the mail.

oOo

# CITY OF LOS ANGELES - DEPARTMENT OF AIRPORT'S INSURANCE REQUIREMENTS

NAME: USAIR, INC.

AGREEMENT / ACTIVITY: Lease - Ticket counter, ticket office, administrative office, operations office, joint use space and other areas in Terminal One at Los Angeles International Airport.

TERM: Three years, six months commencing February 1, 1996 and ending August 31, 1999.

The insured must maintain insurance coverage at limits normally required of its type operation; however, the following coverage noted with an "X" are the minimum required and must be at least the level of the Combined Single Limits indicated.

<u>LIMITS</u>

(X) Workers' Compensation (Statutory)/Employer's Liability      <u>Statutory</u>
- (X) Broad Form All States Endorsement
- (X) Voluntary Compensation Endorsement
- (*) Longshoremen's and Harbor Workers' Compensation Act Endorsement
- (X) Waiver of Subrogation

(X) Automobile Liability - covering owned, non-owned & hired auto      $4,000,000 CSL

(X) Aviation/Airport Liability, including the following coverage:
- (X) General Liability Comprehensive Form /Airport Liab.
- (X) Premises and Operations
- (X) Contractual (Blanket/Schedule)
- (X) Independent Contractors
- (*) Hangarkeepers Legal Liab.
- (X) Personal Injury
- (X) Aircraft Liability (including passenger Liability)

**Limit of Liability must meet Federal Requirements or as follows, whichever is greater:**
Commuters with 60 or fewer passengers or Cargo only,
with payload less than 18,000 lbs ----------      $50,000,000 CSL
Air Carriers with more than 60 passengers or Cargo only,
with payload greater than 18,000 lbs --------      $100,000,000 CSL

(X) Property Insurance      <u>Value of Improvements</u>
90% Co-Ins. ( )Actual Cash Value (X)Replacement Value ( )Agreed Amt.
- (X) Covering airline improvements, w/waiver of subrogation (Department does not insure tenant improvements)
- (**) Covering building structure
- (X) Fire & Extended Coverage, including sprinkler leakage
- (X) Vandalism & Malicious Mischief
- (X) Debris Removal

*** Coverage for Hazardous Substances      Sudden Occurrence      $ ***
     Non-sudden Occurrence      $ ***

** Builder's Risk Insurance - (All Risk Coverage)      <u>Value of Improvements</u>

Comments:      * If exposure exists, coverage is required.
     ** Required if property or building ultimately revert to City.
     *** Must meet Federal and/or State requirements.

IRA1 7/93
i:0705a.ir

DEPARTMENT OF AIRPORTS
TERMINAL 1
US AIR

| | Sq. Ft. | Rent Per Sq. Ft. Space | M&O | Amount |
|---|---|---|---|---|
| **First Level West (Sheet 1)** | | | | |
| Office (46) | 930 | 11.9100 | 12.3281 | $22,541.43 |
| Baggage Conveyor (32) | 147 | 11.9100 | 8.0044 | 2,927.42 |
| | | | | |
| **Second Level West (Sheet 3)** | | | | |
| Office(19) | 1,977 | 13.3700 | 12.3281 | 50,805.14 |
| Baggage Conveyor (32,35) | 298 | 12.5300 | 8.0044 | 6,119.25 |
| Ticket Counter (20) | 1,087 | 21.7300 | 12.3281 | 37,021.15 |
| | | | | |
| **Mezzanine Level West(Sheet 5)** | | | | |
| Lounge(13) | 3,995 | 12.0500 | 12.3281 | 97,390.51 |
| Office(25) | 7,542 | 12.0500 | 12.3281 | 183,859.63 |
| **Operations Level Concourse (Sheet 8)** | | | | |
| Lockers (05) | 1,125 | 11.8500 | 7.9516 | 22,276.80 |
| Office(06,08,12,13,18,19,42,51) | 10,308 | 11.8500 | 12.3281 | 249,227.85 |
| Storage(09,37) | 3,186 | 11.8500 | 7.1006 | 60,376.61 |
| Corridor (20) | 224 | 11.8500 | 12.3281 | 5,415.89 |
| Baggage (50) | 85 | 11.8500 | 8.0044 | 1,687.62 |
| **TOTAL , EXCLUSIVE USE** | 30,904 | | | $739,649.32 |
| **MONTHLY RENTAL** | | | | $61,637.44 |

# SCHEDULE "A"

TERM1M&O.WK4 10/09/96 03:50 PM

1

DEPARTMENT OF AIRPORTS
TERMINAL 1
JOINT USE

| | Sq. Ft. | Rent Per Sq. Ft. | | Amount |
|---|---|---|---|---|
| | | Space | M&O | |
| First Level West (Sheet 1) | | | | |
| Baggage Claim - 50% (26) | 7,512 | 13.3700 | 22.8889 | $272,376.86 |
| Baggage Channel (45,51,52) | 5,863 | 11.9100 | 8.0044 | 116,758.13 |
| First Level East ( Sheet 2) | | | | |
| Baggage Claim - 50% (19) | 7,413 | 13.3700 | 22.8889 | 268,787.23 |
| Second Level West (Sheet 3) | | | | |
| Baggage Area (31) | 14,077 | 12.5300 | 7.9540 | 288,353.27 |
| Baggage Conveyors (44,57,58) | 2,036 | 12.5300 | 8.0044 | 41,808.04 |
| Second Level East ( Sheet 4) | | | | |
| Baggage Area (01) | 11,709 | 12.5300 | 7.9540 | 239,847.16 |
| Baggage Conveyors (05,48) | 985 | 12.5300 | 8.0044 | 20,226.38 |
| Mezzanine Level West (Sheet 5) | | | | |
| Holdroom (03) | 2,274 | 13.1100 | 22.8889 | 81,861.50 |
| Gate Appendage (36) | 503 | 0.4240 | 19.1937 | 9,867.70 |
| Mezzanine Level East (Sheet 6) | | | | |
| Holdroom (26) | 7,896 | 13.110 | 22.8889 | 284,247.31 |
| Gate Appendage (38) | 2,287 | 0.424 | 19.1937 | 44,865.68 |
| Operations Level Concourse (Sheet 8) | | | | |
| Baggage (48) | 18,768 | 10.610 | 7.9540 | 348,409.15 |
| Concourse (Sheet 9) | | | | |
| Holdroom (05,06,07,34,35,37) | 33,474 | 13.970 | 22.8889 | 1,233,814.82 |
| TOTAL , JOINT USE | 114,797 | | | $3,251,223.22 |
| MONTHLY RENTAL | | | | $270,935.27 |

TERM1M&O.WK4 10/09/96 03:48 PM

# SCHEDULE "A"

2

# CITY SUPPLEMENTAL
# EXHIBIT 63

LAA 5961

LEASE


BETWEEN THE CITY OF LOS ANGELES


AND CONTINENTAL AIRLINES, INC.


COVERING PASSENGER TERMINAL FACILITIES AT


LOS ANGELES INTERNATIONAL AIRPORT


JMW
10-19-88

CONTINENTAL AIRLINES, INC.
TERMINAL FACILITIES LEASE

## TABLE OF CONTENTS

| Section | Heading | Page |
|---|---|---|
| -- | Recitals . . . . . . . . . . . . . . . . | 1 |
| 1 | Section Headings . . . . . . . . . . . . | 2 |
| 2 | Definitions . . . . . . . . . . . . . | 3 |
| 3 | Demised Premises . . . . . . . . . . . | 4 |
| 4 | Reservation of Certain Areas of the Demised Premises as City Areas . . . . . . | 9 |
| 5 | Term of Lease . . . . . . . . . . . . | 12 |
| 6 | Rent and Rental Adjustment . . . . . . . | 13 |
| 7 | Use of Demised Premises . . . . . . . . | 24 |
| 8 | Airfield Security . . . . . . . . . . . | 27 |
| 9 | Public Areas; Ingress, Egress and Purchase of Supplies . . . . . . . . . . | 29 |
| 10 | Improvements and Alterations; Force Majeure | 30 |
| 11 | Conditions Governing Improvements and Alterations . . . . . . . . . . . . . | 34 |
| 12 | City's Right to Purchase Lessee's Interest in Demised Premises. . . . . . . . . . . | 38 |
| 13 | Title to Improvements . . . . . . . . . | 40 |
| 14 | Maintenance and Repair by City . . . . . . | 41 |
| 15 | Reimbursement for Maintenance and Operations | 43 |
| 16 | Maintenance by Lessee . . . . . . . . . | 44 |
| 17 | Damage, Destruction, Space and Facilities; and City Areas . . . . . . . . | 45 |
| 18 | Hazardous Substances . . . . . . . . . | 48 |
| 19 | Insurance . . . . . . . . . . . . . . | 49 |

20          Indemnification . . . . . . . . . . . .          56

21          Assignments and Subleases . . . . . . .          57

22          Defaults and Right to Terminate. . . . . .       59

23          Mortgages, Financing and
            Other Encumbrances  . . . . . . . . . . .        63

24          Apron, Gate Positions and Loading Ramps. .       71

25          Assignments of Gate Positions
            and Loading Ramps . . . . . . . . . . . .        72

26          Vehicles and Automotive Equipment
            on Apron and Loading Ramp . . . . . . . .        72

27          Underground Fueling Facilities . . . . . .       73

28          Termination by City . . . . . . . . . . .        74

29          Termination by Lessee . . . . . . . . . .        75

30          Taxes and Licenses . . . . . . . . . . . .       77

31          Food and Beverage Concession Charges . . .       78

32          Rules and Regulations . . . . . . . . . .        78

33          Utility Services . . . . . . . . . . . .         79

34          Signs . . . . . . . . . . . . . . . . . .        80

35          City's Right of Access and Inspection  . .       81

36          Nondiscrimination and
            Affirmative Action Program . . . . . . . .       81

37          Amendments . . . . . . . . . . . . . . .         85

38          Attorney's Fees . . . . . . . . . . . . .        85

39          Successors and Assigns Bound . . . . . . .       86

40          Other Agreements Not Affected . . . . . .        86

41          Lessee's Option to Continue or Renew Lease       87

42          Miscellaneous . . . . . . . . . . . . . .        89

--          Signatures . . . . . . . . . . . . . . .         93

LEASE BETWEEN THE CITY OF LOS ANGELES
AND CONTINENTAL AIRLINES, INC.
COVERING TERMINAL FACILITIES AT
LOS ANGELES INTERNATIONAL AIRPORT

THIS LEASE, made and entered into this _27th_ day of
_DECEMBER_, 19_88_, by and between the CITY OF LOS ANGELES,
a municipal corporation, acting by order of and through its
Board of Airport Commissioners (hereinafter referred to as
"City"), and CONTINENTAL AIRLINES, INC., a Delaware corporation
(hereinafter referred to as "Lessee"),

## W I T N E S S E T H

WHEREAS, City is the owner of Los Angeles International
Airport (hereinafter referred to as "Airport") and operates the
same for the promotion, accommodation and development of air
commerce and air transportation between City and other cities
of the United States and the cities of other nations of the
world; and

WHEREAS, City has undertaken certain construction projects
at Airport, including the construction of expanded passenger
terminal facilities and a second-level roadway approach to said
expanded facilities; and

-1-                                    • JMW

WHEREAS, Lessee is engaged in the business of commercial air transportation of persons, cargo, property and mail as a scheduled air carrier, and desires to lease from City certain premises at Airport consisting of certain portions of previously existing terminal facilities and additional terminal areas and facilities at Airport including, but not limited to, those facilities which it anticipates expanding, remodeling and constructing or has already constructed, all to be financed by the Regional Airports Improvement Corporation (hereinafter referred to as the "Corporation" or "RAIC") or through other means available to Lessee; and

WHEREAS, City has premises available for lease for such purpose on Airport and it is in City's and public's best interest to lease said premises to Lessee; and

NOW, THEREFORE, the parties hereto, for and in consideration of the premises and of the terms, covenants and conditions hereinafter contained to be kept and performed, DO MUTUALLY AGREE AS FOLLOWS:

Sec. 1. <u>Section Headings</u>.  The section headings appearing herein are for the convenience of City and Lessee and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this Lease.

Sec. 2.  <u>Definitions</u>.  For purposes of this Lease, (1) "Preferential Use Gates" shall mean aircraft parking/loading positions assigned by the Executive Director, as hereinafter defined, pursuant to Section 25 hereof for which Lessee shall have the first right of use during the term of this Lease; (2) "Lessee's Improvements" shall mean those terminal areas, structures and facilities acquired, constructed or altered by or on behalf of Lessee, and all other improvements acquired, altered, constructed or installed by or on behalf of Lessee, upon the Demised Premises or attached thereto, regardless of whether such improvements were financed or, if financed, regardless of by what means or through what sources such financing has been achieved; (3) "RAIC Facilities" shall mean those of Lessee's Improvements, consisting of both real and personal property, the acquisition, construction or installation of which has been financed by or through the Corporation; and (4) "Airport Terminal Use" shall mean utilization of all or part of the Demised Premises, directly or indirectly, for any activity which is the same or similar to activities engaged in by Lessee in providing air transportation services in the Demised Premises during the twelve months immediately preceding Lessee's receipt of written notice from City that City will exercise its Buyback right hereunder as defined in Section 12 hereof.

