**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED AIR LINES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 08-cv-3337** |
| ) | |
| **v.** ) | **Hon. James B. Moran** |
| ) | **Magistrate Judge Sidney I. Schenkier** |
| **THE CITY OF LOS ANGELES and** ) | |
| **LOS ANGELES WORLD AIRPORTS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**RESPONSE BY THE CITY OF LOS ANGELES**
**TO THE OBJECTIONS FILED BY UNITED AIR LINES, INC,**
**TO THE BANKRUPTCY COURT'S MEMORANDUM OF DECISION**

ROCKARD J. DELGADILLO
  Los Angeles City Attorney
KELLY MARTIN
  General Counsel
JOHN TAVETIAN
  Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
  ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:  (310) 646-3260
Facsimile:    (310) 646-9617

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Anthony G. Stamato
Robert M. Spalding
KAYE SCHOLER LLC
3 First National Plaza
70 West Madison Street, Suite 4100
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and*
*Los Angeles World Airports*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION.................................................................................. 1

I.    UNITED IS NOT ENTITLED TO DAMAGES SINCE IT NEVER HAD
      TO MOVE TURBOPROP OPERATIONS OUT OF TERMINAL 8......................... 2

      A.    In A Breach Of Contract Case, Awarding Damages In Addition
            To An Injunction Would Be An Impermissible Double Recovery. .................... 2

      B.    The Cases Cited By United Do Not Support An Award Of
            Damages In Addition To An Injunction. ................................. 4

II.   USING REASONING THAT IS ENTIRELY APPLICABLE TO
      UNITED'S CLAIM FOR DAMAGES, THE BANKRUPTCY COURT
      RECENTLY REJECTED ANOTHER ATTEMPT BY UNITED TO
      RECOUP THE RENT PAYMENTS IT MADE ON THE RTF................................. 7

III.  UNITED'S DECISION TO CONTINUE TO RENT THE RTF WAS ITS
      OWN  VOLUNTARY BUSINESS DECISION, AND THUS THE
      ATTENDANT COSTS IT INCURRED AS A RESULT ARE NOT
      DAMAGES. .......................................................................... 9

      A.    The Construction Of The Terminal 8 Lease Makes It Clear That
            United's Decision To Continue To Rent The RTF Was A
            Voluntary Business Decision "To Insure Against An Adverse
            Decision," As The Bankruptcy Court Found. ...................................... 9

      B.    United's Actions Also Demonstrate That Its Decision To
            Continue To Rent The RTF Was A Voluntary Business Decision. ................... 11

IV.   GRANTING UNITED'S MOTION WOULD IN FACT GIVE UNITED
      A SUBSTANTIAL WINDFALL. .................................................... 13

CONCLUSION ................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*3M v. Pribyl*,
  259 F.3d 587 (7th Cir. 2001) ...........................................................................4

*Berman v. Johnson*,
  518 F. Supp 2d 791 (E.D. Va. 2007) ...............................................................4

*Forster v. Boss*,
  97 F.3d 1127 (8th Cir.1996) .........................................................................3, 4

*Paws With a Cause, Inc. v. Crumpler*,
  1996 U.S. App. LEXIS 41 (4th Cir. Jan. 3, 1996) ...........................................4

*RKI Inc. v. Grimes*,
  200 F. Supp. 2d 916 (N.D. Ill. 2002) ..............................................................4

*Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros.*,
  201 F.3d 231 (3rd Cir. 1999) ...........................................................................5

## STATE CASES

*BD Inns v. Pooley*,
  266 Cal. Rptr. 815 (Cal. Ct. App. 1990) ...................................................5, 6, 7

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
  277 Cal. Rptr. 40 (Cal. Ct. App. 1990) ...........................................................6

*Brannon v. Auto Ctr. Mfg. Co.*,
  393 So. 2d 75 (Fla. Dist. Ct. App. 1981) ........................................................4

*Chase v. Blair*,
  288 P.2d 681 (Cal. Ct. App. 1930) ..................................................................5

*CUNA Mut. Life Ins. Co. v. Los Angeles County Metro. Transp. Auth.*,
  133 Cal. Rptr. 2d 470 (Cal. Ct. App. 2003) ....................................................6

*Greenstone v. Clartian Theological Seminary*,
  343 P.2d 161 (Cal. Ct. App. 1959) ..................................................................5

*Guntert v. City of Stockton*,
  126 Cal. Rptr. 690 (Cal. Ct. App.1976) .......................................................2, 3

*Johnson v. Lehtonen,*
 312 P.2d 35 (Cal. Ct. App. 1957) ..................................................................4, 5

*Mycogen Corp. v. Monsanto Co.,*
 51 P.3d 297 (Cal. 2002) ...................................................................................4

## FEDERAL STATUTES AND RULE

11 U.S.C. § 362(a) .........................................................................................................1

11 U.S.C. § 525(a) .........................................................................................................1

Fed. R. Bankr. P. 9033...................................................................................................1

## STATE STATUTE

Cal. Civ. Code § 3307....................................................................................................6, 7

Pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure, the City of Los Angeles (the "City"), by and through its Department of Airports, also known as the Los Angeles World Airports ("LAWA") (the City and LAWA are collectively referred to herein as the "City"), respectfully submits its response to the "Limited Objection to Proposed Findings of Fact and Conclusions of Law Dated May 31, 2008" ("Objection" or United's Objection") filed on June 30, 2008, by United Air Lines, Inc. ("United").[1]

## INTRODUCTION

On May 31, 2008, the Bankruptcy Court issued its Memorandum of Decision ("MoD") setting out findings and conclusions — some final[2] and some proposed — in this adversary proceeding.  One of those proposed conclusions concerned United's request for "damages in addition to injunctive relief, based on its continuing to pay rent for the remote terminal that it has not been using since 2005."  MoD at 19.  The Bankruptcy Court denied United's claim for damages, concluding that "[t]he damages United seeks … are not a result of any breach by the City, but rather a result of United's actions to protect itself against the denial of its request for injunctive relief.  Having succeeded in that request, United cannot claim damages. … A permanent injunction is the limit of the appropriate relief here."  *Id*.

As the Bankruptcy Court correctly found, United obtained precisely the relief it sought in initiating this adversary proceeding — the ability to continue turboprop operations from Terminal 8.  Thus, United's decision to continue to rent the Remote Terminal Facility ("RTF") was United's own voluntary business decision and therefore the City urges this Court to adopt the Bankruptcy Court's proposed finding denying United's claim for damages.

---

[1] For the reasons stated in the Objections by the City of Los Angeles to the Bankruptcy Court's Memorandum of Decision (filed June 30, 2008), the City disagrees with United's introductory comments that support certain conclusions in the Memorandum of Decision.

[2] United did not appeal the Court's denial of its 11 U.S.C. §§ 525(a) and 362(a) claims.

I.     **UNITED IS NOT ENTITLED TO DAMAGES SINCE IT NEVER HAD TO MOVE TURBOPROP OPERATIONS OUT OF TERMINAL 8.**

Because United never had to move turboprop operations out of Terminal 8, it was never damaged.  Consequently, awarding United so-called "damages," in the amount of the rent it paid on the RTF between November 2005 and August 2007 (as United seeks) would give United an impermissible double recovery, as the Bankruptcy Court correctly found.  United merely asserts — without support — that it "is not seeking a windfall duplicative of the injunctive relief the Bankruptcy Court has awarded."  United Objection at 4.  A number of cases reach precisely the opposite conclusion, including *Guntert v. City of Stockton*, 126 Cal. Rptr. 690 (Cal. Ct. App. 1976), a case that applies California law, the law that governs the Terminal 8 Lease.

A.     **In A Breach Of Contract Case, Awarding Damages In Addition To An Injunction Would Be An Impermissible Double Recovery.**

In *Guntert*, the plaintiffs (Guntert and two wholly owned corporations) leased a seven acre tract of land from the City of Stockton.  *Id*. at 693.  Pursuant to the lease, under certain circumstances, Stockton could terminate the lease on 18 months' written notice.  *Id*.  In March 1972, Stockton gave Guntert written notice of termination; in response, plaintiffs filed an injunction and damages suit, challenging the validity of the notice of termination.  *Id*.  A bifurcated trial was held, and after the trial on plaintiffs' substantive claims and prayer for injunctive relief, the trial court concluded that the notice of termination was "a nullity and issued an injunction against dispossession of Guntert."  *Id*.  After a trial on Guntert's damage claim, the trial court awarded Guntert $553,812.81 "representing lost profits and out-of-pocket losses to the date of trial" and a monthly sum of $13,442.53, "representing future lost profits," through the end of the lease or "until earlier termination of the lease."  *Id*.  Stockton appealed the money judgment.

On appeal, the Court of Appeals found that the trial court erred by granting an injunction and damages:  "the trial court awarded something akin to <u>double recovery</u>."  *Id*. at 702 (emphasis added).[3]  The court used an analogy to decisions dealing with nuisances:

_____

[3] While the Court of Appeals upheld a portion of the award of past damages, it concluded that the

2

If the nuisance is permanent, the landowner may recover past and prospective damages; if the defendant can be or is required by decree to abate the nuisance, the plaintiff's damages are limited to those suffered in the past …

*Id.* at 702 n.6.

Both the facts of *Guntert* and the Court's analysis in *Guntert* are on point.  In *Guntert*, Stockton gave Guntert 18 months' notice that Stockton was going to terminate Guntert's lease. Similarly, here, of course, on November 22, 2005, the City gave United six months' notice that it would have to move turboprop operations out of Terminal 8 on or before May 24, 2006.  United Ex. 36.  Guntert was never forced out of its leasehold, as a result of the requirement that it be given 18 months' notice and having obtained an injunction that precluded Stockton from terminating its lease with Guntert before that 18-month period expired.  Similarly, here, turboprop operations were never forced out of Terminal 8, as a result of the City having given United six months' notice and United having obtained a temporary restraining order, which thereafter became a preliminary injunction, well before May 24, 2006, the date on which the City's six-months' notice expired.  Thus, just as awarding Guntert both damages and an injunction constituted "something akin to double recovery," awarding United damages and an injunction would also constitute an impermissible "double recovery."

The Eighth Circuit reached the similar conclusion in *Forster v. Boss*, 97 F.3d 1127 (8th Cir. 1996).  The dispute there centered on the sale of certain lake-front property.  The buyers sued the sellers and were awarded both damages and injunctive relief.  *Id*. at 1128.  The sellers appealed "arguing that plaintiffs are receiving what amounts to a double recovery:  an injunction that makes them whole plus damages to compensate them for the loss of the very rights that the injunction has guaranteed."  *Id*.  The court found that argument to be "compelling" and accepted the defendant's argument that "Plaintiffs have, in effect, received not only damages for fraud and breach of contract, but also specific performance.  They have both the money and the property,

---

trial court overstated those damages by adding to lost profits some of the cost of producing that profit.  *Id*. at 150.

and are in a better position than they would have been in had there been no fraud or breach of contract in the first place." *Id.* at 1129.

A host of other cases reach the same conclusion. *See, e.g., Mycogen Corp. v. Monsanto Co.*, 51 P.3d 297, 307 (Cal. 2002) (under California law, "a party may not obtain both specific performance and damages for the same breach of contract, either in single or multiple actions"); *Berman v. Johnson*, 518 F. Supp. 2d 791, 795 (E.D. Va. 2007) (plaintiff is not entitled to a double recovery of "(i) damages for the contract breach and (ii) specific performance of the contract"); *Brannon v. Auto Ctr. Mfg. Co.*, 393 So. 2d 75, 77 (Fla. Dist. Ct. App. 1981) ("It is clear, however, that it is not proper to award damages for the breach and to enforce the entire contract. For example, it would be improper for the court to award all damages flowing from the breach of a construction contract and then require the contractor to build the structure.").[4]

## B. The Cases Cited By United Do Not Support An Award Of Damages In Addition To An Injunction.

United cites *Johnson v. Lehtonen*, 312 P.2d 35 (Cal. Ct. App. 1957), for the proposition that a "court of equity may grant both specific performance and additional damages resulting from the deficiency in performance." United Objection at 4. *Johnson*, however, concerned the transfer by a husband of property held in joint tenancy with his wife. 312 P.2d at 37. The purchaser sued when the property was not transferred. The court found that "the evidence is clear that the parties intended the contract to cover the entire fee in the property and since [seller]

---

[4] A number of other cases adopt the unremarkable position that a court may award both damages and injunction, <u>so long as the injunction and damages do not compensate plaintiff for the same harm</u>. *See, e.g., 3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001) (an injunction granted "to protect trade secret owners from the ongoing damages caused by the future use of trade secrets" and damages for the cost incurred in the past to develop the trade secret are not necessarily "duplicative"); *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 926 (N.D. Ill. 2002) (Denlow, M.J.) (Court "awarded damages for the use and disclosure of [plaintiff's] trade secrets for the period before the injunction issued"); *Paws with a Cause, Inc. v. Crumpler*, 1996 U.S. App. LEXIS 41, at *25 (4th Cir. Jan. 3, 1996) (because an injunction provides for prospective relief, compensatory damages may also be awarded so long as they provide for the injury already incurred). Here, of course, the timing of the temporary restraining order and injunction are irrelevant — the City gave United six months' notice that turboprops would have to move out of Terminal 8 and United obtained injunctive relief before that deadline (and to this date United has never had to move turboprop operations out of Terminal 8).

can convey only an undivided one-half" interest, the court held that the purchaser was entitled to enforce the contract as to whatever interested the seller had (one-half) and to receive damages for the value of the other half (which the seller's wife had and was unwilling to transfer). *Id.* *Johnson* is thus inapplicable here, as the injunction gave United all the relief it sought — the right to continue to operate turboprops in Terminal 8, and there is therefore no need for damages in addition to that injunction.

