**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| Reorganized Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **UNITED AIR LINES, INC.,** | ) | **Adversary Proceeding No. 05-02806** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **08 cv 3337** |
| | ) | |
| **THE CITY OF LOS ANGELES, a** | ) | **Judge Moran** |
| **municipal corporation, and LOS** | ) | **Magistrate Judge Schenkier** |
| **ANGELES WORLD AIRPORTS,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED AIR LINES' RESPONSE TO DEFENDANTS'
OBJECTION TO THE BANKRUPTCY COURT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

James Joslin (ARDC No. 6229288)
Alex Karan (ARDC No. 6272495)
Micah E. Marcus (ARDC No. 6257569)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Dated: August 15, 2008                    Counsel for United Air Lines, Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I.    United's Contractual Relationship With The City................................................3

    A.    Overview Of LAX ....................................................................................3

    B.    The Relevant Leases ................................................................................6

        1.    United's Specific Preferential Rights at T8 ................................7

        2.    The T-8 Lease Governs The Portion Of The Ramp Or Apron On Which Aircraft Park.................................................................8

        3.    The T8 Lease Prevents The City From Enforcing Rules Or Regulations That Contravene The Terms Of The Lease. ..........10

    C.    The Air Carrier Operating Permit Governs Common Use Areas Of LAX............10

II.    Historical Turbo-Prop Operations At LAX ..........................................................11

    A.    United's Operations Of Turbo-Props From The Central Terminal Area From The Early 1990s - 2005 ...............................................................11

    B.    The City Has Historically Permitted Many Carriers To Operate Turbo-Props In The Central Terminal Area...........................................12

III.    United's Decision In 2005 To Consolidate All United Express Operations At T8 ..........12

IV.    The City's Initial Response To United's Decision To Consolidate All United Express Operations At T8................................................................................14

V.    United's Attempted Rejection Of The Remote Facility Lease ..........................14

VI.    The City's November 30, 2005 Notice Had Nothing To Do With Safety.........15

ARGUMENT ................................................................................................................18

I.    The Doctrine Of Primary Jurisdiction Does Not Apply Here...........................19

II.    The Terminal 8 Lease Grants United The Right To Operate Aircraft On The Loading Ramps Adjacent To Terminal 8..........................................................22

ii

A.      Loading Ramps Are The Portions Of the Pavement Adjacent To a
        Terminal Where Aircraft Park, Load, And Unload Passengers. ........................... 23

B.      The ACOP Is Not Relevant To The Parking, Landing, And Unloading Of
        Aircraft At Terminal 8. ............................................................................................ 27

III.    The City's Alternative Attempts To Avoid Application Of The T8 Lease Are
        Without Merit ................................................................................................................... 28

A.      The Unmistakability and Reserved Powers Doctrines Do Not Apply
        Where A Government's Police Power Is Not At Issue. ........................................ 28

B.      The City's Express Agreement To Limit Regulation Renders The
        Unmistakability Doctrine Inapplicable. ............................................................... 31

C.      The 1997 Resolution Does Not Preclude United's Turbo-Prop Operations
        At The Main Terminal. ......................................................................................... 31

D.      United's Demonstration Of Irreparable Harm Justifies Injunctive Relief. ........... 32

IV.     The City's Remaining Arguments Are Frivolous. ............................................................. 34

A.      Skywest Does Not Sublease United's Gates. ......................................................... 34

B.      The City's "Due Process" Argument Ignores The Entire Record In This
        Case. ..................................................................................................................... 35

CONCLUSION ...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Air Transp. Assoc. of Am., Inc. v. Cuomo,*
   520 F.3d 218 (2d Cir. 2008)................................................................. 2, 21, 30

*AMAV, Inc. v. Maryland Aviation Admin.,*
   FAA Docket No. 16-05-12,
   2006 WL 2038717 (Mar. 20, 2006) ............................................... 20

*Bedford Inv. Co. v. Folb,*
   79 Cal. App. 2d 363,
   180 P.2d 361 (Cal. Ct. App. 2nd Dist. 1947).................................. 35

*Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.),*
   No. Civ. A. 03-12215RGS,
   2004 WL 1778881 (D. Mass. Aug. 9, 2004) .................................. 25

*Bowen v. Public Agencies Opposed to Social Sec. Entrapment,*
   477 U.S. 41, 106 S.Ct. 2390,
   91 L.Ed.2d 35 (1986) .................................................................... 31

*Cleveland Hair Clinic, Inc. v. Puig,*
   968 F. Supp. 1227 (N.D. Ill. 1996) ............................................... 33

*Colorado Public Utilities Comm'n v. Harmon,*
   951 F.2d 1571 (10th Cir. 1991) .................................................... 21

*Cross Wood Products, Inc. v. Suter,*
   422 N.E.2d 953 (1st App. Ct. 1981) ............................................. 33

*Edward Mainardi, Sr. v. Lincoln Park Airport, Inc.,*
   FAA Docket No. 16-02-12,
   2004 WL 3198203 (Oct. 18, 2004).............................................. 2, 19

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,*
   109 Cal. Ct. App. 4th 944 (Cal. App. 4th Dist. 2003) ................... 23

*Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach,*
   86 Cal. App. 4th 534 (Cal. Ct. App. 2nd Dist. 2001) .................... 29

*Horwitz-Matthews, Inc. v. City of Chicago,*
   78 F.3d 1248 (7th Cir. 1996) ........................................................ 29

*In re Kroner*,
    953 F.2d 317 (7th Cir. 1992) ....................................................................... 19

*Johnson v. Artim Transp. Sys., Inc.*,
    826 F.2d 538 (7th Cir.1987),
    *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1998,
    100 L.Ed.2d 229 (1988) ............................................................................. 19

*Kendra Oil & Gas, Inc. v. Homco, Ltd.*,
    879 F.2d 240 (7th Cir. 1989) ...................................................................... 19

*Kimberly Assoc. v. U.S.*,
    261 F.3d 864 (9th Cir. 2001) ...................................................................... 29

*Limberopoulos v. First Midwest Bank (In re Limberopoulos I)*,
    No. 02 C 705,
    2002 WL 1163733 (N.D. Ill. May 31, 2002) .................................................. 19

*McGrath v. Rhode Island Retirement Bd.*,
    88 F.3d 12 (1st Cir.1996) ........................................................................... 30

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) .................................................................. 2, 21

*Morris Waller and M&M Transp. v. The Wichita Airport Auth.*, *The City of Wichita,*
    *Kansas, and Castle Rock Constr. Co.*,
    FAA Docket No. 16-19-13,
    1999 WL 500028 (Mar. 12, 1999) ............................................................... 20

*Oceanside 84, Ltd. v. Fidelity Federal Bank*,
    56 Cal. App. 4th 1441 (Cal. Ct. App. 2nd Dist. 1997) ................................... 23

*Petrzilka v. Gorscak*,
    556 N.E.2d 1265 (Ill. App. Ct. 2nd Dist. 1990) ............................................ 34

*Rowe v. New Hampshire Motor Transp. Ass'n*,
    128 S. Ct. 989 (2008) ................................................................................ 30

*Tasch, Inc. v. Sabine Offshore Serv., Inc., and Diamond Offshore Drilling, Inc.* (*In re*
    *Tasch, Inc.*),
    No. Civ. A. 98-3746,
    2001 WL 1398644 (E.D. La. Nov. 8, 2001) ................................................... 25

*The Ratcliff Architects v. Vanir Constr. Mgmt., Inc.*,
    88 Cal. App. 4th 595 (Cal. Ct. App. 1st Dist. 2001) ...................................... 27

*Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*,
    73 F.3d 1423 (7th Cir. 1996) ........................................................ 21

*Trustees Of The AFTRA Health Fund v. Biondi*,
    303 F.3d 765 (7th Cir. 2002) ........................................................ 21

*U.S. v. Mahone*,
    537 F.2d 922 (7th Cir. 1976) ........................................................ 26

*United States v. Johnson*,
    467 F.2d 804 (1st Cir. 1972) ........................................................ 26

*United States v. Western Pac. R.R. Co.*,
    352 U.S. 59 (1956) ........................................................ 19

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ........................................................ 29

*Vogel v. American Soc'y of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) ........................................................ 33

*Walgreen Co. v. Sara Creek Prop. Co.*,
    966 F.2d 273 (7th Cir.1992) ........................................................ 34

*White v. Davis*,
    108 Cal. App. 4th 197 (Cal. Ct. App. 2nd Dist. 2002) ...................... 29

**Other Authorities**

49 U.S.C. § 41713(b)(1) ........................................................ 21

CA Civ. Code, § 1639 ........................................................ 23

CA Civ. Code, § 1644 ........................................................ 23

## INTRODUCTION

This is a straightforward breach-of-contract case that the City of Los Angeles and Los Angeles World Airports (collectively, "the City") have attempted to transform into a confusing interplay between federal aviation regulations, the police power of a sovereign entity, national security, and a host of other issues (thirty three arguments and sub arguments, to be precise). To this end, throughout its 60-page objection to the Bankruptcy Court's proposed findings of fact and conclusions of law, the City repeatedly creates a "straw man" argument by attempting to frame the issue as whether the City has the ability "to regulate United's aircraft operations at LAX." (City 6/30/08 Op. at 30; *see also id.* at 31 ("the Terminal 8 Lease does not contain any provision that gives United the right to operate aircraft of any kind, including turboprops, at LAX."); *id* at 32 ("United's right to operate aircraft from LAX does not come from its Terminal 8 Lease . . . ."); *id.* at 33 (similar); and *id* at 34 (similar)). These sweeping general statements from the City are far removed from the narrow issue here.

