**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED AIR LINES, INC.,** ) | |
| ) | |
| Plaintiff, ) | Case No. 08-cv-3337 |
| ) | |
| v. ) | Hon. James B. Moran |
| ) | Magistrate Judge Sidney I. Schenkier |
| **THE CITY OF LOS ANGELES and** ) | |
| **LOS ANGELES WORLD AIRPORTS,** ) | |
| ) | |
| Defendants. ) | |

**REPLY BY THE CITY OF LOS ANGELES**
**IN SUPPORT OF ITS OBJECTIONS**
**TO THE BANKRUPTCY COURT'S MEMORANDUM OF DECISION**

ROCKARD J. DELGADILLO
  Los Angeles City Attorney
KELLY MARTIN
  General Counsel
JOHN TAVETIAN
  Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY
  ATTORNEY, AIRPORT DIVISION
1 World Way, P.O. Box 92216
Los Angeles, CA 90009-2216
Telephone:  (310) 646-3260
Facsimile:   (310) 646-9617

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA 90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Anthony G. Stamato
Robert M. Spalding
KAYE SCHOLER LLC
3 First National Plaza
70 West Madison Street, Suite 4100
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and*
*Los Angeles World Airports*

**TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Air Transport Ass'n v. Cuomo*,
    520 F.3d 218 (2d Cir. 2008) ...................................................................................................6

*Arapahoe County Public Airport Auth. v. FAA*,
    242 F.3d 1213, 1222 (10th Cir. 2001) ......................................................................................6

*Santa Monica Airport Ass'n v. City of Santa Monica*,
    659 F.2d 100 (9th Cir. 1981) ....................................................................................................6

*SeaAir NY, Inc. v. City of New York*,
    250 F.3d 183 (2d Cir. 2001)......................................................................................................6

**FAA CASES**

*Carey v. Afton Lincoln County Mun. Airport Joint Powers Bd.*,
    2007 FAA LEXIS 40 (FAA Jan. 18, 2007) .............................................................................4

*Sanford Air, Inc. v. Town of Sanford*,
    2007 FAA LEXIS 84 (FAA Mar. 5, 2007).............................................................................4

**STATE CASES**

*City of Atascadero v. Merrill Lynch*,
    80 Cal. Rptr. 2d 329 (Cal. Ct. App. 1998).............................................................................9

*Bedford Inv. Co. v. Folb*,
    180 P.2d 361 (Cal. Ct. App. 1947) .........................................................................................2

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
    135 Cal. Rptr. 2d 505 (Cal. Ct. App. 2003) ..........................................................................9

**FEDERAL STATUTES AND REGULATIONS**

49 U.S.C. § 41713(b)(1) ..............................................................................................................6, 7

49 U.S.C. § 41713(b)(3) .................................................................................................................6

**STATE STATUTES**

Cal. Civ. Code § 1641.....................................................................................................................9

**FAA ORDERS**

FAA Order 5190.6A, AIRPORT COMPLIANCE REQUIREMENTS .......................................................4

FAA Order 5190.6A § 4-7..............................................................................................................4

FAA Order 5190.6A, § 4-8.............................................................................................................4

The City of Los Angeles (the "City"), by and through its Department of Airports, also known as the Los Angeles World Airports ("LAWA") (the City and LAWA are collectively referred to herein as the "City"), respectfully submits this Reply to the Response filed by United Air Lines, Inc. ("United") on August 15, 2008 ("United Response"), to the City's Objections (filed June 30, 2008) to the Bankruptcy Court's Memorandum of Decision ("MoD") (issued May 31, 2008). The City makes the following brief points:

1.     In its Response, United never addresses the fundamental flaw in its position that the City's decision to prohibit turboprop operations at Terminal 8 breaches the Terminal 8 Lease: Banning turboprop operations at Terminal 8 does not interfere at all with United's preferential rights to use "gate positions" and "loading ramps" at Terminal 8. This is true regardless of whether the Court accepts the City's definition of gate positions and loading ramps (which it should) or United's erroneous definition of those terms (which the Bankruptcy Court adopted). Using either definition, no other airline can use Terminal 8 gate positions and loading ramps, except as provided in the Terminal 8 Lease, and thus United maintains all of its preferential use rights at Terminal 8. There is no language in the Terminal 8 Lease that gives United any sort of "preferential right" to determine the type of aircraft operate at Terminal 8, and neither United nor the Bankruptcy Court has ever identified any. Thus, even under United's mistaken argument that the Terminal 8 Lease (rather than the ACOP) governs aircraft operations at gate positions and loading ramps, prohibiting turboprop operations at Terminal 8 does not breach the Terminal 8 Lease because United's right to use gate positions and loading ramps at Terminal 8 in preference to other airlines remains inviolate.

2.     While United adamantly denies that it <u>subleases</u> its space at LAX to Skywest, United Response at 34, it admits that "Skywest acts as United's agent in its use of United's gates on behalf of the United Express operation for United, *id*. United thus ignores the provision in the Terminal 8 Lease that provides that United shall not "sublet or sublease the demised premises, <u>nor license or permit the use of same, in whole or in part, without the prior written consent of General Manager</u>." Section 19, Terminal 8 Lease (United Ex. 1) at 015478 (emphasis added).

Having admitted that United is "permit[ting] the use of" its Terminal 8 facilities by Skywest, United needs to have the "prior written consent" of the City to do so (even if it is not subleasing any space to Skywest). The City has been unable to find any request for consent or granting of consent for United to permit Skywest to use United's Terminal 8 facilities. Consistent with the City's position in its Response, the District Court should, at a minimum, require United to produce a copy of a consent letter from the City, and if one cannot be produced permit evidentiary development and briefing on whether United's obligation to seek consent before permitting Skywest to use its facilities constitutes a breach of the Terminal 8 Lease that, *inter alia*, excuses any alleged breach by the City.[1]

3.   United asserts that the Terminal 8 Lease "prevents the City from promulgating or enforcing any rules or regulations that contravene United's right to operate its air transportation business (including turboprops) at T8." United Response at 10. The Terminal 8 Lease says no such thing. Section 30 of the Terminal 8 Lease provides that "rules, regulations, orders, directives, laws, ordinances and statutes of City [promulgated during the term of the Lease] … shall be reasonable and not inconsistent with or contravene the rights granted to [United] under this Lease." Section 30, Terminal 8 Lease (United Ex. 1) at 015501. Thus, contrary to United's assertion, the Terminal 8 Lease does not insulate "United's air transportation business" from regulation during the term of the Lease.

Moreover, United's assertion ignores the fact that the Terminal 8 Lease provides that it shall not "in any manner affect, change, impair, amend, modify, or enlarge any of the rights, privileges, duties or obligations of either of the parties hereto under or by reason of any <u>lease, license, permit or agreement heretofore entered into by the parties hereto</u>." Section 38, Terminal 8 Lease (United Ex. 1) at 015509 (emphasis added). Section 38 is significant because,

---

[1] United's reference to the 61-year old decision in *Bedford Inv. Co. v. Folb*, 180 P.2d 361, 363 (Cal. Ct. App. 1947), United Response at 35 n.10, is inapposite since United agreed in the Terminal 8 Lease that "[n]o waiver by City … of any breach of any provision of this Lease shall be deemed for any purpose to be a waiver of any breach of any other provision hereof, or of any continuing or subsequent breach of the same provision." Terminal 8 Lease, Section 39(A) (United Exhibit 1) at 015509.

2

when United signed the Terminal 8 Lease in 1981, United had already previously agreed that the City had the express authority to adopt and enforce rules and regulations that provide for the safety of LAX and that United would observe and obey those rules and regulations. Specifically, Operating [Lease] Agreement No. 1115, which United signed in 1943 and which was still in effect in 1981, *see* City's Objections at 35, provided that the City

> shall adopt and enforce rules and regulations, <u>which Lessee agrees to observe and obey</u>, with respect to the use of the Los Angeles Airport, <u>which shall provide for the safety of those using the same</u>.