Sec. 3. <u>Demised Premises</u>. City hereby leases to Lessee and Lessee takes and leases from City, for the term and upon the conditions hereinafter provided, the Demised Premises as set forth below:

A.  <u>EXCLUSIVE BUILDING SPACE</u>

| <u>PARCEL</u> | <u>LOCATION</u> | <u>DESCRIPTION</u> | <u>AREA</u> |
|---|---|---|---|
| 1 | T6-1 | Baggage Claim | 354 |
| 2 | T6-1 | Baggage Claim | 407 |
| 3 | T6-1 | Baggage Claim | 157 |
| 4 | T6-1 | Baggage Claim | 450 |
| 5 | T6-2 | Ticketing | 426 |
| 6 | T6-2 | Ticketing | 209 |
| 7 | T6-2 | Ticketing | 155 |
| 8 | T6-2 | Ticketing | 284 |
| 9 | T6-2 | Ticketing | 1,840 |
| 10 | T6-2 | Ticketing | 2,530 |
| 11 | S6-1 | Power Room | 191 |
| 12 | S6-1 | Power Room | 191 |
| 13 | S6-1 | Operations | 258 |
| 14 | S6-1 | Operations | 702 |
| 15 | S6-1 | Operations | 2,368 |
| 16 | S6-1 | Operations | 1,700 |
| 17 | S6-1 | Operations | 178 |
| 18 | S6-2 | Public | 1,933 |
| 19 | S6-2 | Public | 3,490 |

It is understood and agreed that parcel numbers 5, 6, 7, and 8 are designated as "City Areas" and are being included within this Lease only for the purpose of assisting the Lessee to obtain attractive financing.  It is the mutual intent of the parties that a Use Permit in favor of the Lessee will be issued covering said Parcel Numbers 5, 6, 7, and 8 for the period commencing concurrent with the commencement of this Lease and ending with the expiration of Lease No. LAA-997 on November 3, 1991.  Except for the rental credit prescribed hereafter, the City shall have no obligation to Lessee relative to said Parcels 5, 6, 7, and 8 subsequent to November 3, 1991.

B.  EXCLUSIVE LAND

| PARCEL | LOCATION | DESCRIPTION | AREA |
|--------|----------|-------------|------|
| 20 | C6-A | Connector | 43,616 |
| 21 | T6-A | Baggage Make-up | 6,695 |
| 22 | T6-1 | Baggage Make-up | 534 |
| 23 | S6-A | Generator Site | 100 |

C.  JOINT USE SPACE

In the interest of promoting air commerce and providing accommodation for the handling of the baggage of air travelers, City designed Satellite and Ticketing Building No. 6 Complex as a terminal facility for multiple number of air carriers, and to that end is providing land and facilities for the common and joint use of all passengers of all air carriers assigned to and using said Complex for the handling and processing of said

passengers' baggage (hereinafter referred to as "Joint Use Space"). In order to assure that said land and facilties are in fact available for said common and joint use, City retains jurisdiction and control thereover, subject to the rights of use thereof hereinabove mentioned and subject further to the right of City to be reimbursed for ground rental plus its capital investment in said facilities plus its costs of maintenance and operation thereof as provided herein. The spaces, facilities and improvements provided by City in said Complex No. 6 for the uses and purposes above mentioned are as follows, to-wit:

1. <u>JOINT USE BUILDING SPACE</u>

| <u>PARCEL</u> | <u>LOCATION</u> | <u>DESCRIPTION</u> | <u>AREA</u> |
|---|---|---|---|
| 24 | T6-1 | Baggage Claim | 8,260 |
| 25 | T6-1 | Baggage Claim | 735 |
| 26 | T6-1 | Baggage Corridor | 1,560 |
| 27 | T6-1 | Baggage Channel | 424 |
| 28 | T6-1 | Baggage Channel | 784 |
| 29 | T6-1 | Baggage Channel | 2,635 |
| 30 | T6-1 | Baggage Channel | 2,561 |
| 31 | T6-1 | Baggage Channel | 265 |
| 32 | T6-1 | Baggage Channel | 308 |

2.  JOINT USE LAND

| PARCEL | LOCATION | DESCRIPTION | AREA |
|--------|----------|-------------|------|
| 33 | T6-A | Baggage Make-up | 2,496 |
| 34 | T6-A | Baggage Make-up | 3,280 |
| 35 | T6-A | Baggage Make-up | 1,964 |

The demised premises are shown outlined in yellow, green, red, and blue on Airport's Engineer's Drawing Nos. 84015-80, 84071-80, 84073-80, 84074-80, 84075-80, 870-22-80, and 870-2480 inclusive, copies of which are attached hereto; marked Exhibits "A", "B", "C", "D", "E", "F" and "G" respectively; and made a part hereof.

All square footages are approximate and shall be corrected to actual square footages upon completion of construction.  In the event the actual square footage of the premises in the Demised Premises differs from the respective approximations set forth above, such correction shall be made by the parties without the need for formal amendment to this Lease, and with an appropriate adjustment in rental, charges or credits, as applicable, by way of an increase or decrease, as the case may be.

Furthermore, completed exhibits reflecting the actual square footage of the premises in the Demised Premises and Exhibits showing the precise location thereof shall be prepared and shall be appended to and made a part of this Lease, without

the need for formal amendment to this Lease, and with an appropriate adjustment in rental, charges or credits, as applicable, by way of an increase or decrease, as the case may be.

Following the completion of construction, minor modification(s) of the Demised Premises, not to exceed a cumulative total of 10% of the actual square footage of the Demised Premises, may be made by the Board of Airport Commissioners (hereinafter referred to as "Board"), through appropriate Order, pursuant to a formal written agreement between Lessee and City, and with an appropriate adjustment in rental, charges or credits, as applicable, by way of an increase or decrease, as the case may be, and will not necessitate further City Council approval.

City reserves the right to further develop or improve the landing area of Airport. The foregoing shall be without prejudice to any other rights or obligations the parties hereto may have under the law.

D. <u>RAIC FACILITIES</u>

The RAIC Facilities shall be as more particularly described in the plans of Lessee filed with the City in accordance with Section 10 hereof.

Sec. 4.    Reservation of Certain Areas of the
           Demised Premises as City Areas.

A.    City reserves the right hereunder to, and hereby
does, designate, for the full term of this Lease, certain areas
of the Demised Premises, as designated on the design plans and
specifications referred to in Section 10.A.1. including, but
not limited to, public, concession, vertical transportation and
building mechanical, electrical and custodial areas, plus said
parcel numbers 5, 6, 7, and 8, as "City Areas".  It is
understood and agreed that City shall have exclusive care,
custody and control of said City Areas excluding said parcel
numbers 5, 6, 7, and 8 and the improvements thereon, shall
assume all risk of loss thereto, and shall, with the exception
of carpeting, if any, installed by Lessee as is provided in
Section 16 hereafter, maintain and operate said City Areas in
accordance with reasonably prudent practices and the terms,
conditions and provisions of this Lease.

B.    Commencing upon the effective date of this Lease,
City hereby grants Lessee a rental credit which shall be
computed based upon Lessee's identifiable Project Costs as
follows:  (1) those which are associated with the construction
of City Areas, pursuant to generally accepted accounting and
allocation practices and principles; and (2) any ground rent
due City pursuant to Section 6.C hereof applicable to said City
Areas.  The rental credit shall be applied against Lessee's
rentals, fees, charges, and other obligations to City at
Airport, on a monthly basis, or City, at its option and in

-9-

its sole discretion, may, with regard to the portion of such credit attributable to Project Costs, at any time, make a lump sum payment to Lessee in the sum of the then unamortized Project Costs associated with construction of said City Areas.

It is understood that the Lessee is to seek and use its best efforts to obtain the most favorable financing terms available for the construction of Lessee's Improvements, including City Areas. In the event that in the combined judgment of the Corporation and Lessee, Corporation lease revenue bonds cannot be sold after reasonable and prudent efforts, then, Lessee will use its best efforts to obtain the lowest interest rate and overall financing costs for construction of Lessee's Improvements and City Areas. It is understood that, in no event, shall said financing include facilities or improvements other than those contemplated in Sections 10 and 11 of this Lease. Lessee further agrees to submit the terms and conditions of any non-Corporation financing program to the Executive Director of the Department of Airports (the "Executive Director") for review. The Executive Director will have thirty (30) calendar days to review terms of such financing.

Within thirty (30) days after receipt by the City of the financing program, the Lessee will be informed in writing if the City chooses to finance the cost of the City Areas by means other than Lessee's proposed financing or if City intends to

make a lump sum payment for the Project Costs associated with the City Areas as provided for in this Section B; provided, that in the event the City elects to make a lump sum payment, the lump sum payment shall be made within the time-frame applicable to Lessee's financing proposal, or, if the City elects alternative financing, all necessary action for such financing shall be taken as promptly as possible.

Upon payment by City of the above-described lump sum payment to Lessee, that portion of rental credit to Lessee provided for in this Section 4.B, with respect to unamortized Project Costs, and City's obligations to Lessee pursuant to Section 4.C, of this Lease shall terminate. An amount equal to the lump sum payment shall be applied by Lessee to reduce the outstanding financial indebtedness incurred by Lessee in making Lessee's Improvements related to the City areas. For purposes of this Section 4, Project Costs shall mean "Cost of the Project" as defined in Exhibit H, which is attached hereto and made a part hereof.

C.  If Lessee pays the Bonds, as defined in Section 23.B, and this Lease terminates as provided in Section 5 hereof, the City is nonetheless obligated to apply and/or pay rental credits attributable to the unamortized Project Costs at the times and amounts set forth in this Lease. Notwithstanding any provision hereof to the contrary, if City exercises its Buyback Right under Section 12 hereof or if City exercises its right to

purchase Corporation's interest in the Facilities pursuant to the Indenture as hereafter defined, any rental credit to Lessee provided for in Section 4.B shall terminate upon the termination of this Lease.

*Effective 12-26-88*

Sec. 5.  <u>Term of Lease</u>.  The full term of this Lease shall be for a period of thirty-five (35) years, commencing thirty-one (31) days following publication of City Council approval of this Lease.  The term of this Lease is, however,

*Expire 2-25-23*

subject to earlier termination as hereinafter provided.

In the event tax-exempt bond financing, pursuant to Section 23.B hereof, is used for the construction of Lessee's Improvements hereunder, the term of this Lease shall expire before the stated 35-year period upon the occurrence of any of the following events:

(a)  All Bonds are paid or redeemed, in accordance with the terms of the Indenture, as defined in Section 23.B hereof and interest thereon ceases to accrue.

(b)  The exercise of the City's Buyback right as defined in and pursuant to Section 12 hereof.

Sec. 6.   <u>Rent and Rental Adjustment</u>.

A.   <u>Exclusive Space (Building and Land)</u>.

For the period commencing on the effective date of this Lease up to and including March 10, 1990, Lessee shall pay as rental for all Exclusive Space as set forth in Section 3A and 3B a monthly sum of Twenty-four Thousand, Seven Hundred Ten Dollars and Eighty-three Cents ($24,710.83), payable in advance, consisting of:

<u>EXCLUSIVE USE SPACE</u>

<u>RENTAL</u>

| <u>PARCEL</u> | <u>LEVEL</u> | <u>AREA</u> | RENTAL<br>RATE<br><u>PSFPY</u> | ANNUAL<br><u>RENTAL</u> |
|--------|--------------|------|----------|-----------|
| 1  | Baggage Claim | 354   | 22.98193 | $8,135.60 |
| 2  | Baggage Claim | 407   | 22.98193 | 9,353.65 |
| 3  | Baggage Claim | 157   | 22.98193 | 3,608.16 |
| 4  | Baggage Claim | 450   | 22.98193 | 10,341.87 |
| 5  | Ticketing     | 426   | 15.89739 | 6,772.29 |
| 6  | Ticketing     | 209   | 15.89739 | 3,322.55 |
| 7  | Ticketing     | 155   | 15.89739 | 2,464.10 |
| 8  | Ticketing     | 284   | 15.89739 | 4,514.86 |
| 9  | Ticketing     | 1,840 | 15.89739 | 29,251.20 |
| 10 | Ticketing     | 2,530 | 15.89739 | 40,220.40 |
| 11 | Power Room    | 191   | 8.50893  | 1,625.21 |
| 12 | Power Room    | 191   | 8.50893  | 1,625.21 |
| 13 | Operations    | 258   | 13.91247 | 3,589.42 |
| 14 | Operations    | 702   | 13.91247 | 9,766.55 |

| 15 | Operations | 2,368 | 13.91247 | 32,944.73 |
| 16 | Operations | 1,700 | 13.91247 | 23,651.20 |
| 17 | Operations | 178 | 13.91247 | 2,476.42 |
| 18 | Public | 1,933 | 15.89739 | 30,729.65 |
| 19 | Public | 3,490 | 14.52434 | 50,689.95 |
| 20 | Connector | 43,616 | .42000 | 18,318.72 |
| 21 | Baggage Make-up | 6,695 | .42000 | 2,811.90 |
| 22 | Baggage Make-up | 534 | .42000 | 224.28 |
| 23 | Generator Site | 100 | .42000 | 42.00 |
| | ANNUAL TOTAL | | | $296,529.92 |

B.   Joint Use.

1.  For the period commencing upon the effective date of this Lease, and ending March 10, 1990, Lessee shall pay as a rental, its proportional share of rental attributal to the Joint Use premises described in Section 3C and 3D, the total amount of which is $403,483.45 per year, payable in advance in monthly installments or $33,623.62.  The Joint Use rental consists of the following components:

JOINT USE SPACE

RENTAL

| PARCEL | LEVEL | AREA | RENTAL RATE PSFPY | ANNUAL RENTAL |
|--------|-------|------|-------------------|---------------|
| 24 | Baggage Claim | 8,260 | 24.26789 | $200,452.77 |
| 25 | Baggage Claim | 735 | 24.26789 | 17,836.90 |
| 26 | Baggage Corridor | 1,560 | 19.43590 | 30,320.00 |
| 27 | Baggage Channel | 424 | 19.43590 | 8,240.82 |

| 28 | Baggage Channel | 784 | 19.43590 | 15,237.75 |
| 29 | Baggage Channel | 2,635 | 19.43590 | 51,213.60 |
| 30 | Baggage Channel | 2,561 | 19.43590 | 49,775.34 |
| 31 | Baggage Channel | 265 | 19.43590 | 5,150.51 |
| 32 | Baggage Channel | 308 | 19.43590 | 5,986.26 |
| 33 | Baggage Make-up | 2,496 | 2.48960 | 6,214.04 |
| 34 | Baggage Make-up | 3,280 | 2.48960 | 8,165.89 |
| 35 | Baggage Make-up | 1,964 | 2.48960 | 4,889.57 |
| | | ANNUAL TOTAL | | $403,483.45 |

2.   Twenty (20%) percent of the amounts due in accordance with Section 6 B 1. shall be divided equally by the number of air carriers utilizing the Joint Use space. The remaining eighty (80) percent due shall be paid by each air carrier utilizing the Joint Use space in direct proportion to the number of passengers (inbound and outbound combined) using the terminal, or on such other basis as the air carriers operating in the terminal and the City mutually agree.