*Chase v. Blair*, 288 P.2d 681 (Cal. Ct. App. 1930), which United asserts stands for the proposition that both specific performance and damages may be awarded simultaneously, United Objection at 4, instead stands for the more limited — and expected — proposition that, in cases involving the sale of property, a plaintiff may be awarded specific performance as well as damages that "may have been suffered by reason of the delay in the performance" of the contract, also known as "delay damages." 288 P.2d at 682. The court in *BD Inns v. Pooley*, 266 Cal. Rptr. 815 (Cal. Ct. App. 1990), cited by the Bankruptcy Court, actually explains in some detail, how a plaintiff can obtain specific performance and delay damages. *Id.* at 820. Significantly, citing *Greenstone v. Claretian Theological Seminary*, 343 P.2d 161, 165-66 (Cal. Ct. App. 1959), the court in *BD Inns* explained: "Confusion [insofar as what may be awarded in addition to specific performance] has existed because of the informal use of the term 'damages' in connection with such an award, but it is settled that such compensation neither constitutes damages as contemplated in an action for breach of contract, nor implies legal damages." 266 Cal. Rptr. at 820 (bracketed language in original). Here, of course, United does not (and cannot) seek delay damages in addition to the injunction, and thus *Chase* is inapposite.

*Sheet Metal Workers' International Association Local 19 v. Herre Bros.*, 201 F.3d 231, 250 (3rd Cir. 1999), is not to the contrary, either. The Third Circuit merely affirmed the district court's decision to calculate "damages up to the time of its order" and to "deal with damages from the date of its order" by issuing an injunction. Like the cases cited above, *see supra* n.4, *Sheet Metal Workers'* thus only stands for the common-sense proposition that both damages and

injunction can be awarded, so long as the injunction and damages do not compensate plaintiff for the same harm incurred at the same time.

As for United's claims that its decision to continue to rent the RTF "can also be equated to a party's reasonable attempt to mitigate damages," United Objection at 4, it is wrong as a matter of law, and the cases it cites do not support its position. United's argument is wrong because United suffered no damages as it was never forced to move turboprop operations out of Terminal 8. Thus, United had no damages which it needed to mitigate. Consequently, what United did in response to the City's November 22, 2005, letter was <u>voluntary</u> — because United obtained an injunction. *See also infra* Section III.

Further, neither of the cases United cites — *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 40 (Cal. Ct. App. 1990), *or CUNA Mutual Life Insurance Co. v. Los Angeles County Metropolitan Transportation Authority*, 133 Cal. Rptr. 2d 470 (Cal. Ct. App. 2003) — holds that a plaintiff is entitled to damages for moneys spent to mitigate damages arising from a breach of contract when the plaintiff has obtained an injunction that prevents any damages arising from the alleged breach. As such, these cases do not support United's claim for damages here.

Finally, United's attempt to distinguish *BD Inns v. Pooley*, 266 Cal. Rptr. 815 (Cal. Ct. App. 1990), is unavailing. The Bankruptcy Court cited *BD Inns* to support its decision to deny United's claim for damages. United's sole retort seems to be that the court there relied upon Cal Civ. Code § 3307 in refusing to grant an injunction and award damages to plaintiff. United Objection at 5-6. To the contrary, § 3307 is not a "limitation of recovery with respect to the sale and/or purchase of real property," as United has characterized it, United Objection at 6, but, rather, sets the measure of damages in such a circumstance.

Section 3307 provides as follows:

> The detriment caused by the breach of an agreement to purchase an estate in real property is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him or her, consequential damages according to proof, and interest.

Cal. Civ. Code § 3307.  Not surprisingly, the court in *BD Inns* did not limit the plaintiff's damages based on § 3307.  Rather, the court's holding was that "the injured seller has a <u>choice</u> of remedies.  It can prove the contract to purchase has been breached and seek damages occasioned by that breach.  In the alternative, a decree of specific performance can be sought."  266 Cal. Rptr. at 820 (emphasis added).  The limitation on choosing either damages <u>or</u> specific performance is therefore not based upon § 3307, as United has argued, and *BD Inns* is thus fully supportive of the Bankruptcy Court's correct conclusion that United is not entitled to damages in addition to an injunction.

## II.     USING REASONING THAT IS ENTIRELY APPLICABLE TO UNITED'S CLAIM FOR DAMAGES, THE BANKRUPTCY COURT RECENTLY REJECTED ANOTHER ATTEMPT BY UNITED TO RECOUP THE RENT PAYMENTS IT MADE ON THE RTF.

On July 2, 2008, United filed in the Bankruptcy Court a Motion to Retroactively Reject the LAX Remote Facility Lease ("Motion to Reject").  (Its Memorandum in Support of its Motion to Reject ("Motion to Reject Memorandum") is attached hereto as Exhibit A).  United asked the Bankruptcy Court to allow it to reject retroactively the Remote Terminal Facility lease ("RTF Lease") which would have allowed it to recoup the "approximately $4,458,000 in unnecessary lease payments from December 2005 until the lease's expiration in August 2008 [*sic*]."  Motion to Reject Memorandum at 6.  Here, of course, United objects to the Bankruptcy Court's conclusion "that United is not also entitled to damages," and asks that this Court, in addition to upholding the Bankruptcy Court's injunction, also award United $4.5 million, representing the amount of rent United paid to the City for its use of the RTF from November 2005 to August 2007, when that lease expired.  United's Objection at 1 & 6.  Thus, United sought the same relief in the Bankruptcy Court that it seeks here.  *See* United's Reply in Support of Its Motion to Reject at 2 ("According to the City, United is seeking 'the same relief' that the Court already denied in its ruling on United's $4.5 million damages claim…. United concedes the relief is the same ….") (emphasis omitted) (attached hereto as Exhibit C).[5]

_____

[5] The City's Opposition to United's Motion to Reject is attached hereto as Exhibit B.

On July 16, 2008, after briefing was complete, the Bankruptcy Court denied United's Motion to Reject. The reasons given by the Bankruptcy Court for denying United's Motion to Reject are fully supportive of denying United's claim for damages here:

> United made a decision that it wanted to insure against an adverse decision by this court if the court had held that LAX was within its rights to bar the use of turboprops from the main terminal.
>
> By not rejecting the remote terminal lease by maintaining the status quo pending assumption or rejection, United held on to that lease, with the right then, in the event of an adverse decision, to step into the remote facility and operate its commuter operations from that facility.
>
> LAX, at the same time, was not able to take action that would interfere with that right on the part of United. LAX could not relet the remote facility to some other airline. It couldn't tear down the remote facility to get more space or build some other facility. It was legally obligated to maintain that facility for United's purposes, regardless of what the outcome had been.
>
> … [G]iven the fact that United maintained a legal right to the premises under the lease pending assumption or rejection, it is entirely appropriate that United should pay LAX for the assertion of that right.
>
> \* \* \* \*
>
> … LAX gave you exactly what you paid for. They gave you the right to use that remote facility throughout the remaining term of that lease. You got what you paid for. It turned out that you didn't need it, but you still had that right throughout the period, and paying for it is appropriate.

7/16/08 Op. Tr. at 9:13-10:16; *id* at 13:18-24 (attached hereto as Exhibit D).

The Bankruptcy Court's conclusion is also fully consistent with United's admissions in its various pleadings that it decided to continue to lease the RTF to protect itself in the event the Bankruptcy Court found (as it should have) that nothing in the Terminal 8 Lease prevents the City from prohibiting turboprop operations at Terminal 8. For example, in its Motion to Reject Memorandum, United admitted that it delayed "rejection of the Remote Facility lease for more than two years in order to protect its interests." Motion to Reject Memorandum (Exhibit A) at 6 (emphasis added). It further admitted that it decided not to reject the RTF Lease because it was "protecting itself" from harm that "did not come to pass." *Id*. at 6 n.2 (emphasis added). And in United' Objection, it also candidly admits that "United [was] securing protection in the event of a sudden, forced return to the Remote Facility." United's Objection at 4 (emphasis added).

8

**III.    UNITED'S DECISION TO CONTINUE TO RENT THE RTF WAS ITS OWN
VOLUNTARY BUSINESS DECISION, AND THUS THE ATTENDANT COSTS
IT INCURRED AS A RESULT ARE NOT DAMAGES.**

The Bankruptcy Court properly denied United's claim for "damages" arising from its

decision to continue to rent the RTF concluding that "[t]he damages United seeks … are not a

result of any breach by the City, but rather a result of United's actions to protect itself against the

denial of its request for injunctive relief.  Having succeeded in that request, United cannot claim

damages. … A permanent injunction is the limit of the appropriate relief here."  Memorandum of

Decision ("MoD") at 19.

**A.    The Construction Of The Terminal 8 Lease Makes It Clear That United's
Decision To Continue To Rent The RTF Was A Voluntary Business Decision
"To Insure Against An Adverse Decision," As The Bankruptcy Court Found.**

The Terminal 8 Lease either permits United to operate turboprops at Terminal 8 (as

United argues) or it does not (as the City argues).  Assuming that the Terminal 8 Lease does not

permit United to operate turboprops at Terminal 8, then any financial harm United suffers as a

consequence of having to move its operations out of Terminal 8 cannot constitute damages (since

United has no contractual right to operate turboprops at Terminal 8 in the first place).  Likewise,

any moneys United has already spent to try to reduce the amount of any such potential financial

harm — such as deciding to continue to pay rent for the right to use the RTF for turboprop

operations — also cannot constitute damages since the Terminal 8 Lease never gave United the

right to operate turboprops at Terminal 8.

On the other hand, assuming for the sake of argument that the Terminal 8 Lease does

permit United to operate turboprops at Terminal 8 (which it does not), since United was <u>never</u>

denied the right to operate turboprops at Terminal 8, it follows that all moneys that United spent

to continue to rent the RTF cannot be damages, as the Bankruptcy Court properly found.  MoD

at 19.

On November 22, 2005, the City informed United that with the required six month's

notice "that the approval granted in the June 7, 2005, letter, is hereby revoked. Accordingly,

United Airlines shall cease such turboprop operations in Terminal 8 on or before May 24, 2006."

United Ex. 36.  On December 30, 2005, United initiated an adversary proceeding, by filing a complaint in the Bankruptcy Court.  Because United obtained a temporary restraining order, which thereafter became a preliminary injunction, United never had to move the turboprop operations out of Terminal 8.

Indeed, as it must, United essentially admits (by negative inference) that it was never forced to move turboprop operations from Terminal 8:  "The City's November 22, 2005 revocation letter, had it taken effect (and had United not otherwise obtained judicial relief), would, of course, have forced United to move its [sic] Turbo-Prop operations back to the Remote Facility from Terminal 8."  United's Objection at 2 (emphasis added).[6]  What is implicit, of course, is the fact that the City's letter did not take effect and that United did obtain judicial relief.  Accordingly, United's decision to continue to rent the RTF was a voluntary decision which, as the Bankruptcy Court correctly concluded, was "not a result of any breach by the City, but rather a result of United's actions to protect itself against the denial of its request for injunctive relief."  MoD at 19.

Even after the Bankruptcy Court denied United's motion for a permanent injunction in June 2007 — and the City presumably could have forced United to move turboprop operations out of Terminal 8 — United and the City entered into a series of standstill agreements which permitted United to continue to operate turboprops from Terminal 8 through May 31, 2008, the date that the Bankruptcy Court issued its Recommended Decision.

Having thus succeeded at all times in its efforts to preclude the City from requiring United to move turboprop operations out of Terminal 8, United was never damaged.[7] Accordingly, any cost that United incurred was its own voluntary business decision to insure

---

[6] United also asserts that it "acted properly to avoid such a potential consequence had it not been able to secure preliminary injunctive relief," United's Objection at 5, but ignores the outcome-determinative fact that it did in fact obtain such "preliminary injunctive relief" and was never forced to move turboprop operations out of Terminal 8.

[7] This is true even if one accepts United's position that the Terminal 8 Lease permits turboprop operations from Terminal 8 and the City's direction to United to move those operations out of Terminal 8 therefore constituted a breach of the Terminal 8 Lease.

against an adverse decision by the Bankruptcy Court if it had held that the City was within its rights to bar the use of turboprops from Terminal 8.

Finally, United seemingly recognizes the fact that it cannot force the City to pay for amounts it chose to spend voluntarily since it is not seeking to recoup the amounts it paid to use the RTF pursuant to the standstill agreements the parties executed after the Bankruptcy Court denied United's motion for a permanent injunction (after the expiration of the RTF Lease).[8] However, United voluntarily made payments under the standstill agreements for the same reason it voluntarily decided not to continue to rent RTF — to ensure that it could relocate turboprop operations at Terminal 8 to the RTF in the event that the Bankruptcy Court concluded (as it should have) that the Terminal 8 Lease did not give United the right to operate turboprops at Terminal 8. Those costs, though, are not damages and are thus not recompensable from the City.

**B.      United's Actions Also Demonstrate That Its Decision To Continue To Rent The RTF Was A Voluntary Business Decision.**

In December 2007, the City sent a letter to United telling United that, because of operational needs, the City was not willing to extend its standstill agreement with United. 12/18/07 Letter from J. Tavetian to J. Joslin (attached hereto as Exhibit E). Accordingly, the City told United that it would have to vacate the RTF at the end of the then-current standstill agreement, which was January 14, 2008. *Id.*

In response, United did not seek to continue to lease the RTF. Instead, it sent a letter to the City in which it demanded that the City provide it with suitable alternative facilities to operate its turboprop operations at LAX in the event that it had to cease turboprop operations from Terminal 8. 1/3/08 Letter from J. Joslin to J. Tavetian (attached hereto as Exhibit F). Moreover, United threatened the City that if the City failed to provide United with suitable alternative facilities:  (1) the City would be in violation of federal law which United asserted requires the City to give United access to LAX on fair, reasonable and non-discriminatory terms;

---

[8] The Bankruptcy Court denied United's motion for a permanent injunction on June 19, 2007. The RTF Lease expired as of August 31, 2007. Pursuant to a series of standstill agreements, United continued to pay the City to be able to use the RTF through January 14, 2008.