This case is *not* about, among other things, which aircraft United can operate into and out of Los Angeles International Airport ("LAX"), which runways and taxiways United can use for its operations, how fast United can fly its aircraft into LAX, how fast United can drive its aircraft once at LAX, which schedules United can set for its operations, or the appropriate fee United must pay for each takeoff and landing. Rather, the exceedingly narrow issue here is whether United has a contractual right under its terminal lease ("the T8 Lease") with the City to *park, load, and unload* FAA-approved commercial aircraft — that is, aircraft (in this case, United's turboprop aircraft) which United has a federal right to fly into and out of LAX — at its terminal 8 leasehold.

With this appropriately more narrow focus in mind, the issues for this Court shrink from dozens to just three: (1) should the Bankruptcy Court have referred this breach-of-contract action to the FAA under the doctrine of "primary jurisdiction"? (2) does the T8 Lease govern what United can and cannot do on the concrete parking positions adjacent to terminal 8 at LAX? and (3) if the T8 Lease provides United the right to park its turboprop aircraft at its leasehold for loading and unloading passengers in connection with its air transportation business, whether some exception to the lease terms, such as the "reserved powers" or "unmistakability" doctrine, dictate a different result?  The Bankruptcy Court correctly answered each of these questions in favor of United here:

- **First,** primary jurisdiction does not apply because disputes over contracts between an airport and an airport user "are a matter of state law and outside FAA's Part 16 jurisdiction." *Edward Mainardi, Sr. v. Lincoln Park Airport, Inc.*, FAA Docket No. 16-02-12, 2004 WL 3198203, at *12 (Oct. 18, 2004). (*See also* Wedoff Op. at 4: "No regulation of the Secretary of Transportation or the Federal Aviation Administration has any bearing on this contract dispute . . . .")  While the City tries to inject issues of "safety" and "efficiency" into the equation in an effort to create a federal regulatory issue where none exists (and thus presumably strengthening its primary jurisdiction argument), the Bankruptcy Court correctly found that "rather than being concerned with safety, the City's decision to prohibit turboprop operations from the central terminal facility was based on a desire to increase passenger capacity at LAX," which as it relates to "air carrier contracts is essentially a financial transaction." (*Id.* at 16-17)  In addition, in the event the City convinces this Court that the issues in this case fall within a federal regulatory scheme, the City will have then walked itself directly into the wall of federal preemption. *See Air Transp. Assoc. of Am., Inc. v. Cuomo*, 520 F.3d 218, 225 (2d Cir. 2008) ("'[T]he FAA [Federal Aviation Act] preempts the entire field of aviation safety through implied field preemption.  The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel, which are not subject to supplementation by . . . state laws.'") (quoting *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007)).  With the FAA regulatory scheme in play, the local regulation on which the City has attempted to rely in its efforts to preclude United's turboprop operations at T8 would be preempted by federal law.

2

- **Second,** numerous provisions of the T8 Lease make clear that the terms of the lease extend beyond the four walls of the terminal building and thus the lease grants United the right to operate its air transportation business (of which turboprop operations are indisputably a part) inside and adjacent to the terminal building.  As an initial matter, a terminal lease would be virtually worthless to an airline if it did not grant the airline the right to conduct its air transportation business from that terminal.  Moreover, the lease here makes clear that United has the "first right of use" of "aircraft parking/loading positions" during the term of the T8 Lease and that, so long as United continues to exercise this "right," the City is required to assign the "gate positions and loading ramps" that are "next adjacent" to the terminal to United.  (*See* Background § I.B, below)  The T8 Lease also precludes the City from issuing any regulations contrary to the terms of the lease (*id*. at § I.C), which the City has impermissibly attempted to do here.  Simply put, the T8 Lease grants United the right to operate its air transportation business at and adjacent to the terminal.

- **Third,** neither the "reserved powers" nor "unmistakability" doctrine has any application here.  While the City contends the "reserved powers" doctrine applies because of the City's asserted safety concerns, the evidence is overwhelming that the City's attempts to ban turboprops from Terminal 8 had nothing to do with safety and thus the City's asserted reasons for its actions were entirely pretextual.  (*See* Background § VI)  As for the unmistakability doctrine, the Bankruptcy Court correctly held that "[e]ven if the T8 lease, as an essentially financial transaction, is subject to the doctrine, the lease does in fact restrict future regulation in unmistakable terms."  (Wedoff Op. at 17-18, citing §§ 23 and 30 of the T8 Lease).

The bottom line is that United has a contractual right to operate its air transportation business from T8.  As such, this Court should (i) adopt the Bankruptcy Court's proposed findings of fact and conclusions of law that reach the same conclusion and (ii) enter a permanent injunction on the same terms as the injunction entered by the Bankruptcy Court.

## BACKGROUND

**I.    United's Contractual Relationship With The City**

**A.    Overview Of LAX**

The Bankruptcy Court succinctly described the configuration of the terminal buildings at LAX:

3

The facilities at Los Angeles International Airport include a large central terminal area composed of nine separate terminals or "satellite buildings." Three of these terminals, designated T1 through T3, are on the north side of the central terminal area. One, the Tom Bradley International Terminal, is on the west end, and the remaining five, T4 through T8, are on the south end. In addition to the central terminal area, there are three remote terminals separate from the central terminal area.

(Wedoff Op. at 5-6; internal citations omitted) Figure 1 below depicts the central terminal area:

### FIGURE 1: THE CENTRAL TERMINAL AT LAX



Source: LAWA (http://www.lawa.org/lax/).

The Bankruptcy Court also noted: "United's current operations at LAX are conducted exclusively from gates at T6, T7, and T8. However, until June 2005, United conducted substantial commuter operations, using smaller, turboprop aircraft, from a remote terminal east of the central terminal area." (*Id*. at 6; internal citations omitted) The areas at LAX of United's operations are depicted in Figure 2 below (City Ex. 21)[1]:

---

[1]   The parties provided the record to this Court in three volumes: (1) the City's trial exhibits; (2) United's trial exhibits; and (3) the relevant docket entries (including the trial transcripts). City trial exhibits are cited herein
(continued)

FIGURE 2: UNITED'S LEASEHOLD AT LAX



Finally, with respect to the concrete portions of the pavement at the airport, there are three universally accepted broad categories: (1) the "runways" (depicted above in Figure 2) from which planes take off and land; (2) the "taxiways," which provide immediate access to the runways (*see* Figure 3, below); and (3) the "ramp" or "apron," which is the large concrete portion of pavement adjacent to a terminal building (the entire light gray portion of Figure 3). The parties agree that "'the terms ramp and apron are synonymous . . . .'" (*See* City 6/30/2008 Obj. at 41 (quoting FAA regulations)) In addition, as explained in more detail below, the

---

as "City Ex. __ at __," United trial exhibits are cited herein as "United Ex. __ at __," and docket entries are cited herein as "DE#__ at __."

"loading ramp" is the portion of the ramp/apron on which aircraft park adjacent to the terminal building.  (*See* Background § I.B.2, below)

**FIGURE 3:  FACILITIES ADJACENT TO TERMINAL 8**



Source:  United Ex. 128.

## B.    The Relevant Leases

United is a party to two leases with the City for use of its air transportation business at Terminal 6 ("T6"), Terminal 7 ("T7"), and T8 at LAX.  (United Exs. 1 and 2; 7/27/2006 Tr., 65:15-66:15 and 70:9-24)  United operates at T7 and T8 pursuant to a lease ("the T8 Lease") entered into in 1981, and it operates at T6 pursuant to a lease ("the T6 Lease") entered into in 1999.  (*Id.*)  Until United consolidated all of its turboprop operations at T8 in 2005, United's operations at the remote facility were pursuant to a lease ("the Remote Facility Lease"), which expired on August 31, 2007.  (United Ex. 3)

Both the T6 and T8 Leases are preferential leaseholds, which simply means that United "has the right to use the gate but can be required to allow use by other airlines under defined conditions."  (Wedoff Op. at 10, n. 8; citing Tr. Vol. I at 71-72)  Such preferential use rights are a middle form of control, between exclusive use (in which the airline has complete control over the gates at the leasehold) and common use (in which there are no fixed rights of

6

any airline and the airlines must share the leasehold equitably).  (*Id.*)  As the Bankruptcy Court recognized (and which is not in dispute), United was able to negotiate the preferential rights in the T8 Lease in exchange for its agreement to undertake the financial responsibility for the new terminal construction.  (*Id.* at 17)

Before the T8 Lease was executed in 1981, United operated at LAX under a lease sometimes referred to as Lease Agreement 1115.  (City Supp. Ex. 1)  That Lease gave United "common use" lease rights at LAX.  (*Id.* at 1 (Preamble))  Thus, the T8 Lease bestowed to United, for the first time, preferential gate rights at LAX.