Art. XVI, Operating [Lease] Agreement No. 1115 (City Supp. Ex. 1) (emphasis added). Although Operating [Lease] Agreement No. 1115 was eventually replaced by the 1993 Air Carrier Operating Permit ("ACOP"), which was later replaced by the 2002 ACOP, both those subsequent bilateral agreements with United incorporated language from Operating [Lease] Agreement No. 1115 that establishes that United agreed that the City has the right to regulate United's operations. For example, the 2002 ACOP provides that the

> exercise of the operating rights under this Permit shall be subject to: (a) any and all applicable rules, regulations, orders and restrictions which are now in force or which may hereafter be adopted by City with respect to the operation of Airport.

Section 10, 2002 ACOP (City Ex. 8). Thus, United has always agreed that the City has the ability to regulate United's operations at LAX — under Operating [Lease] Agreement No. 1115, the 1993 ACOP and the 2002 ACOP — and Section 38 of the Terminal 8 Lease made clear that nothing in that document limited the City's ability to do so. *See* City's Objections at 35-38.

Finally, United's assertion also ignores the fact that the City's decision to ban turboprop operations at Terminal 8 is specifically authorized by "LAX — Los Angeles World Airports Rules and Regulations 2005" ("2005 Rules and Regulations"), City Ex. 17, which provides:

> The Executive Director … shall have the right at any time … <u>to deny the use of the Airport or any portion thereof to any specified class of aircraft</u> … when any such action is considered necessary and desirable to avoid endangering persons or property and to be consistent with the <u>safe and proper</u> operation of the Airport

City Ex. 17 at § 3-2, ¶ 4 (emphasis added). Thus, the City's decision to deny the use of Terminal 8 to turboprop aircraft to "avoid endangering persons or property" and to enhance the

3

"<u>safe and proper</u> operation" of LAX is specifically permitted by the 2005 Rules and Regulations. And because the 2005 Rules and Regulations are plainly "applicable rules [and] regulations … hereafter … adopted by [the] City with respect to the operation of [LAX]," by signing the 2002 ACOP, United agreed that the City could adopt the 2005 Rules and Regulations. *See* Section 10, 2002 ACOP (City Ex. 8).

4.  United's argument that the City's decision to prohibit turboprop operations at Terminal 8 is preempted by federal law, United Response at 2, 21-22 & n.4, reveals a shocking lack of knowledge about the interplay between local airport officials and the Federal Aviation Administration ("FAA"), and should be rejected.

First, United does not even mention Sections 4-7 and 4-8 of FAA Order 5190.6A, AIRPORT COMPLIANCE REQUIREMENTS, much less try to reconcile those sections with its preemption argument. FAA has repeatedly interpreted FAA Order 5190.6A as follows:

> The owner of an airport developed with Federal assistance is responsible for operating the aeronautical facilities for the benefit of the public. <u>This means, for example, that the owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure the safe and efficient operation of the airport</u>.

*E.g., Sanford Air, Inc. v. Town of Sanford*, 2007 FAA LEXIS 84 at \*30 (FAA Mar. 5, 2007) (citing FAA Order 5190.6A §§ 4-7, 4-8) (emphasis added); *Carey v. Afton Lincoln County Mun. Airport Joint Powers Bd.*, 2007 FAA LEXIS 40 at \*22 (FAA Jan. 18, 2007) (same).

In addition to the numerous FAA cases that the City cited in its Objections that support the conclusion that the City has an affirmative obligation to "<u>adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure the safe and efficient operation of the airport</u>," *see* City's Objections at 17-20, the City also introduced into evidence a 195-page document titled, "LAX — Los Angeles World Airports Rules and Regulations 2005." City Ex. 17. As stated in the section titled, "Authority":

> The Rules and Regulations Manual for Los Angeles International Airport (LAX) is published under authority contained in Sections 632(b) and 633(a) and (b) of the Los Angeles City Charter, which empowers the Los Angeles World Airports (LAWA) to make rules and regulations governing the use and control of City airports subject to the powers of the United States respecting commerce.