C.   Payment of Rental.

The total annual rentals, as specified above, shall be payable in equal monthly installments on or before the first day of each calendar month of the term hereof.   In the event the first day is a legal holiday, payment will be due the next business day.   In the event the commencement or termination date of this Lease falls on any date other than the first day of the calendar month, the applicable rental for that month

shall be calculated <u>pro rata</u>, according to the number of days during which Lessee had beneficial occupancy of the Demised Premises, or any portion of same, during said month and said sum shall be paid by Lessee within twenty (20) days after receipt from City of a statement of monies due.

D.    The failure of Lessee to pay the rental on time is a breach of this Agreement for which City may terminate this Lease pursuant to Section 22, and City may take such other legal action as it deems necessary.  City expects all rent to be paid on time and Lessee agrees to pay on time.  If during any calendar year of the term hereof two or more monthly rental payments are delinquent ten (10) or more business days, City may, at its sole option, require the payment of the rental quarterly in advance.  If during any calendar year of the term hereof, two or more quarterly rental payments are delinquent ten (10) or more business days, City may, at its sole option, require the payment of rental annually in advance.

Without waiving any rights available under this Agreement or by law, in the event of late or delinquent payments, Lessee recognizes that City will incur certain expenses, the amount of which are difficult to ascertain.  Therefore, in addition to rental(s) owing, Lessee agrees to pay the liquidated damages set forth below to compensate City for all expenses and/or damages and loss resulting from said late or delinquent payments by Lessee.

The liquidated damages for late or delinquent payments commencing with the effective date of this Lease, and until March 11, 1990, shall be ten percent (10%) per annum, or that percent per annum equal to the prevailing rate on the twenty-fifth day of the month preceding the execution of this Lease as established by the Federal Reserve Bank of San Francisco on advances to member banks under Section 13 and 13a of the Federal Reserve Act, plus four and one-half (4½%) per annum, whichever is greater, on the balance of the unpaid monthly amount calculated from the date of the delinquency until the close of the business day upon which the delinquency payment is received by City. Commencing March 11, 1990, and every five (5) years thereafter, when the rental is adjusted in accordance with Section 4 hereof, the liquidated damages for late or delinquent payments shall also be adjusted to ten percent (10%) per annum, or that percent per annum equal to the prevailing rate on the twenty-fifth day of the month preceding the effective date of each rental adjustment as required in sub-section 6D hereof, as established by the Federal Reserve Bank of San Francisco on advances to member banks under Section 13 and 13a of the Federal Reserve Act plus four and one-half percent (4½%) per annum, whichever is greater, on the balance of the unpaid monthly amount Calculated from the date of the delinquency until the close of the business day upon which the delinquency payment is received by City.

All payments hereunder shall be paid to the City of Los Angeles, Department of Airports, Post Office Box 92216, Los Angeles, California 90009, or to such other address as City may designate by written notice to Lessee.

E. <u>Adjustment of Rental Rates</u>.

Lessee acknowledges that this Lease is made and entered into subject to the provisions of Section 238.9 of the Los Angeles City Charter. In accordance with the requirements of said Section, and pursuant to the policy of the Board, it is agreed that on March 11, 1990, and every five (5) years thereafter, the ground rental and building rental payable hereunder shall be adjusted to a fair rental value, based upon the then-current fair rental value of the Demised Premises, excluding Connector Building, and in accordance with the terms of this Lease. In such event, any value of Lessee's Improvements, including, but not limited to, Lessee's baggage facilities, Connector Building constructed by Lessee, personal property and fixtures placed in or on the Demised Premises shall be excluded, regardless of the passage of title pursuant to Section 13 hereof, in accordance with the following procedures:

1. At least one-hundred and eighty (180) days prior to each of the adjustment dates specified above, the parties shall, by mutual agreement, adjust the annual rental for the Demised Premises thereafter payable by Lessee during the next successive 5-year period, commencing the first month of the new 5-year period, but

-18-

in no event shall the amount of monthly rental be reduced below the original rental sum set for the initial period of this Lease.

2.   If the parties are unable to voluntarily agree upon such adjusted rent before 180 days prior to each of said adjustment dates, then the monthly rent shall be determined as outlined below:

a.   An appraiser, who is a member of the American Institute of Real Estate Appraisers, shall be selected by each of the parties. Either Lessee or City shall, when notified in writing by the other party to do so, deliver to the other party, the name and address of such appraiser. The Executive Director shall immediately fix the time and place for a conference between the parties hereto and their appraisers. At such conference, the parties shall agree upon the general instructions to be given to said appraisers. These general instructions shall be consistent with the provisions of this Section 6.E, but shall not, unless agreed to in writing by City and Lessee, place any limitations upon the appraisal techniques to be employed by the appraisers in evaluating the fair rent provided for hereunder, except that determination of the fair rental value shall specifically exclude evaluation of

the Lessee's Improvements, including, but not limited to, Lessee's baggage facilities, personal property and fixtures placed in or on the Demised Premises, regardless of the passage of title pursuant to Section 13 hereof.

b.    Each of the two appraisers shall, not later than 90 days prior to the specific adjustment date involved, submit one copy of appraiser's appraisal in its entirety to Lessee and another copy of appraiser's appraisal in its entirety to City.    Executive Director or his authorized representative shall, immediately upon receipt of copies of the two appraisals, by written notice, fix a time and place for a hearing and conference.    Those to be in attendance at the hearing and conference shall include (1) Lessee's representatives, including representatives from Lessee's lender if applicable, (2) representatives of City, and (3) the two appraisers, and the parties shall endeavor to voluntarily reach agreement on the adjusted rent.

c.    If the parties cannot so agree, the President of the Southern California Chapter No. 5 of the American Institute of Real Estate Appraisers shall select a third appraiser.    Said third appraiser will be allowed access to the

two appraisers' reports, will prepare a third appraisal and shall submit one copy of same to Lessee and one to City.

d.   If the representatives of Lessee and the representative of City are still unable to reach agreement on the adjusted rent, then the three appraisal reports and any other relevant material shall be furnished to the Board and said parties shall have the right to make oral presentations to said Board during one of its meetings, the date for such presentations to be reasonably selected by Executive Director. Board shall review all facts and evidence submitted to it and shall then prescribe the adjusted rental to apply throughout the respective adjustment period.   Nothing herein shall prejudice the right of Lessee to contest, in a court of competent jurisdiction, such adjusted rental in the event said Board may have acted arbitrarily or unreasonably or if the rental rates set by the Board are other than fair.

e.   Failure of either party or its appraiser to submit an appraisal report within the above-mentioned 90-day period can, at the election of the other party, preclude a later submission of an appraisal report by such party.

If neither report is timely filed, then the parties can renegotiate the time periods for such submission.

f.   Lessee and City shall each pay the fees and expenses of their respective appraisers and shall each pay one-half (1/2) of the fees and expenses of the third appraiser in the event a third appraiser is selected and used.

3.   In the event such readjustment of rent is not completed prior to the commencement of the respective period involved, Lessee shall continue to pay rent as set in the preceding period, at the intervals and in the manner fixed for such preceding period, and if such rent is thereafter fixed or adjusted in a different amount, such new rental shall take effect as of the time when it would otherwise have become effective, and Lessee shall immediately pay to City that sum which has accrued as a result of such retroactive application.

4.   Notwithstanding the foregoing, in the event of Buyback, as that term is defined hereinafter in this Lease, Lessee's rental shall be computed in accordance with Section 41 of this Lease.

5.   It is understood and agreed that the rental will, without exception, be adjusted on the dates described herein.  Accordingly, any deviation from the adjustment procedure shall not be used by either

party as an excuse to avoid or delay the rental adjustment on said dates.

E.  <u>Performance Guarantee</u>

Lessee shall, at all times, throughout the term of the Lease and at Lessee's expense, provide City with a Performance Guarantee.  Said Performance Guarantee shall guarantee the faithful performance of all provisions contained within the Lease, including the payment of rental, and shall be in the form of an Irrevocable Letter of Credit or Surety Bond.  The Performance Guarantee shall be in an amount not less than three (3) times the total monthly compensation payable to City, prior to the application of any rent credit.  In the event the monthly compensation is not constant throughout the term of this Lease, the Performance Guarantee shall be in an amount equal to three (3) times the highest total monthly compensation known at the time the Lease commences.  In accordance with this provision, the Lessee and the City mutually agree that the Performance Guarantee shall initially be in the amount of not less than $80,857.21.  In the event that a Performance Guarantee has previously been provided, and if for any reason, including adjustment of ground rent, building rent, and/or maintenance and operation charges, and the total monthly compensation is subsequently increased in excess of ten percent (10%) of the then existing Performance Guarantee, the Lessee shall provide a new Performance Guarantee equal to three (3) times the new total monthly compensation.

-23-

Sec. 7.  <u>Use of Demised Premises</u>.

A.  The Lessee shall have the right to use the premises for the following purposes:

1.  To remodel Ticketing Building No. 6;

2.  To remodel Satellite Building No. 6;

3.  To construct a Connector Building between Ticketing Building No. 6 and Satellite Building No. 6 in strict accordance with the provisions of Section 10 hereof; and

4.  To use said remodeled and constructed space for office space, personnel and crew training rooms and facilities, flight operations and planning rooms, customer relations and waiting rooms, ticketing counters, passenger processing areas, passenger and baggage handling facilities, employee lounges, storage rooms, communication systems, passenger hold rooms, passenger club and lounge rooms, (including the service of alcoholic and non-alcoholic beverages) and the service of food in the manner and by the methods employed by Lessee in serving in-flight meals, installation and use of baggage conveying facilities, and the carrying on of other operations and activities necessary or incidental to the conduct by Lessee of its air transportation business. Notwithstanding the foregoing, it is understood and agreed that Lessee may serve said beverages and food only in its enclosed passenger club and lounge rooms,

-24-

not to include Lessee's hold rooms, or other public areas; and by vending machines only in employee lunch rooms.

B. There is hereby reserved to City, its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the Demised Premises. This public right of flight includes the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from or operating on Airport. Lessee agrees not to make any claim or institute legal action against City under any theory of recovery for any interference with Lessee's use and enjoyment of the Demised Premises which may result from noise emanating from the operation of aircraft to or from or upon Airport except for claims and actions brought by third parties against Lessee arising from City's operation of the Airport.

C. Lessee, by accepting this Lease, agrees for itself, its successors and assigns that it will not make use of the Demised Premises in any manner which might interfere with the landing and taking off of aircraft from Airport or otherwise constitute a hazard to such operations. In the event the aforesaid covenant is breached, City reserves the right to enter upon the Demised Premises and cause the abatement of such interference at the expense of Lessee.

D.    Accommodation of Other Scheduled Air Carriers.

1.    To facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport, Lessee agrees, upon request by City, to permit other scheduled air carriers assigned by City to gate positions and loading ramps adjacent to Lessee's Demised Premises pursuant to Section 25 of this Agreement, to utilize Lessee's passenger holdroom(s) and jetway passenger loading bridge(s) adjacent thereto in connection with and for the time period(s) for which said gate position(s) and loading ramp(s) are being used by said scheduled air carrier(s) for passenger loading and unloading operations in conjunction with said carrier's scheduled operations upon execution of a written agreement setting forth terms and conditions mutually agreed upon by Lessee and said other scheduled air carrier(s) governing such use, which shall include a charge by Lessee for its pro rata direct costs plus a reasonable administrative charge.  Lessee further agrees to make all reasonable efforts to facilitate any such scheduled air carrier(s)' utilization of such gate position(s) and loading ramp(s) including use of space for a ticket counter area, use of Lessee's baggage facilities and the rendering of customary ground services to said scheduled air carrier(s), upon its/their request, if (a) Lessee has adequate capabilities, capacity, facilities and personnel therefor, after taking into account Lessee's own requirements and contractual obligations, the compatibility of said scheduled air carrier(s)' proposed operations with those of Lessee, and the need for labor harmony, and (b) said scheduled air carrier

-26-

enters into a written agreement with Lessee therefor and agrees to pay Lessee its established rates and charges for such services.

2. Nothing contained in this Lease nor the rights conferred herein relative to common use areas and facilities shall prevent or prohibit the entering into of Inter-Airline agreements between Lessee and other scheduled air carriers authorized to operate into and out of the Airport; provided, however, that any agreements between Lessee and another scheduled air carrier providing for the joint use of any of the facilities in the Demised Premises leased to Lessee, or the joint use of the common use areas or facilities in the passenger terminal areas used by Lessee in connection with its occupation and use of the Demised Premises shall first be approved in writing by the Executive Director and shall be subject to the conditions stated therein, which shall become binding upon the parties to such joint use agreement.

Sec. 8. <u>Airfield Security</u>. Lessee will be responsible for fully complying with any and all applicable present and/or future rules, regulations, restrictions, ordinances, statutes, laws and/or orders of any federal, State, and/or local governmental entity regarding airfield security.

Lessee shall comply with applicable provisions of the Federal Aviation Administration (FAA) Regulations (FAR), 14 CFR

Parts 107 and 108, including the establishment and implementation of procedures acceptable to Executive Director to control access from the Demised Premises to air operation areas in accordance with the Airport Security Program required by Part 107. Further, Lessee shall exercise exclusive security responsibility for the Demised Premises pursuant to Lessee's FAA approved Air Carrier Standard Security Program used in accordance with 14 CFR Part 129.