(2) FAA might potentially withhold federal grant moneys under the Airport Improvement Program from the City; and (3) United would sue the City for damages in "the tens of millions of dollars" if United had to "eliminate dozens of routes from LAX affecting hundreds of thousands of passengers annually." *Id.*

What is of some interest is the City's response. The City, of course, responded that, consistent with federal law, the City intended to make the RTF (referred to as the Commuter Terminal Facility in its letter) "available as a common-use facility to all airlines — including United Air Lines, Inc. ("United") to operate its turboprop operations at [LAX] — on reasonable conditions and without unjust discrimination." 1/10/08 Letter from J. Tavetian to J. Joslin (footnote omitted) (attached hereto as Exhibit G). Whether United was right or not with respect to its position on applicable federal airport law is beside the point. (Of course, this Court need not decide this issue.) But the fact is that the City promptly — within one week of receiving United's letter — informed United that it would be able to continue turboprop operations at LAX, even if United no longer leased the RTF.

What is of more interest is why United did not send a letter like that immediately after it received the City's November 22, 2005, letter (in which the City gave United six month's notice that it would have to cease turboprop operations in Terminal 8). Absolutely nothing prevented United from sending such a letter immediately after receiving the City's letter. One can only surmise that in November 2005 United chose one course — to continue to rent the RTF in case the Bankruptcy Court found that the City could bar turboprop operations in Terminal 8,[9] while in January 2008, it chose another course — to vacate the RTF, but at the same time to make sure that it made its position clear that the City had to permit United to continue turboprop operations at LAX even if United did not continue to rent the RTF. But having chosen one course in November 2005 that resulted in United paying rent until August 2008 does not entitle United to

---

[9] Conceivably, had United been forced to relocate turboprop operations out of Terminal 8, it might have been motivated to continue renting the RTF by a desire to maintain exclusive use of the facility. Exclusive use would have allowed it to keep its "United" signage on the building and to ensure that customers had exclusive use of the RTF, among other things.

any so-called "damages," especially since subsequent events make it obvious that United could have rejected the RTF Lease in November 2005 and nonetheless had a place to operate turboprops at LAX, even if thereafter it was required to move turboprop operations out of Terminal 8.

## IV.    GRANTING UNITED'S MOTION WOULD IN FACT GIVE UNITED A SUBSTANTIAL WINDFALL.

Contrary to what United states in its Objection, United Objection at 4, United would receive a significant windfall if its were awarded the rent it paid for the RTF between November 2005 and August 2007. United's voluntary decision to continue to rent RTF is properly viewed as an effort to protect its ability to operate turboprop flights in the event that it did not prevail on its breach of contract claim. Thus, allowing United to recover as damages the amount of rent it paid for the right to use the RTF would, in essence, allow it to recover its rental payments simply because it did not have to use the RTF. But the whole point of United's making those payments was to preserve its ability to use the RTF if it had to move the turboprop operations out of Terminal 8. Viewed another way, had the Bankruptcy Court ruled that the Terminal 8 Lease did not permit United to operate turboprop flights at Terminal 8, and United had moved turboprop operations to the RTF, United surely would not be seeking to recover those rent payments. Its business decision to continue to rent RTF in that case would have paid off. Thus, having made a decision to protect itself against losses in the event that it did not prevail on its breach of contract claim, the costs that United incurred are its own responsibility.

Lastly, awarding United the rent it paid for the RTF would result in substantial financial harm to the City. Because United continued to rent the RTF, it never surrendered the premises covered by the RTF Lease and the City was precluded from reletting the premises to another tenant and was thus precluded from obtaining rent payments for the RTF from anyone except United.[10] Having been forced to accede to United's desire to continue rent for the RTF, and

---

[10] United asserted in its Motion to Reject Memorandum that the "City has had unfettered access to the" RTF since June 2005. Motion to Reject Memorandum (Exhibit A) at 6. That assertion is incorrect as a matter of law and, as United well knows, is unsupported by any evidence showing that the City was aware it had an "unfettered" right to rent the RTF while United continued in

having thus been forced to forego rent payments from another potential tenant, the City should not now be penalized by granting United a windfall from the City's pockets.

## CONCLUSION

For all of the foregoing reasons, the City respectfully requests that the District Court adopt the proposed findings of fact and conclusions of law to which United has objected.

Dated:  August 15, 2008

Respectfully submitted,

KAYE SCHOLER LLC,

By:   /s/ Robert M. Spalding
    Anthony G. Stamato (ARDC #6207688)
    Robert M. Spalding (ARDC #6256701)
    KAYE SCHOLER LLC
    3 First National Plaza
    70 West Madison Street, Suite 4100
    Chicago, IL 60602-4231
    Telephone: (312) 583-2300
    Facsimile: (312) 583-2360

ROCKARD J. DELGADILLO, City Attorney
KELLY MARTIN, General Counsel
JOHN TAVETIAN, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
   ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:  (310) 646-3260
Facsimile:    (310) 646-9617

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and*
*Los Angeles World Airports*

---

possession of the facility.  Since United was <u>never</u> forced to move turboprop operations out of Terminal 8, it and it alone decided not to continue to rent the RTF and thus United is the reason why the City "could [<u>not</u>] have taken immediate possession and [could <u>not</u>] put the facility back in use."  *Id.* at 6 (emphasis added).  The Bankruptcy Court essentially adopted the City's position (and rejected United's position) by finding that:

> LAX, at the same time, was not able to take action that would interfere with that right on the part of United.  LAX could not relet the remote facility to some other airline.  It couldn't tear down the remote facility to get more space or build some other facility.  It was legally obligated to maintain that facility for United's purposes, regardless of what the outcome had been.

7/16/08 Op. Tr. (Exhibit D) at 9:24-10:6.

14

## CERTIFICATE OF SERVICE

I, Robert M. Spalding, certify that on this 15th day of August, 2008, I caused to be served

by electronic means through ECF as to E-Filing users, in compliance with Local Rule 5.5, a true

and correct copy of the foregoing upon the following:

> James C. Joslin
> Micah E. Marcus
> Kirkland & Ellis LLP
> 200 East Randolph Drive
> Chicago, IL  60601
> jjoslin@kirkland.com
> mmarcus@kirkland.com
> *Counsel for United Air Lines, Inc.*

Service was made by other means to:

> United States Trustee
> Office of the United States Trustee
> 227 West Monroe Street
> Suite 3350
> Chicago, IL 60606

 /s/ Robert M. Spalding_____

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| UAL CORPORATION, et al., | ) | **Chapter 11** |
| | ) | |
| Reorganized Debtors. | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| _____ | ) | |
| | ) | |
| UNITED AIR LINES, INC., | ) | **Honorable Eugene R. Wedoff** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. Pro. No. 05-02806** |
| | ) | |
| THE CITY OF LOS ANGELES, a | ) | |
| municipal corporation, and LOS | ) | |
| ANGELES WORLD AIRPORTS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED AIR LINES, INC.'S MOTION
TO RETROACTIVELY REJECT THE LAX REMOTE FACILITY LEASE**

In November 2005, almost immediately after United Airlines sought to discharge its remaining obligations regarding its LAX Remote Facility Lease by rejecting that lease, the City of Los Angeles and Los Angeles Worldwide Airports (collectively, "the City") informed United that the City was terminating United's right to operate Turbo-Prop Aircraft at Terminal 8. United promptly filed an Adversary Complaint seeking to enjoin the City's improper actions. United withdrew its requested rejection of the Remote Facility Lease pending resolution of its dispute with the City. In August 2006, this Court granted United's preliminary injunction motion, concluding that the City's attempts to bar United's Turbo-Prop operations at Terminal 8 violated United's central terminal lease rights.

Following the Court's ruling and during the approximately nine month delay in proceeding with a hearing for a permanent injunction, on December 21, 2006, United filed its original motion to retroactively reject the LAX Remote Facility Lease, contingent upon its ultimate success on its pending request for a permanent injunction (the "Original Motion"). Upon this Court's June 19, 2007 ruling that United did not have a contractual right to operate Turbo-Props out of Terminal 8, United withdrew the Original Motion without prejudice after this Court acknowledged that the Original Motion could be reasserted if United were successful in appealing the initial merits determination. (*See* 6/19/07 Hr'g Tr. at 30:12-14: "If you should be successful in an appeal of [the Order], obviously, you could reassert [the] motion.") United then filed a motion to reconsider this Court's ruling that United did not have a contractual right to operate Turbo-Props out of Terminal 8.

On June 1, 2008, this Court granted United's motion for reconsideration and reversed its June 19, 2007 ruling. Because the Court concluded that its jurisdiction was non-core, the Court issued its Proposed Findings of Facts and Conclusions of Law for the District Court (the "Proposed Order") and reinstated the preliminary injunction in favor of United pending a final ruling from the District Court.

United now seeks to reinstate its rejection of the Remote Facility Lease and make that rejection retroactive to November 30, 2005, the date on which United initially sought to make its rejection effective. As explained below, because the City's own wrongful conduct is the reason why United was forced to delay rejection of the Remote Facility lease, retroactive rejection is appropriate here.

## BACKGROUND

United is a party to a number of leases with the City for use of various premises and facilities at Los Angeles International Airport ("LAX"). From 1993 until June 2005, United

2

and/or United Express operated some (but not all) of its smaller regional aircraft commonly known as Turbo-Props from a facility commonly known as the Remote Facility. In June 2005, United consolidated all of its commuter operations, including Turbo-Prop operations at Terminal 8. United has not operated aircraft from the Remote Facility since June 2005.

On November 15, 2005, United issued a notice of rejection to the City advising that, effective November 30, 2005, United was rejecting the lease for the Remote Facility, seeking to discharge its remaining obligations owed thereunder pursuant to the Bankruptcy Code. In response, on November 22, 2005, the City sent United a letter advising that the City was revoking its permission for United to use Turbo-Prop aircraft in the central terminal areas, including Terminal 8. That revocation, had it taken effect (and had United not otherwise obtained judicial relief), would have forced United to move its Turbo-Prop operations back to the Remote Facility from Terminal 8. On November 30, 2005, United withdrew its Notice of Rejection pending resolution of its dispute with the City about Turbo-Prop use at Terminal 8.

On January 9, 2006, United moved for a preliminary injunction to enjoin the City's revocation of United's right to operate Turbo-Props at Terminal 8. United also sought an extension of time to assume or reject the Remote Facility Lease pending resolution of the dispute regarding the use of Turbo-Props at Terminal 8. On this latter request, pursuant to a Stipulated Order, United was "granted to and through 60 days after entry of a Bankruptcy Court order resolving the Adversary Complaint to assume or reject the Remote Facility Lease." (1/13/06 Order at ¶ 3, Ex. A) Now, after over two and half years of litigation, this Court has issued the Proposed Order holding that the City breached the Terminal 8 Lease by impermissibly attempting to deny United its ability to operate its air transportation business out of Terminal 8.

Simply said, these facts warrant granting United the equitable relief of retroactive rejection of the Remote Facility Lease in order to place United in the same condition that it would have been in but for the City's wrongful breach of the Terminal 8 Lease.

## ARGUMENT

### I.    Rejection Of The Remote Facility Lease Is Proper Under § 365.

As a starting point, there should be no dispute that "rejection" of the Remote Facility Lease is appropriate here.  Under section 365(a) of the Bankruptcy Code, a debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor" upon approval of the court.   11 U.S.C. § 365(a).[1]   Bankruptcy courts generally approve the rejection of an executory contract or lease if it will benefit the estate under a "business judgment" test.   *In re At Home Corp.*, 292 B.R. 195, 199 (N.D. Cal. 2003).

Here, United initially rejected the Remote Facility Lease on November 15, 2005 — at a time that it undeniably remained executory.  (Notice of Rejection, Ex. B)  The City did not object.  (Reservation of Rights at ¶¶ 10-12, Ex. C)  Instead, the City placed this Court on notice that the City had terminated United's right to operate Turbo-Prop aircraft at Terminal 8, and that United's rejection of the Remote Facility Lease would leave United with no place at LAX from which it could operate Turbo-Prop aircraft.  (*Id.*)  This was the sole reason for United's temporary withdrawal of its requested relief — to protect itself against the City's breach.  Now, not only has this Court found that United has a contractual right to continue its Turbo-Prop operations out of Terminal 8, but the Remote Facility Lease has expired by its own terms and United has no current rights to utilize the Remote Facility, even if it wanted to.  As such, there

---

[1]    While the Remote Facility Lease has expired, the effective date of the rejection would be the proper date to determine whether the Remote Facility Lease was executory for purposes of rejection, not the date of the order approving such rejection.  This is particularly true where, as here, there is a Stipulated Order specifically allowing United "60 days after entry of a Bankruptcy Court order resolving the Adversary Complaint to assume or reject the Remote Facility Lease."  (1/13/06 Order at ¶ 3, Ex. A)

4

should be no dispute that under a "business judgment" test, United's rejection of the Remote Facility Lease is appropriate. Where there likely will be a dispute, however, is whether such rejection should be retroactive. It should be.

## II.   United's Rejection Of The Remote Facility Lease Should Be Made Retroactive To November 30, 2005.

A bankruptcy court approving the rejection of an unexpired nonresidential lease has the equitable power in suitable cases to order that rejection operate retroactively to the date of the initial rejection. *See e.g.*, *In re At Home Corp.*, 392 F.3d 1064, 1075 (9th Cir. 2004) (holding "bankruptcy court has discretion to grant a motion to reject a nonresidential lease retroactively"); *In re Thinking Machines Corp.*, 67 F.3d 1021, 1028-29 (1st Cir. 1995) (same). As a matter of policy, retroactive rejection furthers the purpose of the Bankruptcy Code and "act[s] as a stimulus to all parties to cooperate in getting the … motion to reject heard and determined at the earliest practicable date." *Id.* at 1028.