### 1.    United's Specific Preferential Rights at T8

With respect to the scope of United's preferential gate rights at T8, the T8 Lease provides:

> All assignments of gate positions and aircraft loading ramps shall be made in strict accordance with rules, regulations and directives adopted and promulgated by the Board. . . .  Such rules, regulations and directives ***shall provide for the preferential***, but not exclusive, assignment by the General Manager ***of gate positions and loading ramps*** to the Lessee of the demised premises next adjacent to each gate position and loading ramp, ***taking into account said Lessee's needs and requirements for the use thereof***.  It is further understood that the gate positions and loading ramps are to be used for the loading and unloading of aircraft in passenger service in keeping with industry practice at the Airport.  To facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport, at the direction of the General Manager, Lessee agrees not to use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes.

(United Ex. 1 at UAL-RE 015494) (emphasis added)  "Preferential Use," in turn, is defined as the "first right of use" of "aircraft parking/loading positions" during the term of the T8 Lease.  (United Ex. 1 at UAL-RE 015419)  Stated differently, so long as United is exercising its first right of use of the "parking/loading positions" at T8 (something the City has never claimed

United has failed to do over the twenty-seven year history of the lease), United can use those parking positions to conduct its air transportation business to the exclusion of other carriers.

> **2.    The T-8 Lease Governs The Portion Of The Ramp Or Apron On Which Aircraft Park.**

Given that the terms of the T8 Lease extend to the aircraft "parking/loading positions," one would have expected that there would be no dispute as to whether the lease governs the portion of the pavement adjacent to the terminal building on which the aircraft park for passenger loading and unloading.  The City, however, contends that the scope of the T8 Lease does not extend to this portion of the ramp/apron.  According to the City's latest position, the phrase "loading ramps" in Section 23 describes a "a conveyance outside the terminal building that passengers use to descend from the terminal area to the apron."  (City 6/30/08 Obj. at 43) Unfortunately for the City, this position is contradicted by its own key witness, its own pleadings, and (most importantly) numerous provisions of the T8 Lease.

The City's primary witness in the case, Michael Digiralamo (who is the City's Deputy Director of Airport Operations), testified on direct examination:

> Q:    Okay.  Now, let me back up for half a second just so that we're all on the same page.  What's a gate?
>
> A:    A gate is a facility of which you load and offload passengers from an airplane.
>
> Q:    Was that separate from a loading apron or a loading ramp?
>
> A:    Well, semantically, over time it changed.  The semantics changed where you would have an apron which was adjacent to a building.  But as we got more sophisticated and the invention of passenger bridges, then it became a little more refined to what a gate is versus just an apron where you would have a single entrance maybe serving two different airplanes.
>
> Q:    Am I hearing you that the term "gate" is sort of a construct?

A:     Yeah, yes.

Q:     *The loading apron or the loading ramp is where the plane sits; is that right?*

A:     *Right.*

Q:     And you pass through a gate to get to the loading ramp?

A:     Yeah, you could say that.  Yes.

(3/15/2007 Tr. at 109:15-110:13 (Digiralamo)(emphasis added).  The City, in its initial post-trial brief, then cited this testimony in support of the proposition that "*a loading ramp is where an airplane sits during loading and unloading operations.*"  (DE #140 at 26, n. 11 (emphasis added; citing M. Digiralamo); *see also id.* at 26, n.12: "Loading ramps, the portion of the apron on which aircraft park while engaged in passenger loading and unloading and related activities, are referred to in Section 23 [of the T8 Lease] . . . .")  Stunningly, the City's Objection reads as if these admissions were never made.

The definition of "loading ramp," however, need not turn on flip flopping witnesses or lawyers.  Rather, the fact that the loading ramp is the portion of the concrete apron or ramp on which the aircraft park is confirmed by numerous sections of the lease:

- The last sentence of Section 23 of the T8 Lease provides: "Lessee agrees not to use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes."  (United Ex. 1 at UAL-RE 015494)  If the "loading ramps" were not a portion of the pavement itself, Section 23 would make no sense.  Planes necessarily park on the pavement, not on a passenger conveyance.

- Section 22 of the T8 Lease states the "City is providing as *a means of access for aircraft* between the Satellite Buildings and the taxiway and runway system of the Airport, large areas of apron pavement, airplane gate positions and aircraft loading ramps in the area immediately adjacent to and surrounding the Satellite Buildings."  (*Id.* at UAL-RE 015493) (emphasis added)  Because this provision clearly relates to the *movement* of aircraft, the phrase "airplane gate positions and aircraft loading ramps" plainly refers to an area on the pavement immediately adjacent to the terminal and not simply the

9

opening in the side of the terminal building or a conveyance between the terminal and concrete.

- In Section 24 of the T8 Lease, the City "reserves the right to regulate *the use of vehicles* and automotive equipment upon, *over and across the apron and loading ramps* around the passenger terminals at Airport." (*Id.* at UAL-RE 015494) (emphasis added)  Because vehicles drive on concrete, not passenger conveyances, the City's proposed definition is patently absurd.

### 3.    The T8 Lease Prevents The City From Enforcing Rules Or Regulations That Contravene The Terms Of The Lease.

The T8 Lease also explicitly prevents the City from promulgating or enforcing any rules or regulations that contravene United's right to operate its air transportation business (including turboprops) at T8:

> The leasehold estate herein created shall be subject to any and all applicable rules, regulations, orders and directives governing Lessee's use and occupancy of the demised premises in effect at the commencement of this Lease or thereafter promulgated during the term hereof . . . provided that the rules, regulations, orders, directives, laws, ordinances and statutes of City (including Board and General Manager) *shall be reasonable and not inconsistent with or contravene the rights granted to Lessee under this Lease.*

(United Ex. 1 at UAL-RE 015501) (emphasis added)

### C.    The Air Carrier Operating Permit Governs Common Use Areas Of LAX.

The ACOP is a permit governing "the use of landing facilities" at LAX that every commercial carrier operating at LAX is required to sign.  (City Ex. 8 at LA 00183, 00190)  The term "landing facilities," in turn, is defined as "[c]ommon use areas of the airfield, which include the runways, taxiways, service roads, and *common use ramps*."  (*Id.* at LA 00193) (emphasis added)  The ACOP further requires that carriers utilize only FAA-approved aircraft at the airport. (*Id.* at LA 00196)  Moreover, in exchange for the right to land FAA-approved aircraft at LAX, the carriers agree to pay a "landing fee" (and in the case of those aircraft "parking in public parking in common use parking areas" a parking fee) depending on the number of landings and

10

size of aircraft.  (*Id.* at LA 00199)  That the scope of the ACOP is limited to common use areas

of the airport (as opposed to, as the City contends, preferential use leaseholds such as T8) is

further confirmed by the  "operating rights" portion of the ACOP.  (*Id.* at LA 00195:  "Permittee

shall have the right to use, *in common with others* . . . ." and *id.* at 00195-96:  "In the loading

and unloading of passengers, Permittee shall have the non-exclusive right to use, in *common

with others* … .") (emphasis added)  Finally, the ACOP has a five-year term, but is cancelable by

the City upon thirty-days' notice.  (*Id.* at LA 00199)

## II.    Historical Turbo-Prop Operations At LAX

### A.    United's Operations Of Turbo-Props From The Central Terminal Area From The Early 1990s - 2005

United has regularly conducted its air transportation business at LAX with a mix

of mainline jet aircraft and smaller regional aircraft including turboprops.  (7/27/2006 Tr. at

66:16-67:1 and 70:21-24)  United operates its regional jets and Turbo Props under the "United

Express" banner through contracts with regional carriers, including Skywest Airlines at LAX.