4

> The Federal Aviation Administration (FAA) and the Transportation Security Administration (TSA) has issued Federal Aviation Regulation (FAR) Part 139 and Transportation Security Regulation (TSR) Part 1540 and 1542, which requires Airport management to establish operational and safety procedures and institute certain security measures to meet FAA and TSA requirements for airport certification.

City Ex. 17 at page 1-1. In its Rules and Regulations, the City was clear that the "objective of the manual is to promote the safe and efficient use of LAX facilities." *Id*.

In United's Response, United seems to argue that rules and regulations adopted by an airport operator (like the City) to ensure the safe and efficient operation of the airport are preempted and therefore invalid. *See* United Response at 2, 21-22 & n.4. Presumably, therefore, United's position is that the City's 195-page long 2005 Rules and Regulations is invalid, including provisions that require, among other things, the common-sense safety requirement that "[a]ll aircraft shall be loaded or unloaded and passengers enplaned or deplaned in designated areas." City Ex. 17 at 3-9.[2]

The City respectfully suggests that the FAA would be surprised (to say the least) by United's argument. More significantly, if United's argument were accepted by this Court, it would likely lead to utter chaos at LAX. Specifically, while FAA regulates aircraft operations on runways (areas where aircraft takeoff and land) and taxiways at LAX (areas where aircraft travel from the runways to the taxilanes, or *vice versa*), the City, subject to FAA oversight, regulates aircraft operations once they get to the taxilanes (areas where aircraft operate between terminals) and while aircraft are on the aprons adjacent to and surrounding the terminals. Thus, invalidating the City's regulations that cover aircraft operations on the taxilanes and aprons on the basis that they are preempted, as United suggests, would leave operations on those portions of LAX unregulated. Moreover, in contrast to United's position that the City plays no role in ensuring the safe and efficient use of LAX, the fact is that the City and FAA are <u>partners</u> in that effort. Because the City's prohibition on turboprop operations at Terminal 8 is a regulation

---

[2] United's preemption argument makes clear that the Bankruptcy Court was right to be concerned that United was arguing that "even if there were safety considerations, a regulation based on those considerations would not be enforceable." 6/19/07 Op. Tr. at 25:11-13.

designed to ensure the safe and efficient operation of LAX, it should not be invalidated on preemption grounds.

Second, while United references 49 U.S.C. § 41713(b)(1), United Response at 21 n.4, it neglects to mention § 41713(b)(3), which provides:

> This subsection does not limit a State, [or] political subdivision of a State, … that owns or operates an airport … from carrying out its proprietary powers and rights.

49 U.S.C. § 41713(b)(3). This provision makes clear that a state or political subdivision of a state is not prevented from carrying out its "proprietary powers," so long as the exercise of proprietary powers is reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed to accomplish a legitimate objective in a manner that does not conflict with the Airline Deregulation Act ("ADA"). *See Arapahoe County Public Airport Auth. v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). Certainly, banning turboprop operations at Terminal 8 to enhance the safety and efficiency of airport operations is a legitimate objective of the City, and such a ban does not conflict with the ADA (which, as discussed below, covers regulations that are related to price, routes or service, not to regulations as to where on an airport particular aircraft can operate). *See Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 n.5 (9th Cir. 1981) (municipal proprietor exception permits city to enact ordinances "if it has a rational belief that the ordinance will reduce the possibility of liability").

Finally, United's reliance on *Air Transport Association v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) ("*ATA*"), is misplaced.[3] In *ATA*, the Second Circuit found that a New York State law — the so-called Passenger Bill of Rights ("PBR") — was pre-empted by the Airline Deregulation Act of 1978 ("ADA"). The PBR required airlines to provide "electric generation service," "waste remove service," and "adequate food and drinking water" to passengers who "have boarded an aircraft and are delayed more than three hours on the aircraft prior to takeoff." *Id*. at

---

[3] While United relies on the Second Circuit's decision in *ATA* to argue that the City's prohibition on turboprops at Terminal 8 is preempted, *see* United Response at 2, 21-22 & n.4, United does not mention, much less attempt to reconcile, the Second Circuit's decision in *SeaAir NY, Inc. v. City of New York*, 250 F.3d 183 (2d Cir. 2001), which, relying on § 41713(b)(3), concluded that New York City's restrictions on helicopter flights were not preempted by federal law. *Id*. at 187.