In addition to the foregoing, doors or gates located on the Demised Premises which permit entry into restricted areas at Airport shall be kept locked by Lessee at all times when not in use and/or under Lessee's constant security surveillance. Door or gate malfunctions which permit unauthorized entry into restricted areas shall be reported to Department of Airports' Security Bureau without delay and shall be maintained under constant surveillance by the Lessee until repairs are affected by Lessee.

All civil penalties levied by the Federal Aviation Administration for violation of Federal Aviation Regulations pertaining to security gates located on the Demised Premises, other than City areas, shall be the sole responsibility of Lessee, unless Lessee demonstrates, with respect to any Joint Use area, that another airline is solely at fault.

Sec. 9.   <u>Public Areas; Ingress, Egress and</u>
          <u>Purchase of Supplies</u>.

A.   Lessee shall have the right to use the common use and public areas and facilities of Airport and the right of ingress to and egress from Airport, the Demised Premises, gates, public areas for Lessee and its employees, contractors, agents, passengers, patrons, suppliers, invitees and visitors; provided such use, ingress and egress is for activities incidental to Lessee's air transportation business.  City shall additionally provide Lessee, and Lessee shall have the right to use means of access for its aircraft between the Demised Premises and the Airport's runways and taxiways.  Notwithstanding the foregoing, City reserves the right to license, permit, regulate and locate concessionaires and other tenants at Airport, including, without limitation, booths, counters, offices, lockers, wall spaces and vending machines.  City undertakes to so regulate, maintain and operate said public areas as in its reasonable discretion will best serve the interest of the public, the air travelers, Lessee and the patrons and visitors at Airport.

B.   Lessee shall have the right and privilege over the roads, ways and public areas of the Airport of ingress to and egress from the Demised Premises and the public facilities used in connection therewith for its agents, servants or employees and passengers, patrons, invitees, its suppliers of materials and furnishers of services, and its equipment, vehicles, and

machinery necessary or required for the performance of its air transportation business conducted in and about the passenger terminal facilities and buildings at Airport. Lessee shall, at all times, be free to select suppliers, purveyors and furnishers of materials, supplies, equipment and services of its own choosing. Nothing in this Section 9 shall be construed as in any way limiting the general powers of City to fully exercise its governmental functions. Nothing contained herein shall be deemed to be a grant of any franchise, license, permit or consent to Lessee to operate motor coaches, buses, taxicabs, or other vehicles, carrying persons or property for hire or considerations over the public and/or private streets of City, or the roads, ways or public areas of the Airport.

C.    Nothing herein contained, however, shall prohibit, restrict, limit, impair or otherwise diminish City's right to require Lessee and/or others during the term hereof to enter into a Motor Vehicle Operating Permit for the nonexclusive use of non-public Airport service roads and to pay the fees and charges prescribed within said Permit.

Sec. 10.    Improvements and Alterations; Force Majeure

A.    Lessee's Improvements.

1.    City hereby consents to the undertaking of, and Lessee, subject to the provisions of Paragraph 10.B below, agrees to remodel Ticketing Building No. 6; to remodel Satellite Building No. 6; and to construct between

Ticketing building No. 6 and Satellite Building No. 6 a Connector Building with a floor area of not less than 38,000 square feet. The total cost of this remodeling, construction and equipment is estimated to be $37,000,000 but shall not be less than $30,000,000. All of the remodeling and construction shall be completed not later than March 1, 1989.

The construction of Lessee's improvements shall be pursued in a diligent manner and shall be compatible with the second level roadway constructed by City. Lessee's Improvements shall be in accordance with the preliminary design plans prepared by Lessee's architects and engineers, which have heretofore been approved in concept by the Department and which are incorporated by reference herein and made a part hereof. It is understood and agreed that said preliminary plans may be subject to modification, alteration and change as Lessee may direct, provided that no significant changes may be made without the prior consent of Executive Director, which consent will not be unreasonably withheld. It is understood and agreed that time is of the essence in this Lease and that Lessee's construction of Lessee's Improvements are a material condition to this Lease.

2. Lessee shall, at its expense and subject to the provisions of this Section 10.B and Section 11 hereof, design, construct and install in the Demised Premises, all interior partitions, walls, electrical wiring, conduits,

-31-

ducts, water pipes, heating, air-conditioning and ventilating ducts and outlets, fixtures and equipment, finish plastering, wall and floor covering, including all special flooring, painting and decor, counters, cabinet work and equipment. Lessee shall have the right to install at its expense, in locations acceptable to the Executive Director, such baggage conveying equipment and facilities as it determines is necessary for the safe, fast and economical handling of the baggage of its passengers. Lessee shall also have the right to install, at its expense, in the conduits and ducts provided by either City or Lessee in the basic building structures, the wiring and other equipment necessary for a public address or other communications systems, and the further right to construct and attach, at its expense, on the roof of said Satellite Building, weather recording equipment and communications antennae.

3. For the purpose of promoting and accommodating air commerce and air transportation, Lessee shall have the right, at its expense, to construct and attach to Satellite Building No. 6 and the Connector and South Holdroom Building, loading bridges, structures, and other equipment and facilities used for the purpose of the comfortable, convenient and expeditious loading and unloading of its aircraft passengers.

4. No loading bridge, structure or like facility shall (except in the instances where design plans and

specifications therefor have heretofore been conceptually approved) be constructed, installed or attached to the Satellite or Connector Building without the consent and prior approval of the design plans and specifications therefor by the Executive Director, and then only subject to the following conditions, to wit:

(a)  The construction and installation thereof shall be done and performed in strict compliance with the applicable provisions of Section 11 hereof;

(b)  Subject to the approval of the Executive Director, Lessee may remove, change, replace or install other or later developments of conveyors, loading bridges, structures and like facilities and equipment as the usage and practices of Lessee require. Such approval shall not be unreasonably withheld; and

(c)  All conveyors, loading bridges and equipment, other than RAIC Facilities, are hereby deemed to be fixtures and shall be removed by Lessee, at its expense, upon the cancellation or termination of this Lease; provided, however, that such bridges and equipment, other than RAIC Facilities, may be sold by Lessee to subsequent lessees of City and remain in place or, if the consent of City is obtained therefor, may remain in place and become the property of City. All damage occasioned to the Satellite and Connector Buildings or other property of City by the

removal of the conveyors, loading bridges and equipment shall be repaired and restored to good condition at the sole cost and expense of Lessee removing the same.

B. Force Majeure;

Notwithstanding the provisions of Paragraph A of this Section 10, it is understood and agreed that Lessee shall not be liable for any failure to perform or for any delays in performance of its obligation set forth in Paragraph A above due to acts of God or the public enemy, civil war, insurrection, riots, floods, explosions, fires, earthquakes, governmental (federal, State, local, except the Department of Airports, or agencies thereof) priorities, allocations, directives, regulations or orders, orders and injunctions issued by courts of appropriate jurisdiction affecting materials, facilities, personnel or Lessee's rights or ability to perform, failure of transportation, strikes or labor disputes, or any other cause beyond Lessee's control.

Sec. 11. Conditions Governing Improvements
         and Alterations.

A. Except as provided in Section 10.A of this Lease, no improvements, structures, alterations, or additions, other than those heretofore approved by the Executive Director, shall be made in, to or upon the Demised Premises by Lessee, without the written consent of the Executive Director being first had and

obtained, and all such improvements, structures, alterations, additions and work shall be in accordance with any reasonable conditions relating thereto then stated in writing by the Executive Director.

B. Subsequent to the approval by Executive Director of Lessee's preliminary plans, Lessee shall prepare working drawings and specifications which shall be true and correct developments of the preliminary plans so approved and has caused the construction called for by said working drawings and specifications to be commenced and proceed toward completion with reasonable dispatch. No substantial change, addition or alteration shall be made in said working drawings or specifications or in the construction called for thereby without first obtaining Executive Director's approval in writing, which shall not be unreasonably withheld. Upon completion of said improvements, Lessee shall furnish to City, at no charge, two (2) complete sets of as-built drawings of the improvements so constructed, and City and Lessee shall make a written list of all improvements, including the cost thereof, constructed on the Demised Premises by Lessee.

C. All improvements constructed by Lessee on the Demised Premises, including the plans and specifications therefor, shall conform in all respects to the applicable statutes, ordinances, building codes, rules and regulations of City and such other governmental authority as may have jurisdiction.

Executive Director's approval, to be given as provided in paragraph A of this Section 11, shall not constitute a representation or warranty as to such conformity which shall remain Lessee's responsibility. Lessee, at its own cost and expense, shall procure all permits necessary for such construction and prior to commencement of any such construction, shall first submit to City documentation evidencing the fact that Lessee maintains adequate insurance coverage, or adequate self-insurance in lieu thereof, in the amounts and form required by the Executive Director. If applicable, such documentation shall contain the applicable policy number, the inclusive dates for same and the insurance carrier's name, shall bear an original signature of an authorized representative of said carrier and, pursuant to Section 11.54 of City's Administrative Code, shall also provide thereon that the insurance shall not be subject to cancellation, reduction in coverage or non-renewal except after written notice by certified mail, return receipt requested, to the City Attorney of the City of Los Angeles at least thirty (30) days prior to the effective date thereof. Lessee shall require in any construction contract(s) for said improvements that its contractor(s) comply with all applicable statutes, ordinances, codes, rules and regulations and, if requested so to do by Executive Director, shall also require that its contractor(s) submit to City evidence of required insurance coverage and comply with the provisions of Sections 3235 to 3241 of the Civil Code of the State of California by filing the

-36-

original contract(s) and any modifications thereto in the Office of the Los Angeles County Recorder and by securing, and recording in said Office, the payment bond specified in said Sections. A conformed copy of such bond, recorded as aforesaid, shall be furnished to City. In the event Lessee intends to self-insure for the required workers' compensation and employers liability coverage, Lessee shall first submit to City a copy of its certificate of authority from the State of California to self-insure with respect to said coverage.

D. All construction by Lessee pursuant to this Section 11 shall be at Lessee's sole cost and expense and Lessee shall keep the Demised Premises free and clear of liens for labor and material, provided that Lessee may in good faith contest the validity of any lien. Lessee shall hold City harmless from liability with respect to any such construction.

E. Lessee agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Regulations regarding the structures now planned for, or those to be constructed in the future on, the Demised Premises, and in the event of any planned modification or alteration of any present or future building or structure situated on the Demised Premises.

F. Lessee, by accepting this Lease, expressly agrees for itself, its successors and assigns that it will not erect nor

permit the erection of any structure or object nor permit the
growth of any tree on the land leased hereunder above a mean
sea level elevation of 157.1 feet AMSL.  In the event the
aforesaid covenants are breached, City reserves the right to
enter upon the land leased hereunder and to remove the
offending structure or object and cut the offending tree, all
of which shall be at the expense of Lessee.

Sec. 12.   <u>City's Right to Purchase Lessee's Interest in</u>
<u>Demised Premises</u>.

City may, at any time, to the extent permitted by law,
purchase from Lessee all of Lessee's interests in and posses-
sion of the premises described in Section 3 of the Lease
("Demised Premises") by paying off or retiring or making
provision for the payment of, the then-outstanding balance on
the Bonds (principal, less applicable outstanding sinking fund
balances established for retirement of outstanding obligations,
plus costs of financing, including accrued interest and any and
all premiums and other costs of retirement or redemption of
financing) incurred by Lessee and/or the Corporation under the
hereinafter defined Nonprofit Financing Program including any
such indebtedness held by or in the name of any lender or
institution providing a credit enhancement device in respect of
such indebtedness.  Such purchase of Lessee's interest in and
possession of the Demised Premises is hereinafter referred to
as City's "Buyback" right.

City shall exercise its Buyback right hereunder, if at all, by (i) giving written notice of such proposed action to Lessee (and shall, in any notice, also advise Lessee whether City intends to utilize the Demised Premises in a manner that does not constitute an Airport Terminal Use, as defined in Section 2 of this Lease), (ii) placing into escrow an amount sufficient to defease the Bonds or paying all principal of, premium, if any, and any interest on the Bonds and (iii) paying reasonable costs incident to the defeasance or payment. Upon exercise of the City's Buyback right, subject, however, to the provisions of Section 41 hereof, Lessee shall have ninety (90) days to vacate the Demised Premises.

If City exercises its right of Buyback in accordance with this Section, and utilizes the Demised Premises in a manner that does not constitute an Airport Terminal Use, the Lease shall terminate (except for Lessee's right to exercise the option to renew the Lease provided for in Section 41). If City utilizes, or intends to utilize, the Demised Premises in a manner that does constitute an Airport Terminal Use, then Lessee may have the right to exercise the option to continue the Lease, as provided for in Section 41. If Lessee does not or cannot exercise its option right to continue the Lease as provided under Section 41, the Lease shall terminate and City may thereafter utilize the Demised Premises for any purpose selected by the City in its complete discretion.

Sec. 13.  <u>Title to Improvements</u>.

A.   Title to all improvements, additions or alterations, if any, constructed or installed by City and at its expense upon the Demised Premises before or after the commencement of the term herein, with the consent of Lessee, shall remain in City.

B.   Title to all RAIC Facilities and additions and improvements thereto shall immediately, upon acquisition thereof by the Corporation, vest in City, subject to Lessee's leasehold interest under this Lease, the Corporation's interest in that leasehold interest under the Partial Assignment, as hereafter defined, Lessee's interest under the Facilities Sublease, as hereafter defined, and other encumbrances created, incurred or resulting from the financing by Corporation of RAIC Facilities.   Such RAIC Facilities and all additions and improvements thereto may be altered and/or repaired subject to the provisions of Sections 10, 11, and 17 herein.

Nothing herein in this Section 13 shall impose any affirmative obligation on City for payment of any indebtedness incurred by the Corporation or Lessee.

C.   Lessee's machines, loading bridges, equipment, furniture, trade fixtures and similar installations, of the type commonly installed in and removed from other similar facilities and related improvements by tenants, other than RAIC

Facilities and all additions and improvements thereto, which are installed by Lessee in, on or attached to the Demised Premises shall not be deemed to be part of the realty, even though they are attached to the floor, wall or roof of the facility or to outside pavements, so long as they can be removed without structural damage to said improvements, and provided that if such removal, at Lessee's option, of any such installation results in nonstructural damage to any part of the facility, pavements or premises, Lessee shall repair such damage and restore said damaged part of said facility, pavements or premises to as good a condition as the same was in at the commencement of this Lease, or upon the completion of construction and/or installation, reasonable wear and tear and damage by fire or other casualty to the extent provided in Section 17 excepted.