When deciding whether to approve the rejection of a lease retroactive to an earlier date, courts generally focus on whether the parties have facilitated or hindered the prompt return of the leased premises to the landlord. *At Home*, 392 F. 3d at 1070. As the Ninth Circuit observed in *At Home*, "most cases approving the rejection of a lease retroactively … highlight the fact that the debtor has vacated the premises." *Id.* at 1074. *See also In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (holding retroactive rejection proper when "debtor vacated the premises and turned over the keys to the landlord"); *In re CCI Wireless, LLC.*, 297 B.R. 133, 140 (D. Col. 2003) (holding equities favored retroactive rejection when debtor vacated premises). In addition, "[a] landlord's conduct and motives are relevant to a bankruptcy court's equitable deliberations." *At Home*, 392 F.3d at 1074; *see also In re Jamesway Corp.*, 179 B.R. 33, 38 (S.D.N.Y. 1995) (holding that retroactive rejection of lease was proper because the landlord

caused delay in Bankruptcy Court decision on rejection).  Here, the equities favor approving a retroactive effective date for the rejection of the Remote Facility Lease for multiple reasons.

*First*, United vacated the Remote Facility in June 2005.  Since that time, the Debtors have not occupied the premises, and the City has had unfettered access to the premises.  On November 15, 2005, United gave notice that it was rejecting the Remote Facility Lease effective November 30.  At that point, the City could have taken immediate possession and put the facility back in use.  Instead of exercising this option, the City instead tried to force United back to the Remote Facility by virtue of its breach of the Terminal 8 Lease.

*Second*, the delay in the rejection time was caused exclusively by the City's wrongful conduct.  As a result of the City's attempt to take action that this Court concluded the City had no legal right to take, United was forced to delay rejection of the Remote Facility Lease for more than two years in order to protect its interests.[2]  This delay resulted in United having to make approximately $4,458,000 in unnecessary lease payments from December 2005 until the lease's expiration in August 2008.  (*See* United 4/30/07 Post-Trial Br. at 11, ¶ 21)  Because this delay was caused solely by the City, United should not have to bear the expense (*i.e.*, the continued lease payments) associated with the delayed rejection.  *See Jamesway*, 179 B.R. at 38 (affirming retroactive rejection decision where "the Landlord occasioned the delay in the Bankruptcy Court's ruling on the rejection issue" on the grounds that "[i]f such a delay is allowed to accrue

---

[2]   United's decision to conditionally withdraw the Original Motion was its only reasonable mitigation option.  If this Court had ruled against United, a decision by United not to withdraw its rejection notice would certainly have been patently unreasonable.  Moreover, the fact that the harm from which United was protecting itself did not come to pass is immaterial.  To this end, the reasonableness of a party's mitigation efforts "'must be judged in the light of the situation confronting him at the time the loss was threatened and not by the judgment of hindsight.'"  *CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority*, 108 Cal. App. 4th 382, 396 fn. 12 (Cal. App. 2 Dist. 2003) (*citing Green v. Smith*, 261 Cal. App. 2d 392, 396 (1968).

to the benefit of Landlord, then other creditors will have an incentive to delay decisions, by whatever method possible, in order to expand the time before rejection receives court approval").

Finally, it is important to recognize that nothing in United's requested relief would constitute a duplicative or wind-fall recovery to United. To the contrary, in seeking the requested relief, United is doing no more than seeking to be placed in the same position as it would have been in if the City had not breached the Terminal 8 Lease and improperly attempted to force United's Turbo-Prop operations out of Terminal 8. *See BD Inns v. Pooley*, 218 Cal. App. 3d 289, 290 (Ct. App. 1990) (holding that while plaintiffs are not entitled to damages that would be duplicative of specific performance, "the goal is to put the parties back in the position they would have been had the contract been timely performed"). As Professor Williston explained:

> In its quest to grant complete relief and prevent unnecessary litigation, a court of equity will in some cases give damages not as alternative but rather as supplemental relief to a decree of specific performance. Thus, a court sitting in equity may award monetary compensation in addition to specific performance where necessary to effectuate full and complete relief, to place the injured party in the position it would have occupied had there been no breach of contract.

25 Williston on Contracts § 67:32 (4th ed.) This is precisely what the Court should do here: put United back in the position it would have been in but for the City's breach of the T-8 Lease. Simply put, absent retroactive rejection here, the City will receive a $4.5 million windfall resulting from its breach of contract. Such a result would be neither just nor fair.

## CONCLUSION

Because United was prepared to reject the Remote Facility Lease in November 2005 and return control of the facility to the City, and because the only thing that prevented United from giving effect to the lease rejection was the City's improper threat to bar Turbo-Prop operations at

Terminal 8, equity favors making the Remote Facility Lease rejection retroactive to November

30, 2005.

Dated July 2, 2008     **UNITED AIR LINES, INC.**


         By: *_/s/ Micah E. Marcus_____*
         Marc Kieselstein, P.C. (ARDC No. 6199255)
         James Joslin (ARDC No. 6229288)
         Alex Karan (ARDC No. 6272495)
         Micah Marcus (ARDC No. 6257569)
         KIRKLAND & ELLIS LLP
         200 East Randolph Drive
         Chicago, IL 60601
         (312) 861-2000 (telephone)
         (312) 861-2200 (facsimile)
         Counsel for the Reorganized Debtors

## <u>CERTIFICATE OF SERVICE</u>

       I, Micah E. Marcus, certify that on the 2nd day of July, 2008, I caused to be served, by e-mail (to parties who have provided an e-mail address), facsimile (to parties who have not provided an e-mail address) or by overnight delivery (to all parties who have not provided an e-mail address or a facsimile number), a true and correct copy of the foregoing **Memorandum Of Law In Support Of United Air Lines, Inc.'s Motion To Retroactively Reject The LAX Remote Facility Lease** on the parties on the attached service lists.


Dated: July 2, 2008                             ____*/s/ Micah E. Marcus*_____
         Chicago, Illinois                           Micah E. Marcus

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL Corporation, et al.,** | ) | **Case No. 02 B 48191** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | **Honorable Eugene R. Wedoff** |
| | ) | |
| **United Air Lines, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding** |
| | ) | **No. 05 A 02806** |
| **THE CITY OF LOS ANGELES,** | ) | |
| a municipal corporation, and | ) | |
| **LOS ANGELES WORLD AIRPORTS,** | ) | |
| | ) | |
| Defendants. | ) | |


**OPPOSITION BY THE CITY OF LOS ANGELES TO UNITED AIR LINES, INC.'S
MOTION TO RETROACTIVELY REJECT THE LAX REMOTE FACILITY LEASE**

The City of Los Angeles, by and through its Department of Airports (known as "Los

Angeles World Airports") (collectively, the "City") submits the following opposition to United's

"Motion to Retroactively Reject the LAX Remote Facility Lease" ("Motion to Reject").

**I.    ALTHOUGH NOT MENTIONED IN ITS MOTION TO REJECT, UNITED IS
SEEKING THE SAME RELIEF FROM THIS COURT AS IT IS SEEKING FROM
THE DISTRICT COURT.**

On May 31, 2008, this Court issued a Memorandum of Decision ("MoD") setting out

findings and conclusions — some final[1] and some proposed — in the above-referenced

adversary proceeding.  One of those proposed conclusions concerned United's request for

"damages in addition to injunctive relief, based on its continuing to pay rent for the remote

---

[1] United did not appeal the Court's denial of its 525(a) and § 362(a) claims.

terminal that it has not been using since 2005." MoD at 19. The Court denied United's claim for damages, concluding that "[t]he damages United seeks … are not a result of any breach by the City, but rather a result of United's actions to protect itself against the denial of its request for injunctive relief. Having succeeded in that request, United cannot claim damages. … A permanent injunction is the limit of the appropriate relief here." *Id*.

On June 30, 2008, pursuant to Fed. R. Bankr. P. 9033, United filed its "Limited Objection to Proposed Findings of Fact and Conclusions of Law Dated May 31, 2008" in the District Court for the Northern District of Illinois ("United's Objections") (attached hereto as Attachment A). In that filing, United objected to this Court's conclusion "that United is not also entitled to damages," and asked that the District Court, in addition to upholding this Court's injunction, also award United $4.5 million, representing the amount of rent United paid to the City for its use of the Remote Terminal Facility ("RTF") from December 2005 to August 2007, when that lease expired. United's Objections at 1 & 6.

Just three days later, on July 2, 2008, United filed its Motion to Reject. In its Motion to Reject, United asks for the *same relief* from this Court as it has asked from the District Court — namely United asks that this Court allow it to reject retroactively the RTF lease ("RTF Lease") which would allow it to recoup the "approximately $4,458,000 in unnecessary lease payments from December 2005 until the lease's expiration in August 2008 [*sic*]." Motion to Reject at 6.

With its claim for damages before the District Court, there is no reason for this Court to entertain United's Motion to Reject, which is nothing more than a backdoor attempt to obtain the same relief United is seeking from the District Court. Moreover, having already properly denied United's claim for damages, *see infra* Section V, there is no basis for this Court to grant United's Motion to Reject.

II.  **UNITED'S THIRD ATTEMPT TO REJECT THE RTF LEASE CONSTITUTES AN IMPROPER GAMING OF THE BANKRUPTCY SYSTEM AND, IN ANY EVENT, THE CITY CANNOT BE REQUIRED TO PAY AN EXPENSE UNITED INCURRED IN ORDER TO PROTECT IT AGAINST A LOSS OF ITS ADVERSARY ACTION AGAINST THE CITY.**

This is United's third attempt to reject the RTF Lease.  On November 15, 2005, United notified the City that it was rejecting the RTF Lease, pursuant to the Court's January 15, 2003 order permitting United to reject executory contracts and leases upon 15 days' notice.  United withdrew this notice on November 30, 2005, on the last day of the 15-day notice period.  One year later, on December 21, 2006 (after obtaining a preliminary injunction), United filed a motion to reject the RTF Lease retroactively.  It later withdrew this motion, after this Court ruled on June 19, 2007, that United had no right to operate turboprops at Terminal 8.  Thus, the current Motion to Reject is United's *third* attempt to reject the RTF Lease, and its assertion that it is now entitled to a return of lease payments since November 30, 2005, is pure gamesmanship.

United's seeming inability to decide whether or not to reject the RTF Lease is easy to understand.  Throughout this adversary proceeding, United faced the risk that this Court would hold (correctly) that United had no right to operate turboprop aircraft at Terminal 8, which would have required United to move those operations, presumably to the RTF.  However, United was *never* forced to move the turboprop operations out of Terminal 8 because it actually received injunctive relief which permitted it to continue to operate out of Terminal 8.  In effect, United hedged against the risk that it would ultimately lose its lawsuit, by renting alternative space out of which to operate.  Indeed, United admits that its actions were voluntary by stating that it delayed "rejection of the Remote Facility Lease for more than two years to *protect its interests*."  Motion to Reject at 6 (emphasis added).[2]  And, of course, this is precisely what the Court recognized by finding that "[t]he damages United seeks … are not a result of any breach by the

---

[2] United's assertion that its efforts were "mitigation," Motion to Reject at 6 n.2, misses the mark since only damages can be mitigated; because United was never forced to stop turboprop operations at Terminal 8, it cannot establish damages.  Its voluntary efforts to reduce potential business losses are not mitigation.

City, but rather a result of United's actions to protect itself against the denial of its request for injunctive relief."  MoD at 19.[3]

United's attempt to claim, now, that it is entitled to a refund of all lease payments it made on the RTF Lease after November 30, 2005, uses the Bankruptcy Code as a sword rather than a shield.  A debtor's power of rejection under 11 U.S.C. § 365, however, is meant to enable the Debtor to free itself from financially burdensome contracts, not to manipulate the system to engineer a windfall as United does here.  United reaped the benefit of remaining in Terminal 8 throughout this adversary proceeding.  The City cannot now be required to reimburse United for its voluntary decision to rent the RTF, as a hedge against losing the adversary proceedings.

## III.    UNITED CANNOT REJECT AN EXPIRED LEASE

Section 365(a) of the Bankruptcy Code provides that a trustee, subject to court approval, may assume or reject any executory contract or "unexpired lease" of the debtor.  Here, the RTF Lease expired, by its own terms, on August 31, 2007.  The Motion to Reject admits this, and further admits that United has no current leasehold right to utilize the RTF, even if United so wanted.[4]  Motion to Reject at 4.  United  misleadingly argues that, in essence, the January 13, 2006, Stipulated Order extending United's deadline to assume or reject the RTF Lease extended the term of the RTF Lease itself.  This argument is without merit as it merely set an outer deadline to assume or reject the RTF Lease.  It did not, and could not have, extended the term of the lease to enable United to later assume or reject as it saw fit.

The Motion to Reject suggests that the Court should look to the date UAL *first* notified the City that it sought to reject the RTF Lease — November 15, 2005 — as the date for determining the "executoriness" of the lease.  Motion to Reject at 4.  This date, however, is not

---

[3] Both United's decision not to use the RTF and its decision to continue to rent the RTF while it was the beneficiary of the injunctive relief it had sought, were voluntary decisions on its part. *See also infra* Sections IV & V.

[4] In its Motion to Reject, United neglected to mention the fact that the City has informed United that the City would make the RTF available as a common-use facility to all airlines — including United to operate its turboprop operations at LAX — on reasonable conditions and without unjust discrimination.

4

the right date.  The law is clear that the critical date for determining the executory nature of a contract is the date on which the bankruptcy court considers a debtor's motion to assume or reject it.  *In re Gov't Sec. Corp.*, 101 B.R. 343, 349 (Bankr. S.D. Fla. 1989) (also noting that if an agreement expires by its own terms before the bankruptcy court considers the motion to assume or reject the contract, the motion becomes moot as there is no longer anything to assume or reject); *In re Pesce Baking Co.*, 43 B.R. 949, 957 (Bankr. N.D. Ohio 1984).  This Court has never considered such a request by United, and certainly did not do so on November 15, 2005, or at any other time prior to the expiration of the RTF Lease.  Because the RTF Lease is expired, United no longer has the statutory or jurisdictional power, pursuant to the express language of 11 U.S.C. § 365, to reject it, retroactively or otherwise.