(7/27/2006 Tr. at 37:13-38:6; 162:15-165:1)

In 1993, United began to operate some, but not all, of its turboprop aircraft from

the newly constructed Remote Facility.  (7/27/2006 Tr. at 104:25-106:23 and 125:16-126:15)

United's decision to move some operations to the Remote Facility was driven by United's

immediate needs for additional gate space; the decision was completely voluntary and was not

the result of any pressure from the City.  (7/27/2006 Tr. at 106:24-107:17 and 162:6-163:1)

Despite moving some of its turboprops to the Remote Facility in 1993, United continued

operating turboprops from the central terminal area nearly continuously through May 2005.  (*See*

DE #144 (stipulation regarding extent of turboprop operations at central terminal areas))  In fact,

in 2003, United moved its numerous daily flights to and from San Diego — United's single largest turboprop destination in terms of frequency — from the Remote Facility to T8 without any objection from the City. (7/27/2006 Tr. at 107:18-108:10)  Indeed, at no time before June 2005 did the City ever suggest to United that United was not permitted to operate turboprop aircraft at T8 or anywhere else from which United conducted operations in the central terminal area. (*Id*. at 108:11-20, 109:13-24, 116:14-117:1, and 163:9-19)  This is likely because, as the former executive director for the City conceded, the City did not believe it "had control over" United's leasehold at T8. (3/15/2007 Tr. 78:8-13)

**B.    The City Has Historically Permitted Many Carriers To Operate Turbo-Props In The Central Terminal Area.**

The operation of turboprops in the central terminal area is not, and never has been, exclusive to United.  To the contrary, like United, numerous other carriers have conducted turboprop operations in the central terminal area at LAX for well over a decade, including at least two other carriers as of the date of the trial on this matter. (7/27/2006 Tr. at 126:6-23, 163:20-165:8; 7/28/2006 Tr. at 6:9-18; DE #144)  Consistent with the operation by other carriers of turboprops out of the central terminal area, the record unequivocally establishes that, prior to the City sending its June 3, 2005 letter to United, the City had ***never even suggested*** to a long-term leaseholder with preferential gate rights at LAX that such a leaseholder was prohibited from operating turboprops out of the central terminal area. (7/27/2006 Tr. at 109:13-24; 165:10-14; 7/28/2006 Tr. at 24:23-25:15)

**III.    United's Decision In 2005 To Consolidate All United Express Operations At T8**

In December 2002, United filed for protection under chapter 11 of the Bankruptcy Code.  As part of its overall restructuring efforts, United engaged in a massive operational

restructuring aimed at increasing efficiency of its air transportation business and, in particular, its utilization of real estate in connection with these operations. As part of that restructuring process, United began the process of "depeaking" its operations at each of its hub airports, including LAX. (7/27/2006 Tr. at 110:20-112:13) Generally speaking, depeaking involves spreading scheduled flights at regular intervals throughout the day rather than bunching arrivals and departures at certain peak times, which, in turn, allows airlines to operate essentially the same number of flights from a reduced number of gates. (*Id.* at 30:25-31:18, 45:5-46:3) United's depeaking strategy significantly increased the efficiency of its gate utilization at LAX, thus allowing United to consolidate all of its United Express operations at T8 and eliminating the need for the Remote Facility. (*Id.* at 33:6-13, 35:16-37:3; United Exs. 61 and 68) As LAX's chief of operations recognized in May 2005, United's move of all of its turboprop aircraft to the central terminal area "provide[s] more efficient terminal utilization." (United Ex. 114 at LA 04281)

United's decision to consolidate all United Express operations at the central terminal area at LAX was consistent with United's operations at each of its four other hub airports. Specifically, in conjunction with United's efforts in bankruptcy to improve the customer experience and to offer a consistent product worldwide, United consolidated its commuter operations, including turboprops, at the central terminal area at each of its hubs, thus confirming the industry practice of such operations. (7/27/2006 Tr. at 52:7-53:2; 3/15/2007 Tr. at 35:3-35:21)

**IV.    The City's Initial Response To United's Decision To Consolidate All United Express Operations At T8**

Just days before United's new, depeaked schedule was to take effect, the City notified United on June 3, 2005 that United could not operate turboprop aircraft at T8.  (United Ex. 28)  In support of its position, the City cited to a resolution issued in 1997 (the "1997 Resolution"), which the City contended allowed it to prohibit United from operating its turboprop operations out of the main terminal.  Of course, the 1997 Resolution did no such thing. As found by the Bankruptcy Court:

> During [1997], the airport staff determined that the airport could operate more efficiently if all of the commuter aircraft then using the central terminal area were relocated to remote terminal facilities.  This conclusion followed an FAA study that recommended such a relocation to promote efficiency.  (City Ex. 9.)  The staff recommended to the Board of Airport Commissioners that it "authorize the Executive Director to initiate, develop and implement a plan to relocate commuter aircraft operations away from the Central Terminal Area" and that it "authorize the Executive Director to prohibit any additional commuter airline from operating at gates within the Central Terminal Area."  (City Ex. 11)  By limiting the recommended prohibition to "additional commuter airlines" the staff appears to have recognized that existing commuter airline operations were not subject to forced removal from the central terminal, but could only be relocated pursuant to a voluntary plan.

(Wedoff Op. at 13, n. 9)  Four days later, the City reversed its position and thus blessed United's move from the Remote Facility.  However, the City attempted to condition this reversal by stating that it retained the ability to order all of United's turboprop operations back to the Remote Facility upon six-months' notice.  (United Ex. 29)

**V.    United's Attempted Rejection Of The Remote Facility Lease**

On November 15, 2005, United notified the City that, effective November 30, 2005, United was rejecting the lease for the Remote Facility (the "Notice of Rejection"), thereby seeking to discharge its remaining obligations owed thereunder pursuant to the Bankruptcy

14

Code.  (3/15/2007 Tr. at 46:22-47:2)  Just one week later, the City responded to the Notice of Rejection by informing United that it was revoking its "permission" for United to operate turboprop aircraft in the central terminal area, including T8.  (United Ex. 36)

On November 30, 2005, United withdrew its Notice of Rejection pending resolution of its dispute with the City about turboprop use at T8, and United continued to pay rent to the City for the Remote Facility.  This withdrawal was absolutely necessary for United to mitigate any potential damages in the event the Bankruptcy Court had agreed that the City could prohibit United's turboprop operations at T8.  (3/15/2007 Tr. at 37:13-38:3 and 47:4-48:5) Because United was unable, from a practical standpoint, to reject the Remote Facility Lease, United had no choice but to continue to pay monthly rent to the City despite the fact that the Remote Facility has been vacant since June 2005.  Specifically, between December 2005 and August 31, 2007 (the date on which the Remote Facility expired), United paid rent of approximately $4.5 million to the City.  (DE #131; City Ex. 4; United Ex. 3)

## VI.    The City's November 30, 2005 Notice Had Nothing To Do With Safety.

Contrary to the City's hyperbole and protestations to the contrary, the City's attempt to ban United's turboprop operations at T8 had nothing to do with safety.  Indeed, the City's safety argument is wholly pretextual as evidenced by its own actions.  In particular, on June 3, 2005, the City advised United (United Ex. 28) that it would welcome United's use of T8 for turboprops "in exchange for United's relinquishment of its preferential gate access rights in terminal 6."  (*See* Wedoff Op. at 16: "Airport officials indicated both in writing and orally that they would be willing to allow United to continue to use T8 for turboprop operations if United gave up its preferential right to terminals on T6." (internal citations omitted))  Accordingly, from the outset, the City has willingly acknowledged that it has no safety concerns with United

operating turboprops out of the main terminal.  Of course, safety was not an issue because it is undisputed that "[t]urboprops have safely operated from the central terminal area continuously and in large numbers, since the mid-90s."  (Wedoff Op. at 16)  Indeed, this fact is further confirmed by the City's actions and the testimony of its witnesses.

*First,* Ray Jack (the LAX employee responsible for "the safe and expeditious flow of air traffic commerce and traffic on the airfield") concluded in May 2005 that United's proposed turboprop operations at T8 "ensure[d] an appropriate level of safety to individuals on the Terminal 8 ramp."  (7/28/2006 Tr. at 9:25-18:13 and 21:5-24:18; United Ex. 114)[2]  When asked by the Court to further clarify whether he believed United's proposed operations were "sufficient to be appropriate for the operation of an airport," Mr. Jack testified that United's safety measures were "sufficient for the type of operation they are conducting."  (*Id.* at 18:6-18:13)  (*See also* Wedoff Op. at 16: "[T]he safety of turbo-prop operations was confirmed by the manager of LAX and the chief of its operations, with overall responsibility for airport safety during the relevant period.")

*Second,* over the last several years, the City has been drafting and revising a comprehensive document known as the "Master Plan," which is intended to be the plan that transforms LAX into a world-class airport for the Twenty First Century.  (7/28/2006 Tr. at 147:24-156:22)  The approval process for the Master Plan has been extensive, and the current version (Alternative D) has been submitted to and approved by the FAA.  (*Id.*)  In the Master

---

[2]    Shockingly, the City completely misquotes Mr. Jack's draft approval letter and related testimony for the proposition that Jack testified that *removal* of turboprops from the central terminal area was the only safe manner in which to operate the airport.  (*See* City Obj. at 23)  This is not a slight misquote; it is akin to representing to the Court that a witnesses testified the traffic light was "red" when the witnesses actually testified the light was "green."