6

220 (emphasis added). The Second Circuit found that because the PBR related to "services" provided by an air carrier, it was preempted by the ADA which preempts state laws, regulations and provisions "related to a price, route, or service of an air carrier." *Id*. at 221 (citing 49 U.S.C. § 41713(b)(1)) (emphasis added).

Unlike the PBR, the City's decision to ban turboprops from Terminal 8 is not related to a price, route, or service of an air carrier — it is related to where at LAX turboprops can operate so as to enhance the safety and efficiency of airport operations, as the City is required to do under its grant assurances.[4] Banning turboprops from Terminal 8 does not prevent United from providing turboprop service; indeed, as made clear in the City's Response, had United had to move turboprop operations out of Terminal 8, the City would have made the Remote Terminal Facility available as a common-use facility to all airlines, including United, to operate turboprops at LAX. City's Response at 12.

5.  Contrary to United's bald assertion, the Terminal 8 Lease simply does not define "Preferential Use." United Response at 7. United cobbled together its Frankensteinian "definition" of "Preferential Use" by (1) deleting the word "Gates" from the parties' definition of "Preferential Use Gates" in Section 2 of the Terminal 8 Lease (the three-word phrase actually appears in quotation marks in Section 2), and (2) flipping the order of the phrases "first right of use" and "aircraft parking/loading positions" in that same definition. *See* Section 2, Terminal 8 Lease (United Ex. 1) at 015494 (emphasis added). For obvious reasons, United ignores the innocuous language of Section 2 as written, which simply provides that, during the term of the Terminal 8 Lease, United has the first right to use its "Preferential Use Gates," which are defined as "aircraft parking/loading positions." That aircraft park at gates when loading and unloading passengers is hardly a revelation, and certainly does not support United's position that, because it

---

[4] The court noted that it was concerned that, if the PBR "carried the day, another state could be free to enact a law prohibiting the service of soda on flights departing from its airports, while another could require allergen-free food options on its out-bound flights , unraveling the centralized framework for air travel." 520 F.3d at 225. The City's ban on turboprops at Terminal 8 is of an entirely different character than the requirements of the PBR and of any of the concerns identified by the Second Circuit.

has "Preferential Use Gates," United can usurp the City's mandate to regulate aircraft operations at LAX, *see supra* ¶ 4, and unilaterally decide what type of aircraft United may use at those "Preferential Use Gates."

6. United asserts that Raymond Jack testified that "United's safety measures were 'sufficient for the type of operations they are conducting.'" United Response at 16.[5] Whether United's safety measures were "sufficient" or not is entirely beside the point that the City is making in seeking to prohibit turboprop operations at Terminal 8. An analogy may be helpful. While few people would dispute that wearing a seatbelt while driving a car is "safe," even fewer would probably dispute that wearing a seatbelt while driving a car that also has front and side airbags and anti-locking brakes is <u>safer</u>.[6] Thus understood, United's position is basically that operating turboprops at Terminal 8 is "safe enough" and that this Court should adopt the Bankruptcy Court's decision to prohibit the City's attempt to make those operations safer. Such a result would be peculiar, indeed, given the requirements of the City's grant assurances, and (at least in the City's view) would potentially raise problematic questions should an accident occur at Terminal 8 while the Bankruptcy Court's injunction pending appeal is in effect, as it prevents the City making operations at Terminal 8 safer.