Sec. 14.  Maintenance and Repair by City.

A.  Subject to reimbursement therefor, as hereinafter provided in Section 15, City shall, at its expense, operate and maintain in good condition and repair, and keep in a neat, clean, sanitary and sightly condition, the terminal area, and the buildings, premises and facilities wherein the Demised Premises are located, including but not limited to all additions, improvements and facilities hereafter provided by City or by Lessee in said terminal area, and those City Areas designated pursuant to Section 4 of this Lease, all in keeping and consistent with first-class passenger terminal facilities

of the major international airports throughout the United States, provided that Lessee shall maintain in good condition and repair, and keep in a neat, clean, sanitary and sightly condition, all carpeting installed, on behalf of Lessee, wherever such carpeting may be located.

B.    In addition to the above, City shall perform all maintenance of all structural elements of the buildings and structures in which the Demised Premises are located, including all electrical, up to Lessee's meter(s) only, and plumbing installations constituting a part thereof, all maintenance of partitions constructed by City and structural walls and partitions constructed by Lessee and all maintenance work and services in all areas of Ticketing Building No. 6 and Satellite Building No. 6, and the Connector Buildings. Such maintenance and repair work shall include, but not be limited to, the painting and decorating of wall and ceiling surfaces, the providing of adequate lighting, heating, ventilation, air conditioning, electrical systems and plumbing, the replacement of light bulbs and fluorescent tubes and the furnishing of janitorial services but shall not include that work to be provided by Lessee under Section 16 of this Lease.

C.    City shall, at its expense, furnish all heating, ventilation and air conditioning and any other utilities which are not metered and directly chargeable to Lessee by the utility company furnishing such services, and maintain and

-42-

operate in good repair and working order such heating, ventilation and air conditioning and other utilities systems in the Demised Premises.

D.   City shall, at its expense, maintain all utilities systems in the Demised Premises in good condition and repair up to the point of installation of Lessee's meters for such service; provided, however, that such maintenance work shall not include the maintenance or repair of drinking fountains, toilets, plumbing, refrigerators or other items installed by Lessee in the Demised Premises in Joint Use areas and Exclusive Use areas.

E.   City shall, at its expense, maintain in an attractive, sightly and good condition of repair all signs installed by it, in the City Areas both inside and outside the buildings in which the Demised Premises are located.

Sec. 15.   <u>Reimbursement for Maintenance and Operations</u>.

Lessee, as a material part of the consideration for the services rendered by City under this Lease, hereby agrees to reimburse City for its costs incurred in maintaining, repairing, and operating the areas specified in Sections 14 and 16 of this Lease, including an applicable proportion of the costs of systems facilities and general overhead; provided, however, that except for heat and air conditioning furnished by City, Airline shall pay its apportioned costs for public

utility services used by it where such service is not metered
and all its costs for such service where same is metered to its
demised premise; and, provided, further, that where repairs are
made by City which are covered by insurance proceeds and the
premiums for such insurance have been included in City's costs
for maintenance and operation as herein provided, then the
costs of such repairs shall be excluded from the maintenance
and operations costs chargeable to Lessee.    Through and
including March 10, 1990, City's said costs for maintenance and
operations shall be allocated to the Demised Premises in
accordance with standard and accepted accounting practices on
the basis of the square foot "M & O Service Charge" as may be
revised from time to time, and attached hereto as Exhibit "I".
The maintenance and operation (M & O) service charge shall,
using standard and accepted cost accounting practices, be
adjusted July 1, 1988, March 11, 1990, and every twelve (12)
months following March 11, 1990.

In addition to the foregoing costs of maintenance and
repair, Lessee shall pay City for its direct costs expended for
repairing all damage occasioned by the negligence of Lessee.

Sec. 16.  <u>Maintenance by Lessee</u>.  Lessee, at its sole cost
and expense, shall maintain, as distinguished from the
obligations for reconstruction as provided in Section 17
hereof, the Demised Premises, constituting Joint Use Areas and
Exclusive Use areas, in good condition and repair and in a
neat, clean, sanitary and sightly condition, all in keeping

-44-

with first-class passenger terminal facilities of the major international airports throughout the United States. Such maintenance and repair work shall include, but not be limited to, Lessee's maintenance in good condition and repair of all counters, baggage handling devices, loading bridges, toilets, carpeting, drinking fountains, interior partitions, equipment, facilities, electrical wiring, fixtures, utilities (other than heating, ventilation and air-conditioning and any other utilities not separately metered to Lessee), painting and decorations made or installed by Lessee therein, and shall furnish janitorial service and replace all light bulbs and fluorescent tubes in said Demised Premises, excluding City Areas. Lessee shall be responsible for the maintenance and repair of all Lessee installed carpeting in all parts of the Demised Premises, including all public areas in Ticketing and Satellite Buildings 6, and the Connector. Except for maintenance and repair of carpeting, Lessee's obligations, however, shall not extend to City Areas, roof repairs or maintenance, structural repairs or maintenance, exterior window cleaning, or joint sealing on airport loading ramps, which responsibility shall be Citys.

Sec. 17.   <u>Damage, Destruction, Space,</u>
<u>and Facilities; and City Areas</u>.

In the event of the partial or total destruction, from any cause, of any of the buildings or structures or improvements (except for personal property installed by Lessee) of which the

facilities are a part, or in the event of partial or total destruction, from any cause, during the term of this Lease, of any of the City Areas, City shall forthwith repair, replace or reconstruct the same, but such destruction shall in no way annul or void this Lease, except that Lessee shall be entitled to a proportionate abatement of rent and the charges for maintenance and operation, set forth in Section 15 of this Lease, while such repairs or reconstruction are being made, such proportionate abatement to be based upon the extent to which the destruction and the making of such repairs, replacements, or reconstruction shall interfere with the business carried on by Lessee in the portion of the Demised Premises described above in this Section 17.A, or in portions of the Demised Premises adjacent to City Areas, in the buildings, structure or improvement being repaired or reconstructed.  City shall provide Fire and Extended Coverage insurance, including vandalism, malicious mischief, and debris removal, in an amount equal to the full replacement value of such buildings, structures and improvements with a loss payable endorsement in favor of the parties and Corporation as their respective interests may appear.  Subject to Section 19.C, in the event City cannot make such repairs, replacements or reconstruction within a reasonable time because such repairs, replacements or reconstruction cannot be made under the laws, ordinances, statutes or regulations governing the same, all such insurance proceeds shall be used to discharge indebtedness incurred in the making of Lessee's Improvements.  In respect to

any destruction which City is obligated to repair or reconstruct under the terms of this Section 17, the provisions of Section 1932, subdivision 2, and of Section 1933, subdivision 4, of the Civil Code of the State of California are waived by Lessee. Notwithstanding the foregoing provision of this Section 17, Lessee shall not have the right of termination if City proceeds diligently with such repair, replacement or reconstruction and makes available to Lessee temporary substitute space acceptable to Lessee and if proper adjustment of rent and maintenance and operations charges is made which reflects the difference in value of the substituted space.

In the event of damage or destruction of the Lessee's improvements, Lessee shall repair, rebuild and reconstruct such improvements.

Notwithstanding the provisions of this or any other Section of this Lease, in any event of loss or damage to the Demised Premises and/or contents, each party shall look first to any insurance in its favor before making any claims against the other party; and to the extent possible without additional cost, each party shall obtain, for each policy of such insurance, provisions permitting waiver of any claim against the other party for loss or damage within the scope of insurance, and each party, to such extent permitted, for itself and/or its insurers, waives all such insured claims against the

other party.    Each  party  shall  notify  the  other  party  in
writing in the event it is unable to obtain this waiver.


     Sec. 18.   <u>Hazardous Substances</u>.

     Lessee  agrees  to  accept  sole  responsibility  for  full
compliance with any and all applicable present or future rules,
regulations,  restrictions,  ordinances,  statutes,  laws and/or
orders  of  any  government  entity:    (1)  regarding  any  future
improvements  or  alterations  on  the  Demised  Premises  including,
but  not  limited  to,  storage  tanks,  pipelines,  pumps,  other
structures  and  equipment  thereon,  regardless  of  whether  the
obligation  for  such  compliance  is  placed  on  the  owner  of  the
land,  the  owner  of  the  improvements  or  on  the  user  of  the
improvements;  and  (2)  regarding  the  storage,  distribution,
processing,  handling  and/or  disposal  of  hazardous  substances,
said  substances  to  include,  but  not  necessarily  to  be  limited
to,  gasoline,  aviation,  diesel  and  jet  fuels,  lubricating  oils
and  solvents,  regardless  of  whether  the  obligation  for  such
compliance  is  placed  on  the  owner  of  the  land,  the  owner  of  the
improvements  or  on  the  user  of  the  improvements.    However,  with
respect  to  Joint  Use  areas,  Lessee's  responsibility  is  reduced
to  the  extent  another  Lessee  sharing  such  Joint  Use  space  is
legally  determined  to  be  responsible  therefor.


     Should  Lessee's  compliance  responsibility  for  Lessee's
operated  facilities  covered  by  this  Lease  shift  to  City  due  to
Lessee's  failure  to  respond,  then  the  actual  cost  of  achieving

compliance, plus a fifteen percent (15%) administrative charge, shall be recovered by City from Lessee. In the case of any fuel spill, leak or discharge from the facilities authorized under this Lease, Lessee agrees to make any necessary repairs, as well as to clean-up and properly dispose of the fuel spilled and any ground that is contaminated by the spill. If Lessee fails to repair, clean-up or properly dispose of any spill, leak or discharge as required herein, City may (but shall not be required to) take all steps deemed necessary by City to properly clean-up and repair any spill. Any such clean-up or repair by City shall be at Lessee's sole cost and expense. Lessee shall reimburse City for any and all costs, expenses or damages City incurs plus a fifteen percent (15%) administrative charge.

Sec. 19. Insurance.

A. Lessee shall procure at its expense, and keep in effect at all times during the term of this Lease, the following types of insurance: (1) Comprehensive Airline Liability Insurance covering all third party liability, including Premises and Operations, Independent Contractors' Liability (Contractors' Protective Liability), Personal Injury, Aircraft Liability, including passengers, and Contractual Liability (Blanket or Scheduled), including, but not limited to, the liability assumed by the Lessee under the Hold Harmless provision of this Lease, in an amount not less than Forty Million Dollars ($40,000,000) combined single limit for each occurrence for bodily injury, personal injury, death or

property damage plus a Hundred Thousand Dollars ($100,000) per passenger seat liability; (2) Comprehensive Automobile Liability insurance covering owned, non-owned and hired vehicles, if Lessee's operations require the use of licensed vehicles on Airport, in an amount not less than Four Million Dollars ($4,000,000) combined single limit for each occurrence for bodily injury, death or property damage. In addition, Lessee shall also maintain Workers' Compensation and Employers' Liability insurance in the amounts and form required by the Workers' Compensation Act and insurance laws of the State of California. In lieu of the foregoing policies of Workers' Compensation insurance, Lessee may, at its election, adequately self-insure against any or all of such risks to the extent permitted by and in accordance with the Workers' Compensation Act. In the event Lessee intends to self-insure for the required Workers' Compensation and Employer's Liability coverage, Lessee shall first submit to City a copy of its certificate of authority from the State of California to self-insure with respect to said coverage.

City and Lessee agree that the insurance requirements specified in this Lease shall be reviewed for adequacy annually throughout the term of this Lease by Executive Director, who may thereafter require Lessee to adjust the amounts of insurance coverage to whatever amount the Executive Director deems to be adequate.

B.  Lessee must also provide Fire and Extended Coverage insurance, including vandalism, malicious mischief and debris removal, covering all of Lessee's Improvements including all RAIC Facilities and all personal property installed by Lessee. Subject to Executive Director's approval of reasonable deductible or self-retention levels, such insurance shall be in an amount equal to the full replacement value of all such Improvements and personal property with the policy containing a loss payable endorsement in favor of the parties hereto as their respective interests may appear.  In no event shall Lessee be obligated to provide the above coverage for City Areas or those areas in which the City has assumed the responsibility of repairing, replacing, or rebuilding in Section 17 of this Lease.  Additionally, in the event of Buyback under Section 12 of this Lease, Lessee's obligation to provide Fire and Extended Coverage for any of Lessee's Improvements covered by said Buyback shall cease.

C.  Until payment or redemption, or provision therefor, of all Corporation bonds issued in connection with the making of Lessee's Improvements, all proceeds of insurance (whether such insurance was maintained or provided by Lessee under Section 19.A above or provided by City under Section 17 of this Lease) with respect to loss or damage to any facility financed through Corporation shall be paid to the Trustee under the applicable Indenture or Indentures then in effect (except that proceeds for any one loss not exceeding $50,000 need not be paid to such

Trustee but may be paid to the respective party maintaining or providing the policy(ies) of insurance from which such proceeds have materialized and applied by it to the repair, rebuilding, or replacement of the property destroyed or damaged). Upon payment thereof to such Trustee, if the facility is to be repaired or rebuilt as provided in Section 17 herein, such Trustee shall, deposit the proceeds in the construction fund established under such indenture for application as provided therein with respect to moneys in such fund. If the facility is not to be repaired, replaced or rebuilt, the Trustee shall, to the extent possible, use such proceeds to call and redeem bonds outstanding under such Indenture prior to maturity and for such purpose said proceeds shall be deposited in the bond redemption fund established under such Indenture. Upon payment or redemption or provision therefor of all bonds (including all bonds held by or in the name of any lender or institution providing a credit enhancement device for such bonds), any remaining insurance proceeds shall be distributed to City.