## IV.  A BALANCE OF THE EQUITIES DOES NOT FAVOR RETROACTIVE REJECTION OF THE RTF LEASE NOR CAN THE COURT ORDER RETROACTIVE REJECTION WHERE THE CITY COULD NOT HAVE TAKEN CONTROL AND RENTED THE LEASED PREMISES.

Even assuming that the expired RTF Lease could be rejected — which it cannot — this is not a case in which the Court should impose the extraordinary remedy of permitting the debtor to reject a lease retroactively.  While such a decision turns on a balance of the equities, courts grant retroactive termination only in unusual circumstances, none of which are present here.  For example, in *In re Chi-Chi's, Inc.*, 305 B.R. 396 (Bankr. Del. 2004), the court made termination of a lease retroactive only to the date the property was fully surrendered to the debtor.  In *TW, Inc. v. Angelastro (In re TW, Inc.)*, Civ. No. 03-533, 2004 U.S. Dist. LEXIS 671 (D. Del. Jan. 14, 2004), the court denied a request for retroactive termination of a lease even through the debtor vacated the premises pre-petition and notified the lessor of its intent to vacate the premises, on the grounds that the debtor had still not fully surrendered the property by turning over the keys.  Likewise, the court in *In re Federated Department Stores, Inc.*, 131 B.R. 808 (S.D. Ohio 1991), overturned a lower court decision making a lease rejection retroactive, on the grounds that the debtor and the lessor were equally blameless for the delay, and the lessor should not be punished in that circumstance.  The *Federated* court further noted that making rejection retroactive puts

5

lessors in an awkward position: they would find themselves trying to relet properties prior to a court approving the debtor's rejection of the lease. *Id*. at 815.

Here, because United never surrendered the premises covered by the RTF Lease, the City was precluded from reletting the premises to another tenant and was thus precluded from obtaining rent payments for the RTF from anyone except United. As stated above, United retained the RTF Lease to hedge against the Court later finding that United had no right to operate turboprops at Terminal 8. United certainly did not surrender the RTF Lease as of November 30, 2005, and the City certainly could not have relet the property subject to the RTF Lease the following day (as United seems to suggest), as the RTF Lease was still an executory contract which had not been rejected by order of this Court. Undoubtedly, if the City had attempted to relet the premises to another tenant at anytime before the lease expired, United would have vigorously objected. *See also infra* Section VI & n.5.

None of the cases that United cites are factually similar to this case. *At Home, Amber's Stores* and *CCI Wireless* all involved rejection motions filed within the first 40 days of the filing of the applicable bankruptcy cases. *See Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 292 B.R. 195, 197 (N.D. Cal. 2003); *aff'd* 392 F.3d 1064 (9th Cir. 2004); *In re Amber's Stores, Inc.*, 193 B.R. 819, 820-21 (Bankr. N.D. Tex. 1996); *Stonebriar Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 135-36 (D. Colo. 2003). In the *At Home* and *Amber's Store* cases, unlike here, the premises were vacated prior to the *petition* date**,** and in *CCI Wireless*, unlike here, the debtors vacated before or shortly after the filing of the bankruptcy case. The courts in those cases thus found that the equities favored the applicable debtors in allowing retroactive rejection.

Moreover, none of the cases United cites involved the voluntary withdrawal of a motion to reject a lease or the rejection of an expired lease. And, in each of the above cases, the landlord objected to the debtor's motion to reject — in this case LAX did not object to the original motion to reject. Most importantly, none of the debtors in the above cases sought to use retroactive rejection strategically as United does in its Motion to Reject.

6

In this case, United took a calculated risk to protect itself in the event that it did not prevail on its breach of contract claim against the City, and affirmatively decided not to reject the RTF Lease. United retained access to the RTF premises at all times and, presumably, would have sought to re-occupy the premises had it not prevailed on its breach of contract claim. None of the cases cited by United support retroactive relief under such circumstances. Given these facts, the balance of equities does not favor making United's lease rejection retroactive to November 30, 2005.

## V.    UNITED'S DECISION NOT TO REJECT THE RTF LEASE WAS ITS OWN VOLUNTARY BUSINESS DECISION, AND THUS THE ATTENDANT COSTS IT INCURRED ARE NOT DAMAGES.

This Court properly denied United's claim for "damages" arising from its payments on the RTF Lease concluding that "[t]he damages United seeks … are not a result of any breach by the City, but rather a result of United's actions to protect itself against the denial of its request for injunctive relief. Having succeeded in that request, United cannot claim damages. … A permanent injunction is the limit of the appropriate relief here." MoD at 19.

Here, either the Terminal 8 Lease permitted United to operate turboprops at Terminal 8 or it did not. Assuming that the Terminal 8 Lease does not permit United to operate turboprops at Terminal 8, then any harm United suffered as a consequence of having to move its operations out of Terminal 8 are not damages (since United had no right to operate turboprops at Terminal 8 in the first place). Likewise, any moneys spent to try to reduce the amount of such harm — such as refusing to reject the RTF Lease and continuing to pay rent for the right to use the RTF — would also not be damages (since United had no right to operate turboprops at Terminal 8 in the first place). Assuming that the Terminal 8 Lease *does* permit United to operate turboprops at Terminal 8 (which it does not), since United was never denied the right to operate turboprops at Terminal 8, then all moneys that United spent on the RTF cannot be damages, as this Court has already held. MoD at 19.

United seemingly recognizes the fact that it cannot force the City to pay for amounts it chose to spend voluntarily since it is not seeking to recoup the amounts it paid to use the RTF

pursuant to the standstill agreements the parties executed after the Court denied United's motion

for a permanent injunction (after the expiration of the RTF Lease). However, United voluntarily

made payments under the standstill agreements for the same reason it voluntarily decided not to

reject the RTF Lease — to ensure that it could relocate turboprop operations at Terminal 8 to the

RTF in the event that this Court concluded that the Terminal 8 Lease did not give United the

right to operate turboprops at Terminal 8. Those costs, though, are not damages and are thus not

recompensable from the City.

## VI.    GRANTING UNITED'S MOTION WOULD IN FACT GIVE UNITED A SUBSTANTIAL WINDFALL.

Contrary to what United states in its Motion to Reject, United would receive a significant

windfall if its Motion to Reject were granted. United's voluntary decision not to reject the RTF

Lease is properly viewed as an effort to protect its ability to operate turboprop flights in the event

that it did not prevail on its breach of contract claim. Thus, allowing United to reject the RTF

Lease retroactively would, in essence, allow it to recover its rental payments simply because it

did not have to use the RTF. But the whole point of United's making those payments was to

preserve its ability to use the RTF if it had to move the turboprop operations out of Terminal 8.

Viewed another way, had this Court ruled that the Terminal 8 Lease did not permit United to

operate turboprop flights at Terminal 8, and United had moved its turboprop operations to the

RTF, United surely would not be seeking to reject the Lease, retroactively or prospectively. Its

business decision to keep the RTF Lease in that case would have paid off. Thus, having made a

decision to protect itself against losses in the event that it did not prevail on its breach of contract

claim, the costs that United incurred are its own responsibility.

Lastly, allowing United to reject the RTF Lease retroactively and ordering the City to

return United's payments would result in substantial financial harm to the City. Because United

refused to reject the RTF Lease, the City was unable to relet the facility to other airlines.[5]

---

[5] United's assertion that the "City has had unfettered access to the" RTF since June 2005, Motion
to Reject at 6, is specious at best and disingenuous at worst. Since United continued to pay rent
on the RTF through the end of the lease, United continued in possession of the RTF and the

8

Having been forced to accede to United's desire to continue rent for the RTF, and having thus been forced to forego rent payments from another potential tenant, the City should not now be penalized by granting United a windfall from the City's pockets.

## VII.    AT BEST, UNITED'S MOTION IS PROCEDURALLY PREMATURE.

United relies on a statement the Court made during the June 19, 2007 hearing as support for filing its Motion to Reject. Motion to Reject at 2. That reliance is misplaced, however, since the very words that United quotes do not support filing its Motion to Reject at this time. As this Court stated: "If you should be successful in an *appeal* of this, obviously, you could reassert the motion." 6/19/07 Op. Tr. at 30:12-14 (emphasis added). Clearly, the Court was contemplating that, if its decision to deny the permanent injunction were reversed by the District Court (or Seventh Circuit) on appeal, and the case remanded, then United could reassert its motion to reject the RTF Lease. There has been no appeal, however. On the two core issues which United could have appealed — United's § 525(a) claim and its § 362(a) claim —  United did not pursue an appeal to the District Court. On the non-core contract issue, United and the City have filed objections to the Court's proposed findings of fact and conclusions of law in the District Court, and, thus, there is no final judgment on that issue. *See* 28 U.S.C. § 157(c)(1). In sum, United has not "been successful on appeal," and thus this Court's statement during the June 19, 2007, hearing did not authorize United' Motion to Reject.

In addition, under United's own theory, its Motion to Reject cannot be brought at this time. Throughout this case, United has taken the position that it can only retroactively reject the RTF Lease when there is a *final* decision upholding its right to operate turboprops at Terminal 8. Specifically, as United summarized in the Motion to Reject, after the Court granted United a preliminary injunction, it filed a motion to retroactively reject the RTF Lease "*contingent* upon its ultimate success on its pending request for a permanent injunction." Motion to Reject at 2

---

City's access to the RTF was certainly not "unfettered." Moreover, since United was *never* forced to move turboprop operations out of Terminal 8, it and it alone decided not to reject the RTF Lease and thus United is the reason why the City "could [*not*] have taken immediate possession and [could *not*] put the facility back in use." *Id*. at 6 (emphasis added).

9

(emphasis added). Thus, United took the position that its motion could not be decided until there was a final decision giving it a permanent injunction. Moreover, as United summarized, after the Court's June 19, 2007, ruling denying it a permanent injunction, it withdrew its motion to retroactively reject the RTF lease "*after* this Court acknowledged that the Original Motion could be reasserted if United were successful in appealing the initial merits determination." *Id.* (emphasis added). Again, United took the position that its motion could not be decided until there was a final decision giving it a permanent injunction. Here, of course, there is no final decision — and there will be no final decision until at least after the District Court issues a decision. Thus, under United's own theory, its Motion to Reject is premature.

## VIII.　BY STIPULATING THAT IT WOULD HAVE 60 DAYS AFTER AN ORDER RESOLVING ITS ADVERSARY COMPLAINT TO "ASSUME OR REJECT THE REMOTE FACILITY LEASE." UNITED IS ESTOPPED FROM SEEKING TO REJECT THE LEASE RETROACTIVELY.

Finally, the January 13, 2006, Stipulated Order only permits United to "assume or reject the Remote Facility Lease." Stipulated Order at 3. Since there is no language in the January 13, 2006 Order that suggests that United has a right to reject the RTF Lease *retroactively*, United is estopped from seeking to do so. Had it never agreed to the Stipulated Order, perhaps United could argue that it could reject the lease retroactively. But, having agreed to the Stipulated Order, which by its plain language only contemplates a *prospective* assumption or rejection of the RTF Lease, it cannot now rewrite that Stipulated Order to give it something which the City never agreed to give United.

## CONCLUSION

For all of the foregoing reasons, the City respectfully requests that the Court deny United's Motion to Reject in its entirety.

Dated:  July 9, 2008

Respectfully submitted,

REED SMITH, LLP,

By:  _____/s/Ann E. Pille_____
Ann E. Pille (ARDC No. 6283759)
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7484
Telephone:  (312) 207-3912
Facsimile:  (312) 207-6400

ROCKARD J. DELGADILLO, City Attorney
KELLY MARTIN, General Counsel
JOHN TAVETIAN, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
     ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:     (310) 646-3260
Telecopy:      (310) 646-9617

   and

John J. Bingham, Jr.
Walter K. Oetzell
Aaron E. de Leest
DANNING, GILL, DIAMOND &
  KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, CA 90067
Telephone:     (310) 277-0077
Telecopy:      (310) 277-5735

   and

Jeffery A. Tomasevich
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone:     (202) 682-3500
Facsimile:     (202) 682-3580

   and

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone:     (310) 788-1000
Facsimile:     (310) 788-1200

*Attorneys for the City of Los Angeles*

11

## <u>CERTIFICATE OF SERVICE</u>

I, Ann E. Pille, an attorney with the law firm of Reed Smith LLP, hereby certify that on June 6, 2008, I served a copy of the following document via e-mail, facsimile, and through the Court's ECF system on each of the parties listed on the attached Core Group Service List and other Affected Entities Service List:  **OPPOSITION BY THE CITY OF LOS ANGELES TO UNITED AIR LINES, INC.'S MOTION TO RETROACTIVELY REJECT THE LAX REMOTE FACILITY LEASE**.

Dated:  July 9, 2008                     REED SMITH LLP

                                         By: =            /s/ Ann E. Pille
                                             Ann E. Pille (ARDC No. 6283759)
                                             REED SMITH LLP
                                             10 South Wacker Drive
                                             Chicago, IL  60606-7484
                                             Telephone:  (312) 207-1000
                                             Facsimile:  (312) 207-6400
                                             Email:    apille@reedsmith.com

# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| UAL CORPORATION, et al., | ) | **Chapter 11** |
| | ) | |
|     **Reorganized Debtors.** | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| _____ | ) | |
| | ) | |
| UNITED AIR LINES, INC., | ) | **Honorable Eugene R. Wedoff** |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Adv. Pro. No. 05-02806** |
| | ) | |
| THE CITY OF LOS ANGELES, a | ) | |
| municipal corporation, and LOS | ) | |
| ANGELES WORLD AIRPORTS, | ) | |
| | ) | |
|     **Defendants.** | ) | |
| | ) | |

**UNITED AIR LINES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO
RETROACTIVELY REJECT THE LAX REMOTE FACILITY LEASE**

    The City's Opposition contains a scattershot of eight separate legal arguments. Boiled down, however, the City essentially makes two main arguments. *First*, the City alleges United's motion is procedurally improper because (a) this Court has already ruled on the merits of United's damages claim and the relief United seeks in this motion is identical to the relief this Court already denied; (b) the Remote Facility Lease has expired, and United thus waited too long to file its motion; (c) United's motion is "procedurally premature" (query how the motion can be untimely and premature at the same time); and (d) United somehow stipulated away its right to seek retroactive rejection. *Second*, the City contends United does not satisfy the legal standards for retroactive rejection because (a) United did not turn over the keys to the Remote Facility to

the City and (b) it is not the City's fault that United delayed rejecting the lease. Each argument is

without merit.