Plan, the City has acknowledged that remote terminals "offer a lower level of service than the contact gates" and that such "facilities have limited amenities in terms of holdrooms, concessions, and airline club lounges." (United Ex. 88 at LA 00928, Sec. 2.2.7) Consequently, the Master Plan confirms that "all aircraft parking would be adjacent to a terminal or concourse, eliminating the current need to bus passengers to remote aircraft parking positions." (*Id*. at LA 00869) The Master Plan does not, however, eliminate turboprop operations at LAX. To the contrary, as illustrated below, the Master Plan allocates several gates ***at T8*** exclusively to turboprop operations:



(*Id*. at LA 00930) (*See also* Wedoff Op. at 18, n. 13: "The appropriateness of using the central terminal for turboprop operations at the current time is reflected [in] the current airport Master Plan, which calls for elimination of all remote terminal facilities and for all turboprop operations to be conducted from the central terminal.")

**Finally,** an internal LAX memorandum from November 2005 (United Ex. 111) concludes that "LAWA's approval earlier this year of the operations plan developed by United for propeller operations in Terminal 8 confirms that properly organized propeller aircraft operations at terminal gates can be safely conducted." (*See also* Wedoff Op. at 16) Simply put, the City's safety "concern" should be seen for what it is: a pretextual red herring with no bearing on the present dispute.

## ARGUMENT

The City's brief contains twelve separate argument sections, which in turn contain at least twenty subsections. Because there appears to be little rhyme or reason to the City's organization, United has attempted to follow what is hopefully a more organized framework for responding to the City's arguments. United's Response is organized as follows:

- **Section I** responds to the City's argument that the Bankruptcy Court should have deferred to the FAA under the doctrine of primary jurisdiction. (*See* City Obj. at Argument § III)

- **Section II** responds to the City's argument that the ACOP, not the T8 Lease, governs United's operations on the loading ramps adjacent to T8. (S*ee id.* at §§ VI, VII, VIII, and IX)

- **Section III** responds to the City's argument that even if the T8 Lease governs, it does not prohibit the City's attempt to prohibit United's turboprop operations at T8. (*See id.* at §§ IV, V, X, and XII)

- **Section IV** responds to two new miscellaneous arguments raised by the City — a material breach by United in failing to obtain prior consent for a sublease (that does not exist) between United and Skywest Airlines and a Due Process Clause violation. (*See id.* at §§ II, XI)

Each of the objections raised by the City is without merit.[3]

---

[3]    While United agrees with the City that a district court reviews *de novo* the bankruptcy court's findings of fact and conclusions of law in a non-core proceeding, this review does not permit a party to relitigate its case.

(continued)

## I.     The Doctrine Of Primary Jurisdiction Does Not Apply Here.

As a starting point, the City does not challenge the Bankruptcy Court's subject matter jurisdiction over this dispute.  (Wedoff Op. at 2-3)  Rather, the City argues that the Bankruptcy Court should have referred the matter to the FAA under the doctrine of "primary jurisdiction" (City Obj. at 16-21), a doctrine that has no impact on the authority of a court to hear a case in the first instance.  *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 548 (7th Cir.1987), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988).  Instead, "[p]rimary jurisdiction' involves questions of timing, not of judicial competence."  *Kendra Oil & Gas, Inc. v. Homco, Ltd.*, 879 F.2d 240, 242 (7th Cir. 1989).

More to the point, because the case before this Court is a simple breach of contract action, the doctrine is wholly inapplicable.  As noted by the Bankruptcy Court:

> "Primary jurisdiction," as the Supreme Court explained in *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956), "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  The doctrine has no application here [with respect to United's claim of breach of contract].

(Wedoff Op. at 3-4)  Indeed, the FAA has made it clear that disputes over contracts between an airport and an airport user "are a matter of state law and outside FAA's Part 16 jurisdiction." *Mainardi*, 2004 WL 3198203, *12; *see also Morris Waller and M&M Transp. v. The Wichita Airport Auth.*, *The City of Wichita, Kansas, and Castle Rock Constr. Co.*, FAA Docket No.

---

Rather, district courts adopt non-core findings and conclusions from bankruptcy courts where, as here, such findings and conclusions are supported by the record and well-reasoned.  *See, e.g., Limberopoulos v. First Midwest Bank (In re Limberopoulos I)*, No. 02 C 705, 2002 WL 1163733, at *2 (N.D. Ill. May 31, 2002) ("[D]e novo review allows the reviewing court to take a fresh look at the way the lower court applied the law to the facts of the case and does not give the parties a chance to wipe the slate clean and relitigate their case from scratch.") (citing *In re Kroner*, 953 F.2d 317 (7th Cir. 1992)).

16-19-13, 1999 WL 500028, at *1 (Mar. 12, 1999) (dismissing various allegations in a complaint filed with the FAA because they "are contractual disputes over which the FAA has no jurisdiction"); *AMAV, Inc. v. Maryland Aviation Admin.*, FAA Docket No. 16-05-12, 2006 WL 2038717 (Mar. 20, 2006) (similar).

The City does not dispute this authority. Rather, the City argues that the Bankruptcy Court erred because its conclusions were "preordained" by its determination that this was "simply a 'contract dispute'" and did not involve issues of safety and efficiency, which, according to the City, implicate a host of federal regulations. (City Obj. at 16) As the overwhelming evidence confirms, however, this case has nothing to do with safety. (*See* Background § VI, above) Likewise, the City's "efficiency" argument gets it no further. As explained above, the T8 Lease specifically governs the utilization (*i.e.,* the efficiency) of the gates at T8, with United having the "first right of use" of those gates. (*See* Background § I.B, above) Thus, the City's "efficiency" argument is nothing more than an issue of contractual interpretation, far removed from the purview of the FAA. (Wedoff Op. at 4: "No regulation of the Secretary of Transportation or the Federal Aviation Administration has any bearing on this contract dispute, and the decisions cited by [the] City—which did involve governing administrative regulations—are plainly inapplicable.")

Moreover, the City's repeated references to the FAA's various responsibilities to enforce its regulations and ensure safe and efficient operations do not aid the City's primary jurisdiction claim. As a practical matter, because United agrees with the City that the FAA possesses broad authority over airport operations, presumably if the FAA thought that the operation of turboprops at T8 created a safety issue, it would have expressed those concerns. *The FAA did just the opposite*: it approved the City's own Master Plan, which indisputably

contemplates the elimination of all remote facilities at LAX and the continued operation of turboprop aircraft at T8.  (*See* Background § VI, above)

Furthermore, as a legal and regulatory matter, by raising safety issues to bolster its primary jurisdiction argument, the City walks right into federal preemption.  *See Air Transp. Ass'n of America, Inc.*, 520 F.3d at 225 ("'[T]he FAA [Federal Aviation Act] preempts the entire field of aviation safety through implied field preemption.  The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel, which are not subject to supplementation by . . . state laws.'") (quoting *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007)).[4]  Of course, whether federal preemption applies is a "a question of law" routinely resolved by the courts.  *E.g., Trustees Of The AFTRA Health Fund v. Biondi*, 303 F.3d 765, 772 (7th Cir. 2002).  Thus, by erroneously inserting "safety concerns" into this dispute, the presence of a preemption defense to the 1997 Resolution, if anything, counsels even more against the application of primary jurisdiction here.  *See, e.g., Colorado Public Utilities Comm'n v. Harmon*, 951 F.2d 1571, 1579 (10th Cir. 1991) ("[A] preemption determination involves matters of law--an area more within the expertise of the courts than within the expertise of the Secretary of Transportation.").

---

[4]    In addition, the Airline Deregulation Act of 1978 ("ADA") provides that a political subdivision of a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or *service* of an air carrier . . . ."  49 U.S.C. § 41713(b)(1) (emphasis added).  The type of aircraft a carrier chooses to use in transporting passengers on any particular route is an element of the "service" it provides.  *See, e.g., Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996) (broadly construing "service" under the ADA to "include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *Air Transp. Ass'n of Am., Inc.*, 520 F.3d at 223 (similar).  Because the 1997 Resolution dictates the type of aircraft that may be used by United or other carriers, the 1997 Resolution is precisely the type of airline service regulation that is preempted by the ADA.  However, if this Court agrees with the Bankruptcy Court that this is a straightforward breach-of-contract action that does not implicate a federal regulatory scheme, the Court need not even consider the preemption issue.

Simply put, this is a straightforward contract dispute to which primary jurisdiction does not apply.  To the extent the Court accepts the City's sweeping (and pretextual) arguments that this case falls within the center of a federal regulatory scheme, the City is still no better off with respect to its primary jurisdiction argument.  Instead, the only thing the City would have accomplished in this scenario is the creation of a preemption defense to its attempts through local regulations to interfere with the operation of United's air transportation business at T8.