7. Like the Bankruptcy Court, United has not even attempted to define which part of the paved surface adjacent to United's terminal space is "apron," which part is "gate position" and which part is "loading ramp." *See* City's Objections at Section IX. Moreover, like the Bankruptcy Court, United has also not even attempted to distinguish between "gate position" on

---

[5] United correctly points out that the City mistakenly misquoted Mr. Jack's testimony. *See* United Response at 16 (citing City's Objections at 23). In preparing its Objections, the City mistakenly read Mr. Jack's draft letter as responding to a proposal by United to relocate its turboprop operations <u>from</u> Terminal 8 as opposed to relocating those operations <u>to</u> Terminal 8. The City regrets this error. As noted herein, however, Mr. Jack's opinion, as expressed in his draft letter, that United's proposal to take "certain measures" "ensure[s] an appropriate level of safety to individuals on the Terminal 8 ramp" is not contrary to the City's position that prohibiting turboprop operations from Terminal 8 would make operations <u>safer</u> there.

[6] Similarly, while few would dispute that a four-passenger car that gets 35 mpg is efficient, even fewer would probably dispute that a four-passenger car that gets 45 mpg is more efficient.

8

the one hand, and "loading ramp" on the other, seemingly content to treat those two separate terms as interchangeable. If United's interpretation of the Terminal 8 Lease were adopted by the Court, the Terminal 8 Lease would be rendered uncertain and therefore unenforceable, because United's definitions fail to distinguish these terms from each other. *See id.* Furthermore, United's interpretation of the Terminal 8 Lease is disfavored as it would not give meaning to each term of the lease. *See*, *e.g.*, Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 515 (Cal. Ct. App. 2003) ("An interpretation rendering contract language nugatory or inoperative is disfavored.") (citing *City of Atascadero v. Merrill Lynch*, 80 Cal. Rptr. 2d 329, 349 (Cal. Ct. App. 1998)). Because the City's definitions of aprons, gate positions and loading ramps are different from each other, if the Court were to adopt them, the Terminal 8 Lease would not be rendered uncertain and none of those terms would be rendered nugatory or inoperative (as they are using United's definitions).

In addition, United once again misleadingly conflates the term "ramp" with the term "loading ramp." *See* United Response at 27. The Terminal 8 Lease gives United preferential use rights to "airplane gate positions" and "aircraft loading ramps," but not to "large areas of apron pavement." *See* Section 22, Terminal 8 Lease (United Ex. 1) at 015493. Because the parties are in agreement that aprons and ramps are the same thing,[7] this means that United does not have preferential use rights to "large areas of [ramp] pavement." United inexplicably asserts, once again, however, that "the ACOP does not apply to <u>preferential use ramps</u>" at LAX. United Response at 27. Since the Terminal 8 Lease does not create any "preferential use ramps" at Terminal 8, it follows that the Terminal 8 Lease does not apply to the apron — the ramp — surrounding Terminal 8 on which aircraft are located when they park at United's "Preferential

---

[7] *See* United Response at 5 ("the 'ramp' or 'apron,' which is the large concrete portion of pavement adjacent to a terminal building (the entire light gray portion of Figure 3)").

9

Use Gates" (as defined in Section 2). Instead, as the City has urged, the ACOP governs aircraft operations on those areas of LAX.

United references Mr. DiGirolamo's testimony during the March 2007 trial to try to support its position that aircraft park on loading ramps and/or gate positions (but not aprons). *See* United Response at 8-9. First, Mr. DiGirolamo never used the phrase "loading ramp." Indeed, the last three answers he gave in the snippet United quotes are: (1) "Yeah, yes," (2) "Right" and (3) "Yeah, you could say that. Yes." These answers are hardly compelling "admissions." Moreover, the portion of the colloquy that United bolded in its Response contains a compound question: "The loading apron or the loading ramp is where the plane sits; is that right?" And Mr. DiGirolamo answered that question with a one word answer, "Right," that gives no indication as to with which part of the compound question he agreed. Thus, it is not clear from Mr. DiGirolamo's testimony whether he testified that a plane sites on a "loading apron" or on a "loading ramp."[8] United never sought to clarify this testimony on cross-examination.