D.  In the event of loss or damage to any RAIC Facility wherein the insurance recovery is reduced as a result of the application of a deductible, average or distribution clause in excess of $50,000, or the insolvency of the insurer, the respective party providing the policy(ies) shall deposit with the Trustee under the Indenture or, if more than one Indenture is in effect at the time, with the Trustee under the earliest dated Indenture, or Corporation (as provided herein) within

thirty (30) days after determination of the amount of reduction in insurance proceeds, an amount equal to such reduction. The amounts so deposited with such Trustee or Corporation will be considered the same as proceeds of insurance and subject to distribution as provided herein.

E.  All policies issued by the respective insurers against loss or damage to any improvement herein shall provide that all losses shall, subject to approval by Corporation, if applicable, be adjusted with Lessee and City, and shall be payable to Lessee, Corporation, Trustee, any provider of any credit enhancement device, or City as their respective interests may appear.

F.  Lessee shall provide proof of all specified insurance and related requirements to City either by production of the actual insurance policy(ies); by use of the City's own endorsement form(s); by broker's letter acceptable to Executive Director in both form and content in the case of foreign insurance syndicates or by other written evidence of insurance acceptable to Executive Director. All insurance documents, however, shall be filed with City immediately upon commencement of this Lease, shall contain the applicable policy number, the inclusive dates of policy coverages and the insurance carrier's name, shall bear an original signature of an authorized representative of said carrier and shall provide that such insurance shall not be subject to cancellation, reduction in

coverage, or non-renewal without written notice by certified mail, return receipt requested, to the City Attorney of the City of Los Angeles and to each Trustee under any Indenture then in effect at least thirty (30) days prior to the effective date thereof. City reserves the right to have submitted to it, upon request, all pertinent information about the agent and carrier providing such insurance.

G. The specified insurance (except for Workers' Compensation and Employer's Liability coverage and Fire and Extended Coverage insurance) shall, either by provisions in the policies, by City's own endorsement form or by other endorsements attached to such policies, include and insure City, its Department of Airports, its Board and all of its officers, employees, servants and agents, their successors and assigns as insureds, against the areas of risks described herein as respects Lessee's acts or omissions in its operations, use and occupancy of the premises hereunder or other related functions performed by or on behalf of Lessee at Airport. Each specified insurance policy shall contain the Severability of Interest Clause and Contractual Endorsement set forth below and shall be primary and noncontributing with any other insurance held by City's Department of Airports. City shall have no liability for any premiums charged for such coverage, and the inclusion of City and Department as insureds is not intended to, and shall not, make City or Department as insureds is not intended to, and shall not, make City or

Department a partner or joint venturer with Lessee in Lessee's operations at Airport. In the event financing of any of the improvements specified herein is instituted through Corporation, such insurance shall also insure Corporation against the risks to which it is exposed by virtue of its financing arrangements with Lessee and shall include Corporation, its directors, members, officers and employees, as insureds. Such policies may provide for reasonable deductibles and/or retentions acceptable to Executive Director based upon the nature of Lessee's operations and the type insurance involved.

## Severability of Interest Clause

It is agreed that the insurance afforded by this policy shall apply separately to each insured against whom claim is made or suit is bought except with respect to the limits of the company's liability.

## CONTRACTUAL ENDORSEMENT

Such insurance as is afforded by this policy shall also apply to liability assumed by the insured under insured's Lease with the City.

H. At least ten (10) days prior to the expiration date of any of the above policies, documentation showing that the insurance coverage has been renewed or extended shall be filed with City. If such coverage is cancelled or reduced, Lessee

shall, within fifteen (15) days, file with City evidence that the required insurance has ben reinstated or provided through another insurance company or companies. Upon failure of Lessee to provide and maintain the insurance required herein after ten (10) days prior written notice to comply, City may, but shall not be required to, procure such insurance at Lessee's expense and Lessee agrees to promptly reimburse City for the premium cost thereof plus fifteen (15%) for administrative overhead.

Sec. 20.  <u>Indemnification</u>.

A.  <u>City Held Harmless</u>.

Except for City's sole negligence, Lessee shall indemnify, defend and keep and hold City, including Board, and City's officers, agents, servants and employees, harmless from any and all costs, liability, damage or expense (including, but not limited to, costs of suit and reasonable fees and expenses of legal services) claimed by anyone by reason of injury to or death of persons, or damage to or destruction of property, including property of Lessee, sustained in, on or about the Demised Premises or other jointly used Airport areas, or arising out of Lessee's use of occupancy thereof, as a proximate result of the acts of omissions of Lessee, its agents, servants or employees.

B.  <u>City Areas</u>.

City shall keep and hold Lessee and Corporation, their directors, officers, agents, servants and employees harmless

from any and all costs, liability, damage or expense (including costs of suit and fees and expenses of legal services) claimed by anyone by reason of injury to or death of persons, or damage to or destruction of property, including property of Lessee and Corporation, arising out of City's use or occupancy (including but not limited to City's letting or permitting the use) of City Areas and as a proximate result of the negligent acts or omissions of City, its Board, officers, agents, servants or employees.

Sec. 21.  Assignments and Subleases.  Except as provided in this Section 21 and in Section 23 hereof, Lessee shall not mortgage, pledge or otherwise encumber or assign the leasehold estate herein created without the prior written consent of Board, nor shall Lessee sublet or sublease the Demised Premises, nor license or permit the use of same, in whole or in part, without the prior written consent of Executive Director. Consent to one assignment, subletting, use or occupation shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use. Any attempted assignment, mortgaging or encumbering of the leasehold estate, or any subletting or subleasing of the whole or any part of the Demised Premises, except as provided above, or other violations of the provisions of this Section 21, whether voluntary or involuntary, shall be voidable at the option of City.

City shall not unreasonably withhold its consent to the assignment of this Lease or to the subletting of the Demised Premises or any portion thereof, at any time prior to notice of termination or cancellation of this Lease; provided, however, that the use of said premises by any such assignee or sublessee must be consistent with the use authorized herein. A request by Lessee for assignment or subletting shall be submitted to City in writing and shall include the name and legal composition of the proposed assignee or sublessee, the nature of the proposed assignee's or sublessee's business to be conducted on the premises, the terms and provisions of the proposed assignment or sublease and such reasonable financial information as City may request concerning the proposed assignee or sublessee.

The foregoing shall not prevent the assignment by Lessee of this Lease to any corporation with which Lessee may merge or consolidate, or which may succeed to the business of Lessee.

If Lessee diligently pursues the correction of any condition or the cure of any default, as required by Section 22 hereof, Lessee's right to assign or sublease the leasehold estate herein created shall not be abridged simply by the fact that a written notice to correct such condition or cure such default has been issued to Lessee by City.

In case of the bankruptcy of Lessee, or the appointment of a receiver for Lessee, or if a receiver is appointed to take possession of the Demised Premises as a result of any act or omission of Lessee or if Lessee makes an assignment of this Lease for the benefit of creditors, or if possession of the Demised Premises is taken by virtue of any attachment, execution or the levy of any judicial process, and such appointment or taking is not discharged or terminated within sixty (60) days, City, at its election, may, without notice, terminate this Lease and enter upon said Demised Premises and remove all persons therefrom, subject to any rights of Corporation or any lender providing credit enhancement device in this Lease.

Sec. 22.   <u>Defaults and Right to Terminate</u>.

A.    If either party fails to perform, keep or observe any of the terms, covenants or conditions herein contained on its part to be performed, kept or observed, the other party may give written notice to correct such condition or cure such default.

If Lessee shall default in the payment of ground rent, building rent and/or maintenance and operation service charges, City may, at any time following the default, give Lessee a thirty (30) day written notice to pay all sums then due, owing and unpaid.  If such payment is not made and the default is not cured within thirty (30) days from the receipt of the notice,

the City may, at its sole option, give written notice of its election to terminate this Lease and twenty (20) days after receipt of such notice this Lease shall terminate.

In the event the condition or default is by City; or in the event there is any default by Lessee with respect to any provisions of this Lease (other than the payment of rent, and/or other charges provided for in the preceding paragraph) and such condition or default continues for thirty (30) days after receipt of such notice, the party not in default may give notice of this election to terminate this Lease and twenty (20) days after receipt of such notice, this Lease shall cease and terminate. Such election to terminate by either party shall not be construed as a waiver of any claim it may have against the other party, consistent with such termination.

If, however, any default is of such nature that it cannot physically be corrected within the respective thirty (30) day period specified above, and if the party in default, or in the case of a default by Lessee or its assignee under either Sections 21 or 23 of this Lease, has commenced to remedy such default promptly after the receipt of such notice, and shall continuously and diligently proceed in good faith to eliminate such default, then the period for correction shall be extended for such length of time as is reasonably necessary to complete the same, in the discretion of the Executive Director or the Lessee as the case may be.

It is understood that, if any such default is caused by action or inaction on the part of a sublessee of Lessee, then Lessee shall be deemed to be diligently proceeding in good faith to eliminate such default if either (a) such sublessee, or Lessee on behalf of such sublessee, is proceeding in good faith to eliminate such default or (b) Lessee is proceeding with due diligence to terminate the sublease to such sublessee and/or to remove such sublessee from Demised Premises.

B.    In the event of termination of this Lease by Lessee as a result of City's default, the damages recoverable by Lessee shall be limited to those recoverable under the laws of the State of California.

C.    In the event of termination or cancellation of this Lease, for any reason, at any time prior to the expiration of its full term and subject to the terms of the Contingent Lease Agreement--Terminal Facility between the Corporation and the City (the Contingent Lease Agreement), Corporation or its assignee shall have an option to enter into a new lease for the Demised Premises. City shall assist Corporation, or its assignee, in every reasonable way to relet the Demised Premises for the remainder of the term, on substantially the same terms and conditions as this Lease.

If the Corporation or its assignee exercises the option to enter into a "New Lease" under the Contingent Lease Agreement, the Corporation or its assignee, as the case may be, will be entitled to receive any remaining rental credit existing after applying such rent credit to mitigate or reduce any damages claimed by City against Lessee existing as of the commencement date of the New Lease.

D.   In the event the Corporation or its assignee does not exercise its option to enter into a "New Lease" pursuant to the terms of the Contingent Lease Agreement, the premises will revert to the City free and clear of all encumbrances and the City will have no further obligation of any kind relative to the demised premises, to Lessee, the Corporation or any other entity, except that City shall apply an amount equal to the present value of the remaining balance of the rental credits provided for in Section 4.B., to mitigate or reduce the damages, if any, claimed by City against Lessee.

E.   Except as provided in Section 23.B below, City shall not be under any obligation to mail, deliver or serve any notice under this Section 22 to or upon any person other than Lessee; provided, however, that Lessee may elect to have any notice provided for in this Section 22 mailed or delivered to any lender or institution providing any credit enhancement device or business entity as defined in Section 23 hereof. Such election on the part of Lessee shall become effective upon the delivery by Lessee of a notice in writing to Executive

Director stating that Lessee has elected to have the notice provided for in this Section 22 delivered to such lender or institution under the name and at the address therein stated.

Sec. 23.  Mortgages, Financing and Other Encumbrances.

A.   Lessee shall have the right to assign this Lease and/or to encumber the leasehold estate hereby created by mortgage, pledge, deed of trust or other instrument with, or transfer title during the term hereof to, Lessee's Improvements on the Demised Premises to a reputable lender or lending institution providing any credit enhancement device, subject to the prior consent of the Board, which consent shall not unreasonably be withheld, for the purpose of financing on an interim basis or refinancing on a long-term basis Lessee's Improvements, including any betterments or additions thereto, and Lessee may execute any and all instruments in connection therewith necessary and proper to complete such financing, pledge, or transfer and perfect the security thereof.  In the event this Lease is so assigned, the leasehold estate hereby created is so encumbered or title to the improvements is transferred, except as otherwise provided in this Lease, City shall not be bound, nor shall the terms, conditions and covenants of this Lease nor the rights and remedies of City hereunder be in any manner limited, restricted, modified or affected, by reason of the terms or provisions of the instruments or notes in connection therewith.

The only rights of any such encumbrancer shall be as follows:

1.  The lender or institution providing any credit enhancement device shall not be entitled to any notice required to be given by City to Lessee under the provisions of Section 22.D hereof unless Lessee exercises the election given it under said Section to have notices of defaults or notices to cure defaults sent to such lender or institution providing any credit enhancement device as well as to Lessee;

2.  Upon the giving of any notice of default or notice to cure default to either Lessee or to its lender, such lender or institution providing any credit enhancement device may do and perform all things necessary or required to cure such default and maintain this Lease in good standing including the right, if so provided by the instruments or notes by which this Lease is assigned, or the leasehold estate herein created is pledged or title to the improvements thereon is transferred, to succeed to and take over possession of the Demised Premises; provided, however, that upon such succession to or taking over of the leasehold estate, such lender or any institution providing any credit enhancement device shall be bound by all of the terms, covenants and conditions of this Lease and may continue operations on the Demised Premises and maintain the improvements thereon, directly or through a sublease approved in writing by Executive

Director, only for the purposes and uses specified in Section 7 hereof or for such other purpose as Executive Director may, at that time, authorize in writing;

3. In the event Lessee files with Executive Director a written assignment of its right to participate in the distribution of any insurance proceeds, assigning all of its right, title and interest in and to such proceeds to the lender or institution providing any credit enhancement device, and further, in the event the indebtedness upon the note secured by such assignment, mortgage, deed of trust, encumbrance or instrument transferring title has not been fully paid, satisfied and the security for the debt released, then such lender or lending institution providing any credit enhancement device shall be entitled to the distribution of the insurance proceeds, if any, payable to Lessee; and

4. The lender or institution providing any credit enhancement device shall have the right to succeed to the leasehold estate herein created pursuant to an assignment of this Lease or under the exercise of the power of foreclosure as provided by law or as may be done by voluntary act on the part of Lessee in lieu of sale on foreclosure; provided, however, that said lender or any institution providing a credit enhancement device shall be bound by all of the terms, conditions and covenants of this Lease and shall continue the operation on the Demised Premises for the purpose herein authorized, or for such

other purpose as Board may approve in writing; and, provided further, that if the individual or corporation succeeding to the leasehold estate is someone other than the lender or any institution providing a credit enhancement device, then such individual or corporation will likewise be so bound; provided further, that such lender or institution shall have the right with the consent of Board to sell, convey, transfer, assign, lease or sublease the Demised Premises or any portion thereof to any financially responsible person, firm or corporation engaged in the business of air commerce or air navigation, and the promotion or accommodation thereof, so long as the Demised Premises are used only for intended purposes and uses specified in Section 7, "Use of Demised Premises" herein. The Board's consent shall not be unreasonably withheld.