## ARGUMENT

**I.    United's Motion Is Procedurally Proper.**

### A.    The Theories Of Liability Differ For Retroactive Rejection And Breach Of Contract Claims.

According to the City, United is seeking "the same relief" that the Court already denied

in its ruling on United's $4.5 million damages claim.  While United concedes the *relief* is the

same, the *legal standards* for obtaining that relief are different.  Courts typically analyze two

primary factors in determining whether to approve retroactive rejection: (1) whether the debtor

has facilitated the prompt return of the leasehold; and (2) whether the landlord's conduct

impaired the ability to reject.  *See*, *e.g.*, *In re At Home Corp.*, 392 F.3d 1064, 1074-75 (9th Cir.

2004).

In analyzing these factors, however, there is no hard and fast rule.  Instead, courts that

have considered the retroactive rejection issue have "eschew[ed] any attempt to spell out the

range of circumstances that might justify the use of a bankruptcy court's equitable powers in this

fashion."  *Id.* at 1075 (quoting *In re Thinking Machines Corp.*, 67 F.3d 1021, 1029 n.9 (1st Cir.

1995)).  Such an equitable analysis, of course, is far from synonymous with the inquiry whether

an award of compensatory damages is appropriate in a breach-of-contract case.  As such, the

City's argument that the Court's previous ruling on United's damages claim forecloses recovery

under a retroactive rejection theory fails.

### B.    United Sought To Reject The Remote Facility Lease Long Before It Expired And Thus Its Motion To Retroactively Reject That Lease Is Timely.

According to the City, because the Court has not yet ruled on United's motion to

retroactively reject the Remote Facility Lease and because the Remote Facility Lease expired on

August 31, 2007, the motion is untimely.  (City 7/09/08 Op. at 5: "The law is clear that the critical date for determining the executory nature of a contract is the date on which the bankruptcy court **considers** a debtor's motion to assume or reject it." (emphasis added)).  This argument fails both factually and legally.  As a legal matter, "there is a line of cases suggesting that executoriness may be determined on the date the motion to reject or assume is **filed**."  *In re The Penn Traffic Co.*, 2005 WL 2276879, at *4 (S.D.N.Y. 2005) (citing *In re Riodizio, Inc.*, 204 B.R. 417, 421 (S.D.N.Y. 1997) (emphasis added)).

More importantly, as a factual matter, whether the filing date or hearing is the critical date is irrelevant here.  United's motion is timely under either inquiry.  On November 15, 2005 — nearly two years before the expiration of the Remote Facility Lease — United issued a notice of rejection to the City advising that, effective November 30, 2005, United was rejecting the lease for the Remote Facility.  In response, on November 22, 2005, the City sent United a letter advising United that the City was revoking its permission for United to use Turbo-Prop aircraft in the central terminal areas, including Terminal 8.  Based on that notice, on November 30, 2005, United withdrew its Notice of Rejection pending resolution of its dispute with the City about Turbo-Prop use at Terminal 8.  The City concedes this decision by United was reasonable.  (City 7/09/08 Op. at 3:  "United's seeming inability to decide whether or not to reject the RTF Lease is easy to understand.")

After obtaining a preliminary injunction precluding the City from interfering with its air transportation business at Terminal 8, United filed its motion to retroactively reject the Remote Facility Lease on December 21, 2006 — nearly a year before the expiration of the Remote Facility Lease.  That motion was in fact heard on January 4, 2007.  At that hearing, the Court continued United's motion to be heard in connection with the hearing on the United's request for

a permanent injunction.  The continuance was necessary as United's motion was *premature* because the Court had not yet issued a final ruling on the merits of United's underlying claims.[1]

When the Court issued its ruling on the merits on June 19, 2007, United's motion was up for consideration a second time.  Because the Court ruled in the City's favor at that hearing, United withdrew its motion without prejudice after the Court acknowledged that the motion could be reasserted if United were successful in appealing the initial merits determination.  (*See* 6/19/07 Hr'g Tr. at 30:12-14:  "If you should be successful in an appeal of [the Order], obviously, you could reassert the motion.")[2]

Thus, the motion at issue here is not a "new" one.  Rather, United is "reassert[ing]" a motion that had been previously filed, ruled on, and conditionally withdrawn without prejudice with the understanding that a change in the underlying merits ruling would allow United to reassert the previously filed motion.  This is precisely what United is doing here.

The bottom line is that the City's argument that United may not reject the Remote Facility Lease because it has now expired would turn the policy behind retroactive rejection on its head.  The very purpose behind the allowance of retroactive rejection is that it "act[s] as a stimulus to all parties to cooperate in getting the … motion to reject heard and determined at the earliest practicable date."  *In re Thinking Machines Corp.*, 67 F.3d 1021, 1028 (1st Cir. 1995).  Here, United has done everything in its power to have its motion resolved on the merits.  It is only a result of the City's breach of contract as confirmed by this Court (*see* 5/31/08 MOD at 18: "Now that United has established a breach of contract . . . .") and the unusual procedural history

---

[1]    If the City's argument here were to prevail, assuming this Court's June 19, 2007 ruling on the merits had been delayed by even just a few months until September 1, 2007 (the day after the expiration of the Remote Facility Lease), United's motion *never* would have been timely.  Rather, it would have gone from premature to untimely at the stroke of Midnight on August 31, 2007, a result that would be absurd on its face.

[2]    Again, if the City's argument were to prevail, this Court's statement would be meaningless, as there is no chance any appeal would have been completed by August 31, 2007.

of this case that it has been unable to do so.  Simply put, the City should not be rewarded for its ability to delay United's rejection.

**C.    United's Motion Is Not Premature.**

After first arguing that the time period for United to file its motion has expired, the City then bizarrely argues — citing this Court's statement at the June 19, 2007 hearing (quoted above) — that "at best, United's motion is procedurally premature" because there has been no "appeal." (City 7/09/08 Op. at 9)  While this Court is obviously in the best position to interpret its own statements, United respectfully submits the point of the Court's statement was that if the June 19, 2007 ruling was reversed, regardless of which court was responsible for the reversal, United could then reassert its motion.  Again, this is exactly what United has done.

**D.    The January 2006 Stipulated Order Does Not Bar United's Relief.**

The City's argument that the January 2006 Stipulated Order — which provides that United had "60 days after entry of a Bankruptcy Court order resolving within the Adversary Complaint to assume or reject the Remote Facility Lease"  (1/13/06 Order at ¶ 3) — precludes retroactive rejection — is frivolous on its face.  The order is not a waiver by United of its right to retroactively reject the Remote Facility Lease.  Rather, it simply puts a time limit on when United must make a decision on rejection (regardless of whether such rejection is retroactive or not), and United has done so within the 60-day window.

**II.    United's Rejection Of The Remote Facility Lease Should Be Made Retroactive To November 30, 2005.**

According to the City, retroactive rejection is not appropriate because United "never surrendered the premises" of the Remote Facility (City 7/09/08 Op. at 6), and the City is not to blame for the delayed rejection.  The City also contends that United will receive a "windfall" if

the motion is granted and thus equitable factors favor denial of the motion.  Each argument is without merit.

*First,* the City's argument regarding United not surrendering the premises again places form over substance.  There is no dispute that United vacated the Remote Facility in June 2005 and had no intention of returning to that leasehold absent a court order requiring it to do so.  The only reason United did not hand over the keys was because the City was seeking to force United's Turbo-Prop operations back to the Remote Facility.  Had the City not taken these actions, actions this Court concluded amounted to a breach of contract, United would have formally turned the facility over to the City in 2005.

The Ninth Circuit's *At Home* decision could not be more on point.  Similar to the City's argument here, the landlord in *At Home* focused on the formal legal definition of "possession" as opposed to whether the premises had been vacated for all practical purposes.  According to the landlord, rejection of the lease should not have been made retroactive to the motion filing date because the debtor "remained in possession of the leased premises on that date."  392 F.3d at 1071.  The Ninth Circuit rejected the landlord's argument, stating that the landlord's position "would deprive a bankruptcy court of flexibility in molding its orders to reflect the circumstances and the actions of both parties to the lease."  *Id.* at 1072.

The *At Home* court went on to note that the facts in that case were "truly unusual" (although quite similar to the facts here) in that the tenant "paid rent on the two leased buildings for more than a year without ever occupying either one."  *Id.* at 1074.  The court concluded its analysis by stating that the bankruptcy court had correctly "focused on the practical effect, rather than the legal significance, of the lack of occupancy" and that "[b]y not occupying the premises, Debtor made 'it easier for the landlord to re-let [the buildings].'"  *Id.* (quoting underlying

6

decision). Thus, just like in *At Home*, United's decision to vacate the Remote Facility in 2005 is a strong factor in favor of retroactive rejection here.

*Second,* the City is entirely to blame for the delay in rejection here. There can be no dispute that but for the City's breach of contract, United would not have conditionally withdrawn its notice of rejection in January 2006. This alone should end the analysis. *See In re Jamesway Corp.*, 179 B.R. 33, 38 (S.D.N.Y. 1995) (affirming retroactive rejection decision where "the Landlord occasioned the delay in the Bankruptcy Court's ruling on the rejection issue" on the grounds that "[i]f such a delay is allowed to accrue to the benefit of Landlord, then other creditors will have an incentive to delay decisions, by whatever method possible, in order to expand the time before rejection receives court approval").

*Finally*, because the City caused the delay in United's practical ability to reject, the City's argument throughout its brief that a ruling in United's favor will constitute a "windfall" to United makes no sense. The only party receiving a windfall — to the tune of $4.5 million — is the City. Had the City not breached the T-8 Lease and delayed United's rejection of the remote facility lease, it would not have received the extra $4.5 million in rental payments. This is money that rightfully belongs to United, and the City should not benefit from its conduct. To do otherwise merely will be providing other creditors an incentive to delay such rejections. *See In re Jamesway*, 179 B.R. at 38.

## CONCLUSION

For these reasons and the reasons stated in the memoranda in support of United's December 21, 2007 and July 2, 2008 motions, this Court should enter an order: (i) approving United's rejection of the Remote Facility Lease and (ii) making that rejection retroactive to November 30, 2005.

Dated July 14, 2008                **UNITED AIR LINES, INC.**


                                   By: */s/ Micah E. Marcus*
                                   Marc Kieselstein, P.C. (ARDC No. 6199255)
                                   James Joslin (ARDC No. 6229288)
                                   Alex Karan (ARDC No. 6272495)
                                   Micah Marcus (ARDC No. 6257569)
                                   KIRKLAND & ELLIS LLP
                                   200 East Randolph Drive
                                   Chicago, IL 60601
                                   (312) 861-2000 (telephone)
                                   (312) 861-2200 (facsimile)
                                   Counsel for the Reorganized Debtors

# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


UAL Corporation,                    )  No. 02 B 48191
                                    )      05 A 02806
                                    )  Chicago, Illinois
                                    )  10:00 a.m.
                    Debtor.         )  July 16, 2008



TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF



APPEARANCES:

For the Debtors:            Mr. Erik Chalut;
                            Mr. Micah Marcus;

For the City of
Los Angeles:                Mr. Jeffrey Tomasevich;

Appearing Telephonically:

For the City of
Los Angeles:                Mr. John Tavetian;
                            Mr. Marc Cohen;



Court Reporter:             Amy Doolin, CSR, RPR
                            U.S. Courthouse
                            219 South Dearborn
                            Room 661
                            Chicago, IL  60604.

```
 1                   THE CLERK:  UAL Corporation,
 2   02 B 48191, with related adversary, United Air Lines
 3   versus City of Los Angeles, 05 A 2806.
 4                   THE COURT:  Okay.  I understand we
 5   have appearances by telephone.
 6                   Are there appearances by telephone?
 7                   MR. TAVETIAN:  Yes, Your Honor.
 8   (inaudible.)
 9                   THE COURT:  This won't work.  You're
10   completely inaudible.
11                   MR. TAVETIAN:  Is that better?
12                   THE COURT:  That's much better.  Go
13   ahead.
14                   MR. TAVETIAN:  Okay.  I'll do that.
15                   John Tavetian, T as in Tom, a-v, as in
16   Victor, e-t, as in Tom, for City of Los Angeles.
17                   THE COURT:  Okay, Mr. Tavetian.
18                   MR. COHEN:  And Marc Cohen of Kaye
19   Scholer.
20                   THE COURT:  Okay, Mr. Cohen.  You
21   remain virtually inaudible, but I was able to get
22   your appearance.  If you need to make any statements
23   for the record, I would urge you to try to get a
24   better connection or to speak more loudly.
25                   Appearances in the courtroom.
```

1                    MR. MARCUS:  Your Honor, Micah Marcus

2    for United.

3                    MR. TOMASEVICH:  Jeffrey Tomasevich,

4    Kaye Scholer, for the City of Los Angeles.

5                    THE COURT:  Okay.  The first matter on

6    the call today is a motion of Phyllis Carr

7    essentially objecting to a settlement that was

8    reached between herself and United.  And this motion

9    is going to be denied.