## II.    The Terminal 8 Lease Grants United The Right To Operate Aircraft On The Loading Ramps Adjacent To Terminal 8.

As the Bankruptcy Court observed, United's breach of contract claim is relatively straightforward.  (Wedoff Op. at 8)  Under Section 23 of the T8 Lease, the City agreed that the "rules, regulations and directives" adopted for LAX "shall provide for the preferential, but not exclusive, assignment by the [LAX] General Manager of gate positions and loading ramps" to United.  (United Ex. 1 at UAL-RE 015494)  This preferential right is further defined as a "first right of use."  (*Id.* at UAL-RE 015419)

The assignment of gate positions and loading ramps pursuant to Section 23 must "take into account [United's] needs and requirements" for their use, and such "gate positions and loading ramps are to be used for the loading and unloading of aircraft in passenger service in keeping with the airline industry practice at the Airport."  (*Id.* at UAL-RE 015494)  Morever, Section 22 states that United's preferential use of gate positions and aircraft loading ramps is a right that "shall vest" in United.  (*Id.* at UAL-RE 015493)  And Section 30 explicitly protects United's rights under the T8 Lease from any contradictory airport regulations by providing that such regulations "shall … not … contravene the rights granted to Lessee under this Lease."  (*Id* at 84)

22

Accordingly, as the Bankruptcy Court determined, United has an unambiguous contractual right to operate its air transportation business from the loading ramps adjacent to T8 and has the right to do so in preference to other carriers so long as United is exercising its "first right" of use.  *See also* CA Civ. Code, § 1639; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. Ct. App. 4th 944, 955 (Cal. App. 4th Dist. 2003).  *See also* CA Civ. Code, § 1644 ("The words of a contract are to be understood in their ordinary and popular sense . . . .").[5]

The City, however, takes issue with nearly every aspect of the Bankruptcy Court's findings and conclusions, including the Bankruptcy Court's conclusion that the T8 Lease is the operative document governing the parking, loading, and unloading of aircraft adjacent to T8. According to the City, the phrase "loading ramps" in several sections of the T8 Lease does not pertain to the concrete portion of the apron on which United parks its aircraft adjacent to the terminal building.  The City also contends that the ACOP, not the T8 Lease, governs United's operations on the parking aprons.  The City's objections are without merit.

### A.    Loading Ramps Are The Portions Of the Pavement Adjacent To a Terminal Where Aircraft Park, Load, And Unload Passengers.

As a threshold matter, by arguing that "loading ramps" are something other than the space adjacent to terminals where aircraft park to load and unload passengers, the City is now seeking to unravel the explicit admissions from Michael Digiralamo (*see* Background § I.B.2, above) through none other than Mr. Digiralamo himself.   In an attempt to avoid Mr.

---

[5]    And even if there were some ambiguity in the T8 Lease, as the Bankruptcy Court recognized, "it would be resolved by the parties' performance under the lease, which supports the understanding that turboprop operation in the central terminal is within the rights of an air carrier with preferential gate use."  (Wedoff Op. at 13, n.9, citing *Oceanside 84, Ltd. v. Fidelity Federal Bank*, 56 Cal. App. 4th 1441, 1448 (Cal. Ct. App. 2nd Dist. 1997)).

Digiralamo's previous admissions during the March 15, 2007 trial day (*see* Background § I.B.2, above), the City submitted a declaration from him on December 10, 2007, in which he claimed that the term "loading ramps," as of the time the T8 Lease was executed in 1981, were not (as he had previously testified) portions of the apron on which an airplane parks while loading and unloading passengers. (1/11/2008 Tr. at 76, 102-03)[6] Instead, he stated in his declaration that loading ramps were "large concrete ramps that passengers used to descend to the apron in order to board planes." (*Id.* at 76: 6-12)

This new definition of "loading ramp" had a fatal flaw, however, as applied to Terminals 7 and 8: neither terminal, as he was forced to concede, ever had these large concrete ramps that passengers used to descend to the apron in order to board planes. (*Id.* at 79:17-21) Accordingly, during the January 11, 2008 hearing (the final day of trial testimony), Mr. Digiralamo proceeded to contradict his declaration from just one month earlier (which, itself, had been drafted to contradict his prior trial testimony concerning the meaning of "loading ramp") by offering yet another definition. For the first time, Mr. Digiralamo claimed that the term "loading ramp" referred to any conveyance to get passengers from the satellite building to the apron or ramp, including simple stairs inside and outside LAX terminals. (1/11/08 Tr. at 29:18-30:2) In light of Mr. Digiralamo's three conflicting definitions of "loading ramps" and his admission that there were "several inaccuracies" in his declaration (*id.* at 103), it is frankly no surprise that the

---

6   Mr. Digiralamo tried to explain away his previous sworn testimony he was contradicting with his declaration by stating that in testifying that "[t]he loading apron or the loading ramp is where the plane sits" he meant that the "loading apron" and not the "loading ramp" was where the plane sits. (1/11/2008 Tr. at 102-103)  That is simply not even a remotely credible interpretation of Mr. Digiralamo's prior testimony, especially in light of his admission that the terms "ramp" and "apron" are interchangeable at LAX. (*Id.* at 99)  Oddly enough, within the declaration itself, Mr. Digiralamo stated that "it is true in current parlance that the plane sits on the loading apron or loading ramp." (Id. at 73-74)  During the January 11, 2008 hearing, however, Mr. Digiralamo changed his tune yet again, and testified that even this statement in his declaration was not true. (*Id.*)

Bankruptcy Court rejected his testimony in favor of the plain language of the T8 Lease. (Wedoff Op. at 10-13)[7]

Regarding the plain language in the T8 Lease, numerous provisions unambiguously confirm that the phrase "loading ramp" pertains to the concrete portion of the apron on which aircraft park adjacent to the terminal building. For example, in the last sentence of Section 23, United agreed "not to use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes." As the Bankruptcy Court correctly determined, aircraft can only park on the paved surface outside of the terminal buildings. (*Id.*. at 9, n.5) Airplanes cannot park on staircases; nor can they park in a hole in the terminal wall — both of which would be necessary under the City's definition.

In addition, Section 22 of the T8 Lease likewise explicitly addresses the paved surfaces of the airport outside the terminal. It states:

> City is providing as ***a means of access for aircraft between the Satellite Buildings and the taxiway and runway system of the Airport***, large areas of apron pavement, gate positions and ***aircraft loading ramps*** in the area immediately adjacent to and surrounding the Satellite Buildings.

(United Ex. 1 at UAL-RE 015493 (emphasis added)) As the Bankruptcy Court also correctly observed, Section 22 makes clear that the loading ramps and gate positions are part of the access

---

[7]   Importantly, district courts defer to bankruptcy courts determinations of witness credibility, even in non-core proceedings. *See, e.g.*, *Boston Reg'l Med. Ctr., Inc. v. Reynolds* (*In re Boston Reg'l Med. Ctr., Inc.*), No. Civ. A. 03-12215RGS, 2004 WL 1778881, at *2 n.4 (D. Mass. Aug. 9, 2004) ("To [the rule that no deference is given to bankruptcy courts on non-core matters] I might posit a quasi-exception. Where the record lends itself to two plausible, but competing inferences, the choice of one over the other based on a credibility determination by the Bankruptcy Court will be noticed."); *Tasch, Inc. v. Sabine Offshore Serv., Inc., and Diamond Offshore Drilling, Inc.* (*In re Tasch, Inc.*), No. Civ. A. 98-3746, 2001 WL 1398644, at *4 (E.D. La. Nov. 8, 2001) (Even for *de novo* review of non-core issues, "the bankruptcy court's findings as to witness credibility are entitled to considerable deference due to its position as fact finder."). This makes perfect sense, as the Bankruptcy Court is able to observe first hand a witness's demeanor.

for aircraft to taxiways and runways that surround the terminal building, and are not a part of the terminal itself.  (Wedoff Op. at 12)  Moreover, Section 24 provides that "[t]he City reserves the right to regulate the use of vehicles and automotive equipment upon, over and across the apron and loading ramps around the passenger terminals at Airport."  (United Ex. 1 at UAL-RE 015494)  It is impossible to drive vehicles and automotive equipment "upon, over, and across" stairs on the inside and outside of terminal buildings — yet another absurd result required by the City's proposed interpretation.