The fact is that because United argued for the first time that "the loading ramp is the portion of the apron on which airplanes park adjacent to terminal buildings" on December 7, 2007, it is hardly surprising that testimony elicited during the trial eight months beforehand (in March 2007) did not provide a clear definition of loading ramps (or that briefs filed after the trial misused a term — "loading ramps" — that was not then in dispute). Indeed, the Bankruptcy Court correctly recognized that United's December 7, 2007, argument was new, and informed United that if it wanted to make a new argument, the Bankruptcy Court would reopen the evidence "to address the question of what a loading ramp is." 12/11/07 Tr. at 12:23-13:5.

8. United offers no explanation for the inconsistent testimony offered by its own witnesses that aprons surround the terminals — not loading ramps, and not gate positions, *see* City's Objections at 12-14, 40-41 — and offers no argument to counter the City's position that,

---

[8] United's assertion that "loading apron" is the same as "loading ramp" because the terms apron and ramp can be used interchangeably is illogical. United Response at 24 n.6. Just because the parties agree that the terms ramp and apron are interchangeable, *see, e.g., supra* n.7, there is no evidence to support the conclusion that "loading ramp" and "loading apron" mean the same thing.

10

had they testified during the January 11, 2008, hearing, their testimony would have supported the City's definition of "loading ramps," and not United's, *see id*. at 50-51.

9.  United's reference to the Master Plan showing tuboprops in the Central Terminal Area is highly misleading. United Response at 17. United argues that because the "Master Plan allocates several gates at T8 exclusively to turboprop operations," "safety was not an issue" in the City's ban of turboprop operations at Terminal 8. *See id*. at 16-17. What United neglects to point out, however, is that the 666-page Master Plan, *see* United Ex. 88, in addition to allocating several gates at Terminal 8 to turboprop operations also calls for the demolition of Terminals 1, 2 and 3, *e.g.*, *id*. at 00919, the construction of four new terminals, *e.g.*, *id*., the reconfiguration of five other terminals, *e.g.*, *id*. at 00924, the relocation, extension and widening of various runways, *e.g.*, *id*. at 00910-00911, and other massive demolition and construction projects that would completely alter aircraft operations at LAX, thereby rendering any analysis of what would constitute "safe operations" in the newly reconfigured Central Terminal Area. speculative and irrelevant. Had the Master Plan's only change been to allocate several gates in Terminal 8 exclusively to turboprop operations, United's point might have <u>some</u> merit (and the Master Plan would not be 666 pages long). But given the myriad and massive changes called for in the Master Plan, the fact that some gates in Terminal 8 in the reconfigured LAX area allocated exclusively to turboprop operations says nothing about the safety of those operation in Terminal 8 as currently configured.

## **CONCLUSION**

For all of the foregoing reasons, the City respectfully requests that the District Court reject the proposed findings of fact and conclusions of law to which the City has objected, and that the District Court dissolve the injunction pending appeal entered by the Bankruptcy Court.

Dated:  September 5, 2007

Respectfully submitted,

KAYE SCHOLER LLC,

By:   /s/ Robert M. Spalding

| | |
|---|---|
| ROCKARD J. DELGADILLO, City Attorney | Anthony G. Stamato (ARDC #6207688) |
| KELLY MARTIN, General Counsel | Robert M. Spalding (ARDC #6256701) |
| JOHN TAVETIAN, Deputy City Attorney | KAYE SCHOLER LLC |
| OFFICE OF THE LOS ANGELES CITY ATTORNEY, AIRPORT DIVISION | 3 First National Plaza |
| 1 World Way, P.O. Box 92216 | 70 West Madison Street, Suite 4100 |
| Los Angeles, CA 90009-2216 | Chicago, IL 60602-4231 |
| Telephone:   (310) 646-3260 | Telephone: (312) 583-2300 |
| Facsimile:   (310) 646-9617 | Facsimile: (312) 583-2360 |

Marc S. Cohen
KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA  90067-6048
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Jeffery A. Tomasevich
Steven S. Rosenthal
J.D. Taliaferro
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone (202) 682-3500
Facsimile: (202) 682-3580

*Counsel for the City of Los Angeles and Los Angeles World Airports*