Two (2) copies of any and all security devices or instruments shall be filed with City two (2) weeks prior to the effective date thereof, and Lessee shall give City prior written notice of any changes or amendments thereto.

B.    Nonprofit Financing Program.  The making of Lessee's Improvements, referred to in Sections 2 and 10 hereof, may be financed, in whole or in part, through the Corporation under the nonprofit financing program hereafter described (the Nonprofit Financing Program). City agrees to cooperate with

-66-

Lessee and Corporation in securing such financing.  Corporation was duly incorporated in accordance with the General Nonprofit Corporation Law of the State of California on June 17, 1969, as a non-stock nonprofit corporation.

The Nonprofit Financing Program through Corporation will, in general, include the following steps:  Lessee shall assign this Lease to Corporation pursuant to an "Assignment of Terminal Facilities Lease"; subject to the foregoing assignment; Lessee may assign this Lease to a lender or institution providing a credit enhancement device to provide security to that lender or institution for its obligation to pay or purchase bonds pursuant to the terms of the Indenture and the credit enhancement device; Corporation shall sublease the Demised Premises to Lessee pursuant to a "Facilities Sublease"; City hereby grants to Corporation, so long as it has any interest in the Demised Premises, easements of ingress and egress over the common roadways and taxiways at Airport; Corporation will issue its bonds (together with any Additional Bonds and Refunding Bonds as hereinafter defined, the "Bonds") pursuant to an indenture of mortgage and deed of trust (the "Indenture") between the Corporation and a national or state bank acting in the capacity of a corporate trustee ("Trustee"), to provide funds for the acquisition, construction, modification, expansion and installation of the RAIC Facilities and to pay other costs related thereto; thereafter Corporation may    issue    additional    bonds    ("Additional

Bonds") pursuant to the Indenture to provide additional funds for such purposes, and may also issue refunding bonds ("Refunding Bonds") for the purpose of refunding any Bonds, provided that the last maturity of any Additional Bonds or Refunding Bonds shall not be later than the last maturity of the Bonds; the Bonds shall be payable from rent payments made by Lessee pursuant to the Facilities Sublease. Notwithstanding the foregoing, the Corporation shall have the ability to issue any other evidences of indebtedness for the RAIC Facilities including, but not limited to, Bond Anticipation Notes.

Fee title to all RAIC Facilities shall immediately, upon acquisition thereof by the Corporation, vest in City, subject to Lessee's leasehold interest therein under this Lease, the Corporation's interest in that leasehold interest under the Assignment, the Lessee's interest under the Facilities Sublease and other encumbrances incurred or resulting from the financing by the Corporation of Lessee's Improvements,

When all Bonds are paid or redeemed, in accordance with the terms of the Indenture and interest thereon ceases to accrue, the City shall have fee title and the exclusive possession and use of the RAIC Facilities, including any additions and improvements thereto, unencumbered by this Lease or any interest on the part of the Corporation, Lessee, the Trustee or any holder of any Bonds.

The corporate existence and purposes of Corporation are hereby approved.  The proposed nonprofit financing program, consisting of the steps set forth above, is hereby approved. It is hereby agreed that City accepts the present beneficial interest in the RAIC Facilities constructed or to be constructed under the Nonprofit Financing Program, and will accept title to such RAIC Facilities and all additions and improvements thereto, in accordance with the terms of this Lease.

As part of the Nonprofit Financing Program, with the approval of the Board as to each of the documents and without further consent of City, Lessee may, by executing the Assignment, assign to the Corporation the portion of the Demised Premises described therein; the Corporation may by executing the Facilities Sublease, sublease to the Lessee the RAIC Facilities; Corporation may, by executing the Indenture, grant, bargain, sell, release, convey, assign, mortgage, pledge, and confirm unto the Trustee, with power of sale, all property, rights and privileges which constitute the Trust Estate as defined in the granting clauses of the Indenture; and Corporation may execute any and all instruments in connection therewith necessary and proper under the Indenture.

Corporation and Trustee and the holder or holders of Bonds (including any lender or institution providing any credit enhancement device in the event that it purchases bonds with

funds provided under the credit enhancement device or otherwise), to the extent provided in the Indenture, may exercise any of the rights or remedies of Corporation under this Lease or the Facilities Sublease, including the right with the consent of Board to sell, convey, transfer, assign, lease or sublease the RAIC Facilities or any portion thereof, to any financially responsible person, firm or corporation engaged in the business of air commerce or air navigation, and the promotion or accommodation thereof, so long as the Demised Premises are used only for intended purposes and uses specified in Section 7, "Use of Demised Premises", herein. The Board's consent shall not be unreasonably withheld.

City agrees to give Corporation and each Trustee under the Indenture any notice given or required to be given by City to Lessee under the provisions of subsection A of Section 22, "Defaults and Right to Terminate", hereof and said notice shall be in addition to the notice to be given to Lessee. Upon the giving of any notice of Lessee's default or notice to cure Lessee's default under subsection A of Section 22, City agrees that Corporation may on behalf of Lessee do and perform all things necessary or required to cure such default and maintain this Lease in good standing.

Any items herein required or permitted to be done by Corporation may, if so provided under the Indenture, be

Continental
LAA 5961

performed by the respective Trustee or any holder or holders of any Bond.

City also agrees that if Corporation does not participate in the Nonprofit Financing Program, the acquisition, construction, modification, expansion and installation of new facilities may be accomplished in substantially the manner provided above by a nonprofit corporation other than Corporation, or by use of internal funds or other means of financing.

Sec. 24.    <u>Apron, Gate Positions and Loading Ramps</u>.

Included in the overall plans for the passenger terminal facilities at the Airport, City is providing as a means of access for aircraft between the Satellite Buildings and the taxiway and runway system of the Airport, large areas of apron pavement, airplane gate positions and aircraft loading ramps in the area immediately adjacent to the connector and Satellite Building No. 6. No special possessory, exclusive or vested rights whatsoever, save and except a use in common with other airlines, and Lessee's preferential but nonexclusive use of gate positions and aircraft loading ramps adjacent to Lessee's Demised Premises, pursuant to Section 25, shall vest in Lessee by reason of the proximity of such Demised Premises to said gate positions and aircraft loading ramps.

Sec. 25.  <u>Assignments of Gate Positions and Loading Ramps</u>.

All assignments of gate positions and aircraft loading ramps shall be made in strict accordance with rules, regulations and directives adopted and promulgated by the Board and/or Executive Director to facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport.  Such rules, regulations and directives shall provide for the preferential, but not exclusive, assignment to the Lessee and others by the Executive Director of gate positions and loading ramps adjacent to the Demised Premises and taking into account said Lessee's needs and requirements for the use thereof.  It is further understood that the gate positions and loading ramps are to be used for the loading and unloading of aircraft in passenger service in keeping with industry practice at the Airport.  To facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport, at the direction of the Executive Director, Lessee agrees not to use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes.

Sec. 26.  <u>Vehicles and Automotive Equipment</u>
<u>on Apron and Loading Ramp</u>.

City reserves the right to regulate the use of vehicles and automotive equipment upon, over and across the apron and loading ramps around the passenger terminals at Airport. Except as provided in the rules and regulations adopted by the Board and orders and directives issued by the Executive

Director, for that purpose, as they currently exist or may be amended in the future, no vehicles or automotive equipment shall be operated upon, over or across said apron or loading ramps, and then only in strict accordance with said rules, regulations, orders and directives. In the event of emergencies not specifically provided for in said rules and regulations, the Executive Director, or his designated representative on duty at the time of such emergency, shall have power to take charge of the direction of such vehicular and automotive traffic in the area affected and regulate the same until the cause of such emergency has been removed. The existence of an emergency shall be determined by the Executive Director, or in the event of his absence from the Airport, then by his designated representative.

Sec. 27. <u>Underground Fueling Facilities</u>. Neither the ownership by, nor the control of the underground fueling facilities around or along a Satellite or Connector Building by an airline tenant shall vest in such tenant any special, possessory or exclusive rights in the gate positions or the loading ramp served by such fuel system. Neither shall the entering into of this Lease vest in Lessee any right to operate such underground fueling system, but Lessee shall, before it commences the operation of any such fueling system, secure from City a license agreement authorizing it to perform the services of an aircraft fuel distributor at the Airport.

Sec. 28. <u>Termination by City</u>. City shall have the right to terminate this Lease in its entirety and all rights ensuing therefrom immediately upon the occurrence of the following:

A. The filing by Lessee of a voluntary petition in bankruptcy;

B. The appointment of a trustee in any involuntary bankruptcy proceeding instituted against Lessee and the failure of Lessee to secure the removal of such trustee within ninety (90) days after the date of appointment;

C. The taking of possession of all or substantially all of Lessee's assets pursuant to proceedings brought under the provisions of any federal reorganization act and the failure of Lessee to secure the return of said assets and the dismissal of such proceedings within ninety (90) days from the date of the taking of such possession;

D. The appointment of a receiver of all or substantially all of Lessee's assets and failure of Lessee to secure the return of its assets and the dismissal of such receivership proceeding within ninety (90) days from the date of such appointment;

E. The taking of possession of the Demised Premises or all or substantially all of the assets of Lessee by virtue of

any attachment, execution or the levy of any judicial process in any action instituted against Lessee in any court of competent jurisdiction and the failure of Lessee to secure the release of such attachment, execution or levy within ninety (90) days from the date of the taking of such possession;

F.   The assignment by Lessee of its assets for the benefit of its creditors;

G.   The abandonment for a period of ninety (90) days by Lessee of the conduct of its scheduled air transportation business at the Airport for reasons other than a strike or other cause beyond the control of Lessee.

Sec. 29.  <u>Termination by Lessee</u>.  Lessee shall have the right to terminate this Lease in its entirety and all rights ensuing therefrom immediately upon the occurrence of the following:

A.   The withdrawal or termination by the Department of Transportation or its successor Federal Agency of the permit or authorization required by law permitting or authorizing Lessee to operate into or from said City;

B.   The issuance of any order, rule or regulation by the
Department of Transportation, the Federal Aviation Administra-
tion, or its or their successor Federal Agencies, or other
competent governmental authority, State or Federal, or the
issuance and execution of any judicial process by any court of
competent jurisdiction materially restricting for a period of
at least sixty (60) days, the use of the Airport for scheduled
air transportation; provided, however, that none of the
foregoing is due to any fault of Lessee;

C.   The material restriction of City's operation the
Airport by action of the Federal Government, or any department
or agency thereof, under its wartime or emergency powers, and
the continuance thereof for a period of not less than sixty
(60) days; provided, however, that without prejudice to the
rights of Lessee to terminate as above provided, City and
Lessee may mutually agree to a just abatement of the rent
accordingly as their respective rights are affected;

D.   The suspension or revocation of City's Airport
Operating Certificate for the Airport that continues for a
period of at least sixty (60) days.

E.   The commencement by City of the Operation of a
replacement major international and/or domestic airport with
passenger terminal facilities serving Los Angeles that is used
by air carriers for providing regularly scheduled air

transportation services to the public with aircraft having a maximum gross certificated landing weight in excess of 80,000 pounds, provided Lessee gives written notice of such termination to City within one hundred eighty (180) days of such commencement.

Sec. 30.  Taxes and Licenses.

A.  Lessee shall pay all taxes of whatever character that may be levied or charged upon the leasehold estate in the Demised Premises, or upon Lessee's improvements, fixtures, equipment or other property thereon, or upon Lessee's use thereof.  Lessee shall also pay all license or permit fees necessary or required by law or regulation for the conduct of Lessee's business or use of the Demised Premises.  This obligation, however, shall not prevent Lessee from contesting the validity and/or applicability of any of the above charges and during the period of any such lawful contest, Lessee may refrain from making, or direct the withholding of, any such payment without being in breach of the above provisions.  Upon a final determination in which Lessee is held responsible for such taxes and/or fees, Lessee shall promptly pay the required amount plus all legally imposed interest, penalties and surcharges.

B.  In addition, by executing this Lease and accepting the benefits thereof, a property interest may be created known as a "possessory interest".  If such possessory interest is

created, Lessee, as the party in whom the possessory interest is vested, shall be subject to the payment of the property taxes levied upon such interest.

Lessee shall, at all times throughout the term of the Lease, comply with all applicable provisions of Sections 21.00 to 29.02 inclusive of the Municipal Code of the City of Los Angeles regarding, among other things, Business and Sales Taxes;

Sec. 31. <u>Food and Beverage Concession Charges</u>. In connection with Lessee's service of food and beverages in its enclosed passenger club and lounge rooms, not to include Lessee's holdrooms, Lessee shall pay to City a percentage of the gross receipts, if any, from the sale of same by Lessee to its passengers and invitees in such rooms. Said percentage shall be the same as that paid to City by the food and beverage concessionaires operating the restaurant and bar facilities in the terminal buildings at Airport.

Sec. 32. <u>Rules and Regulations</u>. The leasehold estate herein created shall be subject to any and all applicable rules, regulations, orders and directives governing Lessee's use and occupancy of the Demised Premises in effect at the commencement of this Lease or thereafter promulgated during the term hereof, laws, ordinances, statutes or orders of any governmental authority, federal, state or municipal, lawfully

exercising authority over Airport or Lessee's operations hereunder, provided that the rules, regulations, orders, directives, laws, ordinances and statutes of City (including Board and Executive Director) shall be reasonable and not inconsistent with or contravene the rights granted to Lessee under this Lease. Nothing herein contained, however, shall be deemed to impair Lessee's right to contest any such rules, regulations, laws, ordinances, statutes or orders or the reasonableness thereof.