10                   The settlement was very clear that the

11   agreed amount of Miss Carr's claim would be paid as

12   an allowed general unsecured claim pursuant to the

13   terms of the plan and that would result in a

14   distribution of stock in a particular amount, which

15   would not necessarily be the value of the allowed

16   general unsecured claim.

17                   All of that was very clear in the

18   documentation.  If there is a misunderstanding, the

19   misunderstanding was one that is simply a result of

20   the quality of the representation that was given to

21   Ms. Carr.  She may have a claim against her attorney,

22   but she has no claim against United.  United did

23   nothing wrong in entering into or complying with the

24   settlement that was reached.  And, therefore, this

25   motion is denied.

1                    MR. CHALUT:  For the record, Erik

2   Chalut.  Thank you, Your Honor.

3                    (Brief interruption.)

4                    THE COURT:  I can hear you now.

5                    MR. COHEN:  Okay, Judge.

6                    THE COURT:  The background music was

7   also appreciated.

8                    So that's denied for the reasons

9   stated on the record.  Next is a motion to --

10                   UNIDENTIFIED SPEAKER:  Hello.  Hello.

11                   THE COURT:  Yes.

12                   UNIDENTIFIED SPEAKER:  Hello.

13                   THE COURT:  We can hear you.  Do you

14   want to enter an appearance?

15                   UNIDENTIFIED SPEAKER:  This is for

16   Phyllis Carr.

17                   THE COURT:  Apparently you missed the

18   ruling that I just gave?

19                   UNIDENTIFIED SPEAKER:  Yes.

20                   THE COURT:  Okay.  The ruling is that

21   the motion is denied.  And very briefly, the motion

22   is denied for the reason that United did nothing

23   improper in either entering into or complying with

24   the settlement agreement that was reached.  To the

25   extent that there was any misunderstanding, the

1    misunderstanding was on the part of Miss Carr's

2    counsel, having nothing to do with United.

3              The settlement is clear on its face.

4    United complied with the settlement.  For that

5    reason, the motion is denied.

6              UNIDENTIFIED SPEAKER:  Well, how is it

7    United complied with the settlement?  I mean, does

8    80,000 equal the 12,000 that was paid out?

9              THE COURT:  What was the term of the

10   settlement was an allowed general unsecured claim of

11   $80,000.  The $80,000 general unsecured claim was

12   paid pursuant to the terms of United's confirmed

13   plan.  That called for a certain amount of United

14   stock to be distributed on account of the claim, and

15   that's what United did.  Again, that's clear from the

16   settlement.  And what United did was appropriate.

17             UNIDENTIFIED SPEAKER:  But, Your

18   Honor, it didn't appear clear in 80,000 is what was

19   agreed to to be paid according to the plan.

20             THE COURT:  That is not correct.  The

21   plan did not provide for 100 percent cash payment of

22   allowed general unsecured claims.  It provided for a

23   mechanism of a distribution of a certain amount of

24   stock.  And to the extent there was a

25   misunderstanding there, it was not caused by anything

1    that United did, and it was not caused by any

2    unclarity in the settlement documentation.

3              The settlement calls for the allowance

4    of an unsecured claim in the amount of $80,000.  It

5    does not call for a cash payment of $80,000.  And,

6    counsel, if you were the one who was involved in

7    this, you may have misunderstood that, but that's

8    your problem and not a problem of anything that

9    United did.  The motion is denied.

10             UNIDENTIFIED SPEAKER:  Well, Your

11   Honor, the thing about it --

12             THE COURT:  I don't think that any

13   further discussion of this point is going to be

14   helpful.  If you disagree with the ruling that I

15   made, I think your recourse is to take an appeal to

16   the district court.

17             UNIDENTIFIED SPEAKER:  Thank you, Your

18   Honor.

19             THE COURT:  Okay, next is the debtors'

20   motion to compel a claimant to have counsel enter an

21   appearance or deny its claim.  That's not the right

22   procedure.  What happens here is that the claim

23   objection has got to be pursued.  If there's a

24   nonappearance by the claimant in response to the

25   claim objection, and the claim objection states a

1    valid basis for objection on its face, I will sustain

2    the objection in the absence of any appearance.

3                But let's assume that you didn't have

4    a good basis for a claim objection, and I looked at

5    the claim objection when you presented it without any

6    response from the plaintiff and saw on its face that

7    the claim objection was invalid.  That's happened,

8    for example, in consumer cases where the basis for

9    the objection was that there was no documentation

10   attached.  And that's not a basis for denial of a

11   claim, disallowance of a claim under 502(b).  So I

12   would overrule the objection even though there was no

13   appearance by the claimant.

14               On the other hand, if it's a valid

15   objection, I'd sustain it.  And the fact that the

16   claimant hadn't appeared would not be relevant.  So

17   denying or disallowing the claim on the basis of

18   nonappearance by a claimant would not be appropriate.

19   And that's effectively what you're asking me to do

20   here.

21               They failed to appear with counsel at

22   their own risk.  They won't be able to make any

23   argument, but that's the situation.

24               UNIDENTIFIED SPEAKER:  May I

25   interrupt?

1                      THE COURT:  If this is the claimant,

2      you just won, so you probably don't want to

3      interrupt.

4                      UNIDENTIFIED SPEAKER:  Okay.

5                      THE COURT:  Okay.  I'm denying this

6      motion for the reasons that I've just stated.  But I

7      will tell you that if there is an objection to your

8      claim presented to the court, you will not be able to

9      argue against it on behalf of your corporation.  A

10     corporation, as this motion suggests, can only appear

11     in court by counsel.

12                      So what I am telling United is that

13     they can proceed against your corporation and you

14     will not be able to respond, and I would rule on the

15     merits in the absence of a response the way I would

16     as a default matter.

17                      MR. MARCUS:  Your Honor, at the time

18     we do proceed, and this is actually a breach of

19     contract defense, I want to make clear that he has

20     had an opportunity to obtain counsel.  I don't want

21     this to be another delay once we get to the end to

22     ask for an extension of time.

23                      THE COURT:  Well, I will address that

24     if and when it becomes an issue.  Meanwhile, this

25     motion will be denied for the reasons stated on the

1    record.

2                    Okay.  And the final United matter on

3    the call today is a motion by United to retroactively

4    reject the LAX remote facilities lease.  And what the

5    briefing has done here is make it pretty clear that

6    the question of retroactive rejection is one that's

7    given to the discretion of the bankruptcy court.

8                    And here I would exercise my

9    discretion against allowing retroactive rejection.

10   And the reason for that is consistent with the

11   expression that I made in the opinion on the

12   complaint in this matter.

13                   United made a decision that it wanted

14   to insure against an adverse decision by this court

15   if the court had held that LAX was within its rights

16   to bar the use of turboprops from the main terminal.

17                   By not rejecting the remote terminal

18   lease by maintaining the status quo pending

19   assumption or rejection, United held on to that

20   lease, with the right then, in the event of an

21   adverse decision, to step into the remote facility

22   and operate its commuter operations from that

23   facility.

24                   LAX, at the same time, was not able to

25   take action that would interfere with that right on

Page 10

1    the part of United.  LAX could not relet the remote

2    facility to some other airline.  It couldn't tear

3    down the remote facility to get more space or build

4    some other facility.  It was legally obligated to

5    maintain that facility for United's purposes,

6    regardless of what the outcome had been.

7                This is a very different situation

8    from one in which a court might determine that there

9    had been an effective abandonment of the premises by

10   the debtor prior to the filing of a bankruptcy case,

11   as in one of the decisions that United cited.

12                Therefore, given the fact that United

13   maintained a legal right to the premises under the

14   lease pending assumption or rejection, it is entirely

15   appropriate that United should pay LAX for the

16   assertion of that right.

17                MR. MARCUS:  May I respond, Your

18   Honor?

19                THE COURT:  Yes.

20                MR. MARCUS:  I think the key to focus

21   on here is the reason why United was forced to do

22   this.  United did not insure its rights solely to the

23   extent of a negative ruling by this court with

24   respect to its right to operate turboprops.  It also

25   did so to the extent if this court were to find that

Page 11

1    indeed we did have a right to operate turboprops but

2    for some reason of equity we weren't entitled to

3    injunctive relief, in that case we would have been

4    forced back to --

5              THE COURT:  So you insured against two

6    possibilities.

7              MR. MARCUS:  But in that case, in that

8    case, we might have suffered additional damages if we

9    did not have -- we might have had additional things

10   we were required to mitigate against as a matter of

11   law.

12             THE COURT:  You were not required to

13   do anything.  You could have taken the position that

14   we are going to win and we will take our chances with

15   respect to the remote terminal.

16             We will take our chances that, A,

17   we're going to win, in which case, no problem, we're

18   not going to pay any rent on the remote terminal and

19   we will suffer no loss, or you could take the chance

20   that LAX, not willing to lose the commuter services

21   that United was providing, would maintain the remote

22   terminal empty until the outcome of this case.

23             And again, that's a possibility or you

24   could do what you did here, which was to assure that

25   LAX could not do anything adverse to United's

1   interest in the remote terminal, essentially paying

2   for an insurance policy.  And it's a perfectly

3   reasonable thing to do, but you cannot charge, in my

4   opinion, in equity, LAX for your decision to insure

5   against an adverse outcome.

6               MR. MARCUS:  As a result of their

7   initial breach which this court has found was a

8   breach and an improper interaction --

9               THE COURT:  Their breach did not

10  require you to pay rent on that terminal.  That was

11  your decision.

12              MR. MARCUS:  That is correct, Your

13  Honor.

14              THE COURT:  Okay.  And that's the

15  basis on which I am exercising my discretion against

16  a long retroactive termination or retroactive

17  rejection, excuse me.

18              MR. MARCUS:  Your Honor, I will just

19  say the issue with respect to the abandonment, I

20  don't think any cases said that abandonment is

21  necessary for purposes of a long, retroactive

22  rejection.  As I said, I understand your position.

23  But just to be clear, this court issued (sic) that

24  there was a breach by the City of Los Angeles.

25              Reasonable litigation, which you said

1    it was perfectly reasonable for us to do this, was to

2    try to avoid additional damages that might be

3    incurred to the extent that there wasn't a hundred

4    percent success in front of this court.

5              THE COURT:  I understand your

6    argument.  I don't accept it.  I don't think it was

7    necessary for you to do that.  I think you made a

8    reasonable business decision.  A business decision,

9    like any purchase of insurance, one could say it is a

10   lucky thing you didn't have to collect on your

11   insurance policy, but you still have to pay the

12   premium.

13             MR. MARCUS:  And one would say it's a

14   $4.5 million windfall to LAX for basically receiving

15   rent by virtue --

16             THE COURT:  No.

17             MR. MARCUS:  -- of their breach.

18             THE COURT:  No, no, no, LAX gave you

19   exactly what you paid for.  They gave you the right

20   to use that remote facility throughout the remaining

21   term of that lease.  You got what you paid for.  It

22   turned out that you didn't need it, but you still had

23   that right throughout the period, and paying for it

24   is appropriate.

25             MR. MARCUS:  Thank you, Your Honor.

1                MR. TOMASEVICH:  Your Honor, just so

2       the record is clear, I want to just make this point,

3       that the $4.5 million which the city received from

4       United, it was prohibited from leasing out that

5       facility to anybody else --

6                THE COURT:  I think I've already made

7       that point.

8                MR. TOMASEVICH:  And I just wanted to

9       say that on the record.  And thank you.

10               THE COURT:  Okay.

11               (Which were all the proceedings had in

12               the above-entitled cause, July 16,

13               2008, 10:00 a.m.)

14      I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
        THAT THE FOREGOING IS A TRUE AND ACCURATE
15      TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
        ENTITLED CAUSE.

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

KELLY M. MARTIN
GENERAL COUNSEL

RAYMOND S. ILGUNAS
ASSISTANT GENERAL COUNSEL

M. LYNN MAYO
D. TIMOTHY DAZÉ
LORI L. KEMP
ANDRE L. ROCHER
BRIAN C. OSTLER
MARK F. BURTON
WILLIAM L. WATERHOUSE
KERRIN I. TSO
SUZANNE E. TRACY
CHRISTOPHER N. LEE
PATRICIA A. MOR
JOHN G. TAVETIAN
TAMAMI YAMAGUCHI



AIRPORT DIVISION
1 WORLD WAY
P.O. BOX 92216
LOS ANGELES, CA 90009-2216

TELEPHONE (310) 646-3260
FAX (310) 646-9617
TELEX 65-3413

## OFFICE OF THE CITY ATTORNEY

ROCKARD J. DELGADILLO
CITY ATTORNEY

December 18, 2007

James C. Joslin, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

Re:   *United Air Lines, Inc. v. The City of Los Angeles and Los Angeles World Airports*,
Adv. Proc. No. 05-02806 (Bankr. N.D. Ill.)

Dear Mr. Joslin:

On June 19, 2007, in the matter of *United Air Lines, Inc. v. The City of Los Angeles and Los Angeles World Airports*, in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Adversary Proceeding No. 05-02806, the Honorable Eugene R. Wedoff denied United's request for an injunction, damages, declaratory relief and other relief relating to United's operation of turboprop aircraft from Terminal 8 at Los Angeles International Airport ("LAX") (the "June 19th Ruling"). In the June 19th Ruling, Judge Wedoff held that "United does not have a contractual right under the T8 Lease to operate turboprop aircraft from Terminal 8." The T8 Lease referenced in the June 19th Ruling is United's lease, dated June 4, 1981, of Terminal 8 at LAX. United filed a motion for reconsideration of the June 19th Ruling, and Judge Wedoff has not yet issued a subsequent ruling in the case.