Finally, the City's reliance on the "missing witness rule" to support its new definition of "loading ramps" is frivolous.  The rule has no application in this case because it is well established that the missing witness rule does not apply where the testimony in question would be cumulative or irrelevant.  *U.S. v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976) ("'No inference is permissible … where the unpresented evidence would be merely cumulative,' or where it would be irrelevant to the issues in the case.") (*quoting United States v. Johnson*, 467 F.2d 804, 808 (1st Cir. 1972)).  Here, United did not need its own witnesses to confirm that the loading ramp is the portion of the apron on which aircraft park for at least three reasons:  (1) the T8 Lease, as the Bankruptcy Court found, plainly and unambiguously establishes this fact; (2) Mr. Digiralamo testified to this very definition (and only later attempted to unravel his sworn testimony); and (3) the City adopted this precise definition in its initial post-trial brief.[8]

---

[8]   As a factual matter, there was no "missing" witness.  United's Christopher Sandifer referred to the aircraft parking areas as commonly referred to as "apron or ramp parking positions" and Lori Peters testified that such aprons were made of concrete.  (7/27/06 Tr. at 90:19-21 and 142:18-19)  This testimony is perfectly consistent with the Bankruptcy Court's conclusions that the "loading ramp" is the portion of the apron or ramp adjacent to the terminals where aircraft park for loading and unloading.

### B.     The ACOP Is Not Relevant To The Parking, Landing, And Unloading Of Aircraft At Terminal 8.

The Bankruptcy Court correctly determined that the ACOP does not govern United's preferential use parking positions and thus is perfectly consistent with United's right to operate turboprops at T8.  The ACOP is a permit that governs "Landing facilities," which are defined as "[c]ommon use areas of the airfield, which include the runways, taxiways, service roads, and *common use* ramps."  (City Ex. 8 at LA 00193) (emphasis added)  Thus, the ACOP does not apply to *preferential use* ramps.  If the ACOP were intended to apply to all ramp areas at LAX, the phrase "common use" would not have been needed to modify "ramps."  Of course, a contract should be interpreted to give meaning to all of its words.  *See*, *e.g.*, *The Ratcliff Architects v. Vanir Constr. Mgmt., Inc.*, 88 Cal. App. 4th 595, 601 (Cal. Ct. App. 1st Dist. 2001) ("The whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other.").  (*See also* Wedoff Op. at 12:  "[T]he ACOP distinguishes between common use ramps (paved surfaces that it regulates as part of the landing facilities) and preferential use ramps (paved surfaces that it does not regulate).")

The City tries to expand the reach of the ACOP beyond common-use areas at LAX by arguing that the ACOP never invokes the terms "preferential use ramps," "preferential use loading ramps," and "preferential use apron."  (City Obj. at 51)  This argument makes no sense.  Because the ACOP, by its very terms, limits what areas of LAX it governs ("landing facilities"), there was no need for it also to state what areas it does not govern — just like the ACOP is silent on the regulation of baggage handling, ticket sales, security screenings, and concession areas.

Finally, when analyzing the interplay between the T8 Lease and the ACOP, it is worth re-emphasizing that this case is not about which aircraft United can operate out of LAX. Had the City attempted to ban all turboprop landings at LAX, perhaps the ACOP would be implicated (setting aside the fact that such actions would violate several federal regulations) because the City would then be regulating which FAA-approved aircraft could and could not be operated out of LAX. But the City's wrongful conduct here has ***nothing*** to do with which planes the City permits United to fly into and out of LAX. Rather, the City's conduct is simply directed toward which FAA-approved aircraft United can park, unload, and load at T8 — a matter governed exclusively by the T8 Lease.

## III. The City's Alternative Attempts To Avoid Application Of The T8 Lease Are Without Merit.

The City makes a number of other arguments seeking to avoid the Bankruptcy Court's correct determination regarding United's rights under the T8 Lease, including: (i) the City cannot be assumed to waive its authority to regulate pursuant to the "unmistakability" doctrine; (ii) the "reserved powers" doctrine precludes enforcement of the T8 Lease's express provisions limiting the City's right to regulate; (iii) the City retains authority under the 1997 Resolution to preclude turboprops from the central terminal; and (iv) injunctive relief is not an appropriate remedy. Each such argument is baseless.

### A. The Unmistakability and Reserved Powers Doctrines Do Not Apply Where A Government's Police Power Is Not At Issue.

Neither the "reserved powers" nor "unmistakability" doctrine apply to financial transactions, such as those presently before the Court. (*See* Wedoff Op. at 14-18) Stated differently, these doctrines play no part in contract construction when government "police powers" are not at issue. *See White v. Davis*, 108 Cal. App. 4th 197, 230 (Cal. Ct. App. 2nd Dist.

2002) ("modern contract clause jurisprudence follows the 'reserved-powers doctrine,' which holds that the [taxing and spending] powers, unlike the [police] powers, may be abridged by contract").  Indeed, "when the government is acting as a private contracting party, then the [unmistakability] doctrine does not apply, and the government's rights and duties are governed by law applicable to private parties unaltered by the government's sovereign status."  *Kimberly Assoc. v. U.S.*, 261 F.3d 864, 869 (9th Cir. 2001).  *See also Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach*, 86 Cal. App. 4th 534, 564 (Cal. Ct. App. 2nd Dist. 2001) ("'The state cannot use the police power to avoid meeting its financial obligations.'");  *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250  (7th Cir. 1996) ("when a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contract; it is committing a breach of contract").

The Supreme Court's reasoning in *United States v. Winstar Corp.*, 518 U.S. 839, 897 (1996), is on point.  In *Winstar*, the plurality found that the unmistakability (and reserved powers) doctrines did not apply to disputes concerning ordinary government contracts (like the lease at issue here) because "[i]njecting the opportunity for unmistakability litigation into every common contract action would … produce the untoward result of compromising the Government's practical capacity to make contracts, which we have held to be 'of the essence of sovereignty' itself."  *Id.* at 884.  Further, the Court found that unmistakability and reserved powers do not apply to most government contracts because "agreements to insure private parties against the costs of subsequent regulatory change ***do not directly impede the exercise of sovereign power.*"**  *Id.* at 883 (emphasis added).

Moreover, while it is generally true that courts discussing the "unmistakability" and "reserved powers" doctrine often state that a government cannot surrender its future "police

29

power" in a contract, there is no reason to read such an abrogation of sovereign police powers into the T8 lease because United has never argued that the City abrogated core police powers to regulate safety (subject, of course, to federal preemption). But the City's assertion of its police power to regulate safety is irrelevant here because the Bankruptcy Court correctly recognized the City's stated safety justifications were entirely pretextual. *See McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir.1996) ("when a state is itself a party to a contract, courts must scrutinize the state's asserted purpose with an extra measure of vigilance").

In addition, even if police powers were at issue here (and they are not) as discussed above, the City's reliance on safety concerns in the context of a federal regulatory scheme likely triggers the application of preemption here. And in the preemption context, there is no police power exception to the ADA's express preemption provision. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 128 S. Ct. 989, 996-997 (2008). In *Rowe*, the Court rejected the state's argument that Congress enacted the ADA's preemption provision primarily to reach "state 'economic' regulation" rather than traditional police-power concerns such as "protect[ing] . . . citizens' public health." *Id*. at 997. *See also Air Transp. Assoc. of Am., Inc.*, 520 F.3d at 224 (recognizing that Rowe "declined to read into [the ADA's] preemption provision an exception that preserves state laws protecting the public health" and therefore forecloses the argument that "classifying the [regulation at issue] as a health and safety regulation or a matter of basic human necessities somehow shields it from the preemptive force of [the ADA]").

The bottom line is that the Bankruptcy Court got it right: neither the "reserved powers" nor "unmistakability" doctrines applies here. A contrary ruling would give governmental bodies an "escape hatch" in nearly every contract entered into by them on the sole basis that, based on the passage of time, they no longer like the economic terms of the contract.

**B.    The City's Express Agreement To Limit Regulation Renders The Unmistakability Doctrine Inapplicable.**

The unmistakability doctrine is also inapplicable because the T8 Lease expressly limits the City's right to regulate United's use of its preferential gates.  In particular, as explained by the Bankruptcy Court:

> Even if the T8 lease, as an essentially financial transaction, is subject to the doctrine, ***the lease does in fact restrict future regulation in unmistakable terms***.  As discussed above, Section 23 of the lease clearly accords United preferential use of the gate positions and loading ramps needed to operate its business from T8, and Section 30 explicitly states that the "rules, regulations, orders, directives, laws, ordinances and statutes of City (including Board and General Manager) ***shall ... not ... contravene the rights granted to Lessee under this Lease***."

(Wedoff Op. at 17-18) (emphasis added)

To this end, the "unmistakability doctrine" provides no more than that a governmental entity cannot be assumed to have limited its right to regulate; rather, such agreement must be express.  *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).  Here, Section 30 of the T8 Lease is an express agreement by the City not to issue any "rules, regulations, orders, directives, laws, ordinances and statutes of City (including Board and General Manager) [that] contravene the rights granted to [United] under [the T8 Lease]."  (United Ex. 1 at UAL-RE 015501-02)  As such, even if the doctrine applied to this purely financial transaction — which, as discussed above it, it does not — the doctrine is nevertheless plainly satisfied.

**C.    The 1997 Resolution Does Not Preclude United's Turbo-Prop Operations At The Main Terminal.**

The City contends it has the "authority" under the 1997 Resolution to prohibit turboprop operations.  (City Obj. at 4, 24-26)  Not so.  Because the 1997 Resolution post-dates

the execution of the T8 Lease (by 16 years), it is unenforceable against United, as Section 30 of the T8 Lease unambiguously prohibits the City from issuing any rule or regulation that conflicts with United's operations of its air transportation business at T8.  Indeed, the facts surrounding the 1997 Resolution actually evidence the City's understanding that it could not prohibit United from operating turboprops out of the main terminal.  (*See* Background § IV, above)

Moreover, the parties' course of conduct following the 1997 Resolution confirms that the City knew it could not prohibit United from operating turboprop operations at the central terminal area.  To this end, United and other carriers with preferential leases were allowed to operate turboprops from the main terminal continuously from 1997-2005, notwithstanding the existence of the 1997 Resolution.  (Wedoff Op. at 13, n.9, *citing* Tr. Vol. II at 66-67, 72) Likewise, before the City's attempt to remove United from Terminal 8 in 2005, no carrier with preferential rights was ever even notified that its use of turboprops in the central terminal area was prohibited.  (*Id.*)

Finally, to the extent the Court wades into the federal regulatory issues raised by the City, the 1997 Resolution is unenforceable because it is preempted by the ADA.  (*See* Argument § I, above)

**D.    United's Demonstration Of Irreparable Harm Justifies Injunctive Relief.**

The City disingenuously argues that even were the Court to find a breach of contract, injunctive relief is not warranted because United failed to establish irreparable harm. To the contrary, United put on substantial evidence that the City's breach of the T8 Lease threatened United with irreparable harm, thus warranting injunctive relief.  (Wedoff Op. at 18-19)  The record contains unrebutted evidence that, if a permanent injunction is not granted, United will, among other things:  (1) have to significantly alter its flight schedules (essentially

return to a "peaked" schedule at LAX while the schedules at its other hubs remain de-peaked); (2) be faced with an inconsistent product from hub to hub, where all of its United Express operations would be consolidated at central terminals at each of its hubs except LAX; and (3) be faced with a significant drop in customer satisfaction as a result of a return to the less desirable Remote Facility.  (3/15/2007 Tr. 37:4-8; 7/27/2006 Tr. 38:14-39:8, 115:5-9 and 137:5-138:16)[9]

Because each of these adverse consequences likely will have a significant negative effect on customer goodwill, future sales, and market share, none of the damages can be calculated with any degree of certainty — the very definition of irreparable injury.  *See Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1247 (N.D. Ill. 1996) (plaintiff's "loss of future customers and revenues, as well as its loss of goodwill, is an irreparable injury for which injunctive relief is appropriate"); *Vogel v. American Soc'y of Appraisers,* 744 F.2d 598, 599 (7th Cir. 1984) ("irreparable harm ... means ... plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial"); *Cross Wood Products, Inc. v. Suter,* 422 N.E.2d 953, 957 (1st App. Ct. 1981) (holding that loss of competitive position was not readily subject to measurement by any certain pecuniary standard and thus no legal remedy would be adequate to compensate for that loss).

---

[9]    The City's contention that the market survey evidence "does not measure customer satisfaction with any particular aspect of United's commuter operations at LAX, including whether those flights originate from the RTF or the CTA" is flat wrong.  (City Obj. at 58)  Specifically, the market survey has a distinct component evidencing that "the traveling public prefers commuter flights being operated from the central terminal by a significant measure, and that this operation allows for shorter, more pleasant connections."  (Wedoff Op. at 18, n. 13; *see also* 7/27/06 Tr. at 56:7-58:11)  And the City's identification of the decrease in United's Mileage Plus Premium Members' overall satisfaction with United's operations is meaningless, as reductions in flight schedules, delays, or a host of other factors might impact the overall satisfaction of United's more particular business flyers.  (*See* 7/27/06 Tr. at 62:7-63:13)

Furthermore, as the nature of the property at dispute is real estate, this provides even further support for injunctive relief. (Wedoff Op. at 19, *citing Walgreen Co. v. Sara Creek Prop. Co.,* 966 F.2d 273, 278 (7th Cir.1992) ("[b]ecause of the absence of a fully liquid market in real property and the frequent presence of subjective values ... the calculation of damages is difficult")). *See also Petrzilka v. Gorscak*, 556 N.E.2d 1265, 1268 (Ill. App. Ct. 2nd Dist. 1990) (recognizing rule that to enforce negative covenant in contract relating to real property, plaintiff need not even establish inadequate remedy at law).

## IV.    The City's Remaining Arguments Are Frivolous.

The City raises two new arguments that it had not addressed in the previous three years of litigation of this matter. Each argument is frivolous.

### A.    Skywest Does Not Sublease United's Gates.

The City argues that United's failure to obtain consent for Skywest's sublease of Terminal 8 gates constitutes a material breach of the T8 Lease relieving the City of its own contractual obligations. (City Obj. at 15: "United admittedly subleases its space at LAX to Skywest.") The City's assertion is false. There is no such sublease. The testimony cited by the City merely establishes that Skywest acts as United's agent in its use of United's gates on behalf of the United Express operation for United. (*Id.*) This should not come as any surprise to the City, since the City conceded that Skywest has operated thousands of United Express flights from the central terminal area, including T6 and T8, for more than ten years. (DE #144

(Stipulation))[10]   Simply put, the City's "material breach" argument has no basis in evidence or reality and should be summarily denied.

**B.    The City's "Due Process" Argument Ignores The Entire Record In This Case.**

The City argues that the Bankruptcy Court's determination with respect to the interplay between the T8 Lease and the T6 Lease constituted a denial of due process because "the City was not given the opportunity to submit evidence or argument on the T6 Lease." (City Obj. at 57)   This argument contemptuously ignores the Complaint, the Court's preliminary injunction ruling and, indeed, the entire trial on this matter.   United's Complaint contains numerous paragraphs specifically relating to United's requested relief related to T6. (Cplt. ¶¶ 20, 34-38)   Among other things, United asserted (*id.* at ¶ 38):

> LA and [the City's] attempts to effectively deny United's right to operate turboprops on T8 through the imposition of additional rules relating to United's use of T6 is a thinly veiled and unjustified attempt to do indirectly what LA and [the City] know that they cannot do directly.

In United's opening at the preliminary injunction hearing, United explained how the City was wrongly attempting to condition United's continued preferential gate rights at T6 on United ceasing turboprops out of Terminal 8.   (7/27/06 at 9:13-11:2)   United then put on substantial evidence with respect to its rights under the T6 Lease and the City's illegitimate

---

10  Moreover, even if United did sublease its terminal space to Skywest (which it absolutely does not), the City has long since waived any "right of refusal" with respect to United subleasing such terminal space.  (*See* DE #144) The City's continued collection of rent for terminal space at T8 with express knowledge of Skywest's  alleged "sublease" would constitute a waiver of the City's right to prior written consent of a proposed sublessee.  *See Bedford Inv. Co. v. Folb*, 79 Cal. App. 2d 363, 365, 180 P.2d 361, 363 (Cal. Ct. App. 2nd Dist. 1947) (holding that "[t]he right of the lessor to declare a forfeiture of a lease by reason of the making of a sublease without the lessor's consent in violation of the lease is waived when the lessor, after knowledge of the sublease, accepts the rents specified in the lease.").

attempts to interfere with those rights through the City's improper actions at T8.    (*Id.* at 70:9-81:21)  The Bankruptcy Court agreed with United and granted a preliminary injunction:

> IT IS HEREBY ORDERED, for the reasons stated on the record, that the motion is granted and that defendants, the City Of Los Angeles and Los Angeles World Airports, are hereby enjoined, pending a trial on the complaint in this proceeding or further order of this court, from taking any action to prohibit or interfere with the current operations of United Air Lines, Inc. at **Terminals 6 and 8** of Los Angeles International Airport.

(8/11/06 Order) (emphasis added)  Subsequent to the preliminary injunction hearing, there was a trial on the merits and then a subsequent reopening of the record at the City's request (not to mention hundreds of pages of briefing).  As such, any failure by the City to adequately address the interplay between the T6 and T8 Leases is **solely** its own fault and has nothing to do with a lack of adequate notice.  Due process has been served.  The City's argument to the contrary is baseless.

## CONCLUSION

For these reasons, this Court should adopt the Bankruptcy Court's proposed findings and conclusions of law regarding United's contractual right to operate turboprop aircraft at T8 at LAX and enter a permanent injunction prohibiting the City from interfering with this right.

Dated: Chicago, Illinois
      August 15, 2008

Respectfully submitted,

/s/ James Joslin
James Joslin (ARDC No. 6229288)
Alex Karan (ARDC No. 6272495)
Micah E. Marcus (ARDC No. 6257569)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Counsel for United Air Lines, Inc.