City shall not be liable to Lessee for any diminution or deprivation of Lessee's rights hereunder on account of the exercise of any such authority as is provided in this Section 32, nor shall Lessee be entitled to terminate the whole or any portion of the leasehold estate herein created by reason thereof unless the exercise of such authority so interferes with Lessee's use and occupancy of the Demised Premises or the improvements thereon as to constitute a constructive eviction or a termination, in whole or in part, of this Lease by operation of law or otherwise.

Sec. 33. <u>Utility Services</u>. All charges for water, gas, heat, light, power, telephone and any other utility service used by Lessee in connection with its occupancy of the Demised Premises to the extent that such utility services are not provided by City pursuant to Sections 14 and 15 of this Lease, including deposits, connection fees or charges and meter

rentals required by the supplier of any such utility service, and the costs of all equipment and improvements necessary for connecting the Demised Premises to such utility service facilities, shall be paid by Lessee.  Lessee expressly waives any and all claims against City's Department of Airports for compensation for any and all loss or damage sustained by reason of any defect, deficiency or impairment of any water supply system, drainage or sewer system, gas supply system, telephone system, electrical supply system or electrical apparatus or wires serving the Demised Premises.

Sec. 34.  Signs.  No signs, including those pertaining to Lessee's operations on the Demised Premises or on or in any improvements thereon, shall be installed or placed in or on said premises of Airport until Lessee has submitted to Executive Director, for approval in writing, drawings, sketches, design dimensions and type and character of such signs and advertisements proposed to be placed thereon or therein, and any conditions in respect to the use thereof stated by said Executive Director in his written approval thereof shall be conditions thereof as if set forth herein at length.

Lessee shall not, at any time, under any circumstances, install, place or maintain any type of advertising on the leased premises without the specific written permission of the Executive Director.

Sec. 35.  <u>City's Right of Access and Inspection</u>.  City, by its officers, employees, agents, representatives and contractors, shall have the right at all reasonable times and in a reasonable manner, upon notice to Lessee, to enter upon the Demised Premises for the purpose of inspecting the same or for doing any act or thing which City may be obligated or have the right to do under this Lease, including performing maintenance and making repairs and replacements, or otherwise, and to post any notices which, in the opinion of Executive Director, are necessary to hold City harmless from any claim or liability arising out of any work done in, on or about said premises, or in connection with the use thereof, by Lessee; subject, however, to reasonable property protection rules and regulations of Lessee.  No abatement of rental shall be claimed by or allowed to Lessee by reason of the exercise of such right, nor shall actions by City unreasonably interfere with Lessee's use and enjoyment of the premises.

Sec. 36.  <u>Nondiscrimination and Affirmative</u>
<u>Action Program</u>.

A.  Lessee, for itself, its heirs, personal representatives, successors in interest and assigns, as part of the consideration hereof, does hereby covenant and agree, as a covenant running with the land, that in the event facilities are constructed, maintained or otherwise operated on the property described in this Lease for a purpose for which a DOT program or activity is extended or for another purpose

involving the provision of similar services or benefits, Lessee shall maintain and operate such facilities and services in compliance with all other requirements imposed pursuant to Title 49, Code of Federal Regulations, DOT, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

B.   Lessee, in its operations at Airport, for itself, its personal representatives, successors in interest and assigns, as part of the consideration hereof, does hereby covenant and agree, as a covenant running with the land, that:  (1) no person on the grounds of race, color or national origin shall be excluded from participation, denied the benefits of or be otherwise subjected to discrimination in the use of the facilities covered by this Lease; (2) that in the construction of any improvements on, over or under the premises authorized to be utilized herein and the furnishing of services thereon, no person on the grounds of race, color or national origin shall be excluded from participation in, denied the benefits of or otherwise be subjected to discrimination; and (3) that Lessee shall use said premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of

Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

C.   Lessee agrees that in the event of breach of any of the above nondiscrimination covenants, City shall have the right to terminate this Lease and to reenter and repossess said land and the facilities thereon, and hold the same as if said Lease had never been made or issued.  This provision does not become effective until the procedures of 49 CFR, Part 21, are followed and completed including expiration of appeal rights.

D.   Lessee assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, to ensure that no person shall on the grounds of race, creed or color, national origin or sex be excluded from participation in any employment activities covered in 14 CFR Part 152, Subpart

E.   Lessee assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this subpart. Lessee assures that it will require that its covered suborganizations provide assurances to Lessee that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, as required by 14 CFR Part 152, Subpart E, to the same effect.

E.   In addition, Lessee, during the term of this Lease, agrees not to discriminate in its employment practices against any employee or applicant for employment because of the employee's or applicant's race, religion, national origin, ancestry, sex, age or physical handicap.  Lessee further agrees to abide by the provisions of Section 10.8.4 of City's Administrative Code, a copy of which is printed on the CERTIFICATION FOR CONTRACTS OF MORE THAN $5,000, which Certification City acknowledges Lessee has previously submitted along with a copy of its Affirmative Action Plan.  Said Plan, having been approved by City, shall remain valid for one (1) year from the date of approval and, with said Certification, shall be incorporated by reference in and become part of this Lease.  Lessee agrees that prior to the expiration of said Plan, Lessee will again submit to City its revised and/or updated Affirmative Action Plan for approval as well as another completed Certification.

F.   Lessee shall furnish its accommodations and/or services on a fair, equal and not unjustly discriminatory basis to all users thereof and it shall charge fair, reasonable and not unjustly discriminatory prices for each unit or service; provided that Lessee shall be allowed to make reasonable and nondiscriminatory discounts, rebates or other similar type of price reductions to its users.

G.    Noncompliance with paragraph F above shall constitute a material breach thereof, and in the event of such noncompliance, City shall have the right to terminate this Lease and the estate hereby created without liability therefor, or at the election of City or the United States, either or both said governments shall have the right to judicially enforce the provisions in paragraphs A, B and F above.  Said termination, however, shall not take place until after Lessee has received written notice of such noncompliance as well as an opportunity to be heard regarding same and to correct the practice causing noncompliance.

H.    Lessee agrees that it shall insert the provisions found in paragraphs A, B, F and G above in any sublease by which said Lessee grants a right or privilege to any person, firm or corporation to render accommodations and/or services to the public on the premises herein leased.

Sec. 37.  __Amendments__.  Except as set forth in Section 3 hereof, this Lease shall not be modified in any respect except by formal, written amendment.

Sec. 38.  __Attorney's Fees__.  If either party hereto shall, without any fault, be made a party to any litigation commenced by or against the other party arising out of such other party's use or occupancy of the Demised Premises or operation of the Airport, and as a result of which said party is finally

-85-

adjudicated to be liable, then such other party shall pay all costs and reasonable attorney's fees incurred by or imposed upon said party in connection with such litigation. In any action by City or Lessee for recovery of any sum due under this Lease, or to enforce any of the terms, covenants or conditions contained herein, the prevailing party shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements incurred in such action. Each party shall give prompt notice to the other of any claim or suit instituted against it that may affect the other party.

Sec. 39. <u>Successors and Assigns Bound</u>. All covenants, conditions, stipulations and agreements herein contained shall extend to and be binding upon the successors and assigns of the respective parties hereto.

Sec. 40. <u>Other Agreements Not Affected</u>. Neither this Lease nor any of the terms, covenants, conditions or agreements herein contained shall in any manner affect, change, impair, amend, modify, or enlarge any of the rights, privileges, duties or obligations of either of the parties hereto under or by reason of any lease, license, permit or agreement heretofore entered into by the parties hereto, nor shall any such other lease, license, permit or agreement affect, change, alter, impair, enlarge or limit the rights, duties and obligations of the parties hereunder.

Sec. 41.  <u>Lessee's Option to Continue or Renew Lease</u>.

A.   Lessee shall have an option, which City hereby grants to Lessee, to continue, or renew, the Lease with respect to the Demised Premises, after City's exercise of its Buyback right provided for in Section 12 of the Lease, under the following circumstances:

(1)  If City exercises said Buyback right, and the City does not advise Lessee that the Demised Premises will be utilized for other than an Airport Terminal Use, as defined in Section 2 of this Lease, Lessee may exercise the option to continue the Lease by giving City written notice thereof not later than sixty (60) days after Lessee receives written notice from City that City will exercise said Buyback right; or

(2)  In the event that City exercises said Buyback right, and utilizes or authorizes the utilization of the Demised Premises for other than an Airport Terminal Use, and, at any time within thirty-six (36) months thereafter, City utilizes or authorizes the utilization of the Demised Premises for an Airport Terminal Use, Lessee may exercise the option to renew the Lease by giving City written notice thereof not later than sixty (60) days after the initial date that City utilizes or authorizes utilization of the Demised Premises for an Airport Terminal Use.  If the use of the Demised Premises for other than an Airport Terminal Use continues for a period of thirty-six

consecutive months, Lessee's option to renew the lease shall terminate.

Lessee and the City do not intend that the option granted in this Section 41 should cause the interest on Bonds to be subject to federal income taxes, and the option shall be null and void, if it is determined to adversely affect the tax exempt nature of interest on the Bonds. Lessee may not exercise the option until it obtains an opinion from nationally recognized bond counsel (reasonably acceptable to the Corporation) or a private letter ruling from the Internal Revenue Service that the exercise of the option will not cause the interest on the Bonds to be subject to federal income taxes.

B. Upon exercising said option under (1) or (2) above, the Lease shall be continued, or renewed, and Lessee shall have all rights under the lease to the use, occupancy and enjoyment of the Demised Premises, and the Improvements thereon, for the balance of the original Lease term, under the same terms and conditions of the Lease, except for the deletion of Section 12, and provided that the rental credit to Lessee provided for in Section 4.B, and the parties' respective obligations under Section 4.C, of this Lease shall terminate and City may immediately adjust Lessee's fair rental rate provided for herein for the Demised Premises in accordance with Section 6.D of this Lease, in the computation of which City may take into

consideration the value of Lessee's Improvements, except for those Lessee Improvements that are removable pursuant to Section 13.C. hereof.

C.  Subject to the terms of the last paragraph of Section 41(A) hereof, this Section 41, and the option granted by City herein, and Lessee's right to exercise said option according to its terms, shall survive any termination of this Lease under Section 12 hereof, and shall remain fully effective and enforceable.

Sec. 42.  <u>Miscellaneous</u>.

A.  No waiver by City or Lessee of any breach of any provision of this Lease shall be deemed for any purpose to be a waiver of any breach of any other provision hereof, or of any continuing or subsequent breach of the same provision.

B.  Each right of the parties hereto is cumulative and is in addition to each other legal right which the party may have in the event of the default of the other.

C.  In the event any covenant, condition or provision herein contained is held to be invalid by final judgment of any court of competent jurisdiction, the invalidity of such covenant, condition or provision shall not in any way affect any other covenant, condition or provision herein contained.

D.   It is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.

E.   This Lease shall be construed and enforced in accordance with the laws of the State of California.

F.   In each instance herein where City's, Board's or Executive Director's approval or consent is required before Lessee may act, such approval or consent shall not be unreasonably withheld.

G.   The use of any gender herein shall include all genders, and the use of any number shall be construed as the singular or the plural, all as the context may require.

H.   It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act with respect to those Airport Areas and facilities specified in said Section 308.

I.   This Lease shall be subordinate to the provisions and requirements of any existing or future agreement between City

and the United States relative to the development, operation or maintenance of Airport.

J.    This Lease and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of Airport, or the exclusive or non-exclusive use of Airport, by the United States during the time of war or national emergency.

K.    City represents that it has the right to lease the Demised Premises described herein, together with all facilities, rights, licenses, services and privileges herein granted and has full power and authority to enter into this Lease by virtue of and under its Charter and all applicable laws.

L.    City agrees that on payment of the rent, charges and performances of the covenants, conditions and agreements on the part of Lessee to be performed, Lessee shall have and enjoy the use of the Demised Premises and all of the rights and privileges granted herein.

M.    Written notices to City hereunder and to the City Attorney of the City of Los Angeles shall be given by registered or certified mail, postage prepaid, and addressed to said parties at Department of Airports, Post Office Box 92216,

Los Angeles, California  90009, or to such other address as these parties may designate by written notice to Lessee.

Written notices to Lessee hereunder shall be given by registered or certified mail, postage prepaid, and addressed to _CONTINENTAL AIRLINES, INC.,_____

_Houston, Texas_____

or to such other address as Lessee may designate by written notice to City.

The execution of any such notice by Executive Director shall be as effective as to Lessee as if it were executed by Board or by resolution or order of said Board, and Lessee shall not question the authority of Executive Director to execute any such notice.

All such notices shall be delivered personally to Executive Director or to the Office of the City Attorney, Airports Division, in the one case, or to Lessee in the other case, or shall be deposited in the United States mail, properly addressed as aforesaid with postage fully prepaid by certified or registered mail, and shall be effective upon receipt.

IT WITNESS WHEREOF, City has caused this Lease to be executed by Executive Director and Lessee has caused the same to be executed by its duly authorized officers and its corporate seal to be hereunto affixed, all as of the day and year first hereinabove written.

APPROVED AS TO FORM
JAMES K. HAHN
CITY ATTORNEY

DEC 27 1988

By _____
ASSISTANT/DEPUTY

CITY OF LOS ANGELES

By _____
Executive Director
Department of Airports

ATTEST:

By _____
Secretary (Signature)

_____
B. Hirst
(Print Name)

[SEAL]

CONTINENTAL AIRLINES, INC.

By _____
(Signature)
GARY H. LANTNER
VICE PRESIDENT - PROPERTIES & PURCHASING

_____
(Print Name)

_____
(Print Title)

The within Instrument approved by the Council of the City of Los Angeles at its meeting of

NOV 22 1988

ELIAS MARTINEZ, City Clerk

By _____

-93-