On September 20, 2007, United and Los Angeles World Airports ("LAWA") entered into a letter agreement ("Letter Agreement") which provided, in part, as follows:

> LAWA has agreed (subject to the other provisions of this letter) that United may continue turboprop operations from Terminal 8 until January 14, 2008. LAWA has also agreed to give United at least 60 days' prior written notice (the "Sixty Day Notice") of LAWA's direction to United to cease such operations, which Sixty Day Notice will not be given before November 9, 2007. If by November 9, 2007, (i) LAWA has not otherwise given a Sixty Day Notice to United, (ii) LAWA and United have not agreed in writing to extend this letter agreement, and (iii) there is no legal order, stay or injunction then in effect prohibiting LAWA from ordering the cessation of turboprop aircraft operations from Terminal 8 at LAX, then United is hereby notified, without further action or notification by LAWA to cease all turboprop aircraft operations from Terminal 8 no later than January 14, 2008.



James C. Joslin, Esq.
December 18, 2007
Page 2

> United acknowledges and confirms that the term of the Commuter
> Terminal Lease, dated October 4, 2002 (the "Commuter Terminal
> Lease"), between United, as tenant, and the City of Los Angeles ("City"),
> as landlord, expired on August 31, 2007. United will continue in
> possession of the property demised under the Commuter Terminal Lease
> until the earlier of (i) the date specified in the Sixty Day Notice or
> (ii) January 14, 2008, and United's occupancy will be a month-to-month
> tenancy as specified in Section 2.2 of the Commuter Terminal Lease, and
> will obligate United to pay all of the rent and other charges due pursuant
> to the Commuter Terminal Lease for United's continued occupancy.
> Except as specifically provided in this Letter Agreement, the rights and
> obligations of the parties under the Commuter Terminal Lease remain
> unchanged. Nothing in this letter agreement shall be construed as
> consent by LAWA or the City to any holding over by United under the
> Commuter Terminal Lease. Subject only to this Letter Agreement, City
> and LAWA expressly reserve the right to require United to surrender
> possession of the property demised under the Commuter Terminal Lease
> in accordance with the terms thereof.

Thereafter, in response to an argument United raised for the first time in "United Air
Lines Inc.'s Response to the City's Motion for Leave, *Nunc Pro Tunc,* to File Two
Additional Briefs Regarding the 'Unmistakability' Doctrine" (filed Friday, December 7,
2007), on Monday, December 10, 2007, the City filed a Motion to Strike, or, in the
Alternative, to Reopen the Record. On December 11, 2007, recognizing that United had
raised a new argument in its December 7 filing, and in light of United's position in open
court that it wanted to continue to make its new argument and that "absolutely we want
to reopen the record," Judge Wedoff reopened the record to permit additional evidence
to be submitted on the meaning of "loading ramps" as that term is used in the Terminal 8
Lease.

In light of (1) the fact that the Court has not yet issued a subsequent ruling in the
adversary proceeding, (2) the Court's decision to reopen the record, and (3) the Court's
direction during the December 11, 2007 hearing, LAWA notifies United as follows.

If Judge Wedoff's subsequent ruling confirms the holding in the June 19th Ruling that
"United does not have a contractual right under the T8 Lease to operate turboprop
aircraft from Terminal 8," LAWA will nonetheless permit United to continue turboprop
operations from Terminal 8 for up to sixty (60) calendar days after Judge Wedoff issues
his subsequent ruling or until March 31, 2008, whichever date is earlier. Accordingly,
consistent with the prior Letter Agreement between the parties, if Judge Wedoff's
subsequent ruling confirms the June 19th Ruling, United is hereby notified, without
further action or notification by LAWA, to cease all turboprop aircraft operations from
Terminal 8 no later than sixty (60) calendar days after Judge Wedoff issues his
subsequent ruling or by March 31, 2008, whichever date is earlier, unless there is a legal
order, stay or injunction in effect that prohibits LAWA from ordering the cessation of
turboprop aircraft operations from Terminal 8 at LAX.

Because of LAWA's operational needs, LAWA cannot and will not extend past January
14, 2008, United's possession of the property demised under the Commuter Terminal

James C. Joslin, Esq.
December 18, 2007
Page 3

Lease, which lease United has acknowledged and confirmed expired on August 31, 2007. LAWA's operational needs include, but are not limited to, the relocation of certain other aircraft operations required by scheduled reconstruction of a taxi lane which will require its closure. The taxi lane closure will require LAWA to prohibit aircraft access to certain parts of the airfield, including certain aprons, to ensure the safe and efficient operation of LAX. Aircraft that LAWA will need to displace to perform the taxi lane reconstruction will need to use the Commuter Terminal until that reconstruction is completed.

Accordingly, as provided in the Letter Agreement, on or before January 14, 2008, United must surrender possession of the property demised under the Commuter Terminal Lease in accordance with the terms thereof. Nothing in this letter shall be construed as consent by LAWA or the City to any holding over by United under the Commuter Terminal Lease.

In addition, nothing in this letter modifies or relieves United of its obligation to comply with the Commuter Terminal Lease requirements, including, but not limited to, its obligation to "[m]aintain and repair the Demised Premises in good and safe condition, in compliance with all requirements of law and in accordance with the Maintenance, Exhibit D," Article 2, Subsection 12.1.1, and to "[k]eep the Demised Premises, at all times, free and clear of weeds, wastepaper, discarded plastic, graffiti, discarded pallets, and all other trash and debris of any kind," Article 2, Subsection 12.1.2. These requirements were addressed in the City's Notice to Cure letter dated December 4, 2007, and nothing in this letter modifies, extends or rescinds in any manner any aspect of the City's Notice to Cure.

Finally, LAWA reiterates the parties' agreement that the previously executed Letter Agreement shall be construed in accordance with and governed by the laws of the State of California (without regard to principles of conflict of laws), and that in any matter relating to the construction or enforcement of the terms of this letter, United and LAWA agree that the courts of the State of California shall have exclusive jurisdiction, and that no other court, including the United States Bankruptcy Court for the Northern District of Illinois, shall have jurisdiction.

Sincerely,

John Tavetian
Deputy City Attorney

13123480.DOC

# EXHIBIT F

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

200 East Randolph Drive
Chicago, Illinois 60601

James C. Joslin
To Call Writer Directly:
(312) 861-2116
jjoslin@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: (312) 861-2200

January 3, 2008

**By UPS**
**By Facsimile**

John Tavetian, Esq.
Deputy City Attorney
Los Angeles Office of the City Attorney
  Airport Division
1 World Way
P.O. Box 92216
Los Angeles, CA 90009

Re: :  *United Air Lines, Inc. v. City of Los Angeles and LAWA*, No. 05-02806

Dear Mr. Tavetian:

This letter responds to your December 18, 2007 letter to me on behalf of the City of Los Angeles and LAWA (collectively, "the City"). Your letter contains several inaccurate statements about the procedural history of the case that do not require a response at this time. As for your apparent purpose in sending the letter — namely, to assert that United must vacate the Remote Facility governed by the October 4, 2002 Commuter Terminal Lease no later than January 14, 2008 ("the Threatened Action") — please be advised that if the City takes the Threatened Action without guaranteeing United access to suitable alternative terminal facilities on reasonable terms to support its continuing turboprop operations at LAX, United will have several additional legal claims against the City. Such claims will include, but not be limited to: (1) a claim for violation of federal law, which ensures United a right of access to LAX on fair, reasonable, and non-discriminatory terms (which right would be violated if the Threatened Action effectively eliminates United's turboprop operations from LAX), and (2) fraudulent inducement and other related business torts (arising from the City having induced United to continue paying rent and other charges under the terms of the Commuter Terminal Lease after its expiration, with no intention of allowing United to continue using that Facility as its needs dictate). In addition, if the City takes the Threatened Action without guaranteeing United access to suitable alternative facilities for its on-going turboprop operations at LAX – which could include the right to continue using Terminal 8 for such operations on terms agreed to between the parties – it is my understanding that the Federal Aviation Administration would have grounds to revoke the City's eligibility to receive federal grants under the Airport Improvement Program. Moreover, if the City takes the Threatened Action and, as a result, United is forced to eliminate

Hong Kong     London     Los Angeles     Munich     New York     San Francisco     Washington, D.C.

# KIRKLAND & ELLIS LLP

John Tavetian, Esq.
January 3, 2008
Page 2

dozens of routes from LAX affecting hundreds of thousands of passengers annually, United will hold the City directly responsible for the tens of millions of dollars of damages that the City's actions will have caused.

Sincerely,

James C. Joslin

cc:     Steven Rasher
        Richard Fiore

# EXHIBIT G



KELLY M. MARTIN
GENERAL COUNSEL

RAYMOND S. ILGUNAS
ASSISTANT GENERAL COUNSEL

M. LYNN MAYO
D. TIMOTHY DAZÉ
LORI L. KEMP
ANDRE L. ROCHER
BRIAN C. OSTLER
MARK F. BURTON
KERRIN I. TSO
SUZANNE E. TRACY
CHRISTOPHER N. LEE
PATRICIA A. MOR
JOHN G. TAVETIAN
TAMAMI YAMAGUCHI
CYNTHIA A. ALEXANDER

AIRPORT DIVISION
1 WORLD WAY
P.O. BOX 92216
LOS ANGELES, CA  90009-2216

TELEPHONE (310) 646-3260
FAX (310) 646-9617
TELEX 65-3413

## OFFICE OF THE CITY ATTORNEY
### ROCKARD J. DELGADILLO
### CITY ATTORNEY

January 10, 2008

**VIA FACSIMILE & U.S. MAIL & E-MAIL**

James C. Joslin, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

Re:    *United Air Lines, Inc. v. The City of Los Angeles and Los Angeles World Airports,*
       Adv. Proc. No. 05-02806 (Bankr. N.D. Ill.)

Dear Mr. Joslin:

I write in response to your letter of January 3, 2008, which responded to my letter sent on December 18, 2007.

This letter notifies United that, consistent with federal law, the City of Los Angeles ("City"), by and through Los Angeles World Airports ("LAWA"), intends to make the Commuter Terminal Facility available as a common-use facility to all airlines — including United Air Lines, Inc. ("United") to operate its turboprop operations at Los Angeles International Airport ("LAX") — on reasonable conditions[1] and without unjust discrimination.

This letter also notifies United that, in the event the Bankruptcy Court issues a subsequent decision in the City's favor confirming its ruling of June 19, 2007, LAWA expects that United will immediately comply with the termination notice previously provided to United and cease its turboprop operations at Terminal 8.

Accordingly, LAWA urges United to sit down with LAWA staff as soon as possible to discuss United's current and future operational needs for its turboprop operations at LAX so that the parties can try to formulate an agreed-upon contingency plan to move United's turboprop operations out of Terminal 8 (the "Contingency Plan") in the event that the Bankruptcy Court confirms its June 19, 2007, ruling.  LAWA cannot formulate

---

[1] The City will make the Commuter Terminal Facility available to all airlines (including United) on the terms and conditions set forth in the Los Angeles International Airport Passenger Terminal Tariff (available at http://www.lawa.org/lax/laxTariff.cfm).



James C. Joslin, Esq.
January 10, 2008
Page 2

such a Contingency Plan by itself — LAWA needs information from United that only United has.

With respect to United's threats of bringing additional claims against the City (including, but not limited to, any claim of violating federal law, any claim of "fraudulent inducement" (or "other business torts"), and any claim for monetary damages), the City specifically disclaims any and all alleged liability. Any and all damage that United alleges it might sustain would be the direct result of <u>United's failure</u> to work with the City to formulate an agreed-upon Contingency Plan to move its turboprop operations from Terminal 8.

Specifically addressing United's so-called "fraudulent inducement" claim, the City notes that the terms of and time frame for United's continued use of the Commuter Terminal Facility (no later than January 14, 2008) were agreed to by United, as documented in the September 20, 2007, letter agreement between United and LAWA (the "September 20 Letter Agreement").[2] Moreover, at any time prior to January 14, 2008, United could have moved its turboprop operations to the Commuter Terminal Facility. The City in no way impeded United's ability to do so. United, however, has not moved any of its operations to the Commuter Terminal Facility. Instead, it chose to continue to pay for a facility that it had agreed to vacate on or before January 14, 2008. Indeed, since at least November 9, 2007, pursuant to the terms of the September 20 Letter Agreement, it has been clear that, pursuant to that letter agreement, United must vacate the Commuter Terminal Facility on or before January 14, 2008, and yet your January 3, 2008, letter was the first communication the City received that suggested that United did not want to do so.

Finally, United's implied assertion that it has been using the Commuter Terminal Facility building is false. United has not used the Commuter Terminal Facility building for several years. As recently as last month, it was lying in a state of disrepair and abandonment, with trash, debris and wastepaper strewn about (among other things). The City documented the poor condition of the Commuter Terminal Facility building in thirty (30) photographs attached to the City's Notice to Cure letter dated December 4, 2007. These photographs evidenced that United had failed to "[m]aintain and repair the Demised Premises in good and safe condition, in compliance with all requirements of law and in accordance with the Maintenance, Exhibit D," Article 2, Subsection 12.1.1, and had failed to "[k]eep the Demised Premises, at all times, free and clear of weeds, wastepaper, discarded plastic, graffiti, discarded pallets, and all other trash and debris of any kind," Article 2, Subsection 12.1.2.

---

[2] As United acknowledged and confirmed in the September 20 Letter Agreement, United's Commuter Terminal Facility lease expired on August 31, 2007. The City permitted United to continue in possession of the property demised under the Commuter Terminal Lease until no later than January 14, 2008, pursuant to the terms and conditions set forth in the September 20 Letter Agreement.

James C. Joslin, Esq.
January 10, 2008
Page 3


To the extent that United does not leave the Commuter Terminal Facility in an
acceptable condition upon its vacation, it will obviously take the City longer to renovate
and refurbish that facility which would likely delay the City's ability to make the facility
available as a common-use facility for all airlines (including United's turboprop
operations should that become necessary).  Accordingly, we urge United to comply fully
with the lease requirements which were addressed in the City's Notice to Cure letter of
December 4, 2007.

                            Sincerely,



                            John G. Tavetian
                            Deputy City Attorney

JGT